**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| ABS GLOBAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> INGURAN, LLC d/b/a SEXING TECHNOLOGIES, <br><br> Defendant. | Case No. 14-cv-503 <br><br> **SUPPLEMENTAL COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff ABS Global, Inc. ("ABS") brings this action for treble damages and permanent injunctive relief against Defendant Inguran, LLC ("ST"), d/b/a Sexing Technologies, for violation of the federal antitrust laws and the Wisconsin common law which forbids unfair competition. Plaintiff also seeks a declaratory judgment that its contract with ST does not prohibit ABS from commercializing technology it has developed in order to compete with ST; a declaratory judgment that the contract's prohibitions on researching, developing, and commercializing technologies to compete with ST violate the Texas Covenants Not to Compete Act; a declaratory judgment that the contract's liquidated damages provisions are unenforceable; and a declaratory judgment that no liquidated damages (even if enforceable) are due until the expiration or termination of the contract. Plaintiff also asserts a claim for breach of contract based on ST's failure to apply an advance paid by ABS as a credit against invoices for Sorted Semen. Plaintiff alleges as follows:

<u>**NATURE OF THE ACTION**</u>

1.     Dairy farmers, cattle producers, and bovine breeding stock producers frequently employ artificial insemination to impregnate cows and heifers.

2.      Artificial insemination permits the production of calves which share the genetic attributes of bulls of high quality as demonstrated through testing of their progeny. Such bulls may not otherwise be readily available for breeding purposes.

3.      In recent years, technology has emerged for processing ejaculate from bulls to produce semen in which the viable sperm cells predominantly carry either male-determining Y chromosomes ("male sperm"), on one hand, or female-determining X chromosomes ("female sperm"), on the other. Bovine semen that has been processed so that it contains viable sperm cells that are predominantly female (or male) is referred to as "Sexed Bovine Semen."

4.      Particularly on dairy farms, female calves are more valuable than male calves, and Sexed Bovine Semen has become an attractive option to many dairy producers who use artificial insemination.

5.      Annual sales of Sexed Bovine Semen in the U.S. are approximately $50 million. Sexed Bovine Semen produced in the U.S. is also in demand in overseas markets, accounting for nearly 60 percent of worldwide sales, which total approximately $220 million per year.

6.      In order to attract customers, companies that sell bovine semen for use in artificial insemination normally seek to offer Sexed Bovine Semen as part of their product line.

7.      ST is in the business of processing customers' raw bovine ejaculate into Sexed Bovine Semen. It has contracted with essentially all of the major sellers of bovine semen in the U.S. to provide this service. The semen sellers obtain raw ejaculate from their bulls, and ST then processes the semen, on a contract basis, to produce predominantly female Sexed Bovine Semen, predominantly male Sexed Bovine Semen, or both types, which is returned to the semen sellers for sale.

8.      ST dominates the market for processing raw bovine ejaculate in the U.S. to produce Sexed Bovine Semen (the "Sexed Bovine Semen Processing Market"), having a market share of 100 percent.

9.      ST has maintained, and continues to maintain, its monopoly through anticompetitive, exclusionary conduct.

10.     For example, ST has entered into long-term, evergreen, "take-or-pay" contracts with customers that are intended to impede, and do impede, prospective competitors from entering the Sexed Bovine Semen Processing Market.

11.     In addition, ST has used the economic power created by its monopoly position to impose contractual restrictions on the research and development activities of others.  These restrictions are intended to prevent, and are preventing, the development and commercialization of technology that could be used by prospective competitors to enter the Sexed Bovine Semen Processing Market and compete with ST.

12.     ST has also bought, exclusively licensed, or otherwise obtained control over more than sixty U.S. patents relating to its monopoly.  Any legitimate interest that ST had in practicing the patented technology could have been achieved through a non-exclusive license.  ST's patent acquisition program has had the purpose and effect of discouraging prospective competitors from competing with ST, given the potential risks and cost of patent infringement litigation with ST.  ST's patent acquisition program constitutes exclusionary conduct which had the purpose and effect of illegally maintaining ST's monopoly.

13.     ST's strategy of acquiring patents to prevent new entry into the Sexed Bovine Semen Processing Market has been so successful that its wholly-owned subsidiary, XY, LLC,

openly proclaims in press releases and on its website that XY "is the master licensee in control of all sperm sorting in non-human mammals worldwide."

14.     ABS is a Wisconsin-based company that sells bovine semen produced by its large inventory of high quality bulls.

15.     Because many of its customers demanded Sexed Bovine Semen, and because ST was the only firm offering to process ABS's raw ejaculate into Sexed Bovine Semen in the U.S., ABS contracted with ST to obtain its services.

16.      Because ST had a monopoly in the Sexed Bovine Semen Processing Market, it was able to use its monopoly power to exact onerous terms from ABS, including unreasonably high prices, an "evergreen" provision that makes the contract effectively perpetual absent the invocation of onerous termination procedures, unreasonable "take-or-pay" provisions, and limitations on the performance and use of research and development that ABS or others could use to enter the Sexed Bovine Semen Processing Market and compete with ST.

17.     ABS now wishes to enter the Sexed Bovine Semen Processing Market to compete with ST, but is faced with the many barriers to entry that ST has erected through its exclusionary conduct.

18.     ABS has brought this action to remove these barriers, obtain relief from ST's exclusionary conduct, and open the Sexed Bovine Semen Processing Market to free and fair competition.

**THE PARTIES**

19.     Plaintiff ABS is a Delaware corporation with its principal place of business in DeForest, Wisconsin.

20.     Defendant ST is a Delaware limited liability company with its principal place of business in Navasota, Texas.

## JURISDICTION AND VENUE

21.     This action arises, in part, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain ST's violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  It also arises, in part, under Section 4 of the Clayton Act, 15 U.S.C. § 15, to compensate Plaintiff for its damages.  This Court has jurisdiction over this action pursuant to 15 U.S.C. §§ 15, 16 and 28 U.S.C. §§ 1331, 1337.

22.     This action also arises, in part, under the Wisconsin common law which forbids unfair competition. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, because the claims are so related to Plaintiff's federal antitrust claim that they form part of the same case or controversy.

23.     This action also arises under Texas law in that Plaintiff seeks a declaratory judgment concerning its obligations under the contract between ABS and ST, which contains a choice-of-law provision requiring the contract to be interpreted pursuant to the laws of the State of Texas.  In particular, ABS seeks a declaratory judgment that nothing in the contract prohibits ABS from producing, marketing, and selling Sexed Bovine Semen using a laser-based method that kills or incapacitates most of the male sperm or female sperm, respectively, but does not sort the viable sperm of one sex from the dead sperm of the other sex.  This Court has supplemental jurisdiction over this state law claim pursuant to 28 U.S.C. § 1367, because the claim is so related to Plaintiff's federal antitrust claim that they form part of the same case or controversy.

24.     This action also arises under Texas law in that Plaintiff seeks a declaratory judgment that the covenant not to compete that ST insisted on inserting into its contract with

ABS serves no legitimate business interest and imposes unreasonable competitive restraints upon ABS in violation of the Texas Covenants Not to Compete Act, Tex. Bus & Com. Code § 15.50. This Court has supplemental jurisdiction over this state law claim pursuant to 28 U.S.C. § 1367, because the claim is so related to Plaintiff's federal antitrust claim that they form part of the same case or controversy.

25.    This action also arises under Texas law in that Plaintiff seeks a declaratory judgment that the liquidated damages provisions in ST's contract with ABS are unenforceable under the common law of Texas. This Court has supplemental jurisdiction over this state law claim pursuant to 28 U.S.C. § 1367, because the claim is so related to Plaintiff's federal antitrust claim that they form part of the same case or controversy.

26.    This action also arises under Texas law in that Plaintiff seeks a declaratory judgment that no liquidated damages (even if enforceable) are due until the expiration or termination of the contract. This Court has supplemental jurisdiction over this state law claim pursuant to 28 U.S.C. § 1367, because the claim is so related to Plaintiff's federal antitrust claim that they form part of the same case or controversy.

27.    This action also arises under Texas law in that Plaintiff asserts a claim for breach of contract based on ST's failure to apply an advance paid by ABS as a credit against invoices for Sorted Semen. This Court has supplemental jurisdiction over this state law claim pursuant to 28 U.S.C. § 1367, because the claim is so related to Plaintiff's federal antitrust claim that they form part of the same case or controversy.

28.    ST is subject to this Court's personal jurisdiction pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

29.     ST is also subject to this Court's personal jurisdiction because ST regularly solicits and conducts business in this District and has minimum contacts with this District. Among other contacts, ST is registered to do business Wisconsin; maintains a registered agent for service of process in Wisconsin; does substantial business in this District; maintains facilities and/or offices in this District; and has employees who work in this District.

30.     ST has engaged in conduct in this District which relates to its unlawful efforts to acquire and maintain its monopoly position in the Sexed Bovine Semen Processing Market, including its performance under the onerous contract it has imposed on ABS, which occurs in substantial part in DeForest, Wisconsin.

31.     Because of ST's substantial contacts with this District, the exercise of jurisdiction over ST would not offend traditional notions of fair play and substantial justice.

32.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b)-(d).

## EFFECT ON INTERSTATE COMMERCE

33.      ST's unlawful conduct, as alleged below, has had and continues to have a substantial and adverse effect on interstate commerce.

## RELEVANT MARKET

34.     In this case, the relevant market is the Sexed Bovine Semen Processing Market: the market for processing raw bovine ejaculate in the U.S. to produce Sexed Bovine Semen.

35.     Artificial insemination of a cow or heifer occurs when it is impregnated with semen that was obtained from a bull through human intervention.  Artificial insemination is the predominant method for producing dairy calves in the U.S., accounting for approximately 70

percent of the dairy calves born in the U.S. in recent years. Artificial insemination is also used to produce beef calves, although to a lesser extent.

36.     Bovine egg cells all carry an X chromosome, while bovine sperm carries either an X or a Y chromosome. The chromosome carried by the bovine sperm that fertilizes a bovine egg determines the gender of the resulting calf. If the sperm carries an X chromosome, the calf will be female. If the sperm carries a Y chromosome, the calf will be male.

37.     Raw bovine ejaculate contains roughly equal proportions of sperm carrying an X chromosome and sperm carrying a Y chromosome. Accordingly, a cow or heifer that is impregnated naturally is as likely to give birth to a male calf as a female calf. The same is true if the animal is artificially inseminated using conventionally processed bovine semen.

38.     The owner of a dairy cow or heifer that is about to be bred through artificial insemination will ordinarily prefer a female calf because only female dairy cattle can produce milk. There is also occasional demand for male bovine semen.

39.     Technologies exist for processing raw bovine ejaculate to produce semen in which the viable sperm cells are either predominantly male or predominantly female (*i.e.*, greater than 85% male or female sperm, respectively).

40.     Cattle owners use Sexed Bovine Semen almost exclusively on heifers (females that have not yet given birth), rather than on cows (females that have given birth), because when Sexed Bovine Semen is employed, the conception rate is higher for heifers, and can be unacceptably low for cows. Conventionally processed semen is normally used to artificially inseminate cows.

41.     Cattle owners that employ artificial insemination commonly own both heifers and cows, with heifers making up roughly 30 percent of an average dairy herd. Accordingly,

purchasers of Sexed Bovine Semen typically wish to buy conventionally processed semen as well.

42.    Sellers of bovine semen for use in artificial insemination typically own or have access to large numbers of bulls having high quality genetics.

43.    In order to attract customers, sellers of bovine semen for use in artificial insemination normally seek to offer, as part of their product line, Sexed Bovine Semen from at least some of their bulls.  Which precise bull the Sexed Bovine Semen comes from is important, because sellers of bovine semen compete in part based upon the genetic attributes of specific bulls from which ejaculate is obtained.

44.    The only known way to produce commercially acceptable Sexed Bovine Semen is by processing raw ejaculate to obtain semen in which the viable sperm cells are either predominantly male or predominantly female.  There is no substitute production method.

45.    For an owner of high quality bulls that sells bovine semen for use in artificial insemination, the failure to offer both Sexed Bovine Semen and conventionally processed bovine semen for at least some of the owner's bulls would lead to a competitive disadvantage relative to competing bovine semen sellers.  This is because many customers look for a bovine semen supplier that can provide "one-stop shopping" for both conventionally processed bovine semen and Sexed Bovine Semen.   To provide "one-stop shopping," it is necessary for the bovine semen seller to produce (or have produced) Sexed Bovine Semen by processing raw ejaculate to obtain semen in which the viable sperm cells are either predominantly male or predominantly female.

46.    All of the major sellers of bovine semen in the U.S. sell both conventionally processed bovine semen and Sexed Bovine Semen for at least some of their bulls.

47.     The relevant product market in this case is therefore the market for a service: processing raw bovine ejaculate to produce Sexed Bovine Semen.

48.     Using current technologies, the processing of raw ejaculate to obtain Sexed Bovine Semen must be completed within roughly six hours of when the raw ejaculate is obtained from the bull.  In order to provide sufficient time for processing, raw ejaculate must reach the processing facility within roughly one hour of collection.  Therefore, the processing must occur at a location that can be reached in an hour from where the bull is housed.

49.     For cattle owners whose bulls are located more than one hour from the U.S. border, processing outside the U.S. is not an option.

50.     Transporting the bulls themselves to a foreign country is typically not acceptable to the owner for several reasons.  Shipping bulls to another country is expensive and can interrupt the regular collection of ejaculate, particularly if the bull must be quarantined in the receiving country.  In addition, disease outbreaks can cause regulators to ban the transport of bulls from one country to another.  Transporting a bull outside the U.S. to avoid ST's monopoly is also commercially unattractive because the bull would not be identified in U.S. sire rankings, which can aid in marketing the semen the bull produces.

51.     Moreover, ST has taken steps to ensure that no company will agree to process the ejaculate of bulls transported outside of the country for the purpose of avoiding ST's U.S. monopoly.  For example, prior to entering into an agreement with ST in 2012, ABS worked with a Canadian licensee of XY's patents to reach an agreement to ship bulls to Canada and produce Sexed Bovine Semen there.  On information and belief, ST threatened the Canadian company with termination of its license to XY's patents if it implemented such an agreement with ABS.  Under pressure from ST, the Canadian company broke off discussions with ABS.

52.     When ST enters into a contract to process raw ejaculate to obtain Sexed Bovine Semen, it typically provides the service at a facility that is on or near the customer premises.  The facility is special-built for the customer if needed.

53.     On information and belief, ST is willing to locate a special-built customer facility, upon execution of a suitable contract, anywhere in the U.S.

54.     The relevant geographic market is therefore the U.S.

## MONOPOLY POWER

55.     ST has monopoly power in the Sexed Bovine Semen Processing Market.

56.     ST is the only U.S. service provider to which a bovine semen seller can now turn to process raw bovine ejaculate to produce semen in which the viable sperm cells are either predominantly male or predominantly female.  ST's market share in the Sexed Bovine Semen Processing Market is currently 100%.

57.     ST's exclusionary conduct (as discussed below) demonstrates its monopoly power in the relevant market.  In particular, if ST lacked monopoly power, it could not have successfully imposed onerous contract terms on ABS and ST's other U.S. customers.

58.     The barriers to entry into the Sexed Bovine Semen Processing Market provide further evidence of ST's monopoly power.  In particular, ST and its affiliates have acquired, exclusively licensed, or otherwise gained control over more than sixty U.S. patents relating to its monopoly.  ST's patent acquisition program has had the purpose and effect of discouraging prospective competitors from competing with ST, given the potential risks and cost of patent infringement litigation with ST.

59.     On information and belief, in acquiring these patent rights, ST's aim is to try to prevent potential competitors from using the technology covered by the patents to compete with ST in the Sexed Bovine Semen Processing Market, whether ST practices the technology or not.

60.     On information and belief, licensees of ST's patents outside the U.S. are not licensed under ST's U.S. patents, and will not enter the Sexed Bovine Semen Processing Market for fear of patent infringement litigation in the U.S., initiated by ST or its affiliates, thus maintaining ST's monopoly.

61.     Some of ST's agreements with its customers impose an additional substantial barrier to entry.  As further alleged herein, ST has imposed exclusionary terms in its agreements with customers that effectively prevent these customers from switching their business to a new entrant in the Sexed Bovine Semen Processing Market, in some cases for years into the future.

62.     On information and belief, several companies have expressed interest in entering the Sexed Bovine Semen Processing Market to compete with ST, but none has yet been able to enter the market, due in part to the exclusionary conduct of ST as described below.

## EXCLUSIONARY CONDUCT

63.      ST has maintained, and continues to maintain, its monopoly in the Sexed Bovine Semen Processing Market through exclusionary and unlawful conduct.

### Locking Up Potential Customers to Forestall New Entry
### Into the Sexed Bovine Semen Processing Market

64.     ST has engaged in exclusionary conduct by locking up all large potential customers in order to forestall new entry into the Sexed Bovine Semen Processing Market.

65.     Because of its monopoly position, ST has obtained, as Sexed Bovine Semen processing customers, all of the major sellers of bovine semen in the U.S., including Genex Cooperative, Inc., Select Sires Inc., Accelerated Genetics, Alta Genetics Inc, and ABS.

66.     ST could have provided the service of processing raw bovine ejaculate to produce Sexed Bovine Semen on a purchase order or "at will" contract basis.  But instead of doing so, it has required customers, in recent years, to enter into onerous long-term contracts.

67.     On information and belief, the contracts are typically evergreen contracts, meaning that they are of perpetual duration unless terminated.  The required notice of termination is typically several years in advance of the termination date.  In at least one instance, the customer is required to pay a seven figure penalty to ST merely for having invoked the right to terminate the contract by its terms.

68.     The contracts typically contain large, annual, minimum purchase quantity requirements.  The contracts are "take or pay" contracts, meaning that a customer that cannot make use of the required minimum quantity must still pay ST for the prescribed minimum amount, whether used or not.

69.     ST's agreements also expressly bar customers from processing ejaculate from bulls leased from their competitors.  Citing this provision, ST has refused to allow customers whose demand for semen processing falls short of the annual minimum commitment to meet those commitments using ejaculate provided by other sellers of bovine semen.

70.     In addition, ST has exercised its monopoly power to extract from its customers onerous liquidated damages provisions.  For example, if ABS had sought to terminate its current contract after purchasing the first year's minimum quantity commitment, ABS would have had to pay ST over $35 million just to terminate the contract, including $1.5 million in liquidated damages over and above the damages due for not purchasing the required "take or pay" minimums.  ST was able to use its monopoly power to require ABS to deposit the $1.5 million in liquidated damages with ST in advance, essentially securing an interest free loan in that amount

from ABS. ST has sought to use such terms to put pressure on its customers, including by sending threatening letters and filing suit against ABS in the U.S. District Court for the Southern District of Texas.

71.     The contract contains additional onerous and one-sided terms in ST's favor, reflecting ST's exploitation of its monopoly power. For example, the contract requires ABS to pay amounts owed under the agreement within 15 business days, rather than the customary 30 days, and imposes an 8 percent rate of interest on past due amounts, far in excess of normal business standards.

72.     The purpose and effect of these contract terms is to lock up large prospective customers and to limit substantially the prospective sales opportunities for a new entrant into the Sexed Bovine Semen Processing Market. These contract terms have no procompetitive justification.

### Buying, Exclusively Licensing, and Otherwise Obtaining Control Over Third Party Patents Relating to the Monopoly

73.     ST has engaged in exclusionary conduct by buying, exclusively licensing, or otherwise obtaining control over third parties' U.S. patents relating to ST's monopoly. ST has engaged in such exclusionary conduct both directly and through its affiliates, including XY, LLC.

74.     ST's patent acquisition strategy began at least as early as May 2007, when ST acquired the predecessor of XY, LLC: XY, Inc. At the time, XY, Inc. owned patents relating to the Sexed Bovine Semen Process Market. Prior to being acquired by ST, XY, Inc. had granted non-exclusive licenses to some or all of its U.S. patents to at least two licensees.

75.     On information and belief, in the months following the acquisition, ST caused XY, Inc. to terminate all licenses to its U.S. patents other than the license to ST. For example,

on information and belief, in November 2007, ST caused XY, Inc. to terminate the non-exclusive license that it had granted to Trans Ova Genetics, L.C.

76.    In 2010, XY, Inc. was converted, at ST's direction, from a Colorado corporation to a Delaware limited liability company called XY, LLC.

77.    After acquiring XY, Inc. in order to control its patents, ST bought controlling interests in other companies that owned patents relating to ST's monopoly.  For example, in October 2010, ST acquired a 65.62 percent interest in Cytonome/ST LLC, which owned patents related to the Sexed Bovine Semen Processing Market.  In 2012, ST increased its ownership interest in Cytonome/ST LLC to 86.286 percent.  On information and belief, ST obtained control of Cytonome/ST LLC in order to control the U.S. patents owned by Cytonome/ST LLC that relate to the Sexed Bovine Semen Processing Market.

78.    ST has also acquired outright or exclusively licensed U.S. patents relating to the Sexed Bovine Semen Processing Market.  For example, in early 2008, ST bought Monsanto Company's patents related to the production of Sexed Bovine Semen, and those patents were assigned to ST.  On information and belief, ST does not use the technology covered by these patents in its current commercial method of processing raw bovine ejaculate into Sexed Bovine Semen.  On information and belief, ST bought Monsanto Company's patents to try to prevent competitors and potential competitors from using the technology covered by the patents to compete with ST in the Sexed Bovine Semen Processing Market.

79.    To forestall U.S. bull owners from moving their bulls outside the U.S. and producing Sexed Bovine Semen in countries that are not subject to the exclusionary restrictions of U.S. patents, ST has also acquired, exclusively licensed, or otherwise secured control over non-U.S. patents relating to the production of Sexed Bovine Semen.  Indeed, ST's affiliate, XY,

LLC, openly advertises itself in press releases and on its website as "the master licensee in control of all sperm sorting in non-human mammals worldwide."

80.     Any legitimate interest that ST had in obtaining the right to practice third-party U.S. patents relating to its monopoly could have been satisfied through a non-exclusive license.

81.     The purpose and effect of ST's repeatedly buying, exclusively licensing, or otherwise obtaining control over U.S. patents relating to its monopoly was to create a barrier to prospective new entrants into the Sexed Bovine Semen Processing Market.   In particular, ST's patent acquisition program has had the purpose and effect of discouraging prospective competitors from competing with ST, given the potential risks and cost of patent infringement litigation with ST.  In addition, on information and belief, the purpose and effect of ST's multi-year patent acquisition program is to try to prevent competitors and potential competitors from using the technology covered by the patents to compete with ST in the Sexed Bovine Semen Processing Market, whether ST practices the technology or not.  There is no procompetitive justification for ST having obtained rights to these U.S. patents that went beyond a non-exclusive license and that gave ST or an ST affiliate the power to try to exclude others.

**Imposing Limitations on Third Party Research Relating to the Monopoly**

82.     When ST negotiated its current contract with ABS, ST was aware that ABS was conducting significant research and development relating to the production of Sexed Bovine Semen.  On information and belief, ST was concerned that this research and development would lead to new technology that could be practiced without infringing ST's U.S. patents, thus removing one of the barriers that ST had erected to new entry into the Sexed Bovine Semen Processing Market.  In response, ST engaged in exclusionary and unlawful conduct intended to prevent ABS from developing technology that could be used to compete with ST.

83.    During negotiations over ST's current agreement with ABS, ST's co-Chief Executive Officers, Juan Moreno and Maurice Rosenstein, tried to force ABS to abandon all research relating to Sexed Bovine Semen by threatening to terminate all dealings with ABS.

84.    ST ultimately agreed to continue to do business with ABS, but used its monopoly power to impose severe restrictions on ABS's ability to engage in research and development relating to alternative methods of producing Sexed Bovine Semen that might compete with ST's monopoly.

85.    In particular, Section 18(a) of ST's contract with ABS prohibited ABS, for the term of the agreement, from "directly or indirectly (whether by means of financing or investing in another entity or activities), creat[ing], develop[ing], sell[ing] or market[ing] any method, apparatus, or technology for sorting mammalian semen, . . . where such method, apparatus, or technology is, or is intended to be, directly competitive with (i) ST's technology for Sorted Semen, or (ii) any sorted semen produced by ST's technology for Sorting Semen."

86.    After extensive negotiation between the parties, Section 18(b) of the contract was added to create a narrow exception to the research prohibition, allowing ABS to continue any research program that had been in place at least ninety days before the effective date of the contract.  However, ST used its monopoly power to limit the use of any research results that ABS obtained from the preexisting program:  Section 18(b) expressly prohibited ABS from engaging in "any marketing or sales of Sorted Semen" which was made using the results of ABS's research.

87.    The purpose and effect of these restrictions was to limit ABS's ability to develop and deploy new technology that would facilitate entry of a new competitor into the Sexed Bovine

Semen Processing Market. The restrictions on the nature and use of ABS's research and development had no procompetitive justification.

88. In addition, ST has imposed restrictions on ABS's ability to do business with other firms that might possibly supply Sexed Bovine Semen. Section 18(c) of ST's contract with ABS permitted ABS to continue existing arrangements outside the U.S. with two foreign ST licensees, Cogent in the United Kingdom and Goyaike in South America, for the supply or purchase of Sexed Bovine Semen, but only if the semen was produced using the licensed ST technology.

89. On information and belief, the purpose and effect of these restrictions was to reduce the economic incentive of Cogent and Goyaike to develop new technology for producing Sexed Bovine Semen that could be used by them (or a new potential competitor) to enter the Sexed Bovine Semen Processing Market without infringing ST's U.S. patents.

## HARM TO COMPETITION

90. ST's exclusionary conduct has caused and continues to cause substantial harm to competition in the Sexed Bovine Semen Processing Market.

91. Because of ST's exclusionary conduct, new entry into the Sexed Bovine Semen Processing Market is more difficult than it otherwise would have been. Indeed, several companies have expressed an interest in entering the market, but none has yet been able to do so, due in part to ST's exclusionary conduct. As a result, ST has to date successfully maintained its monopoly.

## ANTITRUST INJURY TO ABS

92. ABS has suffered antitrust injury from ST's exclusionary conduct, both as an ST customer and as a prospective new entrant into the Sexed Bovine Semen Processing Market.

93.     On information and belief, in connection with its purchases from ST of services related to the production of Sexed Bovine Semen, ABS has faced higher costs, and obtained inferior terms of sale, compared to what would have been the case absent ST's exclusionary conduct.  This constitutes antitrust injury.

94.     As a prospective new entrant into the Sexed Bovine Semen Processing Market, ABS faces the hurdles that ST has improperly erected in order to impede new entrants into the Sexed Bovine Semen Processing Market.  This too constitutes antitrust injury.

95.     As described above, ST has used its monopoly power to impose contractual limitations on ABS's conduct and use of research and development relating to Sexed Bovine Semen.  These limitations have increased ABS's costs and constrained ABS's ability to compete with ST through innovation.  This too constitutes antitrust injury.

## COUNT I

### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

96.     Plaintiff repeats and reasserts each of the allegations contained in paragraph 1 through 95 as though fully set forth herein.

97.     ABS is a customer of ST in the Sexed Bovine Semen Processing Market and also a potential competitor of ST in that market.

98.     At all material times, ST has had monopoly power in the Sexed Bovine Semen Processing Market.  ST's monopoly power is demonstrated by, among other things, ST's 100% market share, the substantial barriers to entry into the Sexed Bovine Semen Processing Market, and ST's ability to impose onerous contract terms on its U.S. customers.

99.     ST maintained, and continues to maintain, its unlawful monopoly through exclusionary and unlawful conduct, including but not limited to its use of evergreen, take-or-pay

contracts to lock up potential customers and forestall new entry; its scheme of repeatedly acquiring, exclusively licensing, or otherwise controlling third parties' patents relating to its monopoly in order to threaten new entrants with patent infringement litigation; and its efforts to contractually prohibit and/or disincentivize the development of new technology that would enable a new entrant to avoid infringement of ST's many U.S. patents.

100.     ST's exclusionary conduct has caused and continues to cause substantial harm to competition in the Sexed Bovine Semen Processing Market.

101.     As a direct and proximate result of ST's exclusionary conduct in violation of Section 2 of the Sherman Act, ABS has been injured and financially damaged in its business and property in an amount to be determined at trial.

102.     Unless ST is enjoined, ST will continue to engage in the exclusionary conduct alleged above.  Unless and until the Court enjoins such acts, practices, and conduct, ABS is suffering and will continue to suffer irreparable injury.

## COUNT 2

### Unfair Competition Under the Common Law of Wisconsin

103.     Plaintiff repeats and reasserts each of the allegations contained in paragraph 1 through 95 as though fully set forth herein.

104.     ABS is a potential competitor to ST in the Sexed Bovine Semen Processing Market.  ST's exclusionary conduct as alleged herein has prevented ABS from competing in that market, is not protected by any privilege, and constitutes unfair competition in violation of the common law of the State of Wisconsin.

105.     As a direct and proximate result of ST's exclusionary conduct in violation of the common law of the State of Wisconsin, ABS has been injured and financially damaged in its business and property in an amount to be determined at trial.

106.     Unless ST is enjoined, ST will continue to engage in the exclusionary conduct alleged above.  Unless and until the Court enjoins such acts, practices, and conduct, ABS is suffering and will continue to suffer irreparable injury.

## COUNT 3

### Declaratory Judgment That the Contract Between ST and ABS Does Not Prohibit ABS From Commercializing Its Technology for Producing Sexed Bovine Semen

107.     Plaintiff repeats and reasserts each of the allegations contained in paragraph 1 through 95 as though fully set forth herein.

108.     Section 27 of the contract between ABS and ST provides, in relevant part, that the agreement "shall be governed by and construed in accordance with the laws of the State of Texas without giving effect to any choice of law or conflict of  law provisions or rule that would cause the application of the laws of any jurisdiction other than the State of Texas …."

109.     Under Texas law, a contract must be interpreted consistent with the plain meaning of the language contained within its four corners.

110.     Here, the limitation on ABS's freedom to create, develop, sell, or market any method, apparatus, or technology for producing Sexed Bovine Semen, which ST insisted on inserting in Section 18(a) of the parties' contract, applies by its terms only to a "technology for sorting mammalian semen into X (female) chromosome bearing and Y (male) chromosome bearing sperm populations."  The limitation in Section 18(b) on ABS's freedom to take the future results of preexisting research programs and employ them for "marketing or sales" is similarly limited.  Under the contract terms, ABS cannot take the future results of preexisting research

programs and use them in "any marketing or sales of Sorted Semen or any use of Sorted Semen in third party animals," except for field trials.

111.     The process of "Sorting Semen" is defined in the contract's preamble as "sorting and freezing bovine semen into X (female) chromosome bearing and Y (male) chromosome bearing populations, for use in artificial insemination of cattle."  Likewise, "Sorted Semen" is defined as the "resultant X or Y chromosome bearing populations of sperm."

112.     The ordinary meaning of the word "sort" is to separate and divide things into classes or groups.  This is precisely the meaning that the contract uses in its preamble to define "Sorting Semen," *i.e.*, a process that separates and divides bovine semen into distinct populations, one containing X chromosome-bearing sperm, the other Y chromosome-bearing sperm.  Indeed, this understanding of what it means to "Sort Semen" is inherent in the contract's term for the result of that process, "Sorted Semen," defined as separate populations of X and Y chromosome bearing sperm.

113.     Under its plain meaning, the contract's prohibition on developing new technology for "Sorting Semen" does not apply to the technology that ABS has developed for processing raw bovine ejaculate because that technology does not divide or separate male sperm from female sperm.  Rather, ABS's technology uses a laser-based method that kills most of the male sperm or female sperm, respectively, but does not sort the viable sperm of one sex from the dead sperm of the other sex.

114.     Likewise, given its plain meaning, the contract's limitation on ABS's freedom to take the future results of preexisting research programs and employ them for "marketing or sales of Sorted Semen" does not apply to ABS's technology, because it does not result in separate populations of male and female sperm.  Instead, the semen that results from application of ABS's

technology contains the same proportion of male and female sperm as did the raw ejaculate. ABS's technology simply renders most or all of the male (or female) sperm contained in the processed semen incapable of fertilizing a bovine egg.

115.     Separate and apart from the foregoing, during the term of the current contract, ABS was free and remains free to perform research and development into a laser-based method that kills most of the male sperm or female sperm, respectively, but does not sort the viable sperm of one sex from the dead sperm of the other sex, because a research and development program to do so was in place at least ninety days prior to the effective date of the contract, thus falling within the safe harbor exception in Section 18(b).

116.     There is a live, justiciable controversy as to the proper interpretation of the contract between ABS and ST, as evidenced by the fact that ST has sought a judicial declaration on the same issue in the U.S. District Court for the Southern District of Texas.

117.     Under the plain meaning of the contract, and pursuant to 28 U.S.C. §§ 2201 and 2202, ABS is entitled to a judicial declaration that nothing in the contract prohibits ABS from producing, marketing, and selling Sexed Bovine Semen using a laser-based method that kills most of the male sperm or female sperm, respectively, but does not sort the viable sperm of one sex from the dead sperm of the other sex.

118.     ABS is also entitled to a judicial declaration that nothing in the contract prohibits, or has prohibited, ABS from performing research and development concerning a laser-based method that kills most of the male sperm or female sperm, respectively, but does not sort the viable sperm of one sex from the dead sperm of the other sex.

## COUNT 4

### Declaratory Judgment That the Contract's Restrictions on the Commercialization of ABS Research Violate the Texas Covenants Not to Compete Act

119.    Plaintiff repeats and reasserts each of the allegations contained in paragraph 1 through 95 as though fully set forth herein.

120.    The Texas Covenants Not to Compete Act, Tex. Bus & Com. Code § 15.50(a), provides in relevant part:

> a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

121.    The limitation on ABS's freedom to initiate new research programs relating to the production of Sexed Bovine Semen, together with the restrictions on ABS's ability to engage in "any marketing or sales of Sorted Semen" made using the results of preexisting research programs, constitute covenants not to compete that are subject to the Texas Covenants Not to Compete Act.  Therefore, to be enforceable, these restrictions must be "necessary to protect the goodwill or other business interest" of ST and must be limited "time, geographical area, and scope of activity" to a scope no greater than necessary to protect those interests.

122.    The restrictions on ABS research serve no legitimate business interest.  To the contrary, they have the purpose and effect of protecting ST's monopoly in the Sexed Bovine Semen Processing Market.

123.    ST insisted on inserting language in the contract asserting two possible justifications for the research restrictions:  (1) "[t]o further ensure the efficient and full utilization of ST's sorting capacity" and (2) "to ensure the protection of ST's Confidential Information."

124.     The research restrictions in the contract are not justified by the supposed need to ensure the efficient and full utilization of ST's sorting capacity, as the onerous "take-or-pay" provisions of the contract already provided reasonable assurance that ST's sorting capacity would be utilized to the specified minimums.

125.     The research restrictions in the contract are not justified by the supposed need to protect ST's confidential information, because ST never gave ABS confidential information that was, or could have been, utilized in ABS's research effort.

126.     The research restrictions in the contract are not reasonably limited in time, geography, or scope of activity.  Nor do they impose restrictions that are no greater than necessary.

127.     There is a live, justiciable controversy between ABS and ST as to whether the research restrictions in the contract violate the Texas Covenants Not to Compete Act, as evidenced by the fact that ST has sought a judicial declaration on the same issue in the U.S. District Court for the Southern District of Texas.

128.     Under the Act, and pursuant to 28 U.S.C. §§ 2201 and 2202, ABS is entitled to a judicial declaration that the contract's research restrictions are unenforceable under governing Texas law.

## COUNT 5

### Declaratory Judgment That the Contract's Liquidated Damages Provisions Are Unenforceable Under the Common Law of Texas

129.     Plaintiff repeats and reasserts each of the allegations contained in paragraph 1 through 95 as though fully set forth herein.

130.     Under the common law of Texas, a liquidated damages provision is only enforceable if the harm caused by breach is incapable or difficult of estimation and the amount of liquidated damages is a reasonable forecast of just compensation.

131.     The ST contract with ABS has two separate liquidated damages provisions, neither one of which is a reasonable forecast of a harm that is difficult to quantify.

132.     First, the contract provides that, if ABS terminates the contract for any reason other than ST's material breach, or if ST terminates the contract by reason of ABS's material breach, ABS "will pay ST liquidated damages the sum of $7.50 per unpurchased straw of Sorted Semen from all Annual Minimum Commitments that remain as of the termination date . . . which sum shall be due and payable within 30 days of such termination date."

133.     In addition, the contract provides that, if ABS gives notice to ST of ABS's election not to extend the term of the contract, or if ST terminates the contract by reason of material breach by ABS, ABS must "pay ST as liquidated damages the sum of one million five hundred thousand dollars ($1,500,000)."

134.     The contract provides that the two separate liquidated damages provisions are "a reasonable estimate of the damages that would be suffered by ST due solely to the lost sales of Sorted Semen," and although the provisions are both directed to compensating for the very same harm—*i.e.*, lost sales of Sorted Semen—they "shall not be exclusive of each other, nor of any other remedy available to ST at law or in equity, including but not limited to . . . the recovery of any damages caused by any other breach of this Agreement by ABS."

135.     The "damages that would be suffered by ST due solely to the lost sales of Sorted Semen" are not incapable or difficult of estimation.  ST's profit margins per straw may be readily estimated, and the same is true of the number of lost sales.

136.     The fixed sum of $1.5 million, over and above $7.50 per unpurchased straw, is not a reasonable forecast of harm from ABS's election not to extend the term of the contract. For example, the $1.5 million sum remains fixed regardless of when in the five-year, evergreening term the contract notice is given.

137.     Under the contract, ABS owes ST the $1.5 million fixed sum even if no breach has occurred.  Specifically, the sum is payable if ABS elects not to extend the contract's term pursuant to Section 3, which permits "either party . . . [to] give[] written notice to the other party of its election not to so extend the Term."  The $1.5 million sum cannot be a reasonable forecast of harm from breach because it is triggered by an event—termination with notice pursuant to Section 3—that is not a breach at all.

138.     There is a live, justiciable controversy between ABS and ST as to whether the liquidated damages provisions in the contract are unenforceable under the common law of Texas, as evidenced by the fact that ST has sought a judicial declaration on the same issue in the U.S. District Court for the Southern District of Texas.

139.     Under the common law of Texas, and pursuant to 28 U.S.C. §§ 2201 and 2202, ABS is entitled to a judicial declaration that the contract's liquidated damages provisions are unenforceable.

## COUNT 6

### Declaratory Judgment That No Liquidated Damages Are Due
### Until the Expiration or Termination of the Contract

140.     Plaintiff repeats and reasserts each of the allegations contained in paragraph 1 through 95 as though fully set forth herein.

141.     On August 25, 2014, ABS sent ST notice of ABS's election not to extend the initial term of the Semen Sorting Agreement.  The notice explained that ABS would not "extend

the Term of the Agreement" and therefore "the Agreement shall expire on August 31, 2017, unless earlier terminated pursuant to the terms of the Agreement, by agreement of the Parties, or by court order."

142.    Section 4(b) of the ST contract provides that liquidated damages are "due and payable upon the expiration or earlier termination" of the contract.

143.    The contract has not expired and has not been terminated.  ABS continues to order and ST continues to provide services under the contract, which will expire on August 31, 2017.  Even if the liquidated damages provision were enforceable, no liquidated damages would be due until 2017.

144.    On October 3, 2014, ST sent ABS a letter demanding immediate payment of liquidated damages under Section 4(b) of the ST contract.  That letter threatened legal action if ABS did not respond with prompt payment.

145.    There is a live, justiciable controversy between ABS and ST as to whether liquidated damages under Section 4(b) are due now or upon the expiration of the contract on August 31, 2017.

146.    ABS is entitled to a judicial declaration that the liquidated damages under Section 4(b), if enforceable, are due upon the expiration of the contract.

## COUNT 7

### Breach of Contract for Failure to Apply Advance as a
### Credit Against Invoices for Sorted Semen

147.    Plaintiff repeats and reasserts each of the allegations contained in paragraph 1 through 95 as though fully set forth herein.

148.    In 2012, ABS paid ST an Advance of $1,500,000 under Section 4(b) of the contract.

149.     Section 4(b) of the ST contract provides that "ST shall apply the Advance as a credit against its invoices for Sorted Semen at the rate of $0.30 per straw *until the Advance is fully repaid or an earlier termination occurs*."  (emphasis added)

150.     The Advance has not been repaid and the contract has not been terminated.

151.     In its October 3, 2014 letter, ST notified ABS that ST had stopped applying the Advance as a credit against invoices for Sorted Semen.

152.     ST's failure to apply the Advance as a credit constitutes a breach of contract.

153.     ABS has been injured by ST's breach of contract.  ABS has been forced to pay, and will continue to pay, an additional $0.30 per unit of Sorted Semen since ST stopped applying the Advance as a credit against ABS's invoices.  At the volumes required under the contract, this amounts to an average of more than $25,000 each month.

154.     ABS is entitled to damages and other appropriate relief.

## PRAYER FOR RELIEF

WHEREFORE, ABS respectfully requests that:

A.     The Court adjudge and decree that the unlawful conduct alleged herein constitutes a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

B.     The Court adjudge and decree that the unlawful conduct alleged herein constitutes a violation of Wisconsin common law;

C.     The Court adjudge and decree that the research restrictions in ST's contract with ABS violate the Texas Covenant Not to Compete Act, Tex. Bus & Com. Code § 15.50;

D.     The Court adjudge and decree that the liquidated damages provisions in ST's contract with ABS are unenforceable under the common law of Texas;

E.       The Court adjudge and decree that the liquidated damages under Section 4(b) in ST's contract with ABS are not due until the expiration or termination of the contract;

F.       The Court grant permanent injunctive relief invalidating any and all research restrictions in ST's contract with ABS;

G.       The Court grant permanent injunctive relief invalidating the restrictions in ST's contract with ABS on ABS's use, marketing, and sale of Sexed Bovine Semen made using alternate technology that was developed by ABS in its own research and development program;

H.       The Court grant permanent injunctive relief invalidating the evergreen provisions in ST's contract with ABS and permitting the contract to be terminated by ABS on thirty (30) days' notice;

I.        The Court grant permanent injunctive relief invalidating the take-or-pay requirements in ST's contract with ABS, so that ABS is permitted to pay only for the Sexed Bovine Semen that is actually processed by ST and delivered to ABS;

J.        The Court grant permanent injunctive relief requiring ST to license to ABS, on reasonable terms and conditions, any and all U.S. patents relating to Sexed Bovine Semen;

K.       The Court grant compensatory damages to ABS, trebled as a result of ST's violation of Section 2 of the Sherman Act;

L.       The Court grant compensatory damages to ABS for ST's unfair competition in violation of the common law of the State of Wisconsin;

M.       The Court grant compensatory damages to ABS for ST's breach of contract;

N.   The Court grant pre-judgment and post-judgment interest as permitted by law;

O.   The Court declare that nothing in ABS's contract with ST prohibits ABS from producing, using, marketing, and selling Sexed Bovine Semen using a laser-based method that kills most of the male sperm or female sperm, respectively, but does not sort the viable sperm of one sex from the dead sperm of the other sex;

P.   The Court declare that nothing in ABS's contract with ST prohibits, or has prohibited, ABS from performing research and development concerning a laser-based method that kills most of the male sperm or female sperm, respectively, but does not sort the viable sperm of one sex from the dead sperm of the other sex;

Q.   The Court grant ABS's cost of suit, including reasonable attorneys' fees , pursuant to 15 U.S.C. § 15; and

R.   The Court grant such further relief as may be necessary and appropriate.

### JURY DEMAND

ABS hereby demands a trial by jury of all issues triable to a jury.


Dated: October 28, 2014                                Respectfully submitted,

                                                       *s/ Michael J. Modl*
                                                       Michael J. Modl
                                                       Andrew J. Clarkowski
                                                       **AXLEY BRYNELSON, LLP**
                                                       2 E. Mifflin Street, Suite 200
                                                       Madison, WI 53703
                                                       Tel: (608) 257-5661
                                                       Fax: (608) 257-5444
                                                       mmodl@axley.com
                                                       aclarkowski@axley.com

                                                       *Attorneys for Plaintiff ABS Global, Inc.*

*Of Counsel*:

David T. Pritikin
William H. Baumgartner, Jr.
Lisa A. Schneider
Kevin M. Fee, Jr.
Steven J. Horowitz
**SIDLEY AUSTIN LLP**
1 S. Dearborn Street
Chicago, Illinois  60603
Tel:  (312) 853-7000
Fax: (312) 853-7036
dpritikin@sidley.com
wbaumgartner@sidley.com
lschneider@sidley.com
kfee@sidley.com
shorowitz@sidley.com

Matthew S. Jorgenson
**SIDLEY AUSTIN LLP**
555 W. Fifth Street, Suite 4000
Los Angeles, California  90013
Tel:  (213) 896-6000
Fax: (213) 896-6600
mjorgenson@sidley.com