**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| ABS GLOBAL, INC., | § | |
| | § | |
| Plaintiff/Counterclaim Defendant | § | |
| | § | |
| v. | § | Case No.3:14-cv-00503 |
| | § | |
| INGURAN, LLCd/b/a SEXING | § | |
| TECHNOLOGIES, | § | |
| | § | |
| Defendant/Counterclaim and Third-Party Plaintiff | § | JURY TRIAL DEMANDED |
| | § | |
| v. | § | |
| | § | |
| GENUS PLC | § | |
| | § | |
| Third-Party Defendant | § | |

---

**INGURAN, LLC'S ANSWER TO SUPPLEMENTAL COMPLAINT, COUNTERCLAIMS,
AND THIRD-PARTY CLAIMS SUBJECT TO INGURAN'S MOTION TO DISMISS**

---

Defendant Inguran, LLC d/b/a Sexing Technologies ("Inguran" or "ST") by and through

its counsel, hereby submits its Answer and Counterclaims to Plaintiff ABS Global, Inc.'s

("ABS") Supplemental Complaint, and its claims against Genus plc ("Genus"), subject to

Inguran's Motion to Dismiss and Motion to Transfer, as follows:

<u>**NATURE OF THE ACTION**</u>

1.      Inguran admits paragraph 1 of the Complaint.

2.      Inguran admits paragraph 2 of the Complaint.

3.      Inguran admits that technologies have emerged for processing bull semen.

Inguran admits ABS has identified the term "Sexed Bovine Semen" as meaning "bovine semen

that has been processed so that it contains viable sperm cells that are predominantly female (or male)." Inguran denies the remainder of paragraph 3 of the Complaint.

4.      Inguran lacks knowledge or information sufficient to admit or deny the allegations in paragraph 4 of the Complaint, and therefore denies the same.

5.      Inguran lacks knowledge or information sufficient to admit or deny the allegations in paragraph 5 of the Complaint, and therefore denies the same.

6.      Inguran lacks knowledge or information sufficient to admit or deny the allegations in paragraph 6 of the Complaint, and therefore denies the same.

7.      Inguran admits it is in the business of processing raw bull ejaculate.  Inguran has entered into Semen Sorting Contracts with some sellers of bovine semen in the U.S. to provide its processing services.  Inguran denies the remainder of paragraph 7 of the Complaint.

8.      Inguran denies paragraph 8 of the Complaint.

9.      Inguran denies paragraph 9 of the Complaint.

10.     Inguran denies paragraph 10 of the Complaint.

11.     Inguran denies paragraph 11 of the Complaint.

12.     Inguran admits it has obtained, exclusively licensed, or internally developed patents related to processing raw bovine ejaculate.  Inguran denies the remainder of paragraph 12 of the Complaint.

13.     Inguran admits that XY, LLC is a wholly owned subsidiary.  Inguran admits the website for XY, LLC includes the words "XY LLC is the master licensee in control of all sperm sorting in non-human mammals worldwide."  Inguran denies the remainder of paragraph 13 of the Complaint.

14.     Inguran lacks knowledge or information sufficient to admit or deny the allegations in of paragraph 14 of the Complaint, and therefore denies the same.

15.     Inguran lacks knowledge or information sufficient to admit or deny the allegations in paragraph 15 of the Complaint, and therefore denies the same.

16.     Inguran denies paragraph 16 of the Complaint.

17.     Inguran denies paragraph 17 of the Complaint.

18.     Inguran denies paragraph 18 of the Complaint.

## THE PARTIES

19.     Inguran admits ABS contends it is a Delaware corporation with a principal place of business in De Forest, Wisconsin.

20.     Inguran admits paragraph 20 of the Complaint.

## JURISDICTION AND VENUE

21.     Inguran admits ABS asserts claims under 15 U.S.C. §§ 2, 15, and 26.  Inguran denies the remainder of paragraph 21 of the Complaint.

22.     Inguran denies paragraph 22 of the Complaint.

23.     Inguran admits that ABS's declaratory judgment claims arise under Texas law. Inguran denies the remainder of paragraph 23 of the Complaint.

24.     Inguran admits that ABS's declaratory judgment claims arise under Texas law. Inguran denies the remainder of paragraph 24 of the Complaint.

25.     Inguran admits that ABS's declaratory judgment claims arise under Texas law. Inguran denies the remainder of paragraph 25 of the Complaint.

26.     Inguran admits that ABS's declaratory judgment claims arise under Texas law. Inguran denies the remainder of paragraph 26 of the Complaint.

27.     Inguran admits that ABS's breach of contract claims arise under Texas law. Inguran denies the remainder of paragraph 27 of the Complaint.

28.     Inguran denies paragraph 28 of the Complaint.

29.     Inguran admits it is registered to do business in Wisconsin.  Inguran admits it has a registered agent for services of process in Wisconsin.  Inguran admits it maintains a laboratory at ABS's facilities in DeForest, Wisconsin.  Inguran denies the remainder of paragraph 29 of the Complaint.

30.     Inguran denies paragraph 30 of the Complaint.

31.     Inguran denies paragraph 31 of the Complaint.

32.     Inguran denies paragraph 32 of the Complaint.  Inguran asserts the proper venue is the United States District Court for the Southern District of Texas.

## EFFECT ON INTERSTATE COMMERCE

33.     Inguran denies paragraph 33 of the Complaint.

## RELEVANT MARKET

34.     Inguran denies paragraph 34 of the Complaint.

35.     Inguran admits that artificial insemination may include impregnating a cow or heifer with semen obtained through human intervention.  Inguran further admits that artificial insemination is commonly used for producing dairy calves and less commonly used for producing beef calves.  Inguran lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 35 of the Complaint, and therefore denies the same.

36.     Inguran admits paragraph 36 of the Complaint.

37.     Inguran admits that raw bovine ejaculate contains roughly equal proportions of X and Y sperm.  Inguran further admits that a cow or heifer impregnated naturally or through

artificial insemination with conventional semen is generally as likely to give birth to a male calf or a female calf.

38.     Inguran lacks knowledge or information sufficient to admit or deny the allegations in paragraph 38 of the Complaint, and therefore denies the same.

39.     Inguran admits paragraph 39 of the Complaint.

40.     Inguran denies paragraph 40 of the Complaint.

41.     Inguran lacks knowledge or information sufficient to admit or deny the allegations in paragraph 41 of the Complaint, and therefore denies the same.

42.     Inguran lacks knowledge or information sufficient to admit or deny the allegations in paragraph 42 of the Complaint, and therefore denies the same.

43.     Inguran lacks knowledge or information sufficient to admit or deny the allegations in paragraph 43 of the Complaint, and therefore denies the same.

44.     Inguran lacks knowledge or information sufficient to admit or deny the allegations in paragraph 44 of the Complaint, and therefore denies the same.

45.     Inguran denies paragraph 45 of the Complaint.

46.     Inguran lacks knowledge or information sufficient to admit or deny the allegations in paragraph 46 of the Complaint, and therefore denies the same.

47.     Inguran denies paragraph 47 of the Complaint.

48.     Inguran denies paragraph 48 of the Complaint.

49.     Inguran denies paragraph 49 of the Complaint.

50.     Inguran denies paragraph 50 of the Complaint.

51.     Inguran denies paragraph 51 of the Complaint.

52.     Inguran admits that for some customers it provides sorting services at a facility that is on or near the customer's premises and that it participates in setting up the lab.  Inguran denies the remainder of paragraph 52 of the Complaint.

53.     Inguran admits that in some cases it has provided its services in facilities at a customer's location.  Inguran denies the remainder of paragraph 53 of the Complaint.

54.     Inguran denies paragraph 54 of the Complaint.

## MONOPOLY POWER

55.     Inguran denies paragraph 55 of the Complaint.

56.     Inguran denies paragraph 56 of the Complaint.

57.     Inguran denies paragraph 57 of the Complaint.

58.     Inguran denies paragraph 58 of the Complaint.

59.     Inguran denies paragraph 59 of the Complaint.

60.     Inguran denies paragraph 60 of the Complaint.

61.     Inguran denies paragraph 61 of the Complaint.

62.     Inguran denies paragraph 62 of the Complaint.

## EXCLUSIONARY CONDUCT

63.     Inguran denies paragraph 63 of the Complaint.

64.     Inguran denies paragraph 64 of the Complaint.

65.     Inguran denies paragraph 65 of the Complaint.

66.     Inguran admits its contracts contain certain provisions, and those provisions speak for themselves.  Inguran denies the remainder of paragraph 66 of the Complaint.

67.     Inguran admits its contracts contain certain provisions, and those provisions speak for themselves.  Inguran denies the remainder of paragraph 67 of the Complaint.

68.     Inguran admits its contracts contain certain provisions, and those provisions speak for themselves.  Inguran denies the remainder of paragraph 68 of the Complaint.

69.     Inguran admits its contracts contain certain provisions, and those provisions speak for themselves.  Inguran denies the remainder of paragraph 69 of the Complaint.

70.     Inguran admits its contracts, including its contract with ABS, contain certain provisions, and those provisions speak for themselves.  Inguran admits that by terminating the contract before the contract expired, ABS is required to pay certain damages, including liquidated damages.  Inguran admits ABS deposited $1.5 million with Inguran in advance for liquidated damages.  Inguran admits it filed a lawsuit against ABS in the Southern District of Texas in response to ABS filing this lawsuit, and asserted claims of declaratory judgment on the contract terms, declaratory judgment of no antitrust violation, and a claim for repudiation/anticipatory breach of the 2012 Agreement between the parties.  Inguran denies the remainder of paragraph 70 of the Complaint.

71.     Inguran admits that the parties' contract contains certain provisions, and such provisions speak for themselves.  Inguran denies the remainder of paragraph 71 of the Complaint.

72.     Inguran denies paragraph 72 of the Complaint.

73.     Inguran denies paragraph 73 of the Complaint.

74.     Inguran admits it acquired XY, Inc. in 2007.  Inguran admits XY, Inc. had granted non-exclusive licenses to some of its patents to certain licensees in the U.S.  Inguran denies the remainder of paragraph 74 of the Complaint.

75.     Inguran denies paragraph 75 of the Complaint.

76.     Inguran admits XY, Inc. was converted to XY, LLC in 2010.  Inguran denies the remainder of paragraph 76 of the Complaint.

77.     Inguran admits it acquired an interest in Cytonome.  Inguran denies the remainder of paragraph 77 of the Complaint.

78.     Inguran admits it purchased certain patents from Monsanto in 2008.  Inguran denies the remainder of paragraph 78 of the Complaint.

79.     Inguran admits it owns certain non-U.S. patents.  Inguran admits the website for XY, LLC includes the words "XY LLC is the master licensee in control of all sperm sorting in non-human mammals worldwide."  Inguran denies the remainder of paragraph 79 of the Complaint.

80.     Inguran denies paragraph 80 of the Complaint.

81.     Inguran denies paragraph 81 of the Complaint.

82.     Inguran admits that during the negotiations of the current contract with ABS, Inguran was aware that ABS was conducting research and development relating to the processing of bovine semen.  Inguran denies the remainder of paragraph 82 of the Complaint.

83.     Inguran denies paragraph 83 of the Complaint.

84.     Inguran admits it ultimately entered the contract with ABS.  Inguran denies the remainder of paragraph 84 of the Complaint.

85.     Inguran admits that the parties' contract contains certain provisions, and such provisions speak for themselves.  Inguran denies the remainder of paragraph 85 of the Complaint.

86.     Inguran admits that there was extensive negotiation between the parties.  Inguran admits that the parties' contract contains certain provisions, and such provisions speak for themselves.  Inguran denies the remainder of paragraph 86 of the Complaint.

87.     Inguran denies paragraph 87 of the Complaint.

88.     Inguran admits that the parties' contract contains certain provisions, and such provisions speak for themselves.  Inguran denies the remainder of paragraph 88 of the Complaint.

89.     Inguran denies paragraph 89 of the Complaint.

## HARM TO COMPETITION

90.     Inguran denies paragraph 90 of the Complaint.

91.     Inguran denies paragraph 91 of the Complaint.

## ANTITRUST INJURY TO ABS

92.     Inguran denies paragraph 92 of the Complaint.

93.     Inguran denies paragraph 93 of the Complaint.

94.     Inguran denies paragraph 94 of the Complaint.

95.     Inguran denies paragraph 95 of the Complaint.

## COUNT 1

## Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

96.     Inguran incorporates by reference its responses to paragraphs 1-95 of the Complaint.

97.     Inguran admits that ABS is a customer for Inguran's services for processing raw bovine ejaculate.  Inguran denies the remainder of paragraph 97 of the Complaint.

98.     Inguran denies paragraph 98 of the Complaint.

99.     Inguran denies paragraph 99 of the Complaint.

100.    Inguran denies paragraph 100 of the Complaint.

101.    Inguran denies paragraph 101 of the Complaint.

102.    Inguran denies paragraph 102 of the Complaint.

## COUNT 2

### Unfair Competition Under the Common Law of Wisconsin

103.    Inguran incorporates by reference its responses to paragraphs 1-102 of the

Complaint.

104.    Inguran denies paragraph 104 of the Complaint.

105.    Inguran denies paragraph 105 of the Complaint.

106.    Inguran denies paragraph 106 of the Complaint.

## COUNT 3

### Declaratory Judgment That the Contract Between ST and ABS Does Not Prohibit ABS From Commercializing Its Technology for Producing Sexed Bovine Semen

107.    Inguran incorporates by reference its responses to paragraphs 1-106 of the

Complaint.

108.    Inguran admits paragraph 108 of the Complaint.

109.    Paragraph 109 is purely a legal assertion to which no response is required.  To the

extent paragraph 109 contains any factual allegations, Inguran denies them.

110.    Inguran admits that the parties' contract contains certain provisions, and such

provisions speak for themselves.  Inguran denies the remainder of paragraph 110 of the

Complaint.

111.    Inguran admits that the recitals in the parties' contract address the terms "Sorting

Semen" and "Sorted Semen."  Inguran denies the remainder of paragraph 111 of the Complaint.

112.     Inguran denies paragraph 112 of the Complaint.

113.     Inguran admits that ABS claims to have a technology that uses a laser-based method that kills most of the male sperm or female sperm.  Inguran denies the remainder of paragraph 113 of the Complaint.

114.     Inguran admits that ABS claims to have technology that renders male or female sperm incapable of fertilizing a bovine egg.  Inguran denies the remainder of paragraph 114 of the Complaint.

115.     Inguran lacks knowledge or information sufficient to admit or deny the allegations in paragraph 115 of the Complaint, and therefore denies the same.

116.     Inguran denies paragraph 116 of the Complaint.

117.     Inguran denies paragraph 117 of the Complaint.

118.     Inguran denies paragraph 118 of the Complaint.

## **COUNT 4**

### **Declaratory Judgment That the Contract's Restrictions on the Commercialization of ABS Research Violate the Texas Covenants Not to Compete Act**

119.     Inguran incorporates by reference its responses to paragraphs 1-118 of the Complaint.

120.     Inguran admits the Texas Covenants Not to Compete Act, Tex. Bus. & Com. Code §15.50(a), includes the language cited by ABS in paragraph 120 of the Complaint.

121.     Inguran denies paragraph 121 of the Complaint.

122.     Inguran denies paragraph 122 of the Complaint.

123.     Inguran admits that the parties' contract contains certain provisions, and such provisions speak for themselves.  Inguran denies the remainder of paragraph 123.

124.     Inguran denies paragraph 124 of the Complaint.

125.     Inguran denies paragraph 125 of the Complaint.

126.     Inguran denies paragraph 126 of the Complaint.

127.     Inguran denies paragraph 127 of the Complaint.

128.     Inguran denies paragraph 128 of the Complaint.

<u>COUNT 5</u>

<u>Declaratory Judgment That the Contract's Liquidated Damages Provisions Are
Unenforceable Under the Common Law of Texas</u>

129.     Inguran incorporates by reference its responses to paragraphs 1-128 of the
Complaint.

130.     Paragraph 130 is a purely a legal assertion to which no response is required.  To
the extent paragraph 130 contains any factual allegations, Inguran denies them.

131.     Inguran admits the contract includes liquidated damages provisions.  Inguran
denies the remainder of paragraph 131 of the Complaint.

132.     Inguran admits paragraph 132 of the Complaint.

133.     Inguran admits paragraph 133 of the Complaint.

134.     Inguran denies paragraph 134 of the Complaint.

135.     Inguran denies paragraph 135 of the Complaint.

136.     Inguran denies paragraph 136 of the Complaint.

137.     Inguran admits that the $1.5 million fixed sum is payable by ABS if ABS does not
extend the contract's term pursuant to Section 3 of the contract.  Inguran denies the remainder of
paragraph 137 of the Complaint.

138.     Inguran denies paragraph 138 of the Complaint.

139.     Inguran denies paragraph 139 of the Complaint.

## COUNT 6

### Declaratory Judgment That No Liquidated Damages Are Due Until the Expiration or Termination of the Contract

140.    Inguran incorporates by reference its responses to paragraphs 1-139 of the Complaint.

141.    Inguran admits that ABS provided Inguran notice on August 25, 2014 that ABS was terminating the 2012 Agreement early.

142.    Inguran admits that the parties' contract contains certain provisions, and such provisions speak for themselves.  Inguran denies the remainder of paragraph 142 of the Complaint.

143.    Inguran admits that it continues to provide services under the 2012 Agreement. Inguran denies the remainder of paragraph 143 of the Complaint.

144.    Inguran admits that the parties' have sent letters to each other regarding the liquidated damages, and the letters speak for themselves.

145.    Inguran denies paragraph 145 of the Complaint.

146.    Inguran denies paragraph 146 of the Complaint.

## COUNT 7

### Breach of Contract for Failure to Apply Advance as a Credit Against Invoices for Sorted Semen

147.    Inguran incorporates by reference its responses to paragraphs 1-146 of the Complaint.

148.    Inguran admits that ABS paid an advance of $1,500,000 under Section 4(b) of the 2012 Agreement.

149.    Inguran admits that the parties' contract contains certain provisions, and such provisions speak for themselves.  Inguran denies the remainder of paragraph 149 of the Complaint.

150.    Inguran admits the Advance has not been repaid.  Inguran denies the remainder of paragraph 150 of the Complaint.

151.    Inguran admits that the parties' have sent letters to each other regarding the liquidated damages, and the letters speak for themselves.

152.    Inguran denies paragraph 152.

153.    Inguran denies paragraph 153.

154.    Inguran denies paragraph 154.

## JURY DEMAND

Inguran agrees with ABS's demand for trial by jury, and Inguran also demands a jury trial as to all issues so triable.

## AFFIRMATIVE DEFENSES

For its defenses, Inguran incorporates by reference as if fully set forth herein its responses to Paragraphs 1-154 to the Complaint. Without assuming any burden other than that imposed by operation of law, Inguran asserts these affirmative defenses without admitting that Inguran bears the burden of proof on any of them.

## FIRST AFFIRMATIVE DEFENSE

### (Lack of Case or Controversy)

155.    ABS has failed to plead sufficient facts, and no sufficient facts exist, to create an actual case or controversy between ABS and Inguran.

## SECOND AFFIRMATIVE DEFENSE

### (Fraud/Fraudulent Inducement)

156.    ABS is barred from asserting its claims against Inguran based on its fraudulent conduct in inducing Inguran to enter into and perform under the contract between Inguran and ABS.

## THIRD AFFIRMATIVE DEFENSE

### (Acquiescence, Estoppel, Laches, Waiver)

157.    ABS is barred from asserting its claims against Inguran based on the doctrines of acquiescence, estoppel, laches, and waiver.

## FOURTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

158.    ABS is barred from asserting its claims against Inguran based on the statute of limitations.

## FIFTH AFFIRMATIVE DEFENSE

### (Ratification)

159.    ABS is barred from asserting its claims against Inguran based on its ratification of the contract between Inguran and ABS.

## SIXTH AFFIRMATIVE DEFENSE

### (Mistake)

160.    ABS is barred from asserting its claims against Inguran based on the doctrine of mistake regarding whether ABS's laser-based method for sorting is covered by the 2012 Agreement.

## SEVENTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

161.    ABS is barred from asserting its claims against Inguran based on the doctrine of unclean hands.

## EIGHTH AFFIRMATIVE DEFENSE

### (In Pari Delicto)

162.    ABS is barred from asserting its claims against Inguran based on the doctrine of *in pari delicto*.

## NINTH AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

163.    ABS has failed to state a claim upon which relief can be granted.  Inguran also incorporates by reference its Motion for Partial Dismissal of the Complaint.

## TENTH AFFIRMATIVE DEFENSE

### (No Anticompetitive Conduct)

164.    At all times relevant to ABS's claims, Inguran's conduct was lawful, in good faith, was justified by legitimate purposes, was pro-competitive, constituted bona fide business competition, and lacked any wrongful intent.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Unjust Enrichment)

165.    ABS would be unjustly enriched if allowed to recover any relief claimed to be due under its claims.

## TWELFTH AFFIRMATIVE DEFENSE

### (Competition)

166.    ABS's claims of antitrust and unfair competition are barred, in whole or in part, because the alleged conduct that is the subject of the Complaint did not lessen competition in relevant market or markets.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Relevant Market)

167.    The purported relevant market alleged in the Complaint is not a relevant antitrust market, and ABS cannot carry its burden of defining a proper relevant market.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (No Market Power)

168.    Inguran does not have market power or monopoly power in any properly defined relevant market.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Pass-On)

169.    To the extent there is an allegation or finding of an illegal overcharge, ABS's claims are barred, in whole or in part, to the extent ABS passed on the effect of such overcharge to a third party.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (No Injury)

170.    ABS's claims are barred, in whole or in part, because ABS has not suffered an injury-in-fact or antitrust injury traceable to allegedly unlawful conduct of Inguran.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (No Damages)

171.    Any damages that ABS alleges to have suffered are too remote, speculative, and/or uncertain to allow recovery.  Such damages are not capable of ascertainment and allocation.

## INGURAN'S COUNTERCLAIMS AND THIRD-PARTY CLAIMS

Defendant and Counterclaim/Third-Party Plaintiff Inguran hereby asserts the following counterclaims against ABS and Genus:

172.    For nearly a decade, Inguran and ABS have been in a contractual relationship involving the processing of bull semen into sex-sorted sperm.  They entered into their first services contract on May 30, 2006, whereby Inguran agreed to provide patented sex-sorting services for ABS's bull semen.  They subsequently executed four successor agreements for Inguran to provide similar services, the most recent of which was entered on September 1, 2012 and amended on August 1, 2013 (the "2012 Agreement").

173.    This amicable, productive relationship suddenly ended a few months ago.  On July 14, 2014, without any prior warning to Inguran, ABS filed this lawsuit against Inguran in the United States District Court for the Western District of Wisconsin.  In its complaint, ABS accuses Inguran of engaging in anti-competitive conduct.  ABS also seeks declarations construing various provisions in the 2012 Agreement.  According to ABS's allegations, the contract is unfair, unreasonable, and unenforceable.

174.    ABS initiated the Wisconsin Action without giving Inguran any prior notice of its purported "dispute."  ABS had never communicated any issues, concerns, or disputes regarding any alleged anti-competitive conduct or the terms of the 2012 Agreement.  And Inguran had done nothing to threaten ABS or cause it to fear being sued.

175.    The 2012 Agreement was the result of arm's-length negotiations between sophisticated parties.  Each side expressly acknowledged in the 2012 Agreement that "in consultation with its outside legal counsel, [it] has determined that the terms of this Agreement are fair and reasonable."  In fact, the only issue ever raised with respect to the 2012 Agreement was ABS's request for an amendment lowering ABS's minimum commitment for certain years due to the economic climate at the time.  Inguran agreed to ABS's request, and the 2012 Agreement was amended on August 1, 2013.

176.    ABS manufactured the Wisconsin Action to pressure Inguran into renegotiating the contract's terms.  ABS, which continues to receive benefits under the 2012 Agreement, never intended to fully perform under that Agreement.  It also has repudiated and breached certain of its contractual obligations.  ABS is also infringing Inguran's patents related to sorting technology.  Inguran files this counterclaim to protect its rights under the 2012 Agreement and its patents, and to recover for the harm it has suffered as a result of ABS's conduct.

177.    At all times relevant to the Counterclaims, Inguran's conduct was lawful, in good faith, was justified by legitimate purposes, was pro-competitive, constituted bona fide business competition, and lacked any wrongful intent.

## PARTIES

178.    Defendant and Counter-Plaintiff Inguran is a limited liability company organized under Delaware law.  Its principal place of business is in Navasota, Texas.

179.    Plaintiff and Counter-Defendant ABS is a corporation organized under Delaware law.  Its principal place of business is in DeForest, Wisconsin.

180.    On information and belief, Third-Party Defendant Genus is a corporation organized under the laws of the United Kingdom.  On information and believe, its principal place of business is in Basingstoke, the United Kingdom.

## JURISDICTION AND VENUE

181.    The Court has jurisdiction over these counterclaims based on Patent Laws of the United States, 35 U.S.C. § 1, et. seq.  The Court also has jurisdiction pursuant to 15 U.S.C. §§ 15, 16, and 28 U.S.C. §§ 1331, 1337.

182.    The Court also has jurisdiction over Inguran's state law counterclaims pursuant to 28 U.S.C. §§ 1367 because the claims are so related to Inguran's claims of patent infringement and ABS's claims of federal antitrust that they form part of the same case or controversy.

183.    This Court has personal jurisdiction over ABS at least because ABS is a resident in this district, and ABS has consented to jurisdiction in this judicial district by filing its Complaint against Inguran in this Court.

184.    This Court has personal jurisdiction over Genus at least because Genus regularly solicits and conducts business in this District and has minimum contacts with this District. Genus is ABS's parent company, and directs and controls ABS as its bovine semen-sorting division.  In this District, Genus is a bound party to the executed 2012 Agreement; instructed, directed, and controlled the development and commercialization of ABS's semen sorting technologies; maintains a joint research and development operation with ABS; and participated in the patent infringement as alleged below.

185.    Subject to Inguran's Motion to Transfer, venue for these counterclaims is proper in this district.

20

## BACKGROUND

186.    Inguran (d/b/a Sexing Technologies) is in the business of sorting non-human, mammalian ejaculate into sperm populations that bear either an X (female) or a Y (male) chromosome ("sexed semen").  Inguran typically packages sexed semen in "straws," with each straw generally comprising a single dose for use in artificial insemination.  Inguran's subsidiary, XY, LLC, developed and obtained several patents on a highly successful "sorting" technique for producing such sexed semen.  Over the years, XY has worked to improve the patented sorting methods and associated equipment.  Inguran licensed the patents from XY so that it can provide sex-sorting services using the patented technique. Similarly, Inguran has continued to develop sorting technology and has acquired its own patents in the field, which are made available to XY's licensees.

187.    Inguran provides its sex-sorting services to companies that operate so-called "bull studs."  These "bull stud" companies harvest semen from bulls with desirable genetic traits and sell it to dairy farmers and cattle producers.  The farmers and cattlemen use the semen to breed calves with the same traits as the donor bulls.  Dairy farmers, for example, generally prefer to breed female cows that can produce high volumes of milk.  Depending on their customers' needs, bull stud companies contract with Inguran to produce varying amounts of the sexed semen from the bulls.

188.    ABS is one of the largest bull stud companies in the country.  Since the mid-2000s, Inguran has used the patented sex-sorting method to process semen provided by ABS into predominantly X- or Y- bearing sexed semen.  Inguran has provided its sex-sorting services to ABS under a series of service contracts known as "Semen Sorting Agreements."  The parties entered into their first such agreement on May 30, 2006.  Under the agreement, Inguran was

21

obligated to produce hundreds of thousands of straws of bovine sexed semen for ABS over a 27-month period.  The parties subsequently executed a similar successor agreement in September 2007, and executed amendments and modifications to the agreement on March 2008 and October 2010.

189.    Upon information and belief, Genus has owned ABS since November 1999.

190.    While the September 2007 agreement still was in effect, Inguran, and ABS and Genus, began negotiating yet another successor contract.  In March 2012, two of ABS's and Genus's senior executives, John Worby and Jesus Martinez, travelled to Houston to meet with Inguran's co-CEOs, Juan Moreno and Maurice Rosenstein, and its CFO, Scott Holland.  At all relevant times during the negotiation of the 2012 Agreement with Inguran, Mr. Worby and Mr. Martinez acted on behalf of ABS and Genus.  Following the meeting, Mr. Worby wrote to Mr. Rosenstein at Inguran's Navasota headquarters to express interest in "a longer term extension or renewal of our contract."  Mr. Worby also explained that Genus and ABS desired to significantly increase its purchase quantity going forward.  Two other ABS and Genus executives subsequently travelled to Texas for a second meeting to discuss the terms of the new deal.

191.    Throughout the negotiations, ABS's and Genus's representatives repeatedly approved of the same provisions that ABS now contends are anticompetitive.  In an email exchange in June 2012, for instance, Mr. Worby explained to Mr. Rosenstein that ABS was fine with a five-year term, a liquidated damages clause, and a $1.5 million early termination penalty. Mr. Worby added that ABS and Genus "would agree to [the] requirement that during the course of the contract period, ABS could not sell or market any sorted semen from [its] technology or any other competing technology," and that such a provision was "fair for both parties."  In another email dated August 2, 2012—by which time the parties had agreed on substantially all of

the contract's terms—Mr. Worby represented to Mr. Rosenstein that the contract "reflects our discussions" and was in "a form that we would find acceptable."

192.     After months of careful negotiations, ABS, on its own behalf, and on behalf of Genus and ABS's other affiliates, and Inguran executed the 2012 Agreement that defines their respective rights and obligations in unambiguous terms.  The 2012 Agreement was signed by John Worby on behalf of ABS Global, Inc., and on behalf of its "Affiliates," including Genus.  The 2012 Agreement contains an integration clause, a Texas choice-of-law clause, and confidentiality provisions.  It also expressly states that both parties were represented by counsel, and that after consultation with their attorneys, both parties determined the terms of the contract to be "fair and reasonable."  Specifically, the 2012 Agreement provides that:

> Each party represents that it understands the matters set forth herein, and that, in consultation with its outside legal counsel, has determined that the terms of this Agreement are fair and reasonable.

193.     With the new contract in place, Genus, ABS, and Inguran continued their amicable relationship.  In fact, ABS and Inguran met in Dallas, Texas in July, 2013 to discuss the impact of the economic climate on ABS's commitments under the Agreement.  At ABS's request, Inguran agreed to amend the 2012 Agreement on August 1, 2013 to reduce ABS's minimum commitments for certain years and reduce the demands on ABS.  To this day, Inguran continues sex-sorting large quantities of bovine semen for ABS as provided for in the 2012 Agreement.

194.     On July 14, 2014, nearly two years into the 2012 Agreement, ABS filed this lawsuit.  ABS asserts an antitrust claim under the Sherman Act and an unfair competition claim under Wisconsin common law.  It also seeks declarations construing certain clauses in the 2012 Agreement in its favor, or simply finding the clauses unenforceable.

195.     This was the first time in the parties' eight-year relationship that ABS or Genus ever made such assertions.  Inguran is not a monopolist and has not engaged in anti-competitive or exclusionary conduct.  Inguran negotiated a contract that ABS and Genus acknowledged was "fair and reasonable."  Inguran is providing a service using a highly effective technique that its subsidiary XY developed and patented, and then licensed to Inguran.

196.     As with ABS's antitrust and unfair competition claims, neither ABS nor Genus gave Inguran any prior warning of the purported "dispute" over the 2012 Agreement's scope, fairness, or enforceability.  The parties entered into the 2012 Agreement based largely on ABS's and Genus's representation that it wanted a long-term deal, as well as a significant increase in the volume of Inguran's sex-sorting services.  The parties spent months negotiating the 2012 Agreement, with both sides being represented by counsel throughout the process.  Yet, despite expressly acknowledging the contract to be "fair and reasonable," and then performing without complaint for two years, ABS filed suit against Inguran in Wisconsin.  Six weeks later, on August 25, 2014, ABS sent Inguran a letter in which it cancelled the 2012 Agreement's extension period beyond the end of its current term and thereby terminated the contract, effective August 31, 2017.  ABS also asserted that it would not pay the liquidated damages that it agreed to pay under the contract in the event of such a termination.

### COUNT I – FRAUDULENT INDUCEMENT AGAINST ABS AND GENUS

197.     Inguran realleges and incorporates by reference the allegations of paragraphs 1-196.

198.     Texas law prohibits a party from fraudulently inducing another into entering a contract.  Texas law applies because of the 2012 Agreement's Texas choice-of-law clause.

24

199.     In negotiating the 2012 Agreement, Genus and ABS told Inguran that they wanted and would fully perform a long-term contract.  Genus and ABS specifically represented that they desired "a longer term extension or renewal of" the parties' then-effective September 2007 contract.  And during the contract negotiations, ABS and Genus represented on multiple occasions that the contract was "acceptable" and "fair for both parties," and that its terms "reflect[ed] [the parties'] discussions."  These representations were material, as any reasonable person would consider the duration of a proposed contract an important factor in determining whether to enter that contract.

200.     Genus's and ABS's representations that they wanted and would fully perform a long-term agreement, and that the agreement's terms were fair and acceptable, constituted false statements of fact.  On information and belief, Genus and ABS never intended to perform the 2012 Agreement's full period, and knew as much when they falsely represented to Inguran that they would.

201.     Inguran justifiably relied on Genus's and ABS's false representations when it executed the 2012 Agreement and thereby agreed to be bound for the 2012 Agreement's full period.  The term of the agreement was a material fact in the negotiation and execution of the 2012 Agreement, and Inguran provided ABS preferential pricing because of the length of the 2012 Agreement.  Inguran would not have entered into the 2012 Agreement, or provided the preferential pricing, but for Genus's and ABS's false representations regarding the term of the agreement.

202.     The "safe harbor" clause to the research and design provision (the "R&D provision") in paragraph 18 of the 2012 Agreement allowed ABS to continue its research and development programs that were in place at least ninety (90) days prior to the 2012 Agreement's

25

effective date.  During the negotiations of this clause, Genus and ABS failed to disclose research and development of their alleged "laser-based method" for sorting sperm, and failed to disclose that Genus and ABS considered the laser-based method for sorting sperm to not fall within the R&D provision of paragraph 18 of the 2012 Agreement.

203.    Genus and ABS had a duty to inform Inguran of their laser-based method for sorting, and that Genus and ABS did not consider that the laser-based method was subject to the R&D provision of paragraph 18 of the 2012 Agreement.  Genus's and ABS's failure to disclose and inform Inguran of their laser-based method constitutes an omission of material fact.  Inguran justifiably relied on Genus's and ABS's silence when it executed the 2012 Agreement, and the R&D provision and "safe harbor" clause of paragraph 18 of the 2012 Agreement.  Inguran would not have entered into the 2012 Agreement but for Genus's and ABS's false omissions regarding the R&D provision, the "safe harbor" clause, and its laser-based method for sorting, so as to protect its highly confidential information on its sorting methods.

204.    Genus's and ABS's false representations and omissions directly and proximately caused Inguran injury.  These injuries include, but are not limited to, that Inguran is now locked into an agreement with ABS whereby ABS receives all the benefits but refuses to accept many of its burdens, including the fact that Inguran provided ABS preferential pricing and other beneficial terms in view of the volume and purported length of the 2012 Agreement; providing ABS an increase in volume of Inguran's sex-sorting services which wastes and strains Inguran's limited resources and production capacity, and limits Inguran's ability to provide these services to other potential and actual customers; and the loss of the protection and misuse of Inguran's confidential information, which ABS has improperly appropriated and used to develop and implement its own technology.

205.    Genus's and ABS's false representations and omissions entitle Inguran to rescind the 2012 Agreement, or to affirm it and recover damages.

206.    On information and belief, Genus and ABS made the false representations with actual fraudulent intent or malice, entitling Inguran to recover exemplary damages under Texas Civil Practice & Remedies Code § 41.003(a).

## COUNT II – REPUDIATION/ANTICIPATORY BREACH OF CONTRACT AGAINST ABS

207.    Inguran realleges and incorporates by reference the allegations of paragraphs 1-206.

208.    Under Texas law, a party repudiates a contract when it refuses to perform the contract without just cause.

209.    Under paragraph 3 of the 2012 Agreement, ABS had until August 31, 2014 to elect to terminate the contract beyond the end of its current term.  In the event ABS chose to do so, paragraph 4(b) of the 2012 Agreement obligated ABS to pay Inguran liquidated damages, which shall be due and payable upon the expiration or earlier termination of this Agreement. These liquidated damages include payment for the remaining sorted straws under the 2012 Agreement, and $1.5 million in damages.  The $1.5 million was paid in advance by ABS at the time of execution of the 2012 Agreement, and Inguran's invoices for its services have been credited against the $1.5 million advance.

210.    On August 25, 2014, ABS sent a letter to Inguran explaining that ABS, pursuant to paragraph 3, had decided "not to extend the Term of the Agreement."  As such, paragraph 4(b) was triggered, and ABS is liable for the liquidated damages.

211.     In its letter, ABS also stated "that the liquidated damages provision of Section 4(b) of the Agreement is unenforceable," and that ABS therefore is not liable for the liquidated damages.

212.     ABS repudiated its obligations under paragraph 4(b) of the 2012 Agreement. ABS's repudiation has caused Inguran injury and entitles Inguran to recover the liquidated damages.

213.     ABS's repudiation also entitles Inguran to recover its reasonable attorney fees, as authorized by Texas Civil Practice & Remedies Code § 38.001(8).

### COUNT III –BREACH OF CONTRACT AGAINST ABS AND GENUS

214.     Inguran realleges and incorporates by reference the allegations of paragraphs 1-213.

215.     On information and belief, ABS and Genus breached the R&D provisions of paragraph 18 of the 2012 Agreement.  On information and belief, and as shown by the allegations in ABS's Complaint, ABS and Genus are creating, developing, and commercializing its laser-ablation method for sorting and has exceeded the restrictions placed on sorting technologies under paragraph 18.  Genus and ABS acquired semen-sorting patents and related technologies from Arryx Inc. and/or Haemonetics Corp., created a subsidiary, Premium Genetics, to own these patents and technologies, and have improperly created, developed, and commercialized the Arryx semen-sorting technologies.   These illegal actions by ABS and Genus, among others, constitute a breach of contract under paragraph 18 of the 2012 Agreement.

216.     On information and belief, ABS also breached the packaging and collateral materials provisions of paragraph 13 of the 2012 Agreement.  Under paragraph 13 of the 2012 Agreement, ABS was required to mark the packaging of each straw of sexed semen sold by

ABS, or advertising or promotional materials used by ABS in the commercialization of sexed semen, with an approved form of Inguran's trademarks as required under paragraph 13 of the 2012 Agreement.  ABS has breached paragraph 13 of the 2012 Agreement by failing to mark its straws of sexed semen, or its advertising and promotional materials for sexed semen, with an approved form of Inguran's trademarks.

217.    Also under paragraph 13 of the 2012 Agreement, Inguran was allowed to approve any statements on ABS's packaging for straws of sorted semen or any advertisement concerning the features or characteristics of the sexed semen or semen sorting, its performances, or the outcomes achievable from the sexed semen ("collateral materials").  ABS was required to provide samples of these collateral materials to Inguran for Inguran's written approval before ABS's implementation, distribution, or commercial use of collateral materials.  On information and belief, ABS breached paragraph 13 of the 2012 Agreement because it has implemented, distributed, or commercially used collateral materials without any prior approval of Inguran.

218.    ABS breached the provision related to specific manner of use of Inguran's sexed semen, and the requirement to provide notice to ABS's customers on the specific manner of use of Inguran's sexed semen.  Under paragraph 1 of the 2012 Agreement, ABS and its customers may only use each straw of in one bovine female for a single artificial insemination, and ABS must inform its customers, in written form acceptable by Inguran, that the sexed semen may only be used in this manner.  ABS has failed to meet its obligations under this provision and has breached paragraph 1 of the 2012 Agreement.

219.    On information and belief, ABS has breached paragraph 16 of the 2012 Agreement by improperly disclosing and using "ST's Confidential Information" (as the term is defined in the 2012 Agreement) in ABS's laser-based sex-sorting technologies and other sex-

29

sorting technologies.  Throughout the parties' relationship, ABS has been exposed to Inguran's confidential information and trade secrets related to its sex-sorting methods and technologies, and under paragraph 16 of the 2012 Agreement, ABS was required to keep this information secret and was forbidden from using Inguran's confidential information and trade secrets for its own benefit.  On information and belief, ABS has improperly disclosed and/or used Inguran's confidential information and trade secrets in its laser-based sex-sorting technologies and other sex-sorting technologies.

220.    Inguran has been harmed by ABS's breaches of the 2012 Agreement, including, but not limited to, the loss of Inguran's confidential information, the loss of goodwill and value in Inguran's brand and trademarks, the loss in sales due to ABS's customers' extended use of the sexed semen, and other damages.

221.    ABS's breach of the 2012 Agreement also entitles Inguran to recover its reasonable attorney fees, as authorized by Texas Civil Practice & Remedies Code § 38.001(8).

**COUNT IV – PROMISSORY ESTOPPEL AGAINST ABS AND GENUS**

222.    Inguran realleges and incorporates by reference the allegations of paragraphs 1-221.

223.    In negotiating the 2012 Agreement, Genus and ABS made a number of promises to Inguran, including that they wanted and would fully perform a long-term contract.  Genus and ABS specifically represented that they desired "a longer term extension or renewal of" the parties' then-effective July 2011 contract.  And during the contract negotiations, ABS and Genus represented on multiple occasions that the contract was "acceptable" and "fair for both parties," and that its terms "reflect[ed] [the parties'] discussions."  These promises were material, as any reasonable person would consider the duration of a proposed contract an important factor in

determining whether to enter that contract and the pricing for the services provided. In view of the importance of the duration of the proposed contract, it was foreseeable that Inguran would rely on ABS's and Genus's promises.

224. Inguran justifiably relied on Genus's and ABS's promises when it executed the 2012 Agreement and thereby agreed to be bound for the 2012 Agreement's full period. The term of the agreement was a material fact in the negotiation and execution of the 2012 Agreement. Inguran would not have entered into the 2012 Agreement but for Genus's and ABS's promises regarding the term of the agreement.

225. The "safe harbor" clause to the research and development provision (the "R&D provision") in paragraph 18 of the 2012 Agreement allowed ABS to continue its current research and development programs that were in place at least ninety (90) days prior to the 2012 Agreement's effective date. In negotiating the terms for 2012 Agreement, and in executing the 2012 Agreement, ABS and Genus promised to be bound by the "safe harbor" clause of the 2012 Agreement. During the negotiations of this clause, Genus and ABS failed to disclose their research and development of their alleged "laser-based method" for sorting sperm, and failed to disclose that Genus and ABS considered the laser-based method for sorting sperm did not fall within the R&D provision of paragraph 18 of the 2012 Agreement.

226. Genus and ABS had a duty to inform Inguran of their laser-based method for sorting, and that Genus and ABS did not consider that the laser-based method was subject to the R&D provision of paragraph 18 of the 2012 Agreement, in view of ABS's and Genus's promises to be bound by the "safe harbor" clause. Inguran justifiably relied on Genus's and ABS's promises to be bound by the "safe harbor" clause of paragraph 18 of the 2012 Agreement, and

their silence when it executed the 2012 Agreement.  In view of the importance of the "safe harbor" clause, it was foreseeable that Inguran would rely on ABS's and Genus's promises.

227.    Genus and ABS also promised to be bound by the liquidated damages provisions in the 2012 Agreement through its negotiations of the 2012 Agreement and in executing the 2012 Agreement.  The liquidated damages provisions in the 2012 Agreement are consistent with the liquidated damages requirements in the prior agreements between Inguran and ABS.  In view of the importance of the liquidated damages provisions, it was foreseeable that Inguran would rely on ABS's and Genus's promises.

228.    Genus and ABS also promised to be bound by the packaging and collateral materials provisions of paragraph 13 of the 2012 Agreement.  Under paragraph 13 of the 2012 Agreement, ABS was required to mark the packaging of each straw of sorted semen sold by ABS, or advertising or promotional materials used by ABS in the commercialization of sorted semen, with an approved form of Inguran's trademarks as required under paragraph 13 of the 2012 Agreement.  Also under paragraph 13 of the 2012 Agreement, Inguran was allowed to approve any statements on ABS's packaging for straws of sorted semen or any advertisement concerning the features or characteristics of the sorted semen or semen sorting, its performances, or the outcomes achievable from the sorted semen ("collateral materials").  ABS promised to provide samples of these collateral materials to Inguran for Inguran's written approval before ABS's implementation, distribution, or commercial use of collateral materials.  Genus's and ABS's promises were material, as any reasonable person would consider the goodwill and branding of a company and its trademarks an important factor in determining whether to enter that contract and to provide the underlying services.

229.     Inguran justifiably relied on Genus's and ABS's promises when it executed the 2012 Agreement and thereby agreed to be bound thereby for the 2012 Agreement's full period. The marking and collateral materials provision was material in the negotiation and execution of the 2012 Agreement.  Inguran would not have entered into the 2012 Agreement but for Genus's and ABS's promises regarding the marking and collateral materials provisions under paragraph 13.

230.     Genus and ABS failed to meet its promises.  Inguran relied upon Genus's and ABS's promises to its detriment, which proximately caused Inguran injury.  These injuries include, but are not limited to, that Inguran is now locked into an agreement with ABS whereby ABS receives all the benefits but refuses to accept many of its burdens, including the fact that Inguran provided ABS preferential pricing and other beneficial terms in view of the volume and purported length of the 2012 Agreement; providing ABS an increase in volume of Inguran's sex-sorting services which wastes and strains Inguran's limited resources and production capacity, and limits Inguran' ability to provide these services to other potential and actual customers; the loss of the protection and misuse of Inguran's confidential information, which ABS has improperly appropriated and used to develop and implement its own technology; depriving Inguran of benefits from properly marketing sex-sorted sperm produced for ABS; and liquidated damages, including the loss of sales of sex-sorted straws during the remaining term of the 2012 Agreement.  Injustice can only be avoided by the legal enforcement of ABS's and Genus's promises.

**COUNT V– INFRINGEMENT OF THE '987 PATENT AGAINST ABS**

231.     Inguran realleges and incorporates by reference the allegations of paragraphs 1-230.

232.    U.S. Patent No. 8,206,987 (the "'987 patent") is entitled "Photo-Damage Method for Sorting Particles."

233.    The application that issued as the '987 patent was filed on May 12, 2011.  The U.S. Patent and Trademark Office duly and legally issued the '987 patent on June 26, 2012.  The invention of the '987 patent generally relates to a method for sorting a mixture of stained particles in a fluid flow path, including stained particles from two distinguishable groups.

234.    Inguran owns all rights, title, and interest in the '987 patent, including the right to recover damages for infringement throughout the period of infringement.

235.    Inguran is informed and believes, and thereon alleges, that ABS directly infringes at least one claim of the '987 patent in violation of 35 U.S.C. § 271(a), by, among other things, making, using, selling, offering for sale, or importing into the U.S., without authority or license from Inguran, its laser-based method for the sorting of gender-selected sperm.

236.    ABS contends and believes that its laser-based method for the sorting of gender-selected sperm falls outside the scope of paragraph 18 of the 2012 Agreement.  On information and belief, ABS is commercializing its laser-based method for sorting and has exceeded the restrictions placed on sorting technologies under paragraph 18 of the 2012 Agreement.

237.    On information and belief, ABS had actual knowledge of the '987 patent before the filing of these counterclaims.  ABS has been well aware of Inguran's patents based on the parties' contractual relationship to sort semen.  At the very least, ABS submitted a petition to the United States Patent Office for *inter partes* review of the '987 patent on October 1, 2014, which included ABS's detailed interpretation of the claim language and scope of the '987 patent.  In view of its prior knowledge of the '987 patent and ABS's interpretation of the '987 patent, ABS

acted despite an objectively high likelihood that its actions constituted infringement of the '987 patent.

238.    As a result of the infringement of the '987 patent by ABS, Inguran has been damaged.  Inguran is entitled to damages under 35 U.S.C. § 284 in an amount that presently cannot be ascertained, but that will be determined at trial.

239.    Inguran is informed and believes, and thereon alleges, that ABS's infringement was willful and deliberate, and that this case is therefore an exceptional case, which warrants an award of treble damages and attorneys' fees to Inguran pursuant to 35 U.S.C. § 285.

240.    As a result of the infringement of the '987 patent by ABS, Inguran has been irreparably harmed.  Inguran is entitled to a preliminary and permanent injunction forbidding ABS from further infringing the '987 patent.

### COUNT VI– INFRINGEMENT OF THE '987 PATENT AGAINST GENUS

241.    Inguran realleges and incorporates by reference the allegations of paragraphs 1-240.

242.    U.S. Patent No. 8,206,987 (the "'987 patent") is entitled "Photo-Damage Method for Sorting Particles."

243.    The application that issued as the '987 patent was filed on May 12, 2011.  The U.S. Patent and Trademark Office duly and legally issued the '987 patent on June 26, 2012.  The invention of the '987 patent generally relates to a method for sorting a mixture of stained particles in a fluid flow path, including stained particles from two distinguishable groups.

244.    Inguran owns all rights, title, and interest in the '987 patent, including the right to recover damages for infringement throughout the period of infringement.

245.     Inguran is informed and believes, and thereon alleges, that Genus induces the infringement of at least one claim of the '987 patent in violation of 35 U.S.C. § 271(b), by, among other things, actively and knowingly aiding, abetting, and encouraging the laser based sorting of gender-selected sperm by others, including ABS, with the specific intent to induce others to, among other things, directly make, use, sell, offer to sell, or import into the U.S., without authority or license from Inguran, laser-based methods for the sorting of gender-selected sperm.  On information and belief, Genus instructs, directs, and controls the R&D and commercialization of ABS's laser based sorting of gender-selected sperm, including instruction regarding the technology incorporated in the patents owned by Premium Genetics, a wholly owned subsidiary of Genus.  Genus also instructs, directs, and controls ABS to sort semen into gender-selected sperm for Genus's use on its own or its customers' bulls.  On information and belief, ABS acts as the bovine sperm-sorting division of Genus.

246.     On information and belief, Genus had actual knowledge of the '987 patent before the filing of these counterclaims.  Genus has been well aware of Inguran's patents based on the parties' contractual relationship to sort semen.  At the very least, ABS, Genus's wholly-owned subsidiary and bovine semen division, submitted a petition to the United States Patent Office for *inter partes* review of the '987 patent on October 1, 2014, which included ABS's and Genus's detailed interpretation of the claim language and scope of the '987 patent.  ABS identified Genus as its parent company when identifying the real parties in interest to the *inter partes* review of the '987 patent.  On information and belief, Genus knew the induced acts, i.e., ABS's conduct, constitute infringement of the '987 patent.

247.     In view of its prior knowledge of the '987 patent, and ABS's and Genus's interpretation of the '987 patent, and Genus's knowledge of ABS's infringing conduct, Genus

acted despite an objectively high likelihood that its actions induced the infringement of the '987 patent.

248.    As a result of the infringement of the '987 patent by Genus, Inguran has been damaged.  Inguran is entitled to damages under 35 U.S.C. § 284 in an amount that presently cannot be ascertained, but that will be determined at trial.

249.    Inguran is informed and believes, and thereon alleges, that Genus's infringement was willful and deliberate, and that this case is therefore an exceptional case, which warrants an award of treble damages and attorneys' fees to Inguran pursuant to 35 U.S.C. § 285.

250.    As a result of the infringement of the '987 patent by Genus, Inguran has been irreparably harmed.  Inguran is entitled to a preliminary and permanent injunction forbidding Genus from further infringing the '987 patent.

## CONDITIONS PRECEDENT

251.    All conditions precedent required by Inguran under the 2012 Agreement have been performed or have occurred.

## JURY DEMAND

252.    Pursuant to Federal Rule of Civil Procedure 38(b), Inguran demands a jury trial.

## PRAYER

For these reasons, Inguran respectfully requests that the Court enter judgment against ABS and Genus and award Inguran the following:

a.  Judgment that ABS and Genus are liable for fraudulent inducement;

b.  Judgment that ABS is liable for repudiation/anticipatory breach of the 2012 Agreement;

c.  Judgment that ABS and Genus are liable for breach of the 2012 Agreement;

d.  Judgment that ABS and Genus are liable for promissory estoppel;

e.  Judgment that ABS and Genus are liable for infringement of the '987 patent;

f.  Liquidated damages in the amount provided in the 2012 Agreement;

g.  Other actual damages in an amount to be proven at trial, including by not limited to:

    i.  Any amounts that remain due to Inguran under the terms of the 2012 Agreement;

    ii.  Reasonable expenses incurred in the reliance of ABS's performance of the 2012 Agreement;

    iii.  Any other amount to compensate Inguran for ABS's fraudulent inducement;

    iv.  Amounts to compensate Inguran for loss of goodwill and branding;

    v.  Amounts to compensate Inguran for loss of its confidential information;

h.  Rescission of the 2012 Agreement;

i.  Compensatory damages based on ABS's and Genus's infringement of the '987 patent pursuant to 35 U.S.C. § 284;

j.  Treble damages based on ABS's and Genus's willful infringement of the '987 patent pursuant to 35 U.S.C. § 284;

k.  Preliminary and permanent injunction that ABS, Genus, and their officers, agents, employees, and attorneys, and all those in active concert or participation with them, from further infringing the '987 patent;

l.  Prejudgment and post-judgment interest on any award to Inguran;

m.  Exemplary damages;

n.  Attorneys' fees;

o.  Costs of suit; and

p.   All other relief the Court deems appropriate.


DATED:  November 7, 2014                    Respectfully submitted,

                                            /s/ *Sarah A. Zylstra*
                                            Sarah A. Zylstra
                                            Wisconsin State Bar No. 1033159
                                            Boardman & Clark LLP
                                            One South Pinckney, Suite 410
                                            P.O. Box 927
                                            Madison, Wisconsin  53701-0927
                                            Telephone: (607) 257-9521
                                            szylstra@boardmanclark.com

                                            Kirt S. O'Neill
                                            Texas State Bar No. 00788147
                                            *(admitted pro hac vice)*
                                            Daniel L. Moffett
                                            Texas State Bar No. 24051068
                                            *(admitted pro hac vice)*
                                            Clayton N. Matheson
                                            Texas State Bar No. 24074664
                                            *(admitted pro hac vice)*
                                            AKIN GUMP STRAUSS
                                            HAUER& FELD, LLP
                                            300 Convent Street, Suite 1600
                                            San Antonio, Texas 78205
                                            Telephone: (210) 281-7000
                                            Facsimile: (210) 224-2035
                                            koneill@akingump.com
                                            dmoffett@akingump.com
                                            cmatheson@akingump.com

                                            James L. Duncan III
                                            Texas State Bar No. 24059700
                                            *(admitted pro hac vice)*
                                            AKIN GUMP STRAUSS
                                            HAUER& FELD, LLP
                                            1111 Louisiana Street, 44th Floor
                                            Houston, Texas 77002
                                            Telephone: (713) 220-5800
                                            Facsimile:  (713) 236-0822
                                            jduncan@akingump.com

Fairley Spillman
District of Columbia Bar No. 384879
*(admitted pro hac vice)*
AKIN GUMP STRAUSS
HAUER& FELD, LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000
Facsimile:  (202) 887-4288
fspillman@akingump.com

**ATTORNEYS FOR INGURAN, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served upon all counsel of record via the Court's CM/ECF system on November 7, 2014.

*/s/ Sarah A. Zylstra*