IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ABS GLOBAL, INC.,

                            Plaintiff,                         OPINION & ORDER

     v.

                                                        14-cv-503-wmc

INGURAN, LLC,

                          Defendant.

---

In the dairy farming industry, cattle producers and dairy farmers frequently employ artificial insemination to impregnate cows and heifers. For obvious reasons, female calves are more valuable to dairy farmers than male calves, creating a market for "sexed bovine semen" -- that is, semen processed so it contains primarily female sperm cells.[1] Defendant Inguran, LLC, is in the business of processing sexed bovine semen. Plaintiff ABS Global, Inc., alleges in this lawsuit that Inguran has established a monopoly in that market through a combination of exclusionary contractual provisions and patent acquisitions in violation of the Sherman Act and state law. More specifically, ABS Global challenges various provisions of its 2012 contract with Inguran (the "Agreement") in preparation for the commercialization of its own semen-sorting technology and its entry into the sexed semen market. Pending before the court are Inguran's motions (1) to dismiss ABS Global's amended complaint in part (dkt. #60)[2] and (2) to transfer this case to the United States

---

[1] The owners of dairy cows and heifers ordinarily prefer female calves, but there is occasional demand for male bovine semen as well.

[2] The motion presently before the court is in fact Inguran's renewed motion to dismiss, based upon ABS Global's first amended complaint. The original motion to dismiss (dkt. #17), which is substantively identical to the present motion, will be denied as moot.

District Court for the Southern District of Texas (dkt. #23).  For the reasons discussed below, the court will deny both motions.[3]


PROCEDURAL BACKGROUND

ABS Global filed this lawsuit on July 14, 2014.  On September 5, 2014, Inguran responded by filing its own lawsuit against ABS Global in the Southern District of Texas (the "Texas Action").  The latter seeks a declaratory judgment that: (1) Inguran has not violated the Sherman Act; (2) Inguran has not committed unfair competition; (3) the Agreement prohibited ABS Global from commercializing its technology; (4) the Agreement did not violate the Texas Covenants Not to Compete Law; and (5) the Agreement's liquidated damages clause was enforceable.  In addition, Inguran brought claims for fraudulent inducement and anticipatory breach/repudiation.  (*See* Nov. 7, 2014 Memo. & Order (dkt. #61-1) 2-3.)

On September 12, 2014, ABS Global moved to transfer the Texas Action to this court, pursuant to 28 U.S.C. § 1404(a) and the Fifth Circuit's "first-to-file" rule.  (*See* Steven J. Horowitz Decl. Ex. 9 (dkt. #44-9) (ABS Global's memorandum in support of transfer).)  Under the first-to-file rule, "the court in which an action is first filed is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed."  *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997).  In the Fifth Circuit, the rule *must* be applied "[i]n the absence of compelling circumstances."  *Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 407 (5th Cir. 1971).

---

[3] Also pending are a motion to intervene, a motion to join, and plaintiff's motion to dismiss Inguran's third-party complaint and counterclaims.  Those motions will be addressed in a separate opinion and order.

On November 7, 2014, the District Court for the Southern District of Texas granted ABS Global's request.  It held that the Texas Action substantially overlapped with the case before this court and that Inguran had not shown that the case before this court was an improper anticipatory action.  Accordingly, the court concluded:

> Hence, whether this case proceeds in Wisconsin or in this Court, or if as a separate action, are questions for the Western District of Wisconsin, not this Court, and this Court is obliged by principles of comity and sound judicial administration to transfer the case to Wisconsin for those determinations.

(Nov. 7, 2014 Memo. & Order (dkt. #61-1) at 7.)

After the Texas Action was transferred to this court, Inguran filed its answer in this lawsuit.  (Dkt. #63.)  At the same time, Inguran asserted counterclaims for fraud in the inducement; repudiation/anticipatory breach of contract; breach of contract, premised on the development and commercialization of the laser-based sorting method; promissory estoppel; and patent infringement, again premised on the laser-based sorting method. Finally, Inguran asserted a claim against third-party defendant Genus plc, the parent company of ABS Global, for inducing ABS Global's infringement.

## FACTS

### I.  Allegations in the Amended Complaint

#### A.  U.S. Marketplace for Sexed Bovine Semen

Artificial insemination of a cow or heifer occurs when it is impregnated with semen obtained from a bull through human intervention.  Artificial insemination is now the predominant method for producing dairy calves in the United States and is also used to a lesser extent to produce beef calves.  Raw bovine ejaculate contains roughly equal

3

proportions of sperm with X and Y chromosomes, meaning that a cow or heifer inseminated with raw ejaculate would be equally likely to give birth to a female or male calf.

Thus, a market has arisen for processing raw bovine ejaculate in the United States to produce sexed bovine semen.  In response to this demand, certain technologies were developed to produce semen in which viable sperm cells are either predominately male or predominately female.  Using those current technologies, the processing of raw ejaculate must be completed within six hours or so of acquisition.  Moreover, the ejaculate must reach the processing facility within about an hour of collection.  As a result, processing outside the United States is not an option for cattle owners whose bulls are more than an hour from the U.S. border.  Transporting the bulls themselves outside the U.S. poses its own set of problems:  it is expensive, commercially unattractive and can actually be prohibited in some circumstances.

Defendant Inguran, LLC, is in the business of processing raw bovine ejaculate in the United States to produce sexed bovine semen.  In fact, it is the *only* U.S. service provider offering those services, its market share in the sexed bovine semen processing market is currently at 100%.  One of its longtime customers is plaintiff ABS Global, a Wisconsin-based company that sells bovine semen produced by its inventory of high-quality bulls. Because many of ABS Global's customers demand sexed bovine semen, and Inguran was the only firm offering to process the raw ejaculate into sexed bovine semen in the United States, ABS Global entered into a contract for Inguran's services.

### B. Alleged Exclusionary Conduct

According to ABS Global, Inguran has engaged in exclusionary conduct by "locking up" all large potential customers to forestall new entry into the sexed bovine semen processing market. Based on its monopoly position, Inguran has all major U.S. sellers of bovine semen as customers and requires those customers to enter into long-term contracts. Typically, the contracts include an "evergreen" provision, making them perpetual unless affirmatively terminated consistent with the contract terms. Required notice of termination is typically several years in advance of the termination date. On at least one occasion, Inguran required its customer to pay a seven-figure penalty merely for having terminated the contract by its terms. The contracts also typically contain (1) large annual minimum purchase quantity requirements; (2) provisions barring customers from processing ejaculate from bulls leased from their competitors; and (3) onerous liquidated damages provisions.

Furthermore, ABS Global alleges, Inguran has bought, licensed or obtained control over third-party U.S. patents in order to maintain its monopoly. As early as May of 2007, Inguran acquired XY, Inc., which owned patents related to the sexed bovine semen process market.[4] XY, Inc. had previously granted non-exclusive licenses of at least some of its patents to at least two licensees, but in the months following the acquisition, Inguran allegedly caused XY, Inc. to terminate all licenses other than the one to itself. Inguran allegedly went on to: (1) purchase controlling interests in other companies that owned patents relating to its monopoly, including Cytonomie/ST LLC; and (2) acquire or exclusively license various U.S. and non-U.S. patents related to the sexed bovine semen

---

4 XY, Inc. was converted from a Colorado corporation to a Delaware limited liability company called XY, LLC at Inguran's direction in 2010.

processing market, even where it does not actually use the technology covered by those patents.

Finally, ABS Global claims that while negotiating its current contract, Inguran was aware that ABS Global had begun conducting significant research and development relating to the production of sexed bovine semen.  During negotiations, therefore, Inguran's co-CEOs, Juan Moreno and Maurice Rosenstein, allegedly tried to force ABS Global to abandon its research by threatening to terminate all dealings with it.  Though the threats ultimately did not come to fruition, Inguran did succeed in imposing what ABS Global calls "severe restrictions" on its ability to engage in research and development.  For example, Section 18(a) of the contract prohibits ABS Global from "directly or indirectly (whether by means of financing or investing in another entity or activities), creat[ing], develop[ing], sell[ing] or market[ing] any method, apparatus, or technology for sorting mammalian semen, . . . where such method, apparatus, or technology is, or is intended to be, directly competitive with (i) [Inguran's] technology for Sorted Semen, or (ii) any sorted semen produced by [Inguran's] technology for Sorting Semen."  (Am. Compl. (dkt. #58) ¶ 85.) While a narrow exception for continuing research exists, the contract also prohibits ABS Global from marketing or selling the results of its research.

Based on all of the foregoing conduct, ABS Global alleges that Inguran has caused substantial harm to competition in the sexed bovine semen processing market.  Specifically, ABS Global alleges that it has suffered antitrust injury as a customer and as a potential entrant into that market and asserts (1) antitrust claims under the Sherman Act, 15 U.S.C. § 2; (2) an unfair competition claim under Wisconsin's common law; and (3) various claims

for declaratory judgment seeking to void or alter certain provisions of its current contract with Inguran.

## II. Additional Facts Relevant to the Motion to Dismiss and Motion to Transfer

### A. Communications Surrounding the September 2012 Agreement

According to Maurice A. Rosenstein, the co-CEO and co-President of Inguran, the parties here have maintained a contractual relationship since the mid-2000s. They entered into their first "Semen Sorting Agreement" on May 30, 2006, with successor agreements executed in September of 2007, October of 2010, July of 2011 and September of 2012. (Aug. 28, 2014 Maurice A. Rosenstein Decl. (dkt. #18) ¶ 4 [hereinafter "1st Rosenstein Decl."].) Negotiations for the September 2012 contract began on March of 2012 and took place in Houston and Navasota, Texas. (Sept. 17, 2014 Maurice A. Rosenstein Decl. (dkt. #25) ¶¶ 3-4 [hereinafter "2d Rosenstein Decl."].) Some of ABS Global's negotiators also participated in the negotiations over the telephone from Wisconsin. (Oct. 8, 2014 Jesus Martinez Decl. (dkt. #43) ¶ 13 [hereinafter "2d Martinez Decl."].)

During the negotiations, Inguran was aware that ABS was conducting research and development activities related to the production of bovine semen. (Sept. 25, 2014 Maurice A. Rosenstein Decl. (dkt. #36) ¶ 3 [hereinafter "3d Rosenstein Decl."].) Inguran claims *not* to have known of ABS Global's specific plans for a laser-based sorting technology, however, as discussed further below. (*Id.*)

After the contract's execution, Rosenstein maintains that ABS Global and Inguran continued their "amicable" relationship. Before ABS Global filed the present lawsuit, according to Rosenstein, it had never raised concerns regarding the contract's scope, enforceability or fairness; nor had it accused Inguran of engaging in anti-competitive

conduct.  (1st Rosenstein Decl. ¶¶ 6-7.)  ABS Global's Business Development Director, Jesus Martinez, maintains, however, that one of ABS Global's negotiators said during a May 30, 2012, discussion that Inguran's proposed restrictions on commercializing a competing technology were "unfair."  (Sept. 19, 2014 Decl. of Jesus Martinez (dkt. #33) ¶ 15 [hereinafter "1st Martinez Decl."].)  Rosenstein further represents generally that Inguran had "done nothing that would have caused ABS to fear being sued or otherwise risk suffering harm."  (1st Rosenstein Decl. ¶ 7.)

### B.  Inguran's Activities

Inguran conducts all of its research and development activities in Navasota, where it also determines and implements strategies for filing, acquiring and licensing patents.  (2d Rosenstein Decl. ¶ 7.)  Inguran's decision to purchase XY, Inc., and the subsequent negotiations leading to that transaction also took place in Navasota, as has its subsequent management of that company.  (*Id.* at ¶ 8.)  Finally, Inguran's communications and negotiations with foreign licensees take place in Navasota.  (*Id.* at ¶ 9.)

Inguran also carries out certain, specific activities in Wisconsin.  For example, under its Agreement with ABS Global, Inguran is required to process semen from ABS Global's bulls at a single facility in DeForest, Wisconsin.  (2d Martinez Decl. ¶ 15.)  Indeed, Inguran provides no services to ABS Global anywhere in Texas.  (*Id.*)

More generally, many of Inguran's customers for sexed semen are located in Wisconsin.  (*Id.* at ¶ 20.)

### C. ABS Global's Plan to Enter the Market

ABS Global is preparing to commercialize a laser-based technology for processing bull semen by sex that would compete with Inguran's technology. (1st Martinez Decl. ¶ 12.) That technology was developed at ABS Global's facilities in the Madison, Wisconsin, area. (2d Martinez Decl. ¶ 16.) According to Martinez, the technology has successfully completed large-scale field trials, and ABS Global is preparing for a commercial launch in the United States. (1st Martinez Decl. ¶ 12.) Based on his interactions with Inguran, as well as Inguran's prior conduct, Martinez expects that Inguran will try to terminate the Agreement and sue ABS Global if it attempts to commercialize the technology at issue. (*See id.* at ¶¶ 13-17.)

Inguran denies engaging in any such threatening conduct. As previously noted, while Inguran knew of ABS Global's general research into bovine semen production, Rosenstein denies knowing of the particular, laser-based technology that ABS Global has been researching. Rosenstein also represents that ABS Global never voiced a concern that Inguran would sue based on the introduction of ABS Global's new laser-based method to sex semen in particular. (3d Rosenstein Decl. ¶ 4.)

According to Rosenstein, the contract terms in the Agreement were intended simply to protect Inguran and its confidential information, not to target ABS Global's new technology. (*Id.* at ¶ 5.) Rosenstein also disputes Martinez's recollection of some of their conversations, denying having any recollection of threatening to sue a third party planning to launch a "competing technology." (*Id.* at ¶ 6.) The parties appear to agree, however, that Rosenstein *did* inform Martinez that a party affiliated with Inguran was "exceeding the limited permission it had received" from subsidiary XY, LLC, to use Inguran's *own*

technology.[5]   (*See* Supp. Jesus Martinez Decl. (dkt. #39-1); Oct. 6, 2014 Maurice A. Rosenstein Decl. (dkt. #41) ¶ 3.)

OPINION

## I.  Motion to Dismiss

### A.  Count Two

Inguran first moves to dismiss Count 2 of the amended complaint, which purports to allege a claim for unfair competition under the common law of Wisconsin.  (*See* Am. Compl. (dkt. #58) ¶¶ 103-06.)  Inguran argues that this count fails to state a claim on which relief can be granted because the parties' Agreement contains a choice of law provision mandating that it be "governed by and construed in accordance with the laws of the State of Texas[.]" (*See id.* at ¶ 108.)  In resolving a motion to dismiss under Rule 12(b)(6), the court views the complaint in the light most favorable to the non-moving party, accepts all of plaintiff's well-pled facts as true and draws all reasonable inferences in plaintiff's favor. *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010).

ABS Global does not dispute that Texas law governs the Agreement itself based on the choice of law provision quoted above.  (*See* Pl.'s Br. Opp'n (dkt. #32) 4.)  Instead, it contends that this provision does *not* govern its tort claim for unfair competition under Wisconsin common law.  Even if it did, ABS Global also argues that merely identifying the wrong source of law does not foreclose the possibility of relief.

---

[5] ABS Global moved for permission to file the supplemental declaration of Jesus Martinez.  (Dkt. #39.)  Inguran opposed that motion.  Because Inguran's opposition included its own additional declaration purporting to correct Martinez's "mischaracterization," the court will grant the motion to file the supplemental declaration and will consider both parties' submissions in resolving the motion to dismiss.

The court need not determine at this stage whether the choice of law provision governs the unfair competition claim.  Since regardless of the answer, the Seventh Circuit has oft held that "plaintiffs in federal courts are not required to plead legal theories." *Hatmaker v. Memorial Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010); *see also, e.g., Currie v. Chhabra,* 728 F.3d 626, 629 (7th Cir. 2013) ("[W]e remind parties again that there is no duty to plead legal theories."); *Alioto v. Town of Lisbon,* 651 F.3d 715, 721 (7th Cir. 2011) ("[W]e have stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned during discovery.").  Here, Inguran points to no deficiency in the *factual allegations* in ABS Global's complaint.  On the contrary, its only objection is to ABS Global's invocation of the law of Wisconsin, rather than Texas.  Of course, the source of law ABS Global invokes is irrelevant, "so long as it provided adequate notice of the plaintiff's claim to the defendant[]." *Currie*, 728 F.3d at 629.  This much ABS Global's complaint clearly does, since Inguran moves to dismiss the claim not because of a lack of clarity as to the nature of the unfair competition, but rather uncertainty as to which state's law will govern that claim.

Inguran briefly argues that the general rule against requiring parties to plead legal theories applies only when "the error is corrected . . . and the defendant is not harmed by the delay in correction." *Hatmaker*, 619 F.3d at 743.  The tacit claim inherent in this argument, that Inguran has been "harmed" by ABS Global's invocation of Wisconsin law, however, is equally unpersuasive.  As an initial matter, while Inguran baldly asserts that "the law of unfair competition is different in Wisconsin and Texas," it offers *no* concrete

examples of how the law differs.[6]  Moreover, the only "harm" that Inguran asserts is a lack of fair notice as to whether it should prepare its defense with reference to Wisconsin or Texas law.

This latter assertion borders on the absurd.  ABS Global's complaint asserts that Wisconsin law applies.  That Inguran disagrees with ABS Global on the proper choice of law raises a question of contract law, not pleading standards, and a decidedly ordinary one at that.  Assuming there is any material difference between the two state's laws, Inguran can either argue at summary judgment that Texas law applies according to choice of law principles, as it now confidently asserts, or prepare to defend on both fronts, recognizing that it is not yet clear whether the choice of law provision applies to ABS Global's unfair competition claim.  Any "harm" arising from the latter uncertainty is part and parcel of litigation involving contract and common law.  It does not require ABS Global to replead.

## B. Counts Three through Five

Counts Three through Five of the amended complaint seek declarations pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), that various provisions of the Agreement are unenforceable or inapplicable to the laser-based sorting method ABS Global seeks to commercialize.  Inguran contends that this court lacks subject matter jurisdiction over those counts because there is no justiciable "case or controversy" between the parties.  "Where the defendant raises factual questions concerning jurisdiction, the court need not accept the allegations of the complaint as true; the court may look behind the complaint and view the evidence to determine whether a controversy in fact exists."  *Int'l Harvester Co.*

---

[6] The footnote in Inguran's brief reviews Texas law of unfair competition, but points to nothing suggesting the standards discussed are materially different from those in Wisconsin.

*v. Deere & Co.*, 623 F.2d 1207, 1210 (7th Cir. 1980). "The plaintiff has the burden of supporting the jurisdictional allegations of the complaint by competent proof." *Id.*

As the Supreme Court has recognized, case law has not drawn "the brightest of lines between those declaratory-judgment actions that satisfy the case-or-controversy requirement and those that do not." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). Generally, the Court has "required that the dispute be 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Id.* (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)). At the same time, a plaintiff need not expose itself to liability to create a justiciable controversy. *See id.* at 137 (plaintiff not constitutionally required to breach or terminate license agreement before seeking a declaratory judgment that the underlying patent was invalid, unenforceable or not infringed). The essential question is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

Applying these principles, the court agrees with ABS Global that its declaratory judgment claims present an Article III case or controversy sufficient to establish subject matter jurisdiction. ABS Global has presented sworn testimony that it has developed and field-tested a technology it now wishes to commercialize.[7] ABS Global believes that the

---

[7] Inguran contends that the development and testing of the technology cannot give rise to a justiciable controversy because the Agreement expressly *permitted* ABS Global to engage in those

technology falls outside the terms of the contract but wishes to avoid the real potential for liability that the Agreement expressly imposes should it be proved wrong, including liquidated damages of $1.5 million plus $7.50 per unpurchased straw of sexed bovine semen that remains under the minimum purchase requirements of the Agreement as of the termination date.  In this way, the present case fits easily into what the Seventh Circuit described as the "usual declaratory judgment pattern," one "under which the 'natural' defendant wants to proceed with a business opportunity – *e.g.*, the production of widgets – but it is impeded because of a lack of clarity as to its legal rights, fearing something like a possible patent infringement suit."  *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 711 (7th Cir. 2002); *see also Cnty. Materials Corp. v. Allan Block Corp.*, 431 F. Supp. 2d 937, 945 (W.D. Wis. 2006) ("[A] declaratory judgment action is proper when a declaration of rights is a bona fide necessity for the natural defendant/declaratory judgment plaintiff to carry on with its business.").

Even if this were not enough, ABS Global has amply documented Inguran's litigious history through its wholly-owned subsidiary XY, LLC, including against parties with whom it has an existing or had a previous contractual relationship.  (*See, e.g.*, Steven J. Horowitz Decl. Exs. B, C (dkt. #34-2, #34-3) (complaints in patent infringement cases filed by XY, LLC against licensee and former employee, respectively).)  At minimum, this makes ABS Global's apprehension of suit more plausible.  *See Norfolk S. Ry. Co. v. Guthrie*, 233 F.3d 532, 535 (7th Cir. 2000). While those cases admittedly involved intellectual property rights

---

actions.  This argument appears to assume – erroneously -- that Inguran must breach the Agreement before an Article III controversy arises.  As mentioned above, the Supreme Court has already rejected that view.  *See MedImmune*, 549 U.S. at 137.  If anything, ABS Global's actions thus far show that ABS Global has done what it can without exposing itself to the potential for liability and must now obtain a declaration of its rights before it can go any further.

rather than service agreements, that distinction does not undermine the probative value of Inguran's litigious behavior.   Indeed, given Inguran's understandable interest in legally protecting its market position, whether by asserting patent or contractual rights, any meaningful distinction is largely blurred on the alleged facts here.   Whether Inguran's actions are legal or not, ABS Global contends here that Inguran behaves litigiously whenever its *monopoly* is threatened -- an allegation supported not only by Inguran's patent lawsuits, but also by ABS Global's allegations that Inguran negotiated to restrict its ability to perform research and commercialize the results.[8]   (*See* 1st Martinez Decl. ¶ 15.)   Viewing this history in combination with ABS Global's preparations to enter the market, the court is persuaded that an Article III case or controversy existed at the time ABS Global filed this lawsuit.

Additional support for this conclusion is found in *MedImmune*, a relatively recent Supreme Court case addressing Article III justiciability in declaratory judgment actions brought against private parties.   In *MedImmune*, the plaintiff entered into a patent license agreement with defendant Genentech, requiring it to pay royalties on products covered by Genentech's patents, including an application that later matured into the "Cabilly II" patent.   Upon its issuance, Genentech wrote to MedImmune to advise that one of MedImmune's drugs was covered by the Cabilly II patent and express "its expectation that petitioner would pay royalties beginning March 1, 2002."   *MedImmune*, 549 U.S. at 121.   MedImmune believed the Cabilly II patent was invalid and that its drug did not infringe

---

[8] Inguran contends that the terms in question were intended simply to protect its confidential information, not to preserve a purported monopoly.   Even assuming this is true, those contractual protections evince Inguran's desire to prevent ABS Global's entry into the sexed bovine semen market, or so ABS Global might reasonably believe.

even if the patent *was* valid, but it paid the demanded royalties under protest, unwilling to risk the possibility of treble damages, attorney's fees and an injunction.   *Id.* at 122. MedImmune then sued for a declaratory judgment that it did not owe royalties under the license agreement, which the Supreme Court interpreted as a claim seeking an interpretation of its contractual obligations.  *See id.* at 123-25.

The Supreme Court held that there existed a live "case or controversy" within the meaning of Article III, and that MedImmune was "not required, insofar as Article III is concerned, to break or terminate its 1997 license agreement before seeking a declaratory judgment in federal court that the underlying patent is invalid, unenforceable, or not infringed."  *Id.* at 137.  While the Supreme Court acknowledged that its own jurisprudence is somewhat sparse on the application of the Declaratory Judgment Act to situations in which a plaintiff self-avoids imminent injury due to threatened enforcement from a private party, it noted that "[l]ower federal courts . . . have long accepted jurisdiction in such cases."  *Id.* at 130. The Court went on to reject its earlier decision in *Willing v. Chicago Auditorium Association*, 277 U.S. 274 (1928), which had held there was no case or controversy where a lessee wanted to demolish an antiquated auditorium, believed it could do so without the lessors' consent, but "was unwilling to drop the wrecking ball first and test its belief later."  *MedImmune*, 549 U.S. at 133.

In particular, the Court stated, "Had *Willing* been decided after the enactment (and our upholding) of the Declaratory Judgment Act, and had the legal disagreement between the parties been as lively as this one, we are confident a different result would have [been] obtained."  *Id.* at 133-34.  "The rule that a plaintiff must destroy a large building, bet the farm, or (as here) risk treble damages and the loss of 80 percent of its business before

16

seeking a declaration of its actively contested legal rights finds no support in Article III." *Id.* at 134. Likewise here. ABS Global need not risk breaching its contract with the only supplier of sexed bovine semen in the United States (and incur significant financial penalties under the terms of that contract) before seeking a declaration that it may launch its competing technology. Admittedly, this case differs from *MedImmune* in one significant way that Inguran seeks to exploit. Unlike the defendant in *MedImmune*, who knew of the plaintiff's drug and unequivocally expressed its expectation of royalty payments, Inguran has repeatedly professed its ignorance of ABS Global's new laser-sorting technology. This has prevented Inguran from making the sort of direct threat that was present in *MedImmune,* at least as regards the laser-sorting technology at issue here. Nevertheless, in light of all the facts and circumstances present on this record, the court concludes that "it would be unfair or inefficient to require the parties to wait for a decision" at this point. *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 749 (7th Cir. 1987).

ABS Global is prepared to launch a new technology that may violate the stringent non-compete terms of the Agreement and could expose ABS Global to more than $1.5 million in damages. Inguran has previously engaged in activity rendering ABS Global's fear of suit reasonable. Accordingly, the court concludes that the controversy between the parties is "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[9] *MedImmune*, 549 U.S. at 137. It will, therefore, deny Inguran's motion to dismiss.[10]

---

[9] As discussed in the Procedural Background section above, Inguran has now filed for declaratory judgment against ABS Global, seeking declarations of enforceability with respect to the very provisions that ABS Global seeks to invalidate. (*See* Steven J. Horowitz Decl. Ex. A (dkt. #34-1).) That fact renders Inguran's claim of no justiciable case or controversy "somewhat academic, even

## II. Motion to Transfer

Inguran has also moved to transfer this case to the Southern District of Texas. At the outset, the court notes that the Texas court's decision to transfer the parallel litigation here does not render the motion to transfer moot. Rather, the Texas court's action simply contemplates that this court address whether the parties' dispute should proceed "in Wisconsin or in this Court, or if as a separate action." (Nov. 7, 2014 Memo. & Order (dkt. #61-1) at 7.) Thus, as Inguran accurately points out, "the district court in Texas did *not* rule that this case should be transferred to this Court on the merits[.]" (Status Report (dkt. #62) 1 (emphasis in original).) Accordingly, the question remains whether the *merits* of this case are better litigated here or in the Southern District of Texas.

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). As the moving party, however, Inguran "has the burden of establishing, by reference to particular circumstances, that the transferee forum is clearly more convenient." *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219-20 (7th Cir. 1986). ABS Global does not appear to dispute that venue is proper in this district *and* in the Southern District of Texas. Rather, it contends Inguran has not met its burden to show that the latter district is *clearly* more convenient.

---

though it remains true that later events cannot control the propriety of the district court's jurisdiction[.]" *Coco*, 302 F.3d at 712. Most likely, Inguran's continued insistence on this point is intended to support its motion to transfer by turning the Texas Action into the "first-filed" action with respect to these claims.

[10] Almost two months after the briefing on the motion to dismiss was complete, ABS Global moved for leave to file a supplemental brief related to that motion. (Dkt. #78.) The court has denied the motion to dismiss without the benefit of that additional briefing, and so ABS Global's motion will be denied as moot.

In resolving a motion to transfer, "[t]he statutory language guides the court's evaluation of the particular circumstances of each case and is broad enough to allow the court to take into account all factors relevant to convenience and/or the interests of justice." *Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010). With respect to convenience, courts may consider the availability of and access to witnesses; each party's access to and distance from resources; the location of material events; and the relative ease of access to sources of proof. *Id.* With respect to the interests of justice, courts look to factors like docket congestion; likely speed to trial; each court's relative familiarity with the relevant law; the desirability of resolving controversies in each locale; and the relationship of each community to the controversy. *Id.* Additionally, unless the balance of these factors is "strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed," *In re Nat'l Presto Indus., Inc.*, 347 F.3d 662, 664 (7th Cir. 2003) (citation and quotation marks omitted), although this factor alone is not dispositive and is given less weight "if the chosen forum has relatively weak connections with the operative facts giving rise to the claim." *Von Holdt v. Husky Injection Molding Sys., Ltd.*, 887 F. Supp. 185, 188 (N.D. Ill. 1995).

Notably, Inguran focuses primarily on just three of the various factors that govern resolution of a motion to transfer: the situs of material events, the applicable law, and the existence of parallel litigation. The third factor has fallen out due to the decision of the Texas court to transfer that litigation here under the first-filed rule, and so the court reviews the arguments that Inguran has made on the first two factors to determine whether it has met its burden.

### A. Situs of Material Events

Inguran argues unconvincingly that ABS Global's claims center on *Inguran's* business activities and the actions of its management.  Certainly, Inguran negotiated its contracts with ABS Global from Texas, develops and implements patent acquisition strategies from Texas, and manages XY, LLC, from Texas.  Some of the negotiations for the Agreement at issue took place while representatives of ABS Global were present in Texas as well, although apparently some of ABS Global's negotiators participated from Wisconsin via phone. Because the challenged *conduct* in entering into the Agreement has a stronger connection to Texas, Inguran contends, this factor weighs in favor of transfer.

In contrast, ABS Global argues that the material events actually took place in Wisconsin insofar as the *effects* of the challenged conduct have occurred here.  For example, the allegedly anti-competitive Agreement has been performed by both parties in Wisconsin, and the technology ABS Global seeks to commercialize was developed and is now being practiced in Wisconsin.  Finally, the injury ABS Global has suffered so far (being foreclosed from entering into the market for sexed bovine semen) took place in Wisconsin.

Inguran asks the court to disregard these effects, contending that what really matters is the location of its own allegedly anti-competitive conduct.  The two cases Inguran cite for this proposition, however, provide scant support, if any.  In *JM Computer Services, Inc. v. Schlumberger Technologies, Inc.*, 886 F. Supp. 358 (S.D.N.Y. 1995), the court focused on the location of the defendant's personnel, the plaintiff's witnesses and the principal documents relevant to the case -- not on the location of the anti-competitive practices.  *Id.* at 359. Similarly, in *FTC v. Cephalon, Inc.*, 551 F. Supp. 2d 21 (D.D.C. 2008), the court focused on the risk of inconsistent judgments, the transferee court's familiarity with the governing law

and the congestion of the transferor and transferee courts. *Id.* at 32. Furthermore, at least one district court has held the location of the injury, not the conduct precipitating injury, is more important in assessing a motion to transfer an antitrust case. *See Z-Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.*, 331 F. Supp. 2d 567, 577-78 (E.D. Tex. 2004) (rejecting defendant's argument that the alleged wrong occurred in the place where "the policy and decisions directly responsible for the anticompetitive conduct at issue [were] coordinated" and focusing on location of conduct's effects).

In any event, Inguran has not demonstrated that the court should *disregard* the location of performance under the Agreement or the location of the injury that ABS Global has allegedly suffered. With respect to the latter, in particular, it makes sense that the location of the injury be considered, since it may have a direct impact on potential witnesses in this district. In addition to ABS Global, the alleged antitrust violations would affect a number of Inguran's own customers in Wisconsin, which weighs in *favor* of venue remaining here (particularly since Inguran points to no comparable customers in Texas). *Cf. Kay v. Nat'l City Mortg. Co.*, 494 F. Supp. 2d 845, 857 (S.D. Ohio 2007) ("Defendant's actions giving rise to this litigation affected a number [of] other people who obtained mortgages. Since all of these individuals reside in South Carolina, the Court concludes that this factor weighs heavily in favor of transfer[.]"). While Inguran's own conduct took place primarily in Texas, then, some material events have occurred in Wisconsin as well, making this factor a wash at best.

21

## B. Familiarity with Applicable Law

Inguran next points out that ABS Global's claims depend in large part on Texas law, suggesting that courts in that state are better equipped to handle those claims. There is no reason that a Texas court would be more familiar with the Sherman Act, which not only forms the basis of this court's federal question jurisdiction, but seems to be the principal claim here. *See, e.g.*, *Lewis v. Grote Indus., Inc.*, 841 F. Supp. 2d 1049, 1055 & n.2 (N.D. Ill. 2012) ("[M]ost courts have frowned on the suggestion that the judges of one district are more capable or experienced in a particular area than are judges of another district."; collecting cases); *Wilson v. DirectBuy, Inc.*, 821 F. Supp. 2d 510, 519 (D. Conn. 2011) ("Federal courts are presumed to be equally familiar with federal law.").

Inguran is correct that Texas federal courts are better equipped to deal with the contract-based claims, which rely on Texas common law and the Texas Covenants Not to Compete Act by the terms of the amended complaint. *See Schwarz v. Nat'l Van Lines, Inc.*, 317 F. Supp. 2d 829, 837 (N.D. Ill. 2004) ("Certainly, the Northern District of Illinois is more familiar with Illinois law, which governs five of eight counts in the complaint, than the District of Arizona."). On the other hand, ABS Global alleges a claim for unfair competition under the common law of Wisconsin, even if Inguran contends that Texas law actually governs per the terms of the Agreement. Overall, three of the five claims appear to depend on Texas law and a fourth will implicate Texas law, even if Wisconsin law ultimately applies. The court concludes that this factor weighs slightly in favor of transfer.

## C. Inguran's Burden

Notwithstanding greater familiarity with Texas law and the situs of material events, which at most cancel each other out in the court's view, Inguran acknowledges that most of

the other venue factors "are relatively balanced."  To a certain extent, the court agrees.

Neither party has "established that the other forum would pose an overwhelming hardship

for the parties themselves." *Research Automation*, 626 F.3d at 978.  The convenience of

employee witnesses is also split, with Inguran's witnesses located primarily in Texas and

ABS Global's primarily in Wisconsin, and § 1404(a) does not require transfer where

convenience for the moving party is gained only at the expense of the convenience of the

non-moving party.  *See Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1293

(7th Cir. 1989).  Finally, neither party argues that the location of sources of proof has any

bearing on which forum is more convenient.

On the other hand, a few factors weigh in favor of *Wisconsin* as a forum.  For

example, in the time since filing, the parties have had a chance to begin discovery and move

this case along the path to trial, with a trial date set for January of 2016, suggesting that this

court is likely to resolve the case sooner than would a transferee court required to start from

scratch.  Additionally, Inguran has identified two non-party witnesses located in Wisconsin

(although most of the non-party witnesses are apparently not located within subpoena range

of *either* forum), which weighs, if only marginally, in favor of Wisconsin as a forum.  As

discussed above, Wisconsin also has an interest in this litigation born of its interest in

protecting its residents.

In the end, Inguran's showing is not particularly compelling.  To be fair, neither is

ABS Global's showing, at least when it comes to inconvenience.  "Where the balance of

convenience is a close call, merely shifting inconvenience from one party to another is not a

sufficient basis for transfer." *Research Automation*, 626 F.3d at 978.  Given that it was

Inguran's burden as the movant to show that Texas is *clearly* more convenient in order to

overcome the strong presumption in favor of ABS Global's original choice of forum, this is not a close case, and Inguran's motion to transfer this litigation to Texas must be denied.

## ORDER

IT IS ORDERED that:

1) Defendant Inguran, LLC's partial motion to dismiss the original complaint (dkt. #17) is DENIED as moot;

2) Defendant's partial motion to dismiss the amended complaint (dkt. #60) is DENIED;

3) Defendant's motion to transfer (dkt. #23) is DENIED;

4) Plaintiff ABS Global's motion for leave to file the supplemental declaration of Jesus Martinez (dkt. #39) is GRANTED; and

5) Plaintiff's motion to file a supplemental brief regarding the motion to transfer (dkt. #64) is GRANTED.

6) Plaintiff's motion to file a supplemental brief relating to Inguran's motion to dismiss (dkt. #78) is DENIED as moot.

Entered this 31st day of March, 2015.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

24