IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ABS GLOBAL, INC.,

                    Plaintiff,                  OPINION & ORDER

     v.                                 14-cv-503-wmc

INGURAN, LLC,

                    Defendant,

     v.

GENUS PLC,

                    Counterclaim Defendant.[1]

---

In this civil action, defendant Inguran, LLC, is alleged to have used its monopoly power to engage in anticompetitive conduct, keeping others, including plaintiff ABS Global, Inc., out of the market for processing "sexed bovine semen" in violation of U.S. and Wisconsin antitrust laws. One of its allegedly anticompetitive practices is acquisition of exclusive rights in dozens of third-party patents related to the sexed semen-processing market in order to prevent competitors from using those technologies to enter the market. ABS Global seeks various forms of relief, including a permanent injunction that would require Inguran to license patents owned by Inguran's subsidiary, XY, LLC, to ABS Global on reasonable terms and conditions. Unsurprisingly, XY has filed a motion to intervene to defend its interest in those patents. (Dkt. #65.) Also pending is Inguran's motion to join ABS Global's parent company, Genus plc (dkt. #86), as well as two motions to dismiss

---

[1] Based on the outcome of the motions pending before the court, the caption should reflect Genus plc as a counterclaim defendant, not a third-party defendant. The clerk is directed to update the caption accordingly.

Inguran's counterclaims (dkt. ##79, 81). The court will address each of these motions in this opinion.

## I.  XY's Motion to Intervene

XY moves to intervene as of right, and alternatively by permission, as a party defendant and counterclaim plaintiff. Under Rule 24(a)(2), a court *must* permit intervention when: "(1) the application is timely; (2) the applicant has an 'interest' in the property or transaction which is the subject of the action; (3) disposition of the action as a practical matter may impede or impair the applicant's ability to protect that interest; and (4) no existing party adequately represents the applicant's interest." *Sec. Ins. Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377, 1380 (7th Cir. 1995). Alternatively, a court may in its discretion permit an applicant to intervene under Rule 24(b) when the motion is timely and the applicant "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B).[2]

### A.  Facts

XY, LLC ("XY") is a Delaware limited liability company with its principal place of business in Navasota, Texas. Since the mid-1990s, XY has researched, developed and commercialized technologies for sex selection of non-human mammals, including specialized machines that can produce sex-selected sperm samples and methods for handling sperm cells and freezing them for later use to create in vitro or in vivo fertilized embryos.

Throughout its history, XY has licensed its intellectual property to a number of other companies. Those licensees use XY's intellectual property to create and commercialize

---

[2] After receiving ABS Global's response, XY filed a motion to file a short reply brief on its motion to intervene (dkt. #75). That motion will be granted, and the court will consider its reply.

sperm cell samples with a high likelihood of producing offspring of the chosen sex.  For over a decade, Inguran has also held a non-exclusive license to XY's intellectual property under which it sells sex-selection services and sex-selected semen to companies like ABS Global.

In 2007, Inguran, a long-standing minority shareholder in XY, acquired all of XY's shares.  According to XY, however, the acquisition did not change the "fundamentally distinct nature of XY's and Inguran's businesses[:] XY owns and licenses out its intellectual property, while Inguran uses that intellectual property to offer sex-selected goods and services."  (Mot. Intervene (dkt. #65) 2-3.)  ABS Global vehemently disputes this characterization of Inguran and XY's business arrangement, stating throughout its brief that Inguran wholly controls XY and can direct it to take any action Inguran wishes with respect to its various patents.  The parties also dispute whether Inguran is currently the sole licensee of XY's patents.  *See* discussion *infra* note 3.

## B. Intervention as of Right

### i. Timeliness

"The purpose of the [timeliness] requirement is to prevent a tardy intervenor from derailing a lawsuit within sight of the terminal."  *Reid L. v. Ill. State Bd. of Educ.*, 289 F.3d 1009, 1018 (7th Cir. 2002) (quoting *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 949 (7th Cir. 2000)).  In determining whether a motion to intervene is timely, courts consider "(1) the length of time the intervenor knew or should have known of her interest in the case, (2) the prejudice caused to the original parties by the delay, (3) the prejudice to the intervenor if the motion is denied, and (4) any other unusual circumstances."  *Id.* (citing *Ragsdale v. Turnock*, 941 F.2d 501, 504 (7th Cir. 1991)).  Given the fact that XY is Inguran's wholly-owned subsidiary, XY has almost certainly known of its interest in this litigation

3

since the case was filed in July of 2014. This would mean XY delayed about four months before seeking to intervene. Whether or not this would be timely under other circumstances, XY's proposed intervention would not appear to prejudice ABS Global in any way. Indeed, ABS Global does not even attempt to argue that it *would* be prejudiced. Given that this case is still in its relatively early stages, with dispositive motions months away and discovery ongoing until November 20, 2015, and given the likelihood that XY's discovery and motion practice will run largely parallel to Inguran's, the court concludes XY's motion to intervene is timely.

### ii.    Interest in the Property or Transaction

Intervention as of right "requires a 'direct, significant[,] and legally protectable' interest in the question at issue in the lawsuit." *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 658 (7th Cir. 2013) (quoting *Keith v. Daley*, 764 F.2d 1265, 1268 (7th Cir. 1985) (alteration in original)). The interest must be "based on a right that belongs to the proposed intervenor rather than to an existing party in the suit" and "must be so direct that the applicant would have 'a right to maintain a claim for the relief sought.'" *Keith*, 764 F.2d at 1268 (quoting *Heyman v. Exch. Nat'l Bank of Chi.*, 615 F.2d 1190, 1193 (7th Cir. 1980)). The interest must also be "unique to the proposed intervenor." *Wis. Educ. Ass'n Council*, 705 F.3d at 658.

ABS Global contends that XY lacks the kind of interest contemplated by Rule 24, characterizing this case as involving only one issue: whether Inguran violated antitrust laws by engaging in unlawful monopolization. The court agrees with XY, however, that this is a considerable oversimplification. A not-insignificant portion of the unlawful conduct ABS

Global challenges involves the patents that XY now owns.  (*See* Am. Compl. (dkt. #58) ¶¶ 73-81.)  Thus, contrary to ABS Global's arguments, it *has* alleged that XY "engaged in . . . conduct that violates the antitrust laws" by acquiring and refusing to license patents relating to the sexed semen processing market to Inguran's competitors, thus preventing or dissuading others from entering that market.  (Pl.'s Br. Opp'n Mot. Intervene (dkt. #72) 3.)  XY, therefore, appears to have its own "defense to assert against" ABS Global's claims of exclusionary conduct, *Kamerman v. Steinberg*, 681 F. Supp. 206, 211 (S.D.N.Y. 1988), at least as regards the alleged "scheme of repeatedly acquiring, exclusively licensing, or otherwise controlling third parties' patents relating to its monopoly."  (Am. Compl. (dkt. #58) ¶ 99.)

In response, ABS Global double downs on its position that XY is wholly under the control of Inguran.  That is, in ABS Global's view, *Inguran* is not only the moving force behind XY's allegedly unlawful conduct, but the only entity that could be held liable for the allegedly illegal patent-acquisition "scheme."  (Pl.'s Br. Opp'n Mot. Intervene (dkt. #72) 4 ("After buying XY, [Inguran] directed XY to cancel the existing licenses to other U.S. licensees, and [Inguran] will not permit XY to license a new potential competitor now."); *see also id.* at 6-7 (arguing that XY is "wholly-owned *and controlled*" by Inguran (emphasis added).)  But there is no evidence in the record presently before the court to support a finding that Inguran controls XY to such an extent that it can be held liable for its subsidiary's conduct, and so the court declines to disregard the separateness of XY's corporate form, at least for the purpose of determining whether XY has a sufficient interest in this litigation to intervene as of right.

Even more persuasive, XY rightly points out that as relief, ABS Global expressly requests that "[t]he Court grant permanent injunctive relief requiring [Inguran] to license to ABS, on reasonable terms and conditions, any and all U.S. patents relating to Sexed Bovine Semen."  (Am. Compl. (dkt. #58) 30, ¶ J.)  XY undoubtedly has an intellectual property interest in its own patents, and the parties appear to agree that this interest belongs solely to XY, not to its parent company.  Indeed, one of ABS Global's arguments *against* allowing XY to intervene is that XY should not be permitted to "transform" this litigation by asserting patent infringement counterclaims, presumably meaning that in ABS Global's view, Inguran cannot assert these claims itself.[3]  (*See* Pl.'s Br. Opp'n Mot. Intervene (dkt. #72) 5.)

Assuming that the parties are correct that *only* XY has a protectable property interest in the patents, XY *also* has a "unique" interest in defending them from the injunctive relief that ABS Global seeks, or at a minimum, in asserting its own position as to what constitutes "reasonable terms and conditions" for any court-ordered compulsory licenses.  Accordingly, the court concludes that XY also has a direct, significant and legally protectable interest in this litigation.

---

[3] It is not clear if ABS Global's position is correct.  Both a patent's owner *and* an "exclusive licensee can have constitutional standing to bring an infringement suit[.]"  *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1317 (Fed. Cir. 2010) (quoting *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367 (Fed. Cir. 2008)).  At least according to ABS Global, Inguran is the only licensee of XY's U.S. patents, having forced XY to terminate previously-granted licenses to other companies sometime after May of 2007.  (Am. Compl. (dkt. #58) ¶¶ 74-75.)  Admittedly, it is not enough to be the sole licensee; Inguran must also have the "right to exclude others" from practicing the patents.  *Spine Solutions*, 620 F.3d at 1317 (quoting *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1553 (Fed. Cir. 1995) (en banc)).  Crediting ABS Global's allegations, this would appear to be the case. On the other hand, XY argues in its reply that Inguran is actually a *non*-exclusive licensee. (XY's Reply (dkt. #75-1) 4.)  Since neither party has raised the possibility of Inguran bringing the infringement claims on its own behalf, however, the court will not address that possibility further at this time.

### iii.    Interests May Be Impaired

The third question is whether XY's ability to protect its interests may be impaired by the disposition of this action.  "Impairment exists when the decision of a legal question . . . would, as a practical matter, foreclose the rights of the proposed intervenor in a subsequent proceeding."  *Shea v. Angulo*, 19 F.3d 343, 347 (7th Cir. 1994) (alteration in original).  ABS Global does not raise a separate challenge to this factor, and the court agrees that XY's interests could be impaired in this proceeding.  Specifically, XY may be found liable for antitrust violations based on its business operations without ever having a chance to defend those operations.   Alternatively, XY may find itself ordered to license its intellectual property to ABS Global without having the chance to argue, at least directly, against that course of action or provide evidence as to what would constitute reasonable terms and conditions for such licenses.  *See United States v. Glaxo Grp. Ltd.*, 410 U.S. 52, 64 (1973) ("Mandatory selling on specified terms and compulsory patent licensing at reasonable charges are recognized antitrust remedies.").   Accordingly, XY has established the third factor for intervention as of right.

### iv.    No Existing Party Adequately Protecting Those Interests

XY's main obstacle to establish intervention as of right is the fourth step of the inquiry: whether an existing party adequately protects its interests.  While intervention "requires only a 'minimal' showing of inadequate representation," *Wis. Educ. Ass'n Council*, 705 F.3d at 659 (citing *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)), "[w]here a prospective intervenor has the same goal as the party to a suit, there is a presumption that the representation in the suit is adequate." *Shea*, 19 F.3d at 347.  "The

prospective intervenor then must rebut that presumption and show that some conflict exists." *Wis. Educ. Ass'n Council*, 705 F.3d at 659.

Here, XY and Inguran share essentially the same goal -- defending their business arrangement against ABS Global's antitrust claims, including the challenged acquisition and non-licensing of patents related to sorted semen.  Indeed, should Inguran prevail, XY's interests are also vindicated, and its patents remain unaffected.  This conclusion is further strengthened by the fact that Inguran and XY are represented by the same counsel, strongly suggesting that there is no real (or even foreseeable) conflict of interests between Inguran and its wholly-owned subsidiary XY.  *See, e.g.*, *Southmark Corp. v. Cagan*, 950 F.2d 416, 419 (7th Cir. 1991) ("Here petitioner's interests in defeating foreclosure are adequately represented by the receiver, who has the same interests and who is represented by petitioner's own counsel."); *Clorox Co. v. S.C. Johnson & Son, Inc.*, 627 F. Supp. 2d 954, 962 (E.D. Wis. 2009) (noting that the parties "share[] the same counsel" in denying motion to intervene); *Carroll v. Am. Fed. of Musicians of U.S. & Can.*, 33 F.R.D. 353, 353 (S.D.N.Y. 1963) ("Inadequate representation can hardly be claimed as the same attorney represents both the original plaintiffs and the proposed intervenors.").

XY posits a few weak examples of possible conflict, but none is persuasive.  For instance, XY contends that as a corporate entity separate from its parent Inguran, XY has license-related information to which Inguran lacks access.  This strikes the court as disingenuous, given that XY does not explain why, as a wholly-owned subsidiary, it could not simply provide that information to its parent company.[4]  XY also argues that a conflict

---

[4] Perhaps XY has entered into a confidentiality agreement with a third party that prevents such disclosure, but XY offers *no* evidence of that.

of interest could arise if Inguran, as XY's licensee, must litigate the question of which patents should be licensed to ABS Global as part of its requested relief and under what terms.  This vague prediction of a potential conflict, however, is not enough to overcome the presumption of adequate representation.   Indeed, XY offers *no* reason why its parent company's wishes might diverge from its own in terms of negotiating a favorable licensing arrangement.  Accordingly, the court cannot conclude on this record that XY's interests will not be adequately represented by its parent company.  XY's failure to meet its burden on this point requires that court deny its request to intervene as of right.  *See Vollmer v. Publishers Clearing House*, 248 F.3d 698, 705 (7th Cir. 2001) (noting that "the lack of one element requires that the motion to intervene be denied").

## C. Permissive Intervention

XY has better luck with its motion for permissive intervention, however. "[P]ermissive intervention may be allowed 'when an applicant's claim or defense and the main action have a question of law or fact in common.'"  *Schipporeit*, 69 F.3d at 1381 (quoting Fed. R. Civ. P. 24(b)(2)).  Before a court may grant intervention under Rule 24(b)(2), the proposed intervenor must demonstrate only that "there is (1) a common question of law or fact, and (2) independent jurisdiction."  *Id.*  Beyond those two requirements, permissive intervention is entrusted to the discretion of the district court, although in exercising that discretion courts are instructed to consider "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."  *Id.* (quoting Fed. R. Civ. P. 24(b)(2)).

There is no question that this court has independent jurisdiction over XY's proposed patent infringement counterclaims.  *See* 28 U.S.C. § 1338(a) ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents[.]").  Additionally, XY's defense to the antitrust claims against it shares common questions with Inguran's defense overall.  As XY points out, ABS Global claims that Inguran has unlawfully stifled competition in part *through* XY, which has carried out the accused patent acquisition and U.S. licensing practices.

Furthermore, Inguran has already brought a patent infringement counterclaim of its own.  (*See* Counterclaims (dkt. #63) ¶¶ 231-240.)  As such, this lawsuit now necessarily involves inquiry into the details of ABS Global's laser-based sorting technology, as will XY's proposed patent infringement counterclaims, which are premised on that same technology.  Additionally, both sides' claims in this lawsuit will require at least *some* inquiry into the details of XY's patents, given the factual development required in crafting a patent-related antitrust remedy.  *See generally* Lawrence Schlam, *Compulsory Royalty-Free Licensing as an Antitrust Remedy for Patent Fraud: Law, Policy and the Patent-Antitrust Interface Revisited*, 7 Cornell J.L. Pub. Pol'y 467, 487-92 (1998).  There will, therefore, be common questions of fact and law that arise between the antitrust action as currently pled and XY's proposed defenses and counterclaims.

ABS Global argues that allowing XY to intervene will serve only to complicate and delay this case.  But again, ABS Global itself has put XY's patents at issue by challenging its acquisition and management of those patents and seeking compulsory licenses in order to clear the way for ABS Global to commercialize its own technology.  While this lawsuit will admittedly become somewhat more complex by virtue of including additional patents and

patent claims, it would be inefficient to require the parties to litigate patent infringement claims that are all premised on ABS Global's allegedly infringing laser-based sorting technology in two separate lawsuits.  There is also the potential for inconsistent results between cases should the court refuse to permit intervention.  For example, the questions of validity and infringement of XY's patents could arise in this lawsuit (in the context of the compulsory license inquiry), as well as in any separate lawsuit XY brings.  Accordingly, the court will grant XY's motion for permissive intervention, subject to XY causing no delay in the prosecution of this case.

## II. Joinder of Genus plc

Inguran initially sought to add Genus as a third-party defendant under Federal Rule of Civil Procedure 14, submitting a third-party complaint concurrently with its answer and counterclaims against ABS Global.  (*See* dkt. #63.)  Against Genus specifically, Inguran asserted claims for fraudulent inducement, breach of contract, promissory estoppel, and induced patent infringement.  (*Id.*)  Soon after, Genus moved to dismiss the third-party complaint.  (Dkt. #79.)

As an initial matter, Genus argues that the claims should be dismissed in their entirety as improper under Fed. R. Civ. P. 14, since that rule only allows for derivative claims.  Additionally, Genus asserted separate bases for dismissal of Counts I (fraudulent inducement) and VI (induced patent infringement), arguing that:  (1) Inguran failed to plead fraudulent inducement with particularity as required by Fed. R. Civ. P. 9(b); and (2) Inguran failed to plead sufficient facts to support a plausible claim of induced infringement.

Inguran has since conceded that its invocation of Rule 14 was improper. (*See* Def.'s Br. Opp'n (dkt. #92) 1-2 ("Inguran acknowledges that Rule 14 does not apply (since Inguran does not seek to hold Genus derivatively liable for Plaintiff ABS Global, Inc.'s . . . claims).").) This proved a small concession indeed, as Inguran proceeded to file a new motion to join Genus as a counterclaim defendant under Rules 19 and 20, governing required and permissive joinder respectively.[5] (Dkt. #86.)

Genus and ABS Global concede that Genus can be properly joined under Rule 20, which permits joinder of multiple defendants if:

> (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>
> (B) any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. P. 20(a)(2). The court agrees.

Inguran's counterclaims center on the joint conduct of Genus and ABS Global in negotiating and performing the contract, as well as pursuing development and commercialization of the laser-based semen sorting method. Inguran not only seeks to hold Genus jointly liable, common questions of law and fact exist. Indeed, according to Inguran, the evidence and testimony offered will be essentially the same against the two counterclaim defendants. Since Genus is a proper counterclaim defendant under Rule 20, the court need not address Inguran's arguments that Genus *must* be joined under Rule 19. Accordingly, Genus's motion to dismiss the original, improper third-party complaint is granted, as is Inguran's subsequent motion to join Genus properly as a counterclaim defendant.

---

[5] Pursuant to Fed. R. Civ. P. 13(h), "Rules 19 and 20 govern the addition of a person as a party to a counterclaim or crossclaim."

12

### III. Motion to Dismiss Counts I, II and VI of Counterclaims

Because the revised counterclaims against Genus are essentially the same as those in the defunct third-party complaint, the court still must address the alternative arguments raised in Genus's motion to dismiss. Accordingly, the court now turns to whether Inguran has adequately pled Counts I and VI of its counterclaims. Because the analysis overlaps with ABS Global's other remaining motion, which seeks to dismiss Counts I and II of the counterclaims, the court considers them in tandem.

#### A. Count I: Fraudulent Inducement

First, ABS Global moves to dismiss the claim of fraudulent inducement for failure to plead fraud with particularity. Fed. R. Civ. P. 9(b). The parties agree that Texas law governs the contract. (*See* Pl.'s Br. Supp. Mot. Dismiss (dkt. #82) 2; Def.'s Br. Resp. (dkt. #91) 1.) A claim of fraudulent inducement under Texas law requires a plaintiff to establish "the elements of 'a simple fraud claim.'" *Fletcher v. Edwards*, 26 S.W.3d 66, 77 (Tex. App. 2000) (quoting *Balogh v. Ramos*, 978 S.W.2d 696, 701 (Tex. App. 1998)). Those elements are: "a material misrepresentation; which was false; which was known to be false when made or was made recklessly as a positive assertion without knowledge of its truth; which was intended to be acted upon; which was relied upon; and which caused injury." *Id.* (citing *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998)). Here, ABS Global argues that Inguran has failed to allege with particularity that: (1) ABS made any material misrepresentation; (2) Inguran relied on the misrepresentation; and (3) Inguran suffered an injury.

13

### i.   Material Misrepresentations

Inguran's counterclaim for fraudulent inducement relies primarily on ABS Global and Genus's alleged misrepresentations that they "wanted a long-term deal, as well as a significant increase in the volume of Inguran's sex-sorting services."  (Counterclaims (dkt. #63) ¶ 196.)  Specifically, Inguran alleges that John Worby, a senior executive of both ABS Global and Genus, wrote to Inguran expressing interest in a longer-term extension or renewal of the contract and an increased purchase quantity.  (*Id.* at ¶ 190.)  Worby also allegedly explained that ABS Global viewed the contract as "fair" and was "fine" with a five-year term, a liquidated damages clause and a $1.5 million early termination penalty.  (*Id.* at ¶ 191.)  According to Inguran, however, ABS Global and Genus "never intended to perform the 2012 Agreement's full period, and knew as much when they falsely represented to Inguran that they would."  (*Id.* at ¶ 200.)

"A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (quoting *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998)).  Nevertheless, ABS Global and Genus argue that these statements cannot support a claim for fraudulent inducement because they have turned out to be true: that is, the parties *have* a long-term renewal in place, with the 2012 Agreement continuing in force until August 31, 2017.  (*See id.* at ¶ 196.)

As Inguran points out, however, this view of the claim fails to account for the fact that ABS Global has sued Inguran to *avoid* performing some of the provisions of the 2012 Agreement.  In its complaint, ABS Global asks this court to find unenforceable a number of

14

the 2012 Agreement's provisions, including the liquidated damages provisions; any and all research restrictions; all restrictions on ABS Global's use, marketing and sale of sexed semen that it develops via its own technology; all evergreen provisions that make the 2012 Agreement of perpetual duration unless terminated; and the take-or-pay provision requiring ABS Global to pay for a prescribed minimum quantity of processed semen regardless of whether it can make use of that quantity.  (*See* Am. Compl. (dkt. #58) 29 (Prayer for Relief).)  Inguran's counterclaims also allege that ABS Global has attempted to invalidate portions of the 2012 Agreement.  (*See* Counterclaims (dkt. #63) ¶ 194.)  Assuming for purposes of ABS Global and Genus's motion to dismiss only that, as alleged, both companies made false statements during negotiations that they planned to perform for the 2012 Agreement's full period and that they found its terms acceptable and fair, and that the present lawsuit is part of ABS Global's and Genus's execution of their pre-existing, fraudulent scheme to renege on that agreement, then Inguran may have pled just enough facts to get over Rule 9(b), albeit with a tale of Machiavellian proportions that may or may not pass Rule 56 review.

Inguran also points to an allegedly material *omission* that purportedly supports its fraud in the inducement claim: plaintiffs' failure to inform Inguran of their research and development program and laser-based technology.  In response, Genus points out that under Texas law, a duty to disclose arises in four distinct situations:

> The existence of a confidential relationship is but one of the bases for imposing a duty to disclose information.  A duty to speak may arise in at least three other situations: First, when one voluntarily discloses information, he has a duty to disclose the whole truth.  Second, when one makes a representation, he has a duty to disclose new information when he is aware the new information makes the earlier representation misleading or

15

> untrue.    Finally,  when  one  makes  a  partial  disclosure  and
> conveys a false impression, he has a duty to speak.

*Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 212-13 (Tex. App. 2001) (internal

citations omitted).

In  this  case,  plaintiffs  argue  that  no  confidential  relationship  was  pled,  nor  does

Inguran allege facts suggesting that plaintiffs made a misleading partial disclosure.  To this

argument, Inguran has no response, thereby waiving any opposition.  *See Bonte v. U.S. Bank,*

*N.A.*,  624  F.3d  461,  466  (7th  Cir.  2010)  ("Failure  to  respond  to  an  argument  –  as  the

Bontes  have  done  here  –  results  in  waiver.").   Accordingly,  the  court  will  dismiss  Inguran's

fraud in the inducement claims to the extent they are premised on material *omissions*.

### ii.    Reliance

Plaintiffs next argue that Inguran has failed to plead reliance plausibly, as required by

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Under Texas law, demonstrating reliance requires

"evidence that the claimant would not have entered into the contract but for the alleged

misrepresentation or fraudulent nondisclosure."  *Williams v. Dardenne*, 345 S.W.3d 118,

126 (Tex. App. 2011).  There is no dispute that Inguran has *facially* pled reliance, alleging

that  "Inguran  would  not  have  entered  into  the  2012  Agreement,  or  provided  the

preferential pricing, but for Genus's and ABS's false representations regarding the term of

the  agreement."   (Counterclaims  (dkt.  #63)  ¶ 201.)   Rather,  plaintiffs  contend  that  the

allegation  is  simply  not  plausible  in  light  of  the  parties'  longstanding  contractual

relationship.  (*See* Pls.' Br. Support (dkt. #82) 4.)

"A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft*, 556 U.S. at 678.  Importantly, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.") (internal quotation marks and citation omitted).  Thus, the court cannot dismiss the fraud in the inducement claim simply because Inguran's allegation of but-for reliance seems *unlikely*.

What plaintiffs are really arguing is that by alleging that the parties have been in an amicable contractual relationship for over a decade (Counterclaims (dkt. #63) ¶¶ 172-73), and that ABS Global is one of the largest bull stud companies in the country (*id.* at ¶ 188), Inguran has pled itself out of an allegation of but-for reliance.  While a closer question than it might be, given the somewhat dubious inferences that must be made as to ABS Global's and Genus's unstated motives, the court disagrees.  A party certainly *can* plead itself out of a claim, but it must do so "by pleading facts that establish an impenetrable defense to its claims."  *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008).  Said another way, a party "pleads himself out of court when it would be necessary to contradict the complaint in order to prevail on the merits."  *Id.* (quoting *Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 715 (7th Cir. 2006)).  That is not the case here.

The parties' longstanding relationship and the profitability of having ABS Global as a customer may well make it more *difficult* for Inguran to prove it would not have entered into the 2012 Agreement but for ABS Global's misrepresentations as to its true intent, but those factors do not establish an impenetrable defense to that element.  Accordingly, the court leaves the question of reliance for summary judgment or trial.  *See Celanese Corp. v. Coastal*

17

*Water Auth.*, 475 F. Supp. 2d 623, 638 (S.D. Tex. 2007) ("Reliance is ordinarily a question

for the fact-finder.")

### iii.   Injury

Finally, plaintiffs argue that Inguran fails to allege facts showing how it was injured

by entering into the 2012 Agreement.  Looking to Inguran's counterclaims, it has alleged

the following with respect to damages:

> Genus's and ABS's false representations and omissions directly
> and proximately caused Inguran injury.  These injuries include,
> but are not limited to, that Inguran is now locked into an
> agreement with ABS whereby ABS receives all the benefits but
> refuses to accept many of its burdens, including the fact that
> Inguran provided ABS preferential pricing and other beneficial
> terms in view of the volume and purported length of the 2012
> Agreement; providing ABS an increase in volume of Inguran's
> sex-sorting services which wastes and strains Inguran's limited
> resources and production capacity, and limits Inguran's ability
> to provide these services to other potential and actual customers;
> and the loss of the protection and misuse of Inguran's
> confidential information, which ABS has improperly
> appropriated and used to develop and implement its own
> technology.

(Counterclaims (dkt. #63) ¶ 204.)

Plaintiffs argue that these allegations are insufficient to demonstrate the "concrete,

pecuniary harm" necessary to support a claim for fraud.  *Arisma Grp., LLC v. Trout &*

*Zimmer, Inc.*, No. 3:08-CV-1268-L, 2009 WL 3573418, at *6 (N.D. Tex. Oct. 30, 2009).

The court again disagrees.  Inguran alleges that due to the 2012 Agreement, it has had to

forego other opportunities to sell its services that would have been more profitable than its

sales to ABS Global.  Inguran also alleges that it provided ABS Global with "preferential

pricing and other beneficial terms" in reliance on ABS Global's commitment to perform for

the contract's full term.  Supported with evidence, this could give rise to the kind of

concrete pecuniary harm required to state a claim for fraudulent inducement under Texas law.

Plaintiffs similarly argue that Inguran has not identified a *specific* business opportunity it has missed or customer that it has been unable to serve as a result of the 2012 Agreement.  That level of detail is simply not necessary at the motion to dismiss stage, even in light of the heightened pleading standard of Rule 9(b).  Numerous courts have held that Rule 9(b)'s heightened standard does not extend to allegations regarding damages based on fraud, because those allegations do not bear on the "*circumstances* constituting fraud."  Fed. R. Civ. P. 9(b) (emphasis added); *see, e.g.*, *Bear Ranch, LLC v. HeartBrand Beef, Inc.*, No. 6:12-CV-00014, 2013 WL 6190253, at *2 (S.D. Tex. Nov. 26, 2013) (Rule 9(b) does not extend heightened pleading requirements to damages allegations in fraud case); *Andrews Farms v. Calcot, Ltd.*, 527 F. Supp. 2d 1239, 1252 (E.D. Cal. 2007) ("While Rule 9(b) requires pleading the circumstances of fraud with particularity, defendants cite no case law, and the Court finds none, requiring that fraud damages be pled with more specificity than required under normal notice pleading."); *Williams v. Sabin*, 884 F. Supp. 294, 297 (N.D. Ill. 1995) ("Rule 9(b) does not require any greater detail in pleading damages unless the information is necessary to give the defendant notice of the claims against him.").

Here, plaintiffs are on notice of the financial injury that Inguran has allegedly suffered and can obtain through discovery the specific facts related to those injuries.  If Inguran is unable to provide any factual support for its allegations at that time, then plaintiffs will be able to obtain summary judgment on that basis.  For now, however, Inguran has stated a plausible claim of fraud, including damages, and so the motion to dismiss Count I of its counterclaims will be denied.

### B.  Count II: Anticipatory Breach/Repudiation

Next, Inguran purports to plead a claim for anticipatory breach of contract solely against ABS Global.  Inguran bases this counterclaim entirely on a letter that ABS Global sent on August 25, 2014.  According to Inguran, the 2012 Agreement provides in Section 4(b) that ABS Global must pay Inguran $1.5 million in liquidated damages upon exercising its contractual right to terminate the contract after the end of its current term.  (Counterclaims (dkt. #63) ¶ 209.)  Allegedly, ABS Global's August 25 letter triggered that provision by indicating that it had decided "not to extend the Term of the Agreement" (*id.* at ¶ 210), and (2) went on to say that ABS Global refused to pay the liquidated damages on the grounds that the provision in Section 4(b) is "unenforceable" (*id.* at ¶ 211).

Without more, ABS Global argues that these facts do not state a claim for anticipatory breach.  Under Texas law, "[t]o constitute repudiation, a party to a contract must absolutely and unconditionally refuse to perform the contract without just excuse." *Bans Props., L.L.C. v. Hous. Auth. of City of Odessa*, 327 S.W.3d 310, 315 (Tex. App. 2010).  To support its argument that Inguran failed to plead a plausible repudiation claim, ABS Global provides the letter itself, which reads in relevant part:

> For reasons stated in the Federal Court Complaint filed by ABS on July 14, 2014, ABS maintains that the liquidated damages provision of Section 4(b) of the Agreement is unenforceable. Accordingly, ABS intends to seek judicial relief requiring ST to reimburse the uncredited portion of the $1,500,000 Advance for liquidated damages that was paid under the fourth sentence of Section 4(b) and, in the meantime, expects ST to continue to credit the Advance against invoices for Sorted Semen in accordance with Section 4(b).

(Steven J. Horowitz Decl. Ex. A (dkt. #83-1).)  According to ABS Global, its stated position by no means constitutes the unconditional refusal to perform required to state a claim for

20

repudiation under Texas law.   On the contrary, ABS Global contends that the letter confirms its an intent to continue to perform under Section 4(b), even as it sought judicial relief from what it contends is an illegal contract provision.

Inguran objects that the court cannot consider the full text of the letter because it is outside the pleadings, but "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [its] claim." *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).   Since the letter forms the *sole* basis for Inguran's repudiation claim here, the court may consider it in resolving the motion to dismiss without converting it into a motion for summary judgment.

Read in its proper context, the letter alone does *not* support a claim for repudiation, which under Texas law must be "absolute, positive, unretracted, unretractable, and unconditional." *Dudley v. Born*, 710 S.W.2d 638, 644 (Tex. App. 1986).   Here, the letter is by no means unequivocal.   On the contrary, it simply memorializes ABS Global's belief that the liquidated damages provision is unenforceable, as well as its intent to seek judicial relief from that provision.   At best, the court can infer a *conditional* refusal to perform on ABS Global's part -- that is, ABS Global will refuse to pay the liquidated damages if the provision requiring it is invalidated by the court -- but that is not an unequivocal repudiation.   *See* David R. Dow & Craig Smyster, 49 Tex. Practice Series, Contract Law § 9.11 ("A party's refusal to perform that is based in good faith on a mistake or misunderstanding relating to the party's obligations under the contract does not constitute an anticipatory repudiation."); *cf. Cont'l Cas. Co. v. Boerger*, 389 S.W.2d 566, 568 (Tex. Civ. App. 1965) (in insurance cases, "doctrine of anticipatory breach is not applicable where insurer 'merely denies liability or

21

claims defenses under the terms of the policy'") (quoting *Univ. Life & Accident Ins. Co. v. Sanders*, 102 S.W.2d 405, 407 (Tex. Comm'n App. 1937)).  Indeed, if it *were* enough, a defendant could conceivably bring a counterclaim for anticipatory breach every time it is sued or threatened with suit to invalidate an allegedly unlawful contract provision, which is not only at odds with the Texas requirement that the refusal be "clear and unequivocal," but also with the requirement that the refusal "apply to the entire contract."  Dow & Smyster, *supra*, at § 9.11.

Inguran's only other argument is that ABS Global's letter "inherently" demonstrates an unconditional *intent* to repudiate by stating that Inguran was required to continue to apply the advance on liquidated damages to ABS Global's own unpaid invoices.  (Def.'s Br. Opp'n (dkt. #91) 8.)  This is not a reasonable inference, however, given that ABS Global's request is actually consistent with the terms of the 2012 Agreement itself.  (*See* dkt. #88-1.)  Essentially, reading the letter in full, ABS Global does no more than: (1) indicate it believes the liquidated damages provision in Section 4(b) is unenforceable; (2) state its intent to request judicial relief from that provision; and (3) request that Inguran continue to comply with the 2012 Agreement's terms in the meantime.  It would hardly be reasonable to infer unconditional refusal to pay the liquidated damages from ABS Global's commitment to continue to comply with the terms of the agreement pending judicial review.

At first glance, this conclusion may seem inconsistent with the court's earlier finding that Inguran has adequately pled its fraudulent inducement claim, since that result depends in part on the finding that it is plausible to infer that plaintiffs falsely represented they intended to perform the 2012 Agreement.  In contrast, the court is dismissing Inguran's repudiation claim for failing to adequately plead that ABS Global refused to perform.  The

distinction is both legal and factual.  First, the legal requirement of an absolute, *unconditional refusal* to perform is the basis for the court's dismissal of the repudiation claim.  Second, on the face of the pleading and based on the precise language of the letter, which expressly forms the sole basis for the repudiation claim, there is *no* factual dispute as to the nature of ABS Global's actions.

In contrast, seeking judicial relief from a contract *may* be consistent with a party having actually intended from the outset not to perform under the contract (though corroborating evidence will likely be necessary to prove such a claim), even though it does not make plausible an absolute *refusal* to perform regardless of the outcome.  Without any factual allegations that rise to this level, Inguran has not pled a plausible repudiation claim, and so ABS Global's motion to dismiss Count II of the counterclaims will be granted.

### C.  Count VI: Induced Patent Infringement

Finally, Inguran pleads a claim solely against Genus, which alleges that it induced ABS Global to infringe U.S. Patent No. 8,206,987 ("the '987 patent"), entitled "Photo-Damage Method for Sorting Particles."[6]   According to plaintiffs, Inguran's claim does nothing more than repeat the legal elements of an induced infringement claim, without providing the supporting facts required to pass the plausibility test articulated by the Supreme Court's decisions in *Twombly* and *Iqbal*.  *See In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1336-37 (Fed. Cir. 2012) (Supreme Court precedent controls pleading requirements for claims of indirect infringement).  Of course, bare legal conclusions "contribute nothing to the plausibility analysis," *McCauley v. City of*

---

[6] Count V, which plaintiffs do not challenge in their motion to dismiss, is a corresponding direct infringement claim of the '987 patent against ABS Global.

*Chi.*, 671 F.3d 611, 618 (7th Cir. 2011), and plaintiffs contend that once the court disregards those conclusions, Inguran cannot meet the plausibility test.

To survive the motion to dismiss, Inguran's counterclaims must "contain facts plausibly showing that [Genus] specifically intended [ABS Global] to infringe the . . . patent and knew that the . . . acts constituted infringement." *In re Bill of Lading*, 681 F.3d at 1339. For the most part, Inguran's allegations *are* mere recitations of the black-letter law of induced infringement.  For instance, Inguran alleges that Genus induced infringement by "actively and knowingly aiding, abetting and encouraging the laser based sorting of gender-selected sperm by others, including ABS, with the specific intent to induce others to, among other things, directly make, use, sell, offer to sell, or import into the U.S., without authority or license from Inguran, laser-based methods for the sorting of gender-selected sperm." (Counterclaims (dkt. #63) ¶ 245.)  This allegation parrots the legal standard for induced infringement articulated in cases like *Water Technologies Corporation v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988), and the statutory description of *direct* infringement articulated in 35 U.S.C. § 271(a).

Disregarding Inguran's legal conclusions and conclusory statements, the counterclaims allege only that Genus "instructed" ABS Global in the commercialization of its semen-sorting technology (although it is still somewhat unclear as to what exactly Genus has directed ABS Global to do with respect to commercialization) and that Genus directed ABS Global to sort semen into gender-selected sperm.  (Counterclaims (dkt. #63) ¶ 245.) Assuming that this is enough to place Genus on notice of its alleged role in encouraging ABS Global to infringe the '987 patent, the court agrees with plaintiffs that Inguran has not adequately alleged the corresponding intent to cause infringement.

24

The "mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (quoting *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1364 (Fed. Cir. 2003)). "[I]nduced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011). Furthermore, it is not enough to intend to "cause the acts that produce direct infringement." *DSU Med. Corp.*, 471 F.3d at 1306. Rather, Genus must have affirmatively intended to cause the *infringement itself. Id.*

Inguran's current counterclaims do not meet this standard. The only facts it pleads that bear on Genus's intent are: (1) Genus had actual knowledge of the '987 patent's existence; and (2) ABS Global submitted a petition for *inter partes* review of the '987 patent on October 1, 2014 (a few months after this lawsuit was filed on July 14, 2014).[7] (Counterclaims (dkt. #63) ¶ 246.) Taking these allegations as true, Inguran has pled only facts that are *consistent* with knowledge that ABS Global's activities were infringing and specific intent to cause that infringement. At most, Genus knew that the '987 patent existed, so the court can infer that it also knew ABS Global's laser-sorting method *could potentially* infringe that patent. This does not meet the standard for induced infringement. Facts like these, which are merely consistent with liability, do not "nudge[] . . . claims across

---

[7] The date is relevant because "[t]he weight of authority addressing the knowledge required for indirect infringement, especially following the Supreme Court's decision in *Global-Tech*, requires a plaintiff to allege that defendant had pre-suit knowledge of the patents-in-suit." *Brandywine Comm'ns Techs., LLC v. Casio Computer Co.*, 912 F. Supp. 2d 1338, 1345 (M.D. Fla. 2012) (collecting cases). The allegedly "detailed interpretation of the claim language and scope of the '987 patent" contained in the petition for *inter partes* review, therefore, is of limited value in assessing whether Inguran has adequately pled knowledge and intent with respect to Genus's pre-suit activity.

the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.   Without alleging

something more with respect to Genus's knowledge and intent, Inguran has not pled a

plausible claim of induced infringement.   Accordingly, Genus's motion to dismiss Count VI

of the counterclaims will be granted.[8]

### D. Leave to Amend

Inguran has requested that the court grant it leave to amend its counterclaims to add

additional facts in the event that the court grants plaintiffs' motion to dismiss in whole or in

part.   ABS Global indicates in its reply that it "does not object to letting [Inguran] have one

last try" at pleading plausible counterclaims, arguing at the same time that Inguran cannot

actually add enough facts to render its claims legally sufficient.   (Pl.'s Br. Reply (dkt. #98)

6.)   Inguran has not filed proposed amended counterclaims with the court, however, and so

it is premature at best to assess their sufficiency.

In light of ABS Global's willingness to give Inguran another chance, *and* because the

defects identified in this opinion as requiring dismissal do not appear to be incurable, the

court will dismiss defendant's anticipatory breach and induced infringement counterclaims

without prejudice at this time.   *See* Fed. R. Civ. P. 15(a)(2) (party may amend its pleading

"with the opposing party's written consent" or the court's leave, which should be freely

given "when justice so requires").   Should Inguran wish to amend its counterclaims, it will

---

[8] Inguran also points to its allegation that Genus sought the safe harbor provision in Section 18(b) of
the 2012 Agreement based on its knowledge that the laser-based sorting method infringed the '987
patent.   Section 18(b) does not, however, appear to provide a "safe harbor" from potential liability
for *patent infringement*.   Rather, it merely allows ABS Global and its affiliates to continue its R&D
program without marketing or selling the results, notwithstanding provisions of the 2012 Agreement
that preclude ABS Global from "creat[ing], develop[ing], sell[ing] or market[ing]" any technology
that competes with Inguran's own technology.   (*See* 2012 Agreement (dkt. #88-1) §§ 18(a), (b).)
Thus, as best the court can discern, the safe harbor provision has no impact on what plaintiffs knew
or did not know regarding the '987 patent.

need to file a motion for leave to amend with its proposed pleading, so that ABS Global has the chance to oppose the amendment should it believe that the proposed counterclaims fail to cure the deficiencies of the original pleading or are "futile." *Perkins v. Silverstein*, 939 F.2d 463, 472 (7th Cir. 1991) (leave to amend should be denied if the proposed pleading "could not survive a second motion to dismiss") (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). In order to keep this case moving and avoid delay, Inguran shall have 21 days to file any proposed amended counterclaims.

## ORDER

IT IS ORDERED that:

1) XY, LLC's motion to intervene (dkt. #65) is GRANTED.  The clerk of court is directed to update the caption of this case accordingly.

2) XY, LLC's motion for leave to file a reply brief on the motion to intervene (dkt. #75) is GRANTED.

3) Counterclaim defendant Genus plc's motion to dismiss the third-party complaint (dkt. #79) is GRANTED.

4) Plaintiff ABS Global's motion to dismiss Counts I and II of Inguran's counterclaims (dkt. #81) is GRANTED IN PART and DENIED IN PART.  The claim for anticipatory breach/repudiation and the claims for fraud in the inducement premised on material omissions are DISMISSED without prejudice.

5) Defendant Inguran, LLC's motion to join Genus plc (dkt. #86) is GRANTED. Inguran may not, however, proceed with its induced patent infringement claim against Genus as currently pled; although that claim is DISMISSED without prejudice consistent with the opinion above.

6) Inguran has until April 21, 2015, to file a motion for leave to amend its counterclaims along with a proposed pleading.

Entered this 31st day of March, 2015.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge
