IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ABS GLOBAL, INC.,

        Plaintiff/Counterclaim Defendant,        OPINION AND ORDER

    v.
                                        14-cv-503-wmc

INGURAN, LLC,

        Defendant/Counterclaimant/Third-Party Plaintiff,

    and

XY, LLC,

        Intervening Defendant/Counterclaimant/Third-Party Plaintiff,

    and

CYTONOME/ST., LLC,

        Intervening Defendant,

    v.

GENUS PLC,

        Third-Party Defendant.

---

In this opinion and order, the court takes up the parties' remaining challenges to expert testimony on damages issues.  (Dkt. ##429, 432, 471, 473, 474, 475.)

## I.   Standard

The admissibility of expert testimony in federal courts is governed principally by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).   Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

A district court functions as a "gatekeeper," determining whether proffered expert testimony is relevant and reliable.   *Daubert*, 509 U.S. at 589; *see also United States v. Johnsted*, 30 F. Supp. 3d 814, 816 (W.D. Wis. 2013) (expert testimony must be "not only relevant, but reliable").   Although expert testimony is "liberally admissible under the Federal Rules of Evidence," *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 723 (E.D. Wis. 2008), the Seventh Circuit has held that expert testimony must satisfy the following three-part test under Rule 702 as informed by *Daubert*:

> (1) the witness must be qualified "as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702;
>
> (2) the expert's reasoning or methodology underlying the testimony must be scientifically reliable, *Daubert*, 509 U.S. at 592-93; and

> (3) the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue.  Fed. R. Evid. 702.

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.

## II.  *Daubert* Damages Motions

### A. ABS's Motion to Exclude Certain Testimony of W. Todd Schoettelkotte (dkt. #429).

According to ABS, ST will seek to call W. Todd Schoettelkotte during the damages phase of trial to rebut ABS's position on damages related to its antitrust claim.  ABS explains that if ST had not committed an antitrust violation, it would have begun the commercialization of sexed semen in June of 2014, permitting it to sell sexed semen rather than relying on ST sexed semen processing.  As a result, ABS argues that it would have enjoyed substantial cost savings, equal to the difference between the ST contract price and the ABS processing costs.  That cost savings is what ABS seeks as antitrust damages before trebling.

Apparently, Schoettelkotte will opine that the fertility rate of ABS's own sexed semen is unsalable, or at least it was in June of 2014, and thus ABS would have experienced no cost savings.  Specifically, Shoettelkotte will testify that ABS's product would have to compete with ST and other bull studs' product still using ST's sexed processing technology, and ST's fertility rate was superior.

3

ABS rightly points out that as a CPA, Schoettelkotte has no expertise regarding bull semen, has certainly never run a study to test bovine sperm fertility and does not know how scientists who perform such studies confirm pregnancy in a cow or heifer. ABS also argues that Schoettelkotte did not properly rely on the opinion of any other expert in offering an opinion on the relative fertility rates using the two processing technologies.

Although ABS acknowledged that Schoettelkotte did talk to Jack Hippen and Dr. Nolan about the subject of bovine sperm fertility, it further asserts that Hippen's expertise in the area has not been established and that Dr. Nolan expressed no opinion about what constitutes an acceptable, much less marketable, fertility rate. Similarly, ABS takes issue with Dr. Nolan's opinion that ST's product has a fertility rate equal or near that of conventional semen, arguing that his opinion was based on only one paper written by an ST employee, which was ultimately found to be defective by a peer reviewer.

ABS finally argues that the other evidence Schoettelkotte cites fails to support his opinion that ST's product has a fertility rate equal to or near that of conventional semen. Schoettelkotte cites the testimony of Richard Neis, but Schoettelkotte did not know whether Neis, an ST lab manager and previous ABS lab technician, was an expert in the area of bovine sperm fertility. ABS asserts that Schoettelkotte did not even understand the *meaning* of the cited Neis testimony, which included fertility estimates for both ST's product and conventional semen.

4

In response, ST acknowledges that Schoettelkotte is not an expert in the field of bovine fertility, but asserts that he properly used his experience as an accountant to assess whether ABS's alleged June 2014 launch date for the GSS technology made economic sense.  ST argues that Schoettelkotte's fertility-related testimony need not be factually correct to be admissible.  Rather, the accuracy of the bases for his opinions is a question of credibility that the jury must weigh.  *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of [an] expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.").  Further, ST contends that Schoettelkotte's fertility-related statements are supported by substantial evidence, including ABS-produced documents, deposition testimony of several ABS and Genus employees as well as the statements of the President and CEO of Select Sires, who stated that his company demanded the quality of ABS's product to be comparable or superior to ST.

While ABS certainly points out assumptions of fact on which Schoettelkotte's opinions rest -- including *both* the relative fertility of the two products, as well as the impact of fertility rates on the products' marketability in June of 2014 -- ST has already admitted evidence, as well as pointed to other evidence not yet admitted, that a reasonable jury might find supports those assumptions.  As such, the court agrees with ST that the issue is best addressed by ABS through cross-examination and argument, as well as by the court in limiting testimony.  Accordingly, the motion is DENIED.

5

**B. ABS's Motion to Exclude Certain Testimony of Barry C. Harris (dkt. #432).**

ABS seeks to exclude similar testimony by ST's economist, Barry Harris, that ABS's sexed semen is unsalable (and thus ABS would have experienced no cost savings) because its fertility would have been unacceptable in the marketplace.  As with its motion pertaining to Schoettelkotte, ABS argues that as an economist, Harris has no expertise in bovine sperm fertility, that his fertility-related testimony is factually inaccurate and that he relies on unreliable evidence.

Unsurprisingly, ST responds similarly to its response as to Schoettelkotte's testimony:  Dr. Harris reviewed numerous ST-produced documents, which describe the fertility levels of ST's sexed semen; ABS-produced documents showing fertility levels of the GSS technology products; and the testimony of multiple ABS and Genus employees as well as the Select Sires President and CEO.  Again, the court is not convinced that Dr. Harris's lack of expertise in bovine fertility, or his reliance on the evidence he cites, disqualifies him from opining about the economic feasibility of a June 2014 launch of the GSS technology.

So, too, is the court's ruling similar.  As long as a reasonable jury *could* find sufficient evidence to support a finding that ABS's fertility and marketability rates were sufficient to support meaningful sales in June of 2014, then Dr. Nolan may testify.  According, the motion is DENIED.

### C. ST's Motion to Exclude Testimony of Jane Tereba (dkt. #471).

ST seeks to exclude ABS's damages expert Jane Tereba's opinions on attorney fees and interest as they relate to ABS's antitrust claim. ST argues that: (1) Tereba has no expertise regarding attorney's fees, let alone fees in this particular field of litigation; and (2) her opinions include a calculation of prejudgment interest, which is not available.

Tereba is a certified public accountant, and she has been a senior audit manager for various public accounting firms. She is now a principal at Capital Valuation Group, Inc., in Madison, Wisconsin. ABS retained Tereba to review invoices stemming from the attorney's fees and expenses ABS incurred in defending ST's and XY's infringement claims and in pursuing related IPR reviews. From her review, she calculated the amount of attorney's fees and expenses that relate to the unlawfully acquired patents. Tereba also calculated the interest ABS incurred in borrowing $1.5 million that for prepayment of damages to ST in 2012.

ST seeks exclusion of this testimony because: her opinions would not assist, and could confuse the jury; she is not qualified to offer expert testimony on the reasonableness of attorney fees or expenses; and her interest-related opinions are inadmissible because that type of damages is not recoverable. The court will address the attorney fee and expense opinions separately from the interest opinions.

### 1.   Attorney Fee and Expenses Opinions

Although the parties briefed whether Tereba's fee and expenses opinions are admissible under *Daubert*, the court questioned whether this component of ABS's

antitrust damages is even for a jury during the July 29, 2016, telephonic conference, given that in most contexts the question of attorney fees is for the court.  The parties subsequently submitted additional briefing on this issue, although neither side has provided helpful authority as to whether attorney fees and costs associated with patent-defense costs should be presented to the *jury* for inclusion in any calculation of damages for an antitrust violation, much less how it should be presented.  (*See* dkt. ##599, 624.)

The starting point, of course, is the statute.  Section 4 of the Clayton Act, 15 U.S.C. § 15(a), lays out the damages available to a person whose injury resulted from a violation of federal antitrust laws:  "threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."  ABS explains that its costs in challenging or defending against STs underlying patent claims are counted as *damages* under § 15(a), not as "cost of suit" in prosecuting its antitrust claims before this court, and thus subject to a "threefold recovery."  ABS further argues, therefore, that any reasonableness inquiry as to its patent-defense costs is inappropriate, since antitrust damages *include* patent-related attorney's fees that ABS actually incurred in responding to ST's anticompetitive patent activities, citing multiple decisions in support.  *See TransWeb, LLC v. 3M Innovactive Props. Co.*, 812 F.3d 1295, 1309 (Fed. Cir. 2016) (affirming district court's trebeling of attorney fees and costs incurred in defending patent lawsuit damages because those antitrust damages flowed from anticompetitive conduct, regardless of the success of the patent lawsuit); *Hazeltine Research, Inc. v. Zenith Radio Corp.*, 388 F.2d 25, 35 (7th Cir. 1967) (expenses in defending against infringement lawsuit properly brought under the

threefold recovery analysis because the misuse of the patents had a presumed anticompetitive effect), *rev'd in part on other grounds*, 395 U.S. 100 (1969); *Dairy Foods Inc. v. Dairy Maid Prods. Coop.*, 297 F.2d 805, 809 (7th Cir. 1961) (finding "authority for the recovery of threefold the cost and expense of defending" against "an infringement suit [that] is brought as part of and in furtherance of a combination and conspiracy which violates" Sections 1 and 2 of the Sherman Act).

ST attempts to distinguish these cases in response, arguing that the anticompetitive conduct involved fraud or an unlawful combination or conspiracy, but its arguments are not particularly persuasive.  First, § 15(a) does not include any caveats limiting the types of damages available for a Section 2 violation.  While ABS may have filed its antitrust claim first, ST brought patent claims against ABS, which if the jury agrees, are at least arguably linked to ST's alleged anticompetitive conduct.  Second, although ST attempts to distinguish *Transweb* because it involved allegations of a fraudulently obtained patent, in its decision the Federal Circuit explained that those allegations fell under Section 2 of the Sherman Act as an "attempt to monopolize." *Transweb*, 812 F.3d at 1306.  As such, the court agrees with ABS, and more importantly with the other decisions cited above considering various federal antitrust subsections, that a damages award may include attorney fees and costs incurred due to anticompetitive conduct, separate and apart from any attorney fees incurred in pressing an antitrust claim itself.

Still, ST presses that ABS must demonstrate that its attorney fees were reasonable, citing several cases in other statutory contexts. None of those cases, however, address the award of attorney fees and expenses in the context of a damages award under § 15(a). Indeed, ST fails to identify, and this court could not find, *any* case requiring a reasonableness finding for purposes of establishing attorney fees as a *damage* element under § 15(a).[1]

As to whether the *jury* should determine what amount of attorney fees and costs were actually incurred as patent-defense costs, ABS points out that its Seventh Amendment right to a trial by jury on an antitrust claim is "long-established." *See Beacon Theaters, Inc. v. Westover*, 359 U.S. 500, 504 (1959); *Fleitmann v. Welsbach St. Lighting Co. of Am.*, 240 U.S. 27, 29 (1916). Of course, the Supreme Court's *Beacon* and *Fleitmann* decisions do not address the question of whether a jury should actually calculate the specific award of attorney fees and expenses. Rather, those decisions address the general question of the right to have a jury decide an issue that would result in treble damages, which the court agrees is for the jury.

Accordingly, the jury here must decide *whether* ABS is entitled to attorney fees and expenses by determining whether ST violated Section 2 in pursuing patent claims against ABS in this case or other proceedings, but the jury is ill-equipped and need not decide *the amount* of attorney fees and expenses. Neither ABS nor ST has explained how this

---

[1] Of course, should ABS succeed on its antitrust claim, ABS *will* be required to demonstrate that any attorney's fees incurred in pursuing that claim were reasonable as expressly provided in § 15(a).

10

determination involves any issue of fact proper for jury consideration.  Additionally, ABS's desired approach to proving up those damages is not only overly burdensome, but more importantly potentially prejudicial and confusing.  While ABS is apparently asking that the jury take Tereba's word for the appropriate amount of fees, the jury would inevitably be tasked with reviewing underlying invoices and related documents she reviewed and considering the arguments of both ABS and ST as to which fees pertained to ABS's patent-defense.  This is not only a task to which a jury is ill-suited, but will require an examination of individual attorney entries inevitably disclosing both attorney-client privilege and work product, that would be both confusing a potentially prejudicial to the jury's overall damage award.

Finally, in reviewing the *TransWeb* decision, while the jury found liability for lost profits, a special master reviewed the attorney fees as an element of damages.  812 F.3d at 1308-09.  The court does not anticipate that a special master would be required here, but it is apparent that the Federal Circuit did not view this task as falling on a lay jury.

Unless ST were to challenge causation despite a finding by the jury of Section 2 liability due to ST's anticompetitive conduct or patent acquisition, the court will undertake a determination of attorney fees and expenses incurred for purposes of trebling.  Accordingly, if the jury finds for ABS on its antitrust claim, Tereba's opinions on the specific amount of attorney fees and expenses ABS incurred as a result of ST's antitrust violation will not be presented to the jury.  Rather, ABS may pursue this component of its antitrust damages in a third phase of trial before the court or simply

11

through post-trial briefing.  As such, this portion of the motion is GRANTED IN PART AND DENIED IN PART.

### 2.    Interest-Related Opinions

As for Tereba's interest-related opinions, ST posits two reasons for exclusion: (1) her opinion concerns prejudgment interest, which is only available in antitrust cases when the losing party is guilty of unnecessary delay, *Fishman v. Estate of Wirtz*, 807 F.2d 520, 561 (7th Cir. 1986), and which is not even arguable here; and (2) her opinion on this issue is unreliable because it was based on unsupported and unverified assumptions.

As for the first argument, ST's mischaracterizes this category of damages.  As ABS points out, the interest expenses stem from the interest cost ABS bore related only to the fact that it had to borrow $1.5 million to pay ST's demand for prepayment of liquidated damages.  This amount of interest represents its own category of actual damages under § 15(a), not a theoretical prejudgment interest calculation accruing from the time of the injury.

Second, ST also challenges Tereba's analysis, in particular, the assumptions underlying her opinions.  Namely, ST posits several challenges: (1) she did not support her decision to use interest rates from either the Genus "overdraft facility" or the PIC intercompany loans, and she admitted not actually knowing what company made the actual payment; (2) she did not independently verify the costs at which ABS could have self-supplied its sexed semen needs with GSS technology; and (3) she ignored the tax

benefit ABS would have enjoyed in connection with taking a loss deduction on the interest paid.

In response, ABS argues generally that Tereba's interest-related opinions are based on simple arithmetic, arriving at the interest ABS actually paid because it *had* to incur the $1.5 million loan.   While it fails to address the particular challenges raised by ST, Tereba's report explains that she calculated alternative interest amounts, one based on a Genus overdraft facility rate and one based on an intercompany rate.   Given that she states that both rates are reasonable calculations of the interest, her approach is thus reliable enough to warrant its inclusion over a Rule 702 or *Daubert* objection.   At most, ST's challenges to ABS's interest-related damages goes to the weight the jury should place on Tereba's calculations, not its admissibility, especially given that the jury will be instructed that it has the discretion to fix an amount in the face of uncertainty.   As such, ST's motion as to Tereba's interest-related opinion is DENIED.

### D. Motion to Exclude Testimony of Kevin Murphy (dkt. #473).

ST seeks to exclude testimony from ABS's expert, Kevin Murphy, about the amount of a reasonable royalty, as set forth in his April 12, 2016, report, on the basis that:  (1) his analysis is not based on factual evidence; and (2) his methodology was not reliable.  That motion will be denied.

*First*, as to the facts, Dr. Murphy provided an expert damages report in response to the damages expert report ST submitted from Mr. Schoettelkotte.   In it, Murphy reviewed Mr. Schoettelkotte's work, concluded that his reasonable royalty calculations

were unreliable and proposed alternative reasonable royalty payments for the '987 patent ($282,637) and '092 patent ($185,017).   To reach these payment amounts, he began with the $100,000 allocated to intellectual property out of the $2.5 million total purchase price ST paid in 2008 for Monsanto's semen sorting technology and equipment, which eventually resulted in the '987 and '092 patents.   Then, Murphy made adjustments for the cost of pursuing the patent applications and the risk that the patent would actually be issued.   In particular, he added his estimate of the cost of prosecuting those patent applications to his estimate of the relative purchase price of each application, and then multiplied those sums by a percentage that represents the chance that each patent would be granted.

As context, ST points out that patent infringement damages are permitted "to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."   35 U.S.C. § 384.   Moreover, expert opinion testimony offered in support "must carefully tie proof of damages to the claimed invention's footprint in the marketplace," *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2010) (citations omitted).   This, ST argues, Dr. Murphy did not do.

Instead, ST argues that Dr. Murphy's $100,000 starting point was arbitrary, and his adjustments for the percent chance that the patents would be issued, and the potential cost of prosecuting the patent applications were both irrelevant and unsupported.   In particular, ST argues that Murphy's conclusion that there was an

14

average chance -- 37.5 percent -- that the application would result in patents was not only speculative, but outrights contradicted by the fact that that portfolio actually matured into *25* patents.  According to ST, Murphy also improperly based the likely cost of prosecuting the '987 and '092 patents on the average cost of prosecuting a patent application at that time, which was also based on conjecture.

In response, ABS points out that Dr. Murphy chose his $100,000 starting point because it was the price ST was charged for *all* of Monsanto Company's intellectual property in sexed semen technology, including the patent applications that matured into the '987 and '092 patents at issue here.  With respect to Murphy's adjustments to that purchase price, ABS observes that the prosecution history of the '987 patent, which required ten office actions, and the '092 patent, which required eight actions, support his conclusion as to how hard it is to obtain a patent or patents.  ST's application process is at least arguably consistent with the Patent Office data on which Murphy generally relied, showing that between 2004 and 2008, the yearly average percentage of U.S. patent applications that were granted was 37.5 percent.  Murphy further considered the median legal fees required to respond to an office action, which was $3,000 at that time.  Then he took into account the six different typical Patent Office fees most often associated with applications, ultimately finding that the estimated prosecution cost for the '987 patent was $39,000 and for the '092 patent was $35,968.

However vulnerable Dr. Murphy's opinions may be to cross-examination based on contrary evidence, neither his starting point based on the purchase price of all of

15

Monsanto's intellectual property, not just that ultimately leading to approval of the '987 and '092 patents, nor Murphy's adjustments based on general expertise in the Patent Office, are in any way arbitrary. To the contrary, Murphy attempted to take into account the actual cost of obtaining these patents, which logically includes consideration of the likely associated attorney's fees. Similarly, ST's argument that the 37.5 percent risk factor relied upon by Murphy was improper is unpersuasive because it is based on hindsight, not the actual risk that ABS and ST would have considered at the time they would be engaging in any hypothetical royalty negotiations. Thus, Murphy's $100,000 starting point and adjustments are not so unreliable that his testimony on these issues is inadmissible under Rule 702 or *Daubert*.

*Second*, as to methodology, ST criticizes Dr. Murphy for using a formula of his own making, while largely ignoring the *Georgia Pacific* factors commonly used to ascertain the hypothetical royalty on which the parties would have agreed just before an actual infringement occurred. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324-25 (Fed. Cir. 2009). Specifically, ST disputes Murphy's statement that he claims to have considered, but found irrelevant, *Georgia Pacific* factors 1, 2, 4, 5, 9 and 10. According to ST, Murphy improperly ignored *Georgia Pacific* factor 2 by discounting evidence of royalty rates in licenses for other intellectual property related to sexed semen because he only looked for licenses for patents with comparable value, not patents for comparable intellectual property or license agreements with comparable characteristics. ST also argues that Murphy failed to consider *Georgia Pacific* factor 10 properly -- the benefit to

16

users of the technology -- because he did not consider ABS's claim that its ability to use its GSS technology would increase its profits by millions of dollars.  Finally, ST argues that Murphy failed to consider:  factor 5, the commercial relationship between the parties; factor 9, the advantages of ST's intellectual property over prior technology; factor 6, the impact of selling sexed semen on the sales of conventional semen; factor 8, the commercial success of the technology; and factor 11, ABS's increased use of ST's sorted straws during the relevant time period.

ST also criticizes Dr. Murphy's consideration of factor 1, concerning the use of royalties from other licenses of the patents in suit, arguing that he improperly used as a metric the price ST paid Monsanto, comparing the relationship between purchase price of the two patent applications and the royalty to be paid for any patent that emerges to the selling price of a condo and the rent the owner could charge.  ST also asserts that Murphy's comparison ignores any external market factors, without any evidence in support.

In response, ABS argues that Dr. Murphy took into account evidence of royalty rates in licenses for other intellectual property related to sexed semen, but simply could not locate any reliable information about the royalties ST *has* charged related to the patents-in-suit.  Accordingly, ABS asserts that Murphy *did* consider the *Georgia Pacific* factors, but did not need to consider factors that were wholly irrelevant.  Regardless, ABS asserts that the *Georgia Pacific* factors are simply one way to estimate a reasonable royalty in a patent case, while other ways are permissible as long as they are based on evidence.

17

*See Energy Trans. Group, Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1357 (Fed. Cir. 2012) ("this court does not endorse *Georgia-Pacific* as setting forth a test for royalty calculations, but only as a list of admissible factors informing a reliable economic analysis").

Further, ABS argues in response to ST's claims that Dr. Murphy ignored industry licensing practices, Murphy actually considered the fact that:  (1) ST is *not* in the practice of licensing its patents; (2) the royalties ST paid in other transactions; (3) the price ST paid for XY, as well as its intellectual property; and (4) ST's and ABS's licensing practices for sexed semen IP and technology.  (Murphy Resp. Dam. Rpt., dkt. #457, at 13-17.) Finally, ABS argues that ST's arguments relate to the credibility of Murphy's proposed testimony, not to their admissibility.

The court agrees with ABS.  For one, Dr. Murphy's conclusions were based on a methodology that he adequately explains and ST does not effectively discredit. Additionally, although he appears to have taken them into account, Murphy was not bound to specifically address each of the *Georgia Pacific* factors.  *See Energy Trans. Group*, 697 F.3d at 1357.

The essence of ST's complaints about Dr. Murphy's opinions is not that they are inherently unreliable, but that ST disagrees with them.  ST is free to attack Murphy's conclusions through cross examination, other witness testimony and argument, but the court will not exclude it.  The motion is DENIED.

18

**E.  Motion to Exclude Testimony of Kirit Lezotte (dkt. #474).**

ST also seeks to exclude any lost profits opinion by ABS's antitrust damages expert, Kirit Lezotte, arguing that his report fails to:  (1) provide any factual support for his opinions; or (2) follow accepted accounting principles in determining ABS's cost of goods sold ("COGS"), including any change in price or quality of ABS's product versus ST's product.

In his expert report, Lezotte calculated the cost savings that ABS would have realized if it had switched from ST's semen processing services to self-supply.  He calculated the costs based on the assumption that ABS's GSS technology was ready to launch in June of 2014, relying on information provided in conversations he had with Jonathan Lightner, Genus's Chief Scientific Officer, and Adam Schilffarth, Genus and ABS's Senior Engineering Director.  For this reason, as ST points out, Lezotte's expert report is predicted on two key factual assumptions:  (1) the commercialization date of GSS; and (2) the commercial viability of GSS.

As to both assumptions, ST takes issue with the fact that Lezotte based his assumptions on a single conversation he had with Lightner and Schilffarth.  ST points out that Lezotte's expert report did not consider other relevant evidence, including: documents produced by ST; documents related to the GSS technology's commercial viability; deposition testimony of Lightner and Schilffarth that contradicts the content of their conversation with Lezotte; and marketing documents related to the price difference between ST's product and ABS's technology.

As ABS argues, an expert in a field is entitled to rely on the types of facts or data others in that field would reasonably rely upon, Fed. R. Civ. P. 703, and Lezotte indicated that he routinely relies on information from individuals in Lightner's and Schilffarth's positions in making profit projections and costs savings estimates.  ABS also points out that neither Lightner nor Schillfarth testified that the proper commercialization date of the GSS technology was after June 2014; rather, Schillfarth testified that the GSS technology could have produced commercial-quality semen straws *before* June 2015.  (Schillfarth Dep. (dkt. #320) 309-11.)   Finally, ABS contests ST's suggestion that its sexed semen product is superior to ABS's GSS product, pointing out that ST cites no evidence in support.

As to Lezotte offering a formal opinion regarding ABS's readiness to go to market in June of 2014, he plainly lacks the expertise to do so, or at least cannot do so based on a single conversation with Genes's chief scientist and engineer, which amounts to nothing more than usurping the jury's responsibility to judge credibility.   Of course, as ABS points out, Lezotte's *assumptions* about the commercialization and readiness date is not part of the *Daubert* inquiry, but rather is common for experts of all stripes.  *See Manpower, Inc. v. Ins. Co. of the State of Pennsylvania*, 732 F.3d 796, 808 (7th Cir. 2013) (whether a fact relied upon by an expert is correct is "tested by the adversarial process and determined by the jury").   Indeed, the jury is expressly advised in the court's standard instruction as to its role in determining whether any factual predicates have been proven

before accepting them.  ST is free to discredit Lezotte's underlying factual assumptions through cross examination, other witness testimony and argument.[2]

ST also takes issue with the fact that Lezotte's COGS analysis did not include fixed overhead costs, which violates GAAP accounting methods.  ST asserts that Lezotte admitted as much in his deposition, even though the COGS analysis should have included "labor consumables, instruments, overhead."  Thus, ST points out, Lezotte failed to properly apply GAAP accounting principles to his own hypothetical, "but-for" world.  (*See* Lezotte Dep. (dkt. #460) 254, 263.)  ST further argues that Lezotte contradicted himself in his responding to ST's expert by faulting *him* for not including fixed costs in his COGS analysis related to ST's damages.  Finally, ST takes issue with Lezotte failing to consider a difference in quality or price between the GSS sexed semen and ST's sexed semen, arguing that his projections were, therefore, not based on reliable information.

ABS acknowledges that Lezotte did not take into account all overhead costs, but argues he properly ignored certain fixed costs that ABS had incurred – specifically, the cost of ABS's research and development buildings and the cost of hiring ABS's manufacturing engineering group.  In his deposition, Lezotte explained that he did not include those costs because they were (in his view at least) irrelevant sunk costs, that is, those costs were incurred regardless of whether the GSS technology launches.  Again

---

[2] In so holding, however, the court reserves on the reasonableness of ABS, much less Lezotte, arguing for a readiness date before September of 2016 in light of its admission that any rollout before then would have needed to use trade secrets admittedly stolen and incorporated into GSS technology by Mean.

specifically, Lezotte explained that the buildings used for production were already built, including "enhancements" for research and development activities, and the manufacturing and engineering group has already been hired. (*Id.* at 250, 255-56.)  Even though these costs were incurred with an eye towards the GSS project, they are still irrelevant in Lezotte's view.  While this approach does not follow GAAP, ABS argues that Lezotte did not need to adhere to standard accounting principles because he was not measuring the COGS of an ongoing business, but the cost ABS could have saved if it began self-supply in June 2014.  ABS further responds that when Lezotte *did* take ABS's fixed costs into account in his report in response to ST's expert, but in that instance it was appropriate because he was measuring the *actual* profits that ABS earned from the sale of sexed semen straws to dairy producers.

Because of the glaring inconsistencies in Lezotte's approaches between the two companies' COGS, *and* the fact that at least some of the excluded costs are attributable to a build out *for GSS* technology, this decision is a close one, although completely excluding Lezotte's testimony is not warranted.  Lezotte's justification for excluding fixed costs, including the costs associated with hiring and maintaining the manufacturing and engineering group that is *dedicated* to the GSS technology, appears to be indefensible under any meaningful cost of goods sold calculation, much less GAAP.  Still, Lezotte attempts to provide one, and ST must establish that excluding those costs results in an opinion so unreliable that it should be *excluded* altogether under *Daubert.*  While Lezotte's approach appears flawed, in the sense that it did not take into account all relevant pieces

of information to ABS's potential cost savings, the obvious relief is to have him recalculate his COGS numbers to reflect dedicated costs.  Since neither seeks that relief, however, and since there may be further nuances the court is missing, the motion will be subject to oral argument and possible proffers of evidence by both sides while the jury deliberates on liability.  Accordingly, the court will RESERVE on the motion at this time.

### F. Motion to Exclude the Damages Opinions of Kevin Murphy, Kirit Lezotte and Jane Tereba (dkt. #475).

Finally, ST seeks to exclude Murphy's, Lezotte's and Tereba's opinions that the GSS technology would have been ready for launch in June 2014, thereby rendering their ultimate opinions on damages inadmissible in their entirety.   ST argues that Dr. Murphy's report purports to *opine* that ABS was ready to launch on June 2014.   In response, however, ABS points out that Murphy's report actually cites the deposition testimony of ABS's 30(b)(6) designee, ABS employee Jesus Martinez, as the basis of his assumption that ABS would have begun using its GSS technology to provide some sexed semen processing services in June 2014.    Additionally, in his deposition, Dr. Murphy confirmed that he was not offering an expert opinion on the June 2014 launch date, and that he relied upon others for it.   Accordingly, there is no need to restrict such an opinion.

The motion as to the other experts is equally pointless.  As to Kirit Lezotte's damages assessment, ST argues again that it was inappropriate for him to rely on his conversation with Lightner and Schilffarth in arriving at the June 2014 launch date.  It likewise argues that Jane Tereba's assumption that Lezotte obtained the correct launch

date from Lightner and Schilffarth was inappropriate.  For the same reasons that reliance on this kind of information is not improper under *Daubert*, the court will not disqualify assumptions about launch date.  Of course, ST is free to challenge the assumption and underlying testimony relied upon by the experts, as well as offer contrary evidence, just as the court reserves on the reasonableness of that assumption given ABS's admission that it is still completing testing of the new protocols developed after discovery of Mean's trade secret violations.  Accordingly, the motion is DENIED.


ORDER

IT IS ORDERED THAT:

1. ABS's motion to exclude certain testimony of W. Todd Schoettelkotte (dkt. #429) is DENIED.

2. ABS's motion to exclude certain testimony of Barry C. Harris (dkt. #432) is DENIED.

3. ST's motion to exclude testimony of Jane Tereba (dkt. #471) is GRANTED in part and DENIED in part as set forth above.

4. ST's motion to exclude testimony of Kevin Murphy (dkt. #473) is DENIED.

5. ST's motion to exclude testimony of Kirit Lezotte (dkt. #474) is RESERVED as set forth above.

6. ST's motion to exclude the damages opinions of Kevin Murphy, Kirit Lezotte and Jane Tereba (dkt. #475) is DENIED.

Dated this 9th day of August, 2016.

BY THE COURT:

/s/

_____

William M. Conley
District Judge

24