IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ABS GLOBAL, INC.,

        Plaintiff/Counterclaim Defendant,        OPINION AND ORDER

    v.                                   14-cv-503-wmc

INGURAN, LLC,

        Defendant/Counterclaimant/Third-Party Plaintiff,

    and

XY, LLC,

        Intervening Defendant/Counterclaimant/Third-Party Plaintiff,

    v.

GENUS PLC,

        Third-Party Defendant.

After a ten-day trial, a jury found that defendant Inguran, LLC d/b/a Sexing Technologies ("ST") willfully maintained its monopoly power in the market for sexed bovine semen processing services in the U.S. through anticompetitive acts in violation of Section 2 of the Sherman Act, but that plaintiff ABS Global, Inc. ("ABS") had suffered no antitrust injury. The jury further found ABS liable for patent infringement and breach of contract with ST. Finally, the jury awarded monetary damages to ST on its contract and patent counterclaims.

In this opinion, the court will address the parties' post-trial motions, which challenge various aspects of the jury's well balanced, carefully considered verdict. (Dkt.

##738, 741.)  The court will also address ABS's motion for permanent injunctive relief based on the jury's findings that ST is a monopolist.  (Dkt. #680.)

BACKGROUND[1]

ABS is a "bull stud," meaning it is in the business of selling semen from its own bulls in "straws" for use in artificial insemination, which are prized by dairy farmers and beef producers for their specified genetic characteristics.  ST provides semen-processing services to ABS and other bull studs to produce "sexed semen straws," a product consisting of predominantly male or female sperm cells.  The former is valued by beef producers, and the latter by dairy farmers, ever more so as improvements in sexed semen straw processing have begun to achieve fertility rates approaching those of traditional semen straws.

A relatively new technology, the parties entered into their first, formal contractual relationship for sexed semen processing or "sorting" in 2006.  In August of 2012, ABS and ST entered into their most recent contract (the "2012 Agreement").  Almost two years into that Agreement, ABS filed this antitrust lawsuit, alleging that ST had unlawfully maintained its monopoly power in the market for sexed semen processing services by insisting on anticompetitive terms in the 2012 Agreement and by acquiring related patents for the purpose of keeping others out of the market.  In addition to treble damages, ABS sought a permanent injunction for ST's anticompetitive acts, relieving it of

---

[1] A detailed description of the facts and background of this case is set forth in the fact section of the court's summary judgment order.  (Dkt. #572.)  This opinion assumes a basic understanding of those facts, as well as the evidence at trial.

provisions in the 2012 Agreement that restricted ABS from the development and marketing of a competing sexed semen sorting technology (the "GSS technology").  In response to ABS's lawsuit, ST and its wholly owned subsidiary, XY, LLC, brought counterclaims and third party claims, respectively, for patent infringement, breach of contract and trade secret misappropriation against ABS and its parent company, Genus plc.

After the court denied ST's motion for summary judgment on ABS's Sherman Act claim, the case proceeded to jury trial.

## OPINION

### I.   Sherman Act and Wisconsin Unfair Competition Claims

ABS moves for a new trial on the jury's finding of no antitrust injury under Federal Rule of Civil Procedure 59 on the grounds that the court's jury instructions were faulty.  For its part, ST moves for judgment as a matter of law on the jury's finding of a relevant market and anticompetitive acts under the Sherman Act.  Both parties further move for judgment on ABS's related state law claim for unfair competition, which was not presented to the jury as a separate verdict question.  For the reasons that follow, the court will deny both motions with respect to the jury's special verdict on the Sherman Act claim, finding it eminently reasonable on the facts of record, and will enter judgment under state unfair competition law consistent with those same findings.

A.       New trial on antitrust injury

To obtain a new trial based on erroneous jury instructions, ABS must show that "(1) the instructions did not accurately state the law, and (2) the error prejudiced [it] because the jury was likely to be misled or confused." *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 733 (7th Cir. 2013).   ABS essentially merges these two elements by arguing not so much that the jury instruction on antitrust injury failed to state the law accurately, as the instruction did not fit its theory of the case.  *See Florists' Nationwide Tel. Delivery Network -- Am.'s Phone-Order Florists, Inc. v. Florists' Tel. Delivery Ass'n*, 371 F.2d 263, 270 (7th Cir. 1967) ("A party is entitled to instructions presenting [its] theory of the case if there is evidence to support it."). Specifically, ABS argues that the jury was likely confused by the instruction that ST caused an antitrust injury "[i]f ABS is able to prove by a preponderance of the evidence that its injuries were caused by a *reduction* in competition, acts that would lead to a *reduction* in competition, or acts that would otherwise harm consumers."   (Closing Liability Instructions (dkt. #692) at 17 (emphasis added).)   According to ABS, this jury instruction contradicted the facts of the case, since ST did not "reduce," but rather "*prevented* competition from emerging in a market that had none."   (Pl.'s Opening Br. (dkt. #739) at 2 (emphasis in original).)

In response, ST argues that the theory ABS presented to the jury was that ST's anticompetitive acts caused "a reduction in competition *that otherwise would not have occurred . . . absent those acts,*" and any reasonable jury would have read the "reduction in competition" instruction in accordance with that theory.  (Def.'s Resp. Br. (dkt. #752) at

4

6 (emphasis added).)   The court largely agrees.   ABS's strained interpretation of the injury instruction would restrict "competition" to a knowable, readily quantifiable number that could only be reduced by deterring or eliminating competition from an existing firm already selling competing services to buyers in the relevant market.   Such a narrow reading would not only be inconsistent with the parties' arguments in the monopolization context, but would also read out the broader, more abstract consumer welfare concept in the last clause of the jury instruction as embraced by Section 2 of the Sherman Act.   *See, e.g., Fishman v. Estate of Wirtz*, 807 F.2d 520, 535-36 (7th Cir. 1986) ("[T]he enhancement of consumer welfare is an important policy -- probably the paramount policy -- informing the antitrust laws.").   Moreover, the Sherman Act liability instructions, which referenced "potential" competition or competitors multiple times (Closing Liability Instructions (dkt. #692) at 3, 7, 11, 15), expressly embraced this "consumer welfare-centered" interpretation.   *See Alloy Int'l Co. v. Hoover-NSK Bearing Co.*, 635 F.2d 1222, 1228 (7th Cir. 1980) (considering "the instructions as a whole" in finding it unlikely that the jury was misled).

That the jury was not misled by this "reduction in competition" language in the jury instruction is further bolstered by ABS's own closing argument to the jury based on the evidence at trial.   During closing argument, ABS's counsel asked the jury to find antitrust injury because it was not "able to use [its GSS] technology to supply itself and its customers" due to ST's anticompetitive actions.   (8/9/16 Trial Tr. (dkt. #729) at 68:5-7.)   Ultimately, there is no reason to think that the jury was misled by the presentation of the evidence, nor by the jury instructions, into believing that it needed to

5

find ST had reduced some particular degree of existing "competition," as opposed to analyzing whether ST's actions harmed competition and consumers by preventing (or at least delaying) the launch of ABS's semen sorting technology into the relevant market. Having failed to demonstrate any likelihood that the jury actually misunderstood the appropriate standard for finding antitrust injury, ABS's motion for a new trial on antitrust injury will be denied.  *See Alloy Int'l*, 625 F.2d at 1228 ("The test, then, is not what meaning the ingenuity of counsel can at leisure attribute to the instructions, but how and in what sense, under the evidence before them and the circumstances of the trial, ordinary men acting as jurors will understand the instructions.").

Even if the court were to find that the instruction on antitrust injury was incorrect (or as ABS styles it, inappropriate), it must nevertheless take into account "the instructions as a whole, along with all of the evidence and the arguments."  *Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries*, 272 F.3d 441, 452 (7th Cir. 2001); *see also Ernst v. City of Chi.*, 837 F.3d 788, 794 (7th Cir. 2016) ("District courts have substantial discretion in how to precisely word jury instructions, provided that the final result, read as a whole, is a complete and correct statement of the law.").  Here, between the jury instructions as a whole, as well as expert testimony and lengthy closing arguments by counsel, the court is satisfied the jury understood full well what it was being asked to decide.  Moreover, as discussed more fully in the opinion below, there was an ample evidentiary basis for the jury to find no present injury given that ABS and the rest of the bull stud industry were reluctant to even offer sexed semen until ST had demonstrated its ability to compete with conventional semen, and ABS was forced to retool its processes

6

to eliminate use of ST's wrongfully taken proprietary information.  For both reasons, there was ample evidence for the jury to find that ABS was not yet ready to compete as of the date of trial even if the restrictive provisions in the 2012 Agreement were not present to inhibit it from doing so.[2]

### B.      Relevant antitrust market and anticompetitive acts

ST argues alternatively that judgment as a matter of law should have been entered against ABS on whether a separate submarket existed in the U.S. for sexed semen straws. There is even less merit in this argument.  Generally, the parties agree that "under Seventh Circuit law, ABS must adduce 'economic evidence' rather than 'conclusory assumption[s]' to do so."  (Pl.'s Trial Br. (dkt. #650) at 1 (quoting *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 318 (7th Cir. 2006)).)  Here, ST faults ABS's expert, Professor Kevin Murphy, for failing to present sufficient economic evidence or analysis to meet this standard.  More specifically, since ABS had the burden to prove a relevant antitrust market at trial, ST argues that Murphy acknowledged that analyzing price changes in the relationship between sexed semen straws and conventional semen straws was "important," but then failed to present actual economic evidence on whether those

---

[2] ST also argues that ABS's failure to prove antitrust injury for its violation of § 2 of the Sherman Act "mandates a judgment in favor of ST on that claim" (Def.'s Opening Br. (dkt. #742) at 4), but as ABS points out in response, the jury's verdict is better interpreted as requiring judgment against ST under § 2 and against ABS for treble damages under § 4 of the Clayton Act.  *Cf. Comcast Corp. v. Behrend*, 569 U.S. ___, 133 S. Ct. 1426, 1438 (2013) ("A firm is guilty of monopolization under § 2 if the plaintiff proves (1) 'the possession of monopoly power in the relevant market' and (2) 'the willful acquisition or maintenance of that power[,] as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'  *United States v. Grinnell Corp.*, 384 U.S. 563, 570-571 (1966).  A private plaintiff seeking damages must also show that (3) the monopolization caused 'injur[y].'  15 U.S.C. § 15.") (alterations in original).

products are reasonably interchangeable and instead "testified in a conclusory manner based on hypotheticals." (Def.'s Opening Br. (dkt. #742) at 6.) In response, ABS points to Professor Murphy's testimony that no other "good substitutes for sexing services" exist, including his analysis of the price of sexed semen versus conventional semen over time. (8/3/16 Trial Tr. (dkt. #709) at 50:17-51:3.) Because the price of "sexed semen was going down relative to conventional semen much faster, and most of that decline came out of the bull studs," rather than ST, Professor Murphy concluded that the price of conventional semen did not constrain the price ST could charge for sexed semen processing services. (*Id.* at 54:11-55:17.)

Based on overwhelming evidence that bull studs increasingly felt the need to offer *both* sexed and conventional semen for sale in order to remain competitive, Murphy also testified that they had no reasonable alternative to purchasing sexed semen processing services from ST. (*Id.* at 59:9-23.) Along with other factual evidence of the growing importance of the niche being carved out for sexed semen in the bull stud market (especially after fertility rates for sexed semen began to climb to rival those of conventional semen), Professor Murphy reasonably analyzed the effect of competition between sexed and conventional semen straws on ST's ability to price sexed semen sorting services. This evidence was far more than conclusory or anecdotal. The strong consensus of all actors in the industry was that ST had taken the sexed semen market from a small afterthought to an indispensable, growing part of every bull stud's product offering in less than a decade, at least if it wanted to remain competitive, even in the

market for conventional semen.  Accordingly, ST's motion for judgment as a matter of law on the element of the relevant antitrust market will be denied.

### C.   Anticompetitive contracting practices

On the element of willful maintenance of monopoly power, the jury found that ST insisted on anticompetitive contract terms.  As it did unsuccessfully before the jury, ST again contends that the contract terms ABS now insists were anticompetitive actually served a "normal business purpose."  *State of Ill. ex rel. Burris v. Panhandle E. Pipe Line Co.,* 935, F.2d 1469, 1481 (7th Cir. 1991) ("Conduct that tends to exclude competitors may therefore survive antitrust scrutiny if the exclusion is the product of a 'normal business purpose[.]'") (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 608-10 (1985)).  Given its monopoly position, the court agrees with ABS that the evidence was sufficient for the jury to reasonably find "ST's insistence on long-term, take or pay contracts with high minimum purchase commitments, research and field trial restrictions, and restrictions on the commercialization of competing technologies was anticompetitive."  (Pl.'s Reply. Br. (dkt. #737) at 28 (incorporated by reference in Pl.'s Resp. Br. (dkt. #751) at 8).)

In its brief, ST identifies procompetitive justifications for each of these challenged contract terms:

> (1) the liquidated damages provision benefited ABS by providing a certain price at which it could exit the contract, and it was designed to cover some of the cost of staff and equipment that ST would need to incur to perform under

the contract (Def.'s Resp. Br. (dkt. #727) at 29 (incorporated by reference in Def.'s Opening Br. (dkt. #742) at 7));

(2) the evergreen and three-year notice of cancellation provisions were designed to give ST enough time to relocate the equipment and staff at ABS's facility and give the parties enough time to negotiate any contract renewal (*id.* at 29-30);

(3) the non-compete clause addressed ST's concern that ABS would misuse its confidential information (*id.* at 30-31); and

(4) the five-year term and annual minimum purchase commitments provided the parties with long term certainty and guaranteed ST future sales to defray the upfront costs of setting up at ABS's facility (*id.* at 31).

While there is some merit to the justifications set forth for (1) and (2), the longer non-compete in (3) and the 5-year term and annual minimums in (4) are substantially more suspect, as is the duplicative and constraining nature of all four contract terms together. Regardless, ST's own documents and witnesses at trial were enough for a reasonable jury to disbelieve ST's assertion that it was motivated by these procompetitive purposes. (Pl.'s Reply Br. (dkt. #737) at 28-29.)

In reply, ST argues that Professor Murphy's testimony and the other statements ABS identifies demonstrate that "regardless of the effect of the Agreement on ABS's ability to compete . . ., each of the allegedly anticompetitive contract provisions nevertheless also had a sensible business purpose," and so the jury's verdict is improper as a matter of law. (Def.'s Reply Br. (dkt. #756) at 9.) But ST incorrectly frames the issue

10

the jury was asked to decide.  ST contends "[i]t is well established that anticompetitive conduct is 'conduct *without* a legitimate business purpose that makes sense *only* because it eliminates competition."  (Def.'s Reply Br. (dkt. #756) at 9 (quoting *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295 (11th Cir. 2004) (emphasis added)).)  The question for the jury, however, was not whether the restrictive contract terms had *any* legitimate business justifications, but "[w]hether valid business reasons motivated a monopolist's conduct[, which] is a question of fact."  *Panhandle E. Pipe Line Co.*, 935 F.2d at 1481-82; *see also Aspen Skiing Co.*, 472 U.S. at 602 ("In [a monopolization] case evidence of intent is merely relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive.'").

As the jury was instructed, "generally, the desire to maintain monopoly power or to block entry of competitors is not a legitimate business purpose."  (Closing Liability Instructions (dkt. #162) at 11.)  Since the jury was not required to believe that ST was motivated by valid business reasons with respect to any of the challenged contract provisions, the court must now assume the jury did not do so in considering ST's Rule 50(b) motion.  *May v. Chrysler Grp., LLC*, 716 F.3d 963, 971 (7th Cir. 2012).

"[B]ecause the jury found that ST lawfully acquired the patents that cover the sorting process" addressed in the parties' contracts, ST further asserts that "neither the sorting contracts nor ST's insistence on any terms in them can be unlawfully exclusionary."  (Def.'s Opening Br. (dkt. #742) at 7.)  Some parsing of ST's argument on this point may be helpful to illustrate its flaws.  Generally, ST contends that because the jury found that it attained monopoly power by virtue of its lawful acquisition of patents,

11

"the allegedly anticompetitive provisions in ST's sorting contracts are merely the legal exercise of ST's lawfully acquired patent rights."  (Def.'s Reply Br. (dkt. #756) at 12.)  More specifically, ST asserts that in the absence of "illegal tying, fraud, or sham litigation, a patentee's conduct only runs afoul of the antitrust laws when it (1) 'impermissibly broaden[s] the physical or temporal scope of the patent grant,' *and* (2) 'does so in a manner that has anticompetitive effects.'"  (Def.'s Resp. Br. (dkt. #727) at 34 (emphasis in original) (quoting *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1328 (Fed. Cir. 2000)).)  Because the jury found that ST did not acquire its sexed semen sorting patents for anticompetitive reasons, and because the jury did not find that "the sorting contracts' terms 'impermissibly broaden' the scope of ST's lawfully acquired patents," ST further argues the jury's finding that it insisted on anticompetitive contract terms is contrary to law.  (*Id.* at 34-35.)

While conceding the jury found ST's acquisition of its patent portfolio was lawful, ABS correctly points out that ST never proposed a jury instruction on, nor was the jury explicitly asked to decide, whether "the sorting contracts' terms impermissibly broaden" the scope of its patents.  Accordingly, neither can ABS be faulted for failing to make that showing, nor can the jury be faulted for failing to make that express finding.  Even so, ST argues that it did not waive this argument, having proposed the ABA model jury instruction on the general relationship between the patent and antitrust laws -- "as long as the patent owner acts only to take full advantage of the right to exclude created by his or her patent, he or she does not violate the antitrust laws."

12

There are several flaws in this argument.  As an initial matter, the court provided that very instruction to the jury.  Indeed, because it was provided at the outset of trial, ST was free to refer to it in opening statements, as well as closing arguments.  As importantly, this instruction does not support ST's implicit interpretation of it:  a firm lawfully attaining monopoly power due to patent rights can insist on contract terms that would otherwise be anticompetitive provided the contract is generally related to the patented technology.  Nor does the case ST cites in its Rule 50(a) motion, *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195 (2d Cir. 1981), stand for that proposition.  (*See* Def.'s Reply Br. (dkt. #756) at 12 n.3.)  Finally, ST waived this argument.  *See Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 403 (7th Cir. 2010) (finding waiver of an argument a party presented in a motion for judgment as a matter of law but did not make to the jury or request a relevant jury instruction).

Even if the court were to consider ST's argument that its contracting practices were somehow immunized because its semen sorting contracts were related to patents it acquired lawfully, the court agrees with ABS that the lawful acquisition of patents does not authorize a monopolist's insistence on anticompetitive contract terms to downstream customers with no other options in order to freeze out a possible future entrant into that market.  *Cf. Ford Motor Co. v. United States*, 405 U.S. 562, 576 n.11 (1972) ("Even constitutionally protected property rights such as patents may not be used as levers for obtaining objectives proscribed by the antitrust laws.").

### D.     Anticompetitive conduct as a whole

In addition to finding that ST willfully maintained its monopoly power by insisting on specific anticompetitive contract terms, the jury also found that it did so by its "anticompetitive conduct as a whole."  Because the jury found that ST's acquisition of patents was not anticompetitive, ST again argues that there was no evidence *post-dating* its acquisition of monopoly power in July of 2012 to support the jury's finding of "anticompetitive conduct as a whole," other than evidence of allegedly anticompetitive contract terms.  Accordingly, ST moves to vacate the jury's finding on that element as both duplicative and as potentially leaving ambiguity regarding what conduct the jury found to be anticompetitive to be used for purposes of estoppel or equitable relief.[3]

In reply to ABS's assertion that ST failed to move for judgment as a matter of law on this issue in a Rule 50(a) motion, ST seeks to clarify that it is really moving to *alter* an inconsistent judgment under Rule 59(e).  (Def.'s Reply Br. (dkt. #756) at 15 n.4.)  More specifically, if the court were to hold that the jury's liability findings with respect to ST's patent acquisitions and its anticompetitive conduct as a whole are internally inconsistent, then ST asserts that the court "may dissipate the inconsistency by setting aside one of the conflicting verdicts, if that verdict was unsupported by the evidence."  *Am. Cas. Co. of Reading, Pa. v. B. Cianciolo, Inc.*, 987 F.2d 1302, 1305 (7th Cir. 1993); *see also Fox v. Hayes*, 600 F.3d 819, 844 (7th Cir. 2010) ("A new trial based on inconsistent verdicts is warranted only when a jury's verdict cannot be reconciled with the evidence at trial.").

---

[3] ST also argues that the jury's "anticompetitive conduct as a whole" finding is unsupportable for the same reasons the court should reject the jury's specific anticompetitive contract findings.

14

Of course, "[any] plausible explanation for the verdict precludes reversal." *Id.; see also Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004) (a jury verdict should not be set aside "if a reasonable basis exists in the record to support the verdict, viewing the evidence in the light most favorable to the prevailing party, and leaving issues of credibility and weight of evidence to the jury").   On this record, there was more than sufficient evidence to support the jury's reasonable finding that ST violated the antitrust laws outside of its insistence on anticompetitive contract terms after it obtained monopoly power.   Indeed, ABS identifies *eight* such examples.   Three of those examples involve activity related to patents that the jury expressly found ST acquired lawfully -- securing additional patents using patent applications it purchased from Monsanto, choosing not to license its patents and blocking competitors from using those patents. ABS argues that this patent activity could support an "as a whole" finding because the Seventh Circuit has explained that conduct that may be lawful when analyzed separately could support § 2 liability when considered in concert with other conduct.   *See City of Mishawaka, Ind. v. Am. Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980).   For conduct to be included in a holistic approach, however, it must still support a finding of willful maintenance of monopoly power as a matter of law.   *See Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 717 (7th Cir. 2006); *see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004) (warning courts against the risk of false positives expanding Section 2 liability to "chill the very conduct the antitrust laws are designed to protect") (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)).   And, as ST correctly points out, *SCM* holds that "where a patent

15

has been lawfully acquired, subsequent conduct permissible under the patent laws cannot trigger any liability under the antitrust laws."  645 F.2d at 1206.

Even without applying a *per se* rule adopted by the Second Circuit in *SCM*, this court agrees with its general reasoning that the patent-related activities ABS identifies could not support Section 2 liability under the circumstances of this case, particularly given the evidence of the substantial risk ST took in acquiring those patents and developing its technology to create a new market for sexed semen.  (*See, e.g.*, 8/9/16 Trial Tr. (dkt. #729) at 81-86.)  *See also* III Phillip E. Areeda, et al, *Antitrust Law* § 704 (4th ed. 2015) ("[T]he Patent Act creates a federal right to exclude others from practicing the patent, and the right is generally asserted in court through a constitutionally protected process.  As a result, claims that a patent owner's enforcement activities constitute monopolization must generally be treated very circumspectly.").

ST argues that of the other five examples of misconduct ABS identifies, all are "contracting practices" necessarily subsumed within the jury's finding that ST willfully maintained its monopoly power by "insisting on anticompetitive contract terms."  But at least one of the additional instances of arguably anticompetitive conduct to which ABS points -- ST's efforts to block ABS from obtaining sexed semen from Boviteq (Dep. of Andre Barnabe (dkt. #316) at 16:8-18:4) -- reflects conduct *post-dating* the formation of ST's contracts, particularly given that the jury was instructed that it could find Section 2 liability if ABS proved that ST acted in an anticompetitive way by "[*i*]*nsisting* on specific terms in contracts with customers, whether potential competitors or potential customers of those competitors."  (Closing Liability Instructions (dkt. #692) at 11.)  The "insisting

16

on anticompetitive contract terms" question on the liability special verdict arguably focuses on the *formation* of ST's contracts with the bull studs.  Therefore, since there was evidence in the record for the jury to find that ST's conduct other than its *insistence* on particular terms in its contract with ABS and activity related to its lawfully acquired patents was anticompetitive, the court will not vacate the jury's finding that ST's conduct as a whole was anticompetitive.[4]

### E.    Unfair competition

Both parties move for judgment on ABS's unfair competition claim under Wisconsin common law.  The parties' dispute centers around two issues: (1) whether ABS waived its right to pursue liability or damages under an unfair competition claim separate from its Sherman Act claim; and (2) whether ABS established the elements of an unfair competition claim at trial.[4]  With respect to waiver, ABS argues that it agreed to be bound by ST's "conten[tion] that ABS's claim that Wisconsin's unfair competition law rises or falls with ABS's antitrust claims" only "for purposes of summary judgment." (Pl.'s Opening Br. (dkt. #739) at 43 (quoting Pl.'s Opp'n Br. (dkt. #324) at 58).)  In addition, ABS proposed a separate unfair competition instruction and special verdict question in its initial proposals.  (Pl.'s Proposed Special Verdict (dkt. #491) at 2; Pl.'s Proposed Jury Instrs. (dkt. #492) at 20-21.)  Furthermore, ABS objected to ST's failure to include a separate unfair competition instruction in ST's initial proposed jury instructions, arguing that a separate instruction was required because "[t]he standards for

---

[4] By virtue of the jury denying ABS any monetary damages for past acts, ST's challenge to an award of damages is moot.

17

finding liability are different for the two claims, and the jury could possibly find no violation of the Sherman Act, but unfair competition under Wisconsin law." (Pl.'s Objections (dkt. #534) at 7.)

As to these preliminary skirmishes between the parties, the court agrees with ABS, but the assertion that "ABS expressly objected to the omission from the [*court's*] draft instructions of any mention of ABS's unfair competition claim or of the legal standards for resolving that claim" is misleading at best. (Pl.'s Opp'n Br. (dkt. #751) at 43 (emphasis added).) While ABS objected to ST's omission of the unfair competition instruction in its initial proposed jury instructions -- other than noting that it did not waive any objections it raised earlier and contending the instructions it originally proposed should be given (Dkt. #608 at 1; Dkt. #629 at 1; Dkt. #653 at 2 n.1; Dkt. #661 at 9) -- ABS failed to alert the court as to any *specific, unique* instructions that needed to be included in the multiple draft instructions circulated by the court during any one of the several discussions about jury instructions that the parties had with the court both before and during trial that were required to differentiate its liability for unfair competition under Wisconsin law as opposed to federal law.

Federal Rule of Civil Procedure 51 requires that "a party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the manner objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). "Rule 51 requires that objections to jury instructions be made in a timely fashion, on the record and with *sufficient specificity to allow the presiding judge the opportunity to correct potential mistakes*." *Consumer Prods. Research & Design, Inc. v. Jensen*, 572 F.3d 436,

18

439 (7th Cir. 2009) (emphasis added); *see also Schobert v. Ill. Dep't of Transp.*, 304 F.2d 725, 729-30 (7th Cir. 2002) ("The [Rule 51] objection must be specific enough that the nature of the error is brought into focus.").  Under Seventh Circuit law, merely proposing an instruction that the court does not include is not enough to preserve an objection to that exclusion.  *See Jensen*, 572 F.3d at 439 (collecting cases).

ABS's failure to raise a particular objection to an unfair competition instruction not being included in the court's draft instructions, despite multiple opportunities, is particularly egregious given its further failure to correct the court's observation at summary judgment that "[t]he parties agree that ABS's unfair competition claim under the common law of Wisconsin rises or falls with its Sherman Act claim."  (*See* 7/21/16 Op. & Order (dkt. #572) at 28 n.8.)  Regardless, ABS's initial proffer of a separate, largely generic instruction does not comport with the expectations under Rule 51, nor with the purpose of raising specific objections to jury instructions expressed by the Seventh Circuit.[5]  *See Petkus v. Richland Cty., Wis.*, 767 F.3d 647, 654 (7th Cir. 2014) ("Although it submitted its own instructions, which the judge declined to give, it failed to object to the instructions that the judge did give.  That was another forfeiture."); *Chestnut v. Hall*, 284 F.3d 816, 819-20 (7th Cir. 2002) (holding that a party could did not satisfy the specificity requirement of Rule 51 by objecting to a "similar" proposed instruction because "[t]o hold so would be no different than allowing the appellant to rely on a

---

[5]  ABS's proposed instruction merely explained, "[i]f you do not find in ABS's favor on its antitrust claim, you must consider whether ABS has shown . . . that ST engaged in an act or practice that has substantially interfered with ABS's ability to compete against ST on the merits," and provided a single example of a circumstance in which the only manufacturer of a given drug blocks its competitors by tying up manufacturing of a critical ingredient.  (Proposed Jury Instrs. (dkt. #492) at 20-21.)

general objection, which is insufficient under Rule 51").  ABS's failure to raise a specific objection is even more egregious given its position that it is somehow entitled to damages under the state law claim even though the jury found that it did not suffer antitrust injury under the Sherman Act.

The court similarly rejects ABS's argument that a finding of waiver would be unfair because of the court's statement on the evening of the sixth day of trial that it had "considered each of the briefs and the changes proposed by the parties as objections to my proposals" and observation that "to the extent the final version of the closing instructions is inconsistent with the submissions by the parties, I think you've preserved your record and your objection to the other language, including your comments now." (8/8/16 Trial Tr. (dkt. #720) at 156:19-157:2.)  Both the court's statement and observation immediately followed a discussion about the antitrust liability instructions, which both parties contested vigorously, but not about the need for a wholly separate instruction for ABS's state unfair competition claim, much less some wholly unarticulated difference in the scope of recoverable damages between that claim and its Sherman Act claim.

Nor is ABS's citation to *Dawson v. N.Y. Life Insurance Co.*, 135 F.3d 1158 (7th Cir. 1998), persuasive for the proposition that "if the district court judge assured the parties that the record adequately contains their objections, the parties should not be penalized for relying on such assurances." *Id.* at 1165.  In *Dawson*, the Seventh Circuit gave several reasons for finding that the defendant preserved its objection to the jury instructions, none of which are present here:

20

> First of all, New York Life did more than propose an instruction and then remain silent when the court rejected its proposal.  New York Life submitted a memorandum relating its position on the court's own instructions and proposing modifications to the court's instructions that, if adopted, would have brought the instructions back into line with what New York Life wanted in the first place.  Second, at some point further objection became useless.  The effect New York Life desired from its many objections was the crafting of an instruction that the court had already rejected.  Further objection would have been unavailing.

*Id.* at 1166 (internal quotation marks and citations omitted).  In contrast to the defendant in *Dawson*, ABS never raised a specific objection to the omission of its proposed unfair competition instruction after the court circulated draft instructions, despite multiple invitations for both written and oral objections from the court.

The court does not find waiver here casually or with indifference to any possible unfairness.  To the contrary, the court finds the application of the requirements of Rule 51 to be wholly appropriate and fair because ABS *never* explained what subtle nuances existed in state and federal law that required separate treatment, much less offered adequate, supplemental instructions distinguishing "antitrust injury" under the Sherman Act and "injury" or "harm" under state law for either the liability *or* damages phases of trial.

Even if the court were to consider the merits of ABS's argument that it is entitled to a new trial on damages because its state unfair competition claim applies a different, more lenient standard of proof than Section 2 of the Sherman Act, ABS faces another insurmountable hurdle.  Under Federal Rule of Civil Procedure 51(d)(2), a party can obtain relief for an erroneous omission of a jury instruction only if that error affected its

21

substantial rights and it can "articulate how [it] was affected by the refused jury instruction." *Jensen*, 572 F.3d at 439-40.  Here, ABS argues that a new trial based on its unfair competition claim is necessary because an "antitrust injury is *not* an element of unfair competition," which somehow entitles ABS "to a new trial limited to the question of whether ABS suffered harm as a result of ST's unfair competition, since the jury's monopolization verdict already conclusively establishes that ST engaged in unfair competition." (Pl.'s Reply Br. (dkt. #754) at 36 (emphasis in original).)  This argument is nonsensical, since it is premised on a finding of liability for *exactly* the same conduct the jury found violated the Sherman Act, yet argues the same jury that found no "injury," would nevertheless find "harm."

Even if the court were willing to entertain that decidedly remote possibility, ABS again offered no proposed instruction at trial, and still offers no explanation now, that articulates this supposedly unique standard for determining harm under Wisconsin common law of unfair competition.  Hence, ABS meets the same dead end.  *See Lewis v. City of Chi. Police Dep't*, 590 F.3d 427, 438-39 (7th Cir. 2009) ("Even if a party is entitled to an instruction, it is required to tender an instruction that correctly stated the law in order to challenge the district court's refusal to use it.") (internal quotation marks and citations omitted).

For all these reasons, while ABS is entitled to judgment as a matter of law on its unfair competition claim given the jury's findings as to its Sherman Act claim, it is not entitled to a new trial on damages.

## II.   Patent Claims

Both parties also challenge the jury's findings as to ST's counterclaims for infringement of two of its patents.  With respect to U.S. Patent No. 8,198,092 (the "'092 patent"), the jury found that ABS infringed all but one of the eight asserted claims (claim 13), but found that two of those infringed claims (1 and 13) were invalid. (Special Liability Verdict #2 (dkt. #697); Special Liability Verdict #4 (dkt. #699).) ABS also conceded that its sexed bovine semen sorting technology infringed the three asserted claims of the other patent, U.S. Patent No. 8,206,987 (the "'987 patent"), but the jury found one of those claims (claim 2) was invalid.  (Special Liability Verdict #2 (dkt. #697).)

### A.   Infringement of the '092 Patent

ST asserted infringement of independent claims 1 and 40 of the '092 patent at trial, as well as dependent claims 4, 13, 41, 42, 44 and 46.  Among other things, claims 1 and 40 require the step of "detecting waveform pulses," which the court earlier construed to mean "applying logic to distinguish waveform pulses that represent live cells from waveforms that represent noise, debris, or dead cells."  (7/22/16 Op. & Order (dkt. #572) at 71-72.)  Notwithstanding the jury's verdict, ABS argues that it is entitled to judgment as a matter of law on all of the asserted claims of infringement of the '092 Patent because ST presented no evidence at trial that its GSS technology performed the step of "detecting waveform pulses."

In response, ST effectively concedes that it needed to show that the GSS system actually performed the step of detecting waveform pulses to establish infringement --

rather than to show merely that it was *capable* of detecting waveform pulses -- since all of the asserted claims of the '092 patent are either method claims or apparatus claims.  (*See* Pl.'s Opening Br. (dkt. #739) at 20.)   Therefore, the parties primarily focus their attention on the evidence at trial regarding the "minimum span," or "min span," feature of the GSS system.

At trial, ST's expert, Dr. John Nolan, testified that the GSS system used the min span feature to avoid processing waveforms that are not likely to be live cells.  As support, Nolan referenced Trial Exhibit 1174, an ABS document, which includes a diagram of a sample waveform rejected by the GSS system's min span function, as well as a "snippet of code" describing the min span feature.  (8/8/16 Trial Tr. (dkt. #717) at 39:7-42:8.)  ST also points to testimony at trial from ABS's expert, Dr. J. Paul Robinson, that the min span feature can detect and exclude "events," including "electronic spikes," or "electronic noise" (8/8/16 Trial Tr. (dkt. #720) at 126:18-127:1, 128:9-12), as well as testimony from ABS's engineer, Adam Schilffarth, that if an event "fails the minimum span test, it's rejected" (*id.* at 32:6-10).

ABS first argues that this evidence fails to support a finding that its sorting process actually detected waveform pulses using the min span feature.  Specifically, ABS asserts that the values in the diagram in Exhibit 1174, including the min span value, were exaggerated and that ABS had never actually "built a GSS system that's on the scale shown in [Exhibit] 1174."  (*Id.* at 10:18-24, 11:35.)  The court agrees with ABS that Trial Exhibit 1174 alone would be insufficient to establish infringement, since it merely illustrated an example of how the min span function was *designed* to work.

24

ABS also points to Schilffarth's trial testimony that as the GSS technology developed, ABS recognized that it need not even use the min span feature.  Instead, it was set to 0.1 microseconds, which "has no significant difference from zero."  (*Id.* at 13:8-14:3.)  Schilffarth further testified that the GSS system uses a 400 kilohertz low pass analog filter to block "higher speed, shorter things," like "noise," from being converted to a digital signal and analyzed by the system's processor, but claimed the system does not apply "logic" in doing so.  (*Id.* at 15:15-17:10.)  As a result, Schilffarth testified on direct examination that the min span setting was set so low that it would not filter out any noise that had not already been rejected by the analog filter, and as he clarified on redirect, to the extent that min span was "used" in the GSS system, it was "not a meaningful feature."  (*Id*. at 41:24-42:4.)  Finally, Schilffarth testified that the GSS system determines whether to fire its kill laser based on whether an event is inside of a "gate" drawn by the operator of the machine, regardless whether events outside the gate represent live or dead cells.  (*Id.* at 7:5-15.)

Based on this testimony, ABS argues, the GSS system does not practice the step of detecting waveform pulses, or "applying logic to distinguish waveform pulses that represent live cells from waveforms that represent noise, debris, or dead cells."  Put more succinctly, ABS argues that since the parties agree "logic" can only be applied digitally, the GSS system's analog filter that blocks noise from being processed as a digital signal cannot perform logic, and since the kill laser fires at *everything* outside of a drawn gate, it also applies no logic to distinguish live cells from noise, debris, or dead cells.

In response, ST points out that "the jury was free to disregard or disbelieve Mr. Schilffarth's testimony" that the GSS system's analog filter rejects noise, debris and dead cells without using logic.  (Def.'s Opp'n Br. (dkt. #752) at 29.)  More specifically, ST attempts to draw a contrast between Schilffarth's response to a question from the court, indicating that the GSS technology does not use the min span feature "at all," and a description of the min span function in another one of ABS's documents, Trial Exhibit 518.  That document was created by ABS's instrumentation development manager, Dr. Dave Appleyard, and states that its purpose is to "detail[] the computational steps involved in event detection, processing and laser triggering that are used in the GSS instrumentation."  (Trial Ex. 518 at 4.)  The min span function is described in that document as "[t]he minimum span value that an event must exceed to be processed further.  Used as a way to remove extremely short events (noise or particulates in the stream) from further processing."  (*Id.* at 7.)

Even if the jury disbelieved Schilffarth's testimony about the GSS system's usage of the min span feature, ABS argues it would still be entitled to judgment of noninfringement as a matter of law because ST failed to present any other evidence that its technology actually performs the step of detecting waveform pulses.  Specifically, ABS rejects ST's infringement theory that the min span feature rejects noise in the form of "electronic spikes," arguing that ST presented no evidence of, nor is ABS aware of any, waveforms with "a high enough amplitude to cross the threshold, but a short enough duration to fall below the 'min span' limit of 0.1 microseconds."[6]  (Pl.'s Opening Br. (dkt.

---

[6] ABS also notes that while Exhibit 518 identifies the analog filter and the min span function as

#739) at 24.)  On cross, ABS expert Robinson acknowledged that the min span function "could" reject electronic spikes, but agreed with Schilffarth that they were "not going to be seen" by the digital processor because "the 400 kilohertz filter will cut [them] out, so [they] won't get there."  (8/8/16 Trial Tr. (dkt. #720) at 126:14; 127:6-10.)

Still, ST points to one last portion of Robinson's testimony.  As ST's counsel emphasized during its closing argument, Robinson acknowledged that it was "possible" noise could be introduced between the conversion of the analog signals to digital ones, including by the unit responsible for that conversion itself.  (8/8/16 Trial Tr. (dkt. #720) at 127:11-16; 8/10/16 Trial Tr. (dkt. #722) at 16:8-17:6.)  For its part, ABS argues that Robinson's concession as to that *possibility* is merely hypothetical, lacking *evidence* to support the jury's verdict, just as Schilffarth acknowledged on cross examination that the min span feature would reject an event "if for some reason the analog filter didn't work." (8/8/16 Trial Tr. (dkt. #720) 32:23-33:3.)

While this evidence of infringement of the '092 patent at trial was far from overwhelming, the court is persuaded that the description of the min span function in Trial Exhibit 518, as well as Robinson's and Schilffarth's testimony that min span would reject noise from further processing in the event that a waveform pulse was not rejected by the threshold analog filter, was sufficient to support a reasonable jury's finding of

---

features, it also states that min span is set at 0.01 microseconds, which is the same level to which Schilffarth testified before min span was changed to 0.1 microseconds.  (Pl.'s Reply Br. (dkt. #754) at 18-19.)

infringement, particularly given Robinson's admission that the processor that converts analog to digital signals could itself introduce noise.[7]

ABS's final argument as to infringement of the '092 patent is that ST's electronic spike theory misapplies the meaning of "detecting waveform pulses" as construed by the court. According to ABS, it is not enough for ST to show that the GSS digital processing system "did something to distinguish at least some kinds of noise from live cells," but rather distinguished "between live cells on one hand, and debris or dead cells on the other hand." (Pl.'s Opening Br. (dkt. #739) at 26.) ABS appears to argue that the court's claim construction required that the "noise" be filtered out using logic to eliminate anything that might contaminate the sorted semen or create inefficiency and waste in processing (*see id*.) rather than "[s]imply distinguishing noise from live cells." (Pl.'s Reply Br. (dkt. #754) at 19.)

ST asserts, and the court agrees, that ABS's attempts at further refinements really amount to additional, late claim construction to argue that an infringing system must

---

[7] The parties fault each other for the limited evidence as to how much "noise," if any, is filtered by the digital processor. ST faults ABS for introducing its analog filter theory of non-infringement for the first time at trial (Def.'s Opp'n Br. (dkt. #752) at 29 n.6), while ABS claims that it introduced evidence about how the analog filter operates only after ST first presented its electronic spike infringement theory at Robinson's deposition, which was held on this subject on the weekend after the trial itself had already begun (Pl.'s Reply Br. (dkt. #756) at 18 n.4). The court permitted ST to take this late deposition because ABS was given leave to reassert its non-infringement defense with respect to claims 40-46 of the '092 patent after the court entered summary judgment of infringement based on ABS's earlier concession of infringement. In turn, this change in ABS's position was prompted by ST's late-proposed construction of "detecting waveform pulses," which itself was triggered by ABS's late assertion of a newly-identified prior art reference. (*See* 7/29/16 Op. & Order (dkt. #622).) As the court remarked in the opinion and order permitting ST to take the deposition, rather than parcel out fault at the time, counsel for both parties recognized that "patent litigation frequently involves managing moving targets and contingent positions." (*Id*. at 3-4.) The court is no more inclined to allocate fault now for the parties' late-developing arguments.

actually distinguish live cells from: (1) noise, debris and dead cells, rather than noise only; or (2) all, rather than only some, types of noise.  (Def.'s Opp'n Br. (dkt. #752) at 32.)  In reply, ABS attempts to characterize this claim construction argument as instead a "postverdict elaboration" that "only clarified what was inherent in the construction," making "plain what . . . should have been obvious to the jury."  (Pl.'s Reply Br. (dkt. #756) at 19 (quoting *Cordis Corp. v. Boston Sci. Corp.*, 658 F.3d 1347, 1356 (Fed. Cir. 2011)).)  To the contrary, the court explained in construing "detecting waveform pulses" that claims 1 and 40 of the '092 patent and its specification describe "'pulse detection' as a process by which the system identifies particles likely to be sorted, suggesting that the step of detecting waveform pulses uses logic to identify live cells from other waveforms." (7/21/16 Op. & Order (dkt. #572) at 68-69.)  No further specificity regarding the court's claim construction was necessary, much less inherent in that construction.  Accordingly, a system infringed even if it only filtered out some noise in the detecting waveform pulses step consistent with the ordinary meaning of the court's claim construction.  *See Cordis Corp.*, 658 F.3d at 1355-56 ("[B]ecause [the defendant] did not object to the court's jury instruction regarding the construction of the term, . . . the verdict must be tested by the charge actually given under the ordinary meaning of the language of the jury instruction.") (internal quotation marks, citation and brackets omitted); *see also SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1199 (Fed. Cir. 2013).  For all these reasons, the court will not disrupt the jury's verdict as to infringement of the '092 patent.

## B.     Validity of claims 1 and 13 of the '092 patent

In finding that claims 1 and 13 of the '092 patent were invalid, the jury was obviously persuaded by ABS's only invalidity argument -- those claims are anticipated by the FACS DiVa system ("DiVa").  ABS argues that the verdict was amply supported by "testimony from both sides' experts establishing that the digital electronics in the DiVa system distinguished between live cells and a certain type of noise -- *e.g.*, noise that is substantially shorter in duration than 0.1 microseconds -- in the same way the GSS system did."  (Pl.'s Opp'n Br. (dkt. #751) at 23.)  ST, on the other hand, argues that ABS did not establish at trial that the DiVa detects waveform pulses in light of the court's claim construction.[8]

Instead of applying logic to distinguish waveform pulses, ST contends, the evidence showed that the DiVa "analyzes and classifies *every* signal that crosses its preset threshold."  (Def.'s Opening Br. (dkt. #742) at 25 (emphasis in original).)  As support, ST points to testimony from Nolan, who opined that "a threshold isn't logic," as well as

---

[8] ST also contends that ABS's argument presents a "practicing the prior art" theory, which fails as a matter of law.  Contrary to ST's assertion, ABS's contention that claim 13 of the '092 patent is invalid because the DiVa system does not process signals shorter than 0.1 microseconds in a similar way that the min span function of the GSS system rejects signals of the same length is not a classic "practicing the prior art" defense, but rather a clumsy argument for interpreting the distinguishing "noise" element of the "detecting waveform pulses" step consistently in both the infringement and invalidity contexts.  *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 ("Because the claims of a patent measure the invention at issue, the claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses.").  The basic reasoning that nullifies "practicing the prior art" arguments is nevertheless pertinent here.  By focusing so heavily on ST's infringement arguments regarding the GSS system in its invalidity case, ABS failed to meet its higher burden of proving invalidity by clear and convincing evidence.  *See Zenith Elecs. Corp. v. PDI Commc'n Sys., Inc.*, 522 F.3d 1348, 1363 (Fed. Cir. 2008).

Robinson's testimony agreeing that the DiVa processes every signal that crosses the threshold, "including live cells, noise, debris and dead cells." (*Id.* at 25-27.)

In response, ABS cites Nolan's acknowledgment on cross-examination that a signal that was "much shorter" than 0.1 microseconds might not be detected as an event by the DiVa's electronics. (8/9/16 Trial Tr. (dkt. #721) at 106:22-107:4.) But, as ST points out in reply, Nolan made clear in his testimony that the contingency regarding whether that short signal would be detected is dependent only on the DiVa's 0.1-microsecond *sampling rate* (meaning one sample taken every 0.1 microseconds); because "if any signal passed the threshold during that .1 microsecond, it would cross the threshold and be recorded as an event." (*Id.* at 15-21.) In other words, ST argues because the DiVa did not apply "logic" to distinguish waveform pulses at the step in which it analyzed every signal that crossed its pre-set threshold, then ABS was required to show that its rejection of signals shorter than 0.1 microseconds limitation was an application of "logic," which ABS failed to do.

The court agrees with ST that without any showing that the DiVa's sampling rate was a function of "logic," ABS did not present clear and convincing evidence that claims 1 and 13 of the '092 patent are invalid. ABS effectively concedes that its own expert did *not* opine that claims 1 and 13 of the '092 Patent are invalid because the prior art DiVa disclosed the "detecting waveform pulses" limitation. Thus, to establish that the DiVa did disclose that limitation, ABS is forced to rely on *ST's* expert, who disavowed that very assertion. This is a strained, convoluted argument at best, which fails to meet the clear

31

and convincing evidence standard of proof, even if it convinced the jury.  Therefore, the court grants ST's motion.[9]

### C.     Infringement of claim 13 of the '092 patent

ST also moves for judgment as a matter of law that ABS infringed claim 13 of the '092 patent on the basis that the jury necessarily rejected ABS's noninfringement argument by finding infringement on claim 1, since the evidence that it performed the additional limitations in claim 13 was unrebutted.  Indeed, ABS acknowledges that "both sides' experts testified that the only disputed elements in claim 13 were those in underlying independent claim 1."  (Pl.'s Opp'n Br. (dkt. #751) at 27.)  Nevertheless, ABS argues that ST's Rule 50(b) motion fails because it made no Rule 50(a) motion regarding infringement of claim 13 of the '092 patent in its written motion regarding its patent claims (dkt. #670), nor orally at the close of ABS's noninfringement and invalidity rebuttal case, even though the court invited ST to describe those grounds in taking notice of any motions that would be filed.  (8/9/16 Trial Tr. (dkt. #721) at 66:7-13.)

For its part, ST acknowledges making no Rule 50(a) motion on its infringement claims, but asserts that it did not do so because the court stated after ST rested its rebuttal case on the patent claims, that "both sides' motions are preserved" in direct response to ABS's counsel advising before the jury was charged that it would be filing Rule 50(a) motions.  (*Id.* at 133:21-22.)  Based on this statement, ST claims to have

---

[9] Obviously, therefore, ABS's argument that a new trial is required to resolve any inconsistencies in the jury's invalidity findings as to claims 1, 13 and 40 of the '092 Patent is rendered moot.

"reasonably understood the Court to be preserving patent-related Rule 50(a) motions, and, therefore, did not make a motion on its infringement claims." (Def.'s Reply Br. (dkt. #756) at 36.) But, that claimed understanding does not comport with ST's written submission just one day *after* this exchange that set forth the specific grounds for its Rule 50(a) motions on invalidity, which the court allowed the parties to file to detail their oral "placeholder" motions to avoid delaying the jury trial. Therefore, ST should have raised any grounds for judgment as a matter of law on infringement of claim 13 of the '092 patent in that written submission. *See Wallace v. McGlothan*, 606 F.3d 410, 418 (7th Cir. 2010) ("Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion.") (quoting Fed. R. Civ. P. 50(b) committee note (2006 amend.)).

That said, the Seventh Circuit has recognized an exception to a party's waiver of a challenge to the sufficiency of the evidence supporting a jury's verdict "when the failure to review a sufficiency-of-the-evidence argument would result in 'manifest injustice.'" *SEC v. Yang*, 795 F.3d 674, 680 (7th Cir. 2015).[10]  Moreover, the Seventh Circuit has instructed district courts to interpret jury verdicts "so as to avoid inconsistency whenever possible." *Freeman v. Chi. Park Dist.*, 189 F.3d 613, 615 (7th Cir. 1999).  Here, the court can avoid any inconsistency between the jury's verdicts that ST infringed claim 1 of the '092 patent (as well as claims 40, 41, 42, 44 and 46, for which the jury was instructed

---

[10]  "The Federal Circuit reviews procedural matters that are not unique to patent issues under the law of the particular regional circuit court where appeals from the district court would normally lie." *DMI, Inc. v. Deere & Co.*, 802 F.2d 421, 428 (Fed. Cir. 1986); *see also Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1343 (Fed. Cir. 2009) ("We review inconsistent verdicts, an issue not unique to patent law, under regional circuit law.").

that "the sole issue in dispute as to infringement is whether ABS practices the step of 'detecting waveform pulses'" (Closing Liability Instrs. (dkt. #692) at 20)) and its verdict that ABS did not infringe claim 13, by interpreting the jury's non-infringement verdict on a finding that the GSS system did not perform the additional limitations in claim 13.

As ST points out, however, ABS presented *no* evidence to rebut the trial testimony of Robinson, Schilffarth and Nolan that the digital signal processor of the GSS system extracts features from waveform pulses "correspond[ing] to one or more of the following features: pulse area, pulse peak, pulse inner area, pulse width, pulse gaussianity, pulse lagging peak or pulse slope." (Def.'s Opening Br. (dkt. #742) at 30-31 (quoting Trial Ex. 1626 ('092 Patent) at 246).) Indeed, ABS admits that "[t]here was no dispute at trial that if the limitations of claim 1 were met by the GSS system, the additional limitations of claim 13 (and claim 11 on which it depends) were met." (Pl.'s Opening Br. (dkt. #739) at 29.)

Accordingly, there was *no* evidence at trial to support the jury's verdict that ABS did not infringe claim 13 of the '092 patent because ABS did not rebut any of ST's evidence that the GSS system performed the limitations that claim 13 adds to claim 1, and so the court will grant ST's motion for judgment as a matter of law that ABS infringed claim 13, despite its failure to move timely under Rule 50(a).[11]

---

[11] ST did not seek a new damages trial for infringement of claim 13 of the '092 patent, moving only for the court to "enter judgment as a matter of law of infringement in ST's favor." (Def.'s Opening Br. (dkt. #742) at 31.)

### D.   Validity of claims 1, 2 and 7 of the '987 patent

Next, ABS moves for judgment as a matter of law that claims 1, 2 and 7 of the '987 patent are invalid on the grounds of either obviousness or lack of enablement. Claim 1 is an independent claim disclosing a "method of sorting a mixture of stained sperm cells," one of the steps of which is photodamaging sperm cells that were selected based on their classification.  (Trial Ex. 7.)  The other two claims depend on claim 1. Claim 2 adds the limitation that the step of selecting sperm cells to be photodamaged applies a "sort strategy," while claim 7 adds the limitation that sorting is based on the presence or absence of X-chromosomes.  (*Id.*)  The jury found that ABS had not proven that claims 1 and 7 were invalid, but had established that claim 2 was invalid.

#### 1.  Obviousness

The parties dispute what the jury's verdict as to the claims of the '987 patent means and, relatedly, in which party's favor the court must construe the disputed facts in resolving ABS's motion.  As an initial matter, ABS further contends that the court need not reach that question because clams 1, 2 and 7 are invalid as a matter of law on the *undisputed* facts at trial.

"Obviousness is a question of law based on underlying findings of fact," *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1237 (Fed. Cir. 2010), although the "ultimate judgment of obviousness is a legal determination," *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007).  Judgment as a matter of law is appropriate when "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors."  *Id.*

35

Moreover, conflicting expert testimony regarding the factors relevant to obviousness does not necessarily create a dispute of material fact. *See Wyers*, 616 F.3d at 1239. Given *KSR*'s instruction for courts to take an "expansive and flexible approach" to obviousness, including recourse to logic, judgment and common sense, in lieu of expert testimony," courts can resolve "the question of motivation to combine . . . on summary judgment or JMOL in appropriate circumstances." *Id.* at 1238-39 (quoting *KSR*, 550 U.S. at 415).

ABS identifies several facts concerning obviousness that the parties did not dispute at trial: (1) there were three, relevant prior art references -- "Johnson 1999," "Keij 1994" and the Shapiro patent; (2) a combination of Johnson and Keij or Johnson and Shapiro would include every limitation in the three claims; (3) the general definition of the level of ordinary skill in the art; and (4) five secondary considerations of obviousness. (Pl.'s Opening Br. (dkt. #739) at 7.) ABS also asserts there was no dispute at trial that: (1) photodamage sorting systems were one of only three conventional sorting approaches known to those with skill in the art; (2) "combining Johnson with Keij or Shapiro would have been a routine matter, and that there would have been a reasonable expectation of success"; and (3) "there was undisputed evidence of a motivation to use photodamage sorting in place of droplet sorting." (*Id.* at 8.) More specifically, ABS argues that the evidence showed combining Johnson with one of the other two references would have been routine because Keij explained that most commercially available, "dual-beam flow sorters," including the "MoFlo cytometer," could be converted to a photodamage sorter with only "minor modifications." (*Id.*) ABS further asserts that the evidence showed a reasonable expectation of success at the time of invention because Johnson established

36

that the MoFlo cytometer could sort viable sperm cells at high speeds.  (*Id.*)  With respect to a motivation to combine the references to use photodamage sorting, instead of droplet sorting, ABS points to evidence in the prior art references identifying photodamaging as a method to sort large numbers of cells at high speeds, both factors known to be critical in improving on the sorting of sperm cells.  (*Id.* at 9.)

On the other hand, ST rightly points to other evidence presented at trial that:  (1) a person having ordinary skill in the art would not have been motivated to combine the prior art; and (2) a person having ordinary skill would not have expected success in combining them.  In particular, ST cites:  (1) ABS expert Robinson's testimony that droplet sorters were commercially viable at the time the technology underlying the '987 patent was invented, but that photodamage sorters were not; (2) Robinson's testimony that the Keij reference does not "specifically suggest" photodamaging sperm cells; and (3) Robinson's acknowledgement that the Shapiro reference does not mention sperm cells. (Def.'s Opp'n Br. (dkt. #752) at 11-12.)

With respect to a reasonable expectation of success, ST also identifies the evidence presented at trial that sperm cells were less likely to withstand two of the problems causing damage to the hardier types of cells described in the Keij reference -- ultraviolet (UV) light leakage and limitations on how quickly the photodamaging laser could be turned on or off; both of particular concern given the large size and unique shape of sperm cells and the possibility of damaging their tails or their DNA, thus rendering them undesirable for artificial insemination because they cannot regenerate themselves.  (*Id.* at 12-15.)  Finally, ST's expert credibly testified that the Keij reference

"teaches away" from sorting sperm cells because it emphasized that his method was appropriate for "small and sturdy" cells and also identified similar limitations due to UV light leakage and laser speed.  (*Id.* at 15-17.)

In light of this conflicting contemporary evidence as to the possible benefits of photodamage sorting of bull semen, the court disagrees with ABS that the obviousness of the '987 patent is established by undisputed facts "that photodamage sorters were a known way to improve cell sorters to sort at higher speeds, that a MoFlo sperm sorter as taught in Johnson 1999 could have been converted to a photodamage sorter, and that the required modifications would have been 'minor.'"  (Pl.'s Opening Br. (dkt. #739) at 11.) Nor does the court agree with ABS that the combination of the Johnson and Keij references was obvious simply because the combination puts together old elements performing the same functions for the same benefits.  *See KSR*, 550 U.S. at 417 ("[W]hen a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious.") (internal quotation marks and citation omitted).  On the contrary, the benefits of combining the prior art references were not clearly ascertainable, again due to the unique properties of sperm cells and the limitations of photodamage sorting at the time the '987 patent was filed.[12]

---

[12] Even though Nolan admitted that the specifications of the '987 patent do not address which kill laser to use, how to avoid light leaking or how to turn the laser on or off, the failure of the '987 patent to address those issues alone does not render its claims obvious.  As explained below, while the '987 patent's discussion of photodamage sorting is admittedly somewhat superficial, this is not a situation where the patent fails completely to explain how to implement the claimed invention, which would give rise to an enablement problem.  *See Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1327 n.3 (Fed. Cir. 2008) (noting that a party's argument that a person of

Construing the evidence regarding obviousness of the '987 patent presented at trial in favor of ST, a reasonable jury certainly had a legally sufficient evidentiary basis to find in ST's favor on obviousness.  Although ABS presented evidence including that the MoFlo cytometers sorted sperm cells at high speeds and could have been converted to photodamage sorters with only "minor" modifications, the jury was not required to find that a person of ordinary skill in the art would have been motivated to combine existing cytometers that sorted sperm with the photodamaging technique or would have had a reasonable expectation of success, given the contrasting evidence that ST presented.  In particular, ST emphasized at trial that the Keij reference described the photodamaging technique as appropriate for "small and sturdy" cells with properties unlike sperm cells, which would have presented difficulties in using a laser to sort sperm cells, even if that statement did not rise to the level of "teaching away."  *See Apple*, 839 F.3d at 1051 n.15 (noting that "even if [a prior art reference] does not teach away, its statements regarding users preferring other forms of switches are relevant to a finding regarding whether a skilled artisan would be motivated to combine").[13]

Nor would a reasonable jury be required to find that the Keij reference's suggestion that sorting sperm cells using the photodamaging technique was an "interesting possibility" (8/8/16 Trial Tr. (dkt. #720) at 59:4-14) led only to an

---

ordinary skill would not have been able to incorporate a web browser into existing electronic prior art systems "might suggest that the claims present an enablement issue, rather than support a conclusion of nonobviousness" because the patent was "itself silent regarding how to actually implement the methods claimed therein with a web browser").

[13] The court will grant ST's unopposed motion for leave to file supplemental authority (dkt. #758).

obviousness verdict, since that statement falls short of presenting an "identified, predictable solution[]." *KSR*, 550 U.S. 421; *see also PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1364 (Fed. Cir. 2007) ("[A]n invention would not be deemed obvious if all that was suggested was to explore a new technology or general approach that seemed to be a promising field of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it.") (internal quotation marks and citation omitted).  Thus, there was adequate evidence to support the jury's findings that the asserted claims of the '987 patent were not invalid as obvious.

### 2. Enablement

#### a.   Claim 2

Since ABS cannot establish that the asserted claims of the '987 patent are invalid on obviousness grounds based on undisputed facts, the court turns to the parties' dispute regarding the deference that should be given to the implied factual findings of the jury based on its verdicts.  In particular, ABS argues that the jury's invalidity verdict is inconsistent, and so the court is not bound to construe the facts in the light most favorable to either party.  In contrast, ST argues that the jury's findings that claims 1 and 7 are valid, but claim 2 is invalid, are not inconsistent.  Rather, the jury could have found that claim 2 was invalid on written description or enablement grounds.

Since the jury's invalidity verdict as to the '987 patent is not inconsistent for reasons set forth below, the court ultimately will construe the trial evidence in favor of the prevailing party in reviewing ABS's Rule 50(b) motion, and determine whether a

reasonable jury would have "a legally sufficient evidentiary basis" to find in that party's favor.  *See Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 822 (7th Cir. 2016) (citations omitted); *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 761 (7th Cir. 2015) ("Judgment as a matter of law is proper if 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'") (quoting Fed. R. Civ. P. 50(a)(1)); *see also Apple, Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1040 (Fed. Cir. 2016) (applying the standard of the circuit in which the district court sits in reviewing order granting or denying motion for judgment as a matter of law).

As already discussed, courts must interpret jury verdicts in a manner that would render them consistent, if supportable by the evidence at trial.  *See Fox*, 600 F.3d at 844. ABS first argues that it is necessarily inconsistent for a dependent claim to be invalid if the broader, independent claim from which it depends is valid.  Certainly, as ABS points out, case law establishes that "[a] broader independent claim cannot be nonobvious where a dependent claim stemming from that independent claim is invalid for obviousness."  *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1344 (Fed. Cir. 2009). ABS argues that the same is true if the jury found claim 2 invalid on enablement grounds:  since enablement requires "the full scope of the claimed invention [to] be enabled," if the full scope of the *narrower* claim was not enabled, then ABS asserts neither could the full scope of the broader claim be enabled.  (Pl.'s Opening Br. (dkt. #739) at 17-18.)  There is, however, no basis in law or logic to support this argument.

In support, ABS cites *Sitrick v. Dreamworks, LLC*, 516 F.3d 993 (Fed. Cir. 2008), in which the Federal Circuit held that the patent failed for lack of enablement because the

41

patent claimed, but the specification failed to enable those skilled in the art for, both movies and video games. *See id.* at 1000. As such, *Sitrick* stands for the proposition that all embodiments of a particular claim must be enabled, not that a nonenabled, dependent claim renders an enabled independent claim invalid as well. Indeed, unlike obviousness, one can readily conceive the possibility of a patent's independent claim being enabled, without providing to one skilled in the art sufficient guidance to enable one of its dependent claims. Accordingly, the court is unpersuaded that a patent's specification is necessarily invalidated simply because an *additional* limitation in a dependent claim is not enabled, even if the broader claim on which it depends is enabled. *Cf. TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*, 264 F.3d 1111, 1120, 1126 (Fed. Cir. 2001) (affirming the district court's ruling that a dependent claim was invalid for an inadequate written description and remanding for the district court to consider the validity of the claim on which it depended in light of the Federal Circuit's claim construction); 3 Donald S. Chisum, *Chisum on Patents* § 8.06[5][c] at 8-692 ("A dependent claim may not be patentable, despite the allowability of the independent claim, because of the absence of support in the specification for the added limitation.").

ABS next argues that the jury's validity findings cannot be reconciled with the evidence presented at trial, because there was no evidence regarding the written description at trial, nor of the "sort strategy" limitation lacking enablement. (Pl.'s Opening Br. (dkt. #739) at 18 n.3; Pl.'s Reply Br. (dkt. #754) at 5.) In response, ST points to *ABS* expert Robinson's acknowledgement that a column of the '987 patent discussing "photodamage sorting having a sort strategy" lacked "any details," which ST

42

contends was sufficient to support the jury's invalidity finding as to claim 2.  (8/9/16 Trial Tr. (dkt. #721) at 46:3-15.)  While conceding that the column to which Robinson testified provided no details about sort strategies, ABS argues two other columns in the '987 patent's specification provided enough information for claim 2 to survive an enablement challenge.  (Pl.'s Reply Br. (dkt. #754) at 7.)  In a similar turn, ABS points out: (1) that *ST* expert Nolan acknowledged the '987 patent "describes how you would use the various sort strategies"; (2) the "fulsome" discussion of the sort strategy limitation in the specification; and (3) there was "no dispute that the prior art, and the Johnson 1999 reference in particular, disclosed the concept of using a 'sort strategy.'" (*Id.* at 5, 6, 8.)

ABS, however, does not cite to any testimony or other evidence at trial concerning what a person having ordinary skill in the art would have understood about sorting strategies, nor what the prior art disclosed about them.  Moreover, ABS fails to establish enablement by remarking generally that "if anything was adequately addressed in the '987 patent's discussion of the photodamaging embodiment, it was the concept of a sort strategy."  (*Id.* at 5.)

The jury was instructed that "ABS contends that *all* of the asserted claims of the '987 patent are invalid" for lack of enablement.  (Closing Liability Instrs. (dkt. #692) at 25.)  Furthermore, ABS insisted in its closing argument that the only portion of the specification of the '987 patent that discusses photodamaging using a laser was "very sparse," contained in two columns that, **combined**, span "about half a page" of the 200-page specification.  (8/10/16 Trial Tr. (dkt. #722) at 60.)  In fairness, ABS's counsel

argued in his closing argument that the specification of the '987 patent contemplates that a practitioner will "decide whether you want to have a high recovery or a high purity," but its argument that "the patent doesn't contain enough information to enable someone to make and practice the [invention]" constituted a broad attack on the '987 patent on enablement grounds.   (*Id.* at 61-62.)   Ultimately, in light of the breadth of ABS's enablement arguments and the lack of any significant discussion of sorting strategies in columns 126 and 127 of the '987 patent, which ABS identified to the jury as the *only* language in the patent concerning photodamage sorting, the jury could reasonably have found that claim 2, but not claims 1 or 7, was invalid for lack of enablement under its additional, sorting strategy limitation.   Accordingly, the jury's validity findings as to claims 1, 2 and 7 of the '987 patent are not inconsistent, and ABS is not entitled to a new trial on those grounds.

### b.   Claims 1 and 7

Similarly, the court rejects ABS's motion for judgment as a matter of law that claims 1 and 7 of the '987 patent are invalid for lack of enablement.   "The enablement requirement is satisfied when one skilled in the art, after reading the specification, could practice the invention without undue experimentation."   *Sitrick*, 516 F.3d at 999. (internal quotation marks and citation omitted).   With respect to enablement, ABS stresses ST expert Nolan's acknowledgement that:  (1) the '987 patent does not disclose "a specific kill laser to use"; and (2) a person of ordinary skill in the art who read the '987 patent would have needed to do "experimentation regarding engineering in the optics," including "optimizing optical elements such as beam shaping, approaches to

44

controlling the laser, and the direction and intensity of the pulse." (8/9/16 Trial Tr. (dkt. #721) at 117:3-7, 123:8-15.)   ABS further cites Nolan's testimony at trial that the experimentation to implement the kill laser would be "extensive." *Id.*  Finally, as already discussed, ABS again emphasizes that the only substantive discussion of photodamage sorting in the '987 patent is found in columns 126 and 127 and supported by one diagram.

In contrast, the jury found a person having ordinary skill in the art would have been able to implement photodamage sorting as disclosed by the '987 patent without *undue* experimentation, a finding that is also in accordance with Nolan's trial testimony. (*Id.* at 128:20-129:7.)   While ABS correctly notes that Nolan's trial testimony lacked much detail as to the specific portions of the specification of the '987 patent that were enabling, ABS's list of the elements of "engineering in the optics" that the '987 patent failed to address only go so far, as ABS offers no case law that the specification of the '987 patent *needed* to address every problem related to photodamage sorting of sperm cells that Nolan identified as evidence of nonobviousness to be enabling.  Though again far from overwhelming, Nolan's testimony that a person skilled in the art would be able to practice the photodamage sorting technology disclosed in the '987 patent with extensive, but not undue experimentation was sufficient to support the jury's verdict. Thus, ABS is not entitled to judgment as a matter of law that claims 1 and 7 are invalid for lack of enablement.  For the reasons explained above, therefore, ABS is not entitled to a new trial on the patent claims.

## III.  Contract Claims

At trial, the jury returned a verdict in favor of ST on its claim that ABS and Genus materially breached the confidentiality provision in Section 16 of the 2012 Agreement when ABS's employee, Kathy Mean, used or disclosed ST's confidential media protocols. ABS moves for judgment as a matter of law to the contrary.  Both parties also move for judgment as a matter of law as to the enforceability of the liquidated damages provision contained in the 2012 Agreement, as well as its covenant not to compete.

### A.      Breach

ABS argues that the jury's finding of a material breach is flawed for three, independent reasons:  (1) the media protocols were not "disclosed" by ST to ABS under a proper interpretation of the contract; (2); no reasonable jury could have found that ABS's breach was material based on the evidence presented at trial; and (3) ST did not prove any damages resulting from the breach as required under Texas law.

### 1.  Interpretation of "disclosed"

Section 16 of the 2012 Agreement defines "ST's confidential information" as the following:

> (i) information pertaining to the research, processing or production of Sorted Semen that is disclosed by ST or its Affiliates to ABS and is confidential, non-public, proprietary and/or generally not known to the public, to include but not limited to: any and all information relating to technology, methods, techniques, processes, know-how, concepts, secrets and scientific or technical know-how, whether such information be tangible, intangible, intellectual or otherwise; and (ii) any information related to Sorted Semen that is

> based on or derived from any of the foregoing, whether by
> ABS or ST or third parties.

(Trial Ex. 82 at 9.)

The court found both clauses (i) and (ii) of the definition "ST's confidential information" in Section 16 to be ambiguous, and thus instructed the jury to "decide their meaning by determining the intent of the parties at the time of the agreement." (Closing Liability Instrs. (dkt. #692) at 29-30.) For example, a key factual question was whether a former ST employee may bring information with her to ABS without ABS violating the meaning of Section 16. Based on its verdict, the jury necessarily found that "ST's confidential information" included that information, even though it was not affirmatively disclosed by ST to ABS.[14] The court agrees with ST that there was enough evidence for the jury to find that both parties intended information defined in (i) "that is disclosed by ST or its Affiliates to ABS" to include information obtained by ABS in a manner other than through a direct disclosure from a current ST employee to an ABS employee.

Specifically, ST presented evidence at trial that its principals expressed their concern multiple times during the course of negotiating the 2012 Agreement about ABS using confidential information obtained from former employee Kathy Mean. (8/2/16

---

[14] ST argues that the jury could have inferred that "ST protocols were in fact disclosed to ABS under Section 16 of the Agreement by direct transmission from the ST sorting lab to ABS personnel, rather than through an earlier 'taking' by Kathy Mean," based on testimony at trial from an ABS employee that she and other ABS "technical personnel . . . routinely entered ST's laboratory, where ST's confidential protocols were kept, and interacted with ST's employees." (Def.'s Opp'n Br. (dkt. #752) at 46-47 (citing 8/5/16 Trial Tr. (dkt. #719) at 32-35).) Even if the jury could have reached its verdict based on that evidence, however, the jury would have had to interpret the definition of ST's confidential information in Section 16 as encompassing a similarly broad scope that would cover the Kathy Mean scenario -- in other words, that the confidentiality provision precluded use and disclosure of ST's confidential information even if it was obtained by ABS through means other than an ST employee directly disclosing that information to an ABS employee.

Trial Tr. (dkt. #711) at 106:22-107:2; 8/2/16 Trial Tr. (dkt. #715) at 71:2-11.)  Among them was ST's co-CEO Maurice Rosenstein, who testified credibly at trial that ST insisted on the inclusion of the non-compete clause in the 2012 Agreement because of its concerns about Kathy Mean using and sharing confidential information obtained while working for ST.  (8/2/16 Trial Tr. (dkt. #715) at 67:7-15.)

In response, ABS argued to the jury and now again to the court that inclusion of the phrase "disclosed by ST" in defining "ST's confidential information" in the parties' 2007 Agreement evinces the parties' intent to exclude circumstances like those involving Kathy Mean, since ST had no similar concerns about ABS using its confidential information when they entered into their earlier contract.  (Pl.'s Opening Br. (dkt. #739) at 31-32 (citing Trial Ex. 117 at ¶ 13).)  As ST pointed out in reply to the court, however, the parties *did* add to the definition of "ST's confidential information" in Section 16 of the 2012 Agreement clause (ii), which a reasonable jury might find further evinces an intent to expand the definition to cover the use or disclosure of protected information by a former employee.  Accordingly, there was enough evidence for the jury to find that the parties intended for Section 16 of the 2012 Agreement to include as confidential information media protocols Kathy Mean brought to ABS from ST.

### 2.  Materiality

Next, ABS argues that it is entitled to judgment as a matter of law because any breach was not material.  Consistent with the Texas pattern jury instructions, the jury was instructed to consider the following non-exclusive list of factors in deciding materiality:

48

- the extent to which the injured party will be deprived of the benefit which it reasonably expected;

- the extent to which the injured party can be adequately compensated for the part of that benefit of which it will be deprived;

- the likelihood that the party failing to perform or to offer to perform will cure its failure, taking into account the circumstances including any reasonable assurances; and

- the extent to which the behavior of the party seeking to perform or to offer to perform comports with standards of good faith and fair dealing.

(Closing Liability Instrs. (dkt. #692) at 30.)

ABS argues that those factors all break in its favor:  (1) ST was not "substantially deprived" of the primary benefit of the contract, having received approximately $14 million per year in payments from ABS for ST's services; (2) ABS's use of ST's 2005 protocols "was not material, especially since ABS has never sold any sexed semen made with the protocols copied by Kathy Mean"; (3) ABS quickly terminated Mean after learning that she was using XY's protocols, and then began developing new ones; and (4) ABS will be obligated to pay XY $750,000 for its misappropriation of XY's trade secret protocols anyway.  (Pl.'s Opening Br. (dkt. #739) at 34-35.)  But, these are the same arguments that the jury heard and rejected, obviously giving more weight to counter evidence that the use of XY's protocols gave ABS an important advantage in designing its competing sorting technology.  (*See* Def.'s Opp'n Br. (dkt. #752) at 56-60.)  Along with proof of ABS's failure to investigate timely and thoroughly the extent of its use of confidential information, the court agrees with ST that this was enough evidence for the jury to find that ABS's breach was material under the broad, flexible factors dictated by Texas law.  *See Hiles v. Arnie & Co., P.C.*, 402 S.W.3d 820, 831 (Tex. App. 2013)

("Generally, the issue of whether a breach rises to the level of a material breach that will render the contract unenforceable presents a dispute for resolution by the trier of fact."). ABS's motion, therefore, will be denied.

### 3. Damages

Finally, ABS argues that ST's claim of a material breach must fail as a matter of law because it failed to prove damages at trial. Under Texas law, the elements of a breach of contract claim are: (1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resulting pecuniary loss suffered by the plaintiff. *See Am. Certified Equip., Inc. v. Houston Plating and Coatings, LLC*, Civil Action No. 4:13-CV-853, 2014 WL 3543715, at *3 (S.D. Tex. July 14, 2014); *Taub v. Houston Pipeline Co.*, 75 S.W.3d 606, 615 (Tex. App. 2002). A plaintiff carries the burden of showing a loss resulting from a breach. *Sport Supply Grp., Inc. v. Columbia Cas. Co.*, 335 F.3d 453, 465 (5th Cir. 2003) (citing *Taub*, 75 S.W.3d at 617). Under Texas law, "[a] breach of contract claim cannot survive if the plaintiff was not damaged by the breach." *Eckland Consultants, Inc. v. Ryder, Stilwell Inc.*, 176 S.W.3d 80, 89 (Tex. App. 2004).

The trial was bifurcated. In the liability phase, the jury found that ABS materially breached the 2012 Agreement by using or disclosing ST's confidential media protocols, and it awarded ST's wholly owned subsidiary, XY LLC, a reasonable royalty in the amount of $750,000 for injuries caused by ABS's trade secret misappropriation in the damages phase. The jury was not instructed on, nor asked to decide an amount for, damages for ABS's breach of the confidentiality provision of the 2012 Agreement. Nor

was the jury asked to determine during the liability phase whether ST suffered a pecuniary loss for ABS's breach.

The section regarding contract damages was removed from the jury instructions, because ST's damages expert did not provide any opinions as to breach of contract damages for ABS's use or disclosure of ST's confidential media protocols (as opposed to damages for a breach based on use or disclosure of quality control data), which was the only basis for the jury's finding of a breach of contract.  (8/10/16 Trial Tr. (dkt. #722) at 105:7-10.)  Because the jury was only asked to decide what amount XY was entitled to for damages resulting from ABS's misappropriation of its trade secret protocols, ABS now argues that ST failed to present any proof of breach of contract damages at trial, requiring entry of judgment in its favor on ST's breach of contract claim.

In support, ABS cites several cases in which Texas courts held that a plaintiff failed to prove a breach of contract for failure to show that it had suffered damages as a result of the breach.  *See Sport Supply*, 335 F.3d at 465-66 (grant of summary judgment of no breach of contract because plaintiff could not show resulting damages); *Silver Lion, Inc. v. Dolphin Street, Inc.*, No. 01-07-00370-CV, 2010 WL 2025749, at *14-*16 (Tex. App. May 20, 2010) (reversing trial court's judgment of a breach of contract because plaintiff failed to offer sufficiently credible proof of damages); *Eckland Consultants*, 176 S.W.3d at 89 (trial court erred in awarding judgment to two of three, related plaintiffs who sustained no damages); *Taub*, 75 S.W.3d at 616 (summary judgment of no contract breach was appropriate because no evidence of recoverable damages and plaintiffs did not claim nominal damages).

51

In opposition, ST initially argues that ABS waived this argument, having never asserted it in a Rule 50(a) motion.  ST also argues that any failure on its part to seek a separate damages instruction as to the breach of contract claim was the result of its "rel[iance] on ABS's repeated treatment of ST and XY as indistinguishable for purposes of the misappropriation claim and the damages stemming from the misuse of the media protocols."  (Def.'s Opp'n Br. (dkt. #752) at 54.)

In reply, ABS argues that no Rule 50(a) motion was required, nor was there any waiver, because ST admits making no pretrial disclosure of damages from a breach of contract based on ABS's use or disclosure of its confidential media protocols. Accordingly, there was nothing ST could do to prove damages for its breach of contract claim at trial.

Alternatively, ABS argues that even if a Rule 50(a) motion was required, then it sufficiently alerted ST and the court by seeking "judgment as a matter of law [under Rule 50(a)] because 'ST was not substantially deprived of the benefits it reasonably expected under the Agreement.'"  As to this last argument, however, ABS acknowledges that "this language appeared in [its] brief in the legal context of whether there was proof of a material breach," not whether ST had adequate proof of a pecuniary loss.  (Pl.'s Reply Br. (dkt. #754) at 32 (citing Pl.'s Mot. (dkt. #662) at 4).)

The court agrees with ST that ABS failed to alert both ST and the court timely about a possible, post-trial argument that it was entitled to judgment as a matter of law on any breach of contract claim because ST failed to offer proof of damages evidence separate from XY's trade secret misappropriation claim.  At no time during trial did

ABS's counsel indicate that ABS was entitled to judgment on ST's breach of contract claim if it failed to present separate damages evidence on that claim.  On the contrary, in response to the court's question whether asking the jury to clarify whether it found a material breach based on use or disclosure of ST's confidential quality control data or media protocols "matter[ed] for purposes of materiality," ABS's counsel simply responded, "Well, our position would be that neither breach was material.  There's going to be a finding to the contrary, Your Honor."  (8/11/16 Trial Tr. (dkt. #730) at 12:25-13:7.)  This statement, as well as ABS's argument in its Rule 50(a) motion that "ST was not substantially deprived of the benefits it reasonably expected under the Agreement," was inadequate to put ST or the court on notice that ST was essentially waiving its breach of contract claim by not asserting separate damages.

Moreover, this was a deficiency that could *potentially* have been solved if raised before the jury decided damages.  *See Laborers' Pension Fund v. A & C Envt'l, Inc.*, 301 F.3d 768, 775 (7th Cir. 2002) ("The purpose of requiring that [a Rule 50] motion be made after submission of all the evidence, but before the case is given to the jury, is to afford the opposing party an opportunity to cure any defect in its case before the jury retires.").  Although ST's damages expert did not present an opinion on separate breach of contract damages based on ABS's use or disclosure of the media protocols, the court cannot conclude definitively that ST would not have been able to present, at least, a case for nominal damages for its breach of contract claim, particularly given the jury's award of substantial damages to XY on its trade secret misappropriation claim.  *Cf. Southwest Airlines Co. v. BoardFirst, L.L.C.*, Civil Action No. 3:06-CV-089-B., 2007 WL 4823761, at

53

*10 (N.D. Tex. Sept. 12, 2007) ("Texas courts recognize a distinction between uncertainty about the *fact* that damages have been sustained and uncertainty as to their *amount*. . . . [U]nder Texas law a plaintiff's failure to prove actual damages stemming from a breach of contract does not prevent recovery on a contract theory; nominal damages may still be obtained upon proof that a contract was formed and breached.") (emphasis in original).  As a result, ABS cannot now be heard on its breach of contract damages argument, nor is it entitled to judgment on ST's breach of contract claim on that basis.  Instead, the court will award nominal damages of $1.00.

### B.    Liquidated damages

Both parties move for judgment as a matter of law under the liquidated damages provision in Section 4(a) of the 2012 Agreement.  Under Texas law, liquidated damages provisions are enforceable when: "(1) the harm caused by the breach is incapable or difficult of estimation, and (2) the amount of liquidated damages called for is a reasonable forecast of just compensation." *FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.*, 426 S.W.3d 59, 69 (Tex. 2014) (internal quotation marks omitted) (citing *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991)).  Texas courts consider each element "from the perspective of the parties at the time of contracting."  *Id.*  A challenge that a liquidated damages clause constitutes an unenforceable penalty is an affirmative defense under Texas law, and so "the party asserting penalty bears the burden of proof."  *SP Terrace, L.P. v. Meritage Homes of Tex., LLC*, 334 S.W.3d 275, 287 (Tex. App. 2010).

Section 4(a) provides for ABS to pay ST $7.50 per unpurchased straw of sexed semen in the event that the Agreement is terminated because of ABS's material breach.

ABS first contends that Section 4(a) is unenforceable because any harm caused by ABS's material breach was not "incapable or difficult of estimation," as "[t]he harm is the simple difference between the revenue ST would have gotten from those straws (*i.e.*, price times quantity), minus the cost of producing them."  (Pl.'s Opening Br. (dkt. #739) at 36.)  But as ST's CFO testified at trial, determining marginal costs over time is difficult, which is no doubt why both sides originally agreed to side step that dispute in the 2012 Agreement, given variations in factors that affect its costs, not to mention the growing demand for sexed semen and changes in the number of bulls whose semen ST was required to sort.  (Def.'s Opening Br. (dkt. #742) at 18 (citing 8/3/16 Trial Tr. (dkt. #712) at 94:8-14).)  Accordingly, ABS has failed to show that at the time of contracting, the amount of harm for straws that were manufactured, but went unpurchased as a result of a material breach, was an unreasonable forecast, much less that $7.50 per straw amounts to a penalty now.

ABS further argues that the liquidated damages provision is unenforceable because Texas law frowns upon liquidated damages clauses that do not disclaim cumulative remedies.  *See Nexstar Broadcasting, Inc. v. Gray*, No. 09-07-364 CV, 2008 WL 2521967, at *3 (Tex. App. June 26, 2008) ("Generally, a contractual provision that does not exclude further liability for actual damages is not a reasonable forecast of just compensation and is an unenforceable penalty.") (citing *Robert G. Beneke & Co. v. Cole*, 550 S.W.2d 321, 322 (Tex. Civ. App. 1977)).  In support, ABS points to Section 4(c) of the 2012 Agreement, in which:

> The parties agree that the sums set forth in Sections 4(a) and 4(b) above are a reasonable estimate of the damages that

55

would be suffered by ST due solely to the lost sales of Sorted
Semen as a result of the termination scenarios set forth in
Sections 4(a) and 4(b), as the case may be, and that such
sums are not intended to be a penalty.  *These liquidated
damages shall not be exclusive of each other, nor of any other remedy
available to ST at law or in equity, including but not limited to
termination of this Agreement, or of the recovery of any damages
caused by any other breach of this Agreement by ABS.*

(Trial Ex. 82 at 4 (emphasis added).)

At summary judgment, the court dismissed ST's claim for damages under Section
4(b) of the 2012 Agreement, finding a $1.5 million flat fee that applied equally in the
first year of a five-year (or longer) agreement as it did in the last year was not a
reasonable estimate of compensation for sunk costs, but rather a straightforward penalty
for breach.  (7/21/16 Op. & Order (dkt. #572) at 17-22.)  Nevertheless, ABS argues that
since Texas courts determine the validity of a liquidated damages clause at the time of
contracting, the court should consider the cumulative remedies contemplated by sections
4(a), 4(b) and 4(c) of the Agreement in addressing whether Section 4(a) is enforceable.
Given that Section 4(c) states that the liquidated damages remedies in Sections 4(a) and
4(b) "shall not be exclusive of each other, nor of any other remedy available to ST at law
or in equity," the court agrees that the plain language of Section 4(c) at least allows for a
duplicative award.

As ST points out, however, courts applying Texas law can:  (1) reform liquidated
damages provisions that would otherwise be unenforceable; or (2) sever the language
from the 2012 Agreement that would make Section 4(a) unenforceable.  While ABS
suggests that reformation would only be available if ST could show that the parties made
a mutual mistake, citing *Comiskey v. FH Partners, LLC*, 373 S.W.3d 620 (Tex. App.

2012), ST points to a more recent decision by the same Texas appeals court in *Arcturus Corp. v. Espada Operating, LLC*, NUMBER 13-13-00713-CV, 2016 WL 4272381 (Tex. App. Aug. 11, 2016), affirming a trial court's reforming and enforcing a liquidated damages provision without finding mutual mistake.[15]  ST also cites other cases applying Texas law, which hold that the concerns about overlapping liquidated and actual damages remedies seek to preclude parties from obtaining a duplicative recovery for the same injury, *see Palmco Corp. v. Am. Airlines, Inc.*, 983 F.2d 681, 686-87 (5th Cir. 1993), suggesting that the language ABS cites from *Nexstar* that a liquidated damages "provision must make clear that the amount of liquidated damages will be in lieu of other damages," 2008 WL 2521967, at *3, goes too far; rather, any further recovery must be for non-duplicative damages.  Indeed, as ST emphasizes, Section 23 of the 2012 Agreement contemplates that if a court modifies a provision of the Agreement due to it being illegal, invalid or unenforceable, then the remaining provisions should be construed "in accordance with the modified provision."[16]  (Def.'s Reply Br. (dkt. #756) at 25-26.) Several other provisions of the 2012 Agreement would entitle ST to damages for reasons other than ABS's material breach in failing to purchase its quota in straws.  (Def.'s Opening Br. (dkt. #742) at 22-23.)

---

[15]  In *Arcturus*, the trial court lowered the amount of the liquidated damages to reflect a "commercially reasonable sum" under the circumstances.  2016 WL 4272381, at *5.

[16]  In full, Section 23 provides that: "Should any provision of this Agreement be held to be illegal, invalid or unenforceable, by any court of competent jurisdiction, such provision shall be modified by such court in compliance with the law and, as modified, enforced.  The remaining provisions of this Agreement shall be construed in accordance with the modified provision and as if such illegal, invalid or unenforceable provision had not been contained herein."  (Trial Ex. 82 at 11.)

Therefore, ST has no right to recover duplicative, liquidated damages under Section 4(b) or 4(c) for the same injury for which it can recover liquidated damages under Section 4(a).  Indeed, the liquidated damages amount in Section 4(a) represents a reasonable estimate of a harm that was certainly difficult to estimate at the time of contracting, and remained so even at the time of breach, and so the court will interpret Sections 4(b) and 4(c) to avoid cumulative recoveries for "lost sales of Sorted Semen" for unpurchased straws as set forth in Section 4(a).  This result best accomplishes the apparent intent of the parties in negotiating the liquidated damages amount in Section 4(a), which is the ultimate aim of courts applying Texas law.  *See Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 657-58 (Tex. 2009) ("[A] contract's overriding purpose is to capture the parties' intent, meaning we must construe it in light of how the parties meant to construe it.").  Thus, Section 4(a) is enforceable under Texas law.

### C.   Covenant not to compete

Finally, the court addresses the parties' dueling motions as to the enforceability of the non-compete clause at Section 18 of the 2012 Agreement.  Under Texas law, "[t]he enforceability of a covenant not to compete is a question of law." *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).  To be enforceable, a covenant not to compete must be

> ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a

> greater restraint than is necessary to protect the goodwill or
> other business interest of the promisee.

Tex. Bus. & Com. Code § 15.50(a).  If the covenant satisfies the ancillary requirement, but is overbroad as to time, geographical area, or scope of activity, then "the court shall reform the covenant to the extent necessary[.]"  Tex. Bus. & Com. Code § 15.51(c).

ABS argues that Section 18 is unenforceable because it is not: (1) ancillary to an otherwise enforceable agreement; and (2) reasonably limited as to geographical area and the scope of activity restrained.  As a starting point, the parties agree that an interest in protecting confidential information is sufficient to justify restrictions on competition.  *See Wharton Physician Servs., P.A. v. Signature Gulf Coast Hosp., L.P.*, No. 13-14-00437-CV, 2016 WL 192069, at *4 (Tex. App. Jan. 14, 2016) ("A covenant not to compete can be enforceable not only to protect trade secrets but also to protect proprietary and confidential information.") (internal quotation marks, citation and brackets omitted).  ABS contends that Section 18 is not ancillary to an otherwise enforceable agreement because ST provided no consideration for the non-compete clause, at least none "reasonably related" to an interest in protecting its confidential information.  Instead, ABS contends that the only consideration ST provided was a promise to sort semen, not to provide ABS with any confidential information.  *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 775 (Tex. 2011) ("Consideration for a noncompete that is reasonably related to an interest worthy of protection, such as trade secrets, confidential information or goodwill, satisfies the statutory nexus[.]").

ABS's contentions are ridiculously superficial on the facts here.  While ST did not expressly promise to provide confidential information to ABS, this was certainly implied,

not just by the non-compete clause itself *but also* the language of the parties' larger agreement, which "requires confidential information to be provided" to carry out that agreement. *Mann Frankfort*, 289 S.W.3d at 850; *see also id.* at 849-50 (explaining that because a covenant not to compete must only be "'ancillary to or part of' the agreement at the time the agreement is made," then "the requirement that there be an 'otherwise enforceable agreement' can be satisfied by the employer actually performing its illusory promise to provide an employee with confidential information").   Here, given the evidence that ABS employees working on the GSS system had access to ST's confidential information in its laboratory in ABS's facility (at least for some period of time), as well as the jury's finding that ABS used ST's confidential media protocols to develop its competing technology, the court agrees that Section 18 satisfies the "ancillary to or part of an otherwise enforceable agreement" requirement under Texas law.

Whether Section 18 constitutes an overbroad restriction on competition as to geography and scope of activity, however, presents a closer question.  Under Texas law, "[a] covenant is unreasonable if it is greater than required for the protection of the person whose benefit the restraint is imposed or imposes undue hardship upon the person restricted." *Republic Servs., Inc. v. Rodriguez*, No. 14-12-01054-CV, 2014 WL 2936172, at *7 (Tex. App. June 26, 2014) (citation omitted).  The covenant not to compete in the 2012 Agreement is certainly broad -- during the five-year term of the 2012 Agreement and any additional years tacked-on under the renewal provision, Section 18 prevents ABS from developing, marketing, or selling technology or services for sorting sexed semen on a worldwide basis, with the exception of a limited "safe harbor" for

research and development of the GSS system that was already in progress by a certain time before the 2012 Agreement went into effect.  (Trial Ex. 82 at 10.)

In light of the jury's verdict that "sexed bovine semen processing in the U.S." is a relevant antitrust market, ABS has a strong argument that Section 18's restriction on any "technology for sorting mammalian semen" was an "industrywide exclusion," which are unreasonable under Texas law.  *Republic Servs.*, 2014 WL 2936172, at *7.  Moreover, Section 18's global geographic restriction appears overbroad, especially in light of the evidence at trial that ST actually provides sexed semen sorting services in only a limited number of countries outside of the U.S.  *See Cobb v. Caye Publ'g Grp. Inc.*, 322 S.W.3d 780, 786 (Tex. App. 2010) ("The parties have not cited and we have not found, a case in which a geographical limitation including areas where an employer does not currently operate but has targeted for future potential expansion, standing alone, is reasonable.").

ST asserts -- without providing supporting case law -- that "[t]he scope of the activity was reasonably limited to 'sorting mammalian semen' because the evidence shows that information on ST's sorting method could be used for ABS's different 'laser killing' technology."  (Def.'s Reply Br. (dkt. #756) at 24.)  ST also contends that the worldwide restriction is reasonable because "both ST and ABS are sophisticated companies that are active in the global marketplace."  (*Id.* (citing *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 567-68 (S.D. Tex. 2014) (global reach of an employer's covenant not to compete was likely to be reasonable for a "high-level sales manager," who had direct sales responsibilities over a large, global territory and access to the employer's confidential information regarding its global operations)).

61

Given its breadth, length and scope, the court is not persuaded that the restrictions in Section 18 are reasonable, and reformation would ordinarily be in order under Texas law. Here, however, the parties give little guidance as to what would be a reasonable scope for reformed geographic and activity restrictions. Given this lack of direction or legal authority from the parties as to the reasonable scope of covenants not to compete in this context under Texas law, the court will exercise its equitable power to reform Section 18 in accordance with the injunctive relief ordered below.

## IV. Permanent Injunction

On the liability special verdict form, the jury found that ABS had proven: (1) a relevant antitrust market for sexed bovine semen processing in the U.S.; (2) ST had achieved monopoly power in that market in July of 2012; and (3) ST had willfully maintained its monopoly power in that market by insisting on anticompetitive contract terms. (Dkt. #696.)

In answering whether ABS had proven antitrust injury, however, the jury was instructed that ABS must further prove three things:

1. ABS was in fact injured as a result of ST's violation of the antitrust laws;

2. ST's illegal conduct was a material cause of ABS's injury; and

3. ABS's injury was of the type that the antitrust laws were intended to prevent.

(Closing Liability Instrs. (dkt. #692) at 16.)   The jury was further instructed that materiality in the second of these three requirements was not satisfied if it found that

62

"ABS's injury was caused primarily by something other than any antitrust violation[.]" (*Id.*)

Having been so instructed, the jury found that ABS failed to prove by a preponderance of the evidence that it suffered antitrust injury as a result of ST's violation of the Sherman Act.[17]   (Special Liability Verdict (dkt. #696).)   As a result, ABS cannot obtain monetary damages for ST's Sherman Act violation.  15 U.S.C. § 15(a).

Having failed to prove an antitrust injury, ABS nevertheless moves for a permanent injunction based on the jury's findings that ST used its monopoly power in the U.S. market for sexed bovine semen processing to obtain anticompetitive contract terms in the parties' 2012 Agreement.  (Dkt. #680.)  For the reasons that follow, the court agrees that some injunctive relief is warranted.  Accordingly, ABS's motion will be granted, if only in part.

At trial, ABS argued that ST leveraged its monopoly power to obtain several terms in the 2012 Agreement for anticompetitive reasons:  an initial five-year commitment with a rolling annual, automatic renewal provision; a minimum, three-year notice of termination; minimum purchase requirements; restrictions on research, testing and marketing of competing sexed semen sorting technologies; and a $1.5 million payment triggered by ABS's termination of the Agreement.  (*See* 8/9/16 Trial Tr. (dkt. #729) at 43:17-44:14.)  ABS further argued that ST acquired exclusive patent licenses related to sexed semen sorting technology from XY, Monsanto and Cytonome for anticompetitive

---

[17] As already discussed, the jury also found in ST's favor on a number of ST's patent infringement claims and its claim that ABS materially breached the 2012 Agreement by using its confidential information.  (Liability Special Verdict #2 (dkt. #697).)

reasons.  (*See id.* at 59:7-12.)  All of these actions, ABS argues, caused it antitrust injury because its GSS technology was ready to launch in direct competition as early as June of 2014.  (*See id.* at 67:19-68:6.)

On the other hand, ST advanced procompetitive reasons for the contract terms and patent acquisitions, including a need to protect, invest in and improve its own intellectual property, as well as argued that ABS suffered no antitrust injury, since its GSS technology was not ready to launch any earlier than September or October of 2016.  (*See id.* at 125:8-126:6.)

While the jury obviously agreed with ST on this latter point, it also found that ST is a monopolist that engaged in anticompetitive contracting practices.  As to this latter finding, ABS argues that injunctive relief is necessary to prevent likely, future injury and to open the market for sexed bovine semen processing to competition.  Specifically, ABS seeks a permanent injunction that would:

- enjoin ST from enforcing restrictions in the 2012 Agreement on ABS's researching, conducting field trials, sales or marketing of competing technologies;

- permit ABS to terminate the 2012 Agreement and the related lease with ST on 90 days' notice without any penalties or damages; and

- permit other bull studs in the U.S. to terminate their existing sexed semen sorting agreements and related leases with ST on 12 months' notice without any penalties or damages.

(Dkt. #680.)

In response, ST argues that ABS is not entitled to injunctive relief because the jury necessarily found that ABS would not suffer injury throughout the life of the 2012 Agreement, and by implication that the terms of the 2012 Agreement are not

anticompetitive.  In a series of arguments that are harder to follow, ST also maintains that: ABS has no claim to future injury; ABS has waived its claim for injunctive relief; and ABS's claim for injunctive relief is moot.  Finally, ST argues that ABS has not demonstrated that it is entitled to injunctive relief under the traditional equitable principles.[18]

## A.    Future injury, waiver and mootness

As an initial matter, the parties agree that ABS's failure to show injury for the purpose of a treble damages award does not preclude ABS from seeking injunctive relief under Section 16 of the Clayton Act.  *See Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 591 (7th Cir. 1998).  While a showing of injury is required to obtain damages under Section 4 of the Clayton Act, a party seeking injunctive relief under Section 16 need only show "threatened loss or damage by a violation of the antitrust laws[.]"  15 U.S.C. § 26; *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969); *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1377-78 (7th Cir. 1987).

Nevertheless, ST does maintain that the jury's verdict necessarily precludes ABS's request for an injunction in this case.  Since the injury ABS claimed at trial (an inability to self-supply sexed semen at a lower cost using its GSS Technology) "clearly would remain in effect for as long as ST's contracts are in force," ST contends that "the jury must have considered how the Agreement would affect ABS through the full five-year

---

[18] In addressing ST's arguments, the court will also grant its motion for leave to file, and will consider, ST's surreply.  (Dkt. #746.)

term."  (Def.'s Opp'n Br. (dkt. #727) at 5.)   Therefore, ST asserts, ABS cannot now claim that it will suffer an injury that the jury did not already reject.  Put differently, ST seems to argue that ABS's motion for permanent injunctive relief is premised on a claim of a future injury or damage that the jury already rejected at trial.  *Cf. Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 669 F.2d 490, 494 (7th Cir. 1982) ("Res judicata bars the plaintiff from splitting his cause of action; once he sues, he must seek all the damages that have then accrued as a result of the defendant's antitrust conduct," including future damages, if they "are not speculative at the time of trial").   Citing *In re G-Fees Antitrust Litigation*, 584 F. Supp. 2d 26 (D.D.C. 2008), ST argues that when a party brings an antitrust claim based on an allegedly anticompetitive contract, injury occurs when that party first enters into the contract, and any future harm concerns only future damages.

This argument fails on at least two levels.  First, *G-Fees* is inapposite.  In that case, the plaintiffs were identified in the complaint as "those who have obtained residential real estate loans from commercial lenders and make monthly mortgages that include G-Fees at artificially inflated levels set by the Defendants."  584 F. Supp. 2d at 34. Plaintiffs in that case further alleged that those "G-Fees" were "baked into the loan [in a single] transaction at the outset[.]"  *Id.* at 34-35 (internal quotation marks omitted). The district court explained that "even if this alleged collusion were to be enjoined, plaintiffs would not feel relief because none claims to be a future mortgagee, and as current mortgagees, the G-Fees are already 'baked in' to their mortgages as current mortgagees."  *Id.* at 35.  As a result, the court concluded that "[a]ny injury that occurred

to the plaintiffs occurred when they obtained their mortgages, and plaintiffs' predicament is one of future damages, not future injury." *Id.*

In contrast here, ABS did not claim any injury at the time the parties entered into the 2012 Agreement. Indeed, like its competitors, ABS needed to renew its contractual relationship with ST in 2012, having no alternative to its sexed semen processing technology, which was by then crucial for a bull stud to compete effectively. ABS's claimed injury began instead when it was ready to launch its competing GSS technology in 2014, but was locked into a longer term contract with ST that prevented it from doing so. Thus, *G-Fees* is distinguishable, except to the extent the lock-in provision could be viewed as a "prospective" injury.

Second, as ABS correctly points out in reply, the jury was instructed to consider only whether ABS "*was* in fact injured as a result of ST's violation of the antitrust laws," not whether ABS might be injured in the future. (Closing Liability Instrs. (dkt. #692) at 16 (emphasis added).) In other words, the jury only considered past -- that is, up to the beginning of trial -- and not future injury. *See Penry v. Johnson*, 532 U.S. 782, 799 (2001) ("We generally presume that jurors follow their instructions."); *Soltys v. Costello*, 520 F.3d 737, 744 (7th Cir. 2008).[19]

ST's mootness and waiver arguments can be dispatched as easily. ST argues that its September 22, 2016, notice of cancellation, informing ABS that it would stop performing sexed semen processing services if permitted to do so by the court due to the

---

[19] As a practical matter, this is a distinction without a difference, since the court does not find a competitive need for ABS to be freed from its contractual obligations until the end of its current contract.

jury's finding that ABS materially breached the confidentiality provision of the 2012 Agreement, moots ABS's claim for injunctive relief.  (*See* Def.'s Surreply (dkt. #746-1) at 2.)  Even if future events could potentially moot part of ABS's motion for a permanent injunction, however, those events will not fully moot the motion to permit other bull studs to cancel their semen sorting contracts with ST upon a year's notice without penalties or damages.[20]

The court similarly rejects ST's argument that ABS waived any claim for injunctive relief, having "said nothing about seeking an injunction during the numerous pretrial conferences," giving "no notice that it would not be introducing evidence of future harm" and making "no mention of injunctive relief in its most recent disclosures." (Def.'s Opp'n Br. (dkt. #727) at 24.)  Contrary to ST's assertions, ABS's claim for injunctive relief is hardly a moving target: not only has ABS included a claim for injunctive relief since its original complaint, a party's entitlement to equitable relief under the Clayton Act is within the exclusive province of the court.  Accordingly, there was no need for ABS to introduce independent evidence or propose any additional, advisory special verdict question, at least provided ABS was willing to stand on the trial record in seeking post-verdict, equitable relief.  *See Florists' Nationwide*, 371 F.2d at 270-71.

---

[20] Moreover, as discussed later in this opinion, ST's cancellation notice does not moot ABS's claim for injunctive relief because ST will not be permitted to unilaterally stop providing sexed semen processing services to ABS before the 2012 Agreement ends by its terms on August 31, 2017.

## B.      Consistency with the jury's verdict

Next, ST argues that an award of injunctive relief would necessarily contradict the jury's verdict.  In *Miles v. Indiana*, 387 F.3d 591 (7th Cir. 2004), the Seventh Circuit described the standard under which a district court must assess a jury's verdict before awarding any equitable relief:

> The judge is bound by the issues necessarily decided by the jury, and, therefore, the jury's determination often affects the judge's disposition of the accompanying equitable claim. However, when the basis of the jury's verdict is unclear, each of the potential theories supporting the verdict is open to contention unless this uncertainty be removed by extrinsic evidence showing the precise point involved and determined. Therefore, when several issues have been litigated, and the jury may have supported its verdict by finding in the plaintiff's favor on any one of the issues but which one is not clear, the court is free to determine the basis of the jury's verdict unless extrinsic evidence clearly resolves the issue.

*Id.* at 599-600 (internal quotation marks and citations omitted).   Furthermore, in analyzing the possible basis of a jury's verdict, the court must do so "[u]nder the evidence and instructions, and as the case was argued."  *See Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 844 (7th Cir. 1978).

Two of ST's arguments are again premised on a misinterpretation of ABS's claimed injury.  First, ST argues that the jury's finding of no injury means that the prices ABS and other bull studs are paying for sexed semen processing services from ST are not supracompetitive, since the jury knew what those prices were and ABS was bound by the minimum purchase requirements until the 2012 Agreement would terminate some twelve months after trial.  This argument, however, ignores that ABS's claimed antitrust injury and resulting damages was based on being prevented from using its competing GSS

technology to self-supply sexed semen at a lower cost, not for being charged supracompetitive prices in the abstract.

Second, ST asserts that the jury must have found the challenged contract terms in the 2012 Agreement were not anticompetitive, instead finding that ST insisted on anticompetitive contract terms in "ST's subsequent sorting agreements with other bull studs." (Def.'s Opp'n Br. (dkt. #727) at 8.)  Specifically, ST argues that the jury could not possibly have found that any of the challenged terms were unlawful under the Sherman Act because "the parties had agreed on most, if not all, of the Agreement's allegedly onerous terms by early June 2012 at the latest." (*Id.*)  As ABS points out, however, the parties did not sign the 2012 Agreement until August of that year, and it did not become effective until September.  (Pl.'s Reply Br. (dkt. #737) at 5 (citing Trial Ex. 82 at 1, 12).)  Particularly in light of the incorporation clause in the 2012 Agreement (Trial Ex. 82 at Section 21), ST does not explain why the fact that the parties began negotiating the terms before the month in which the jury found ST achieved monopoly power somehow would immunize it from later leveraging its newfound monopoly power to coerce agreement to its terms.  Regardless, as previously noted, ABS's claimed antitrust injury is based on the *effect* of the challenged contract terms on its later-developed ability to self-supply, not based on the terms of the parties' contract at the time entered.

ST further contends that the basis of the jury's verdict is "impossible to tell" with respect of two of the special verdict questions: (1) which, if any, of the terms of the 2012 Agreement were anticompetitive; and (2) whether ST began its anticompetitive conduct when it achieved monopoly power in July of 2012 or at some point after the parties

executed the Agreement.  (Def.'s Opp'n Br. (dkt. #727) at 12.)  Thus, for the reasons already discussed, as well as evidence of procompetitive reasons for the challenged terms of the 2012 Agreement that ST introduced at trial, ST argues that the jury's verdict forecloses ABS's claim for injunctive relief.  (*See id.*)

Contrary to ST's assertions, the jury plainly held in its special verdict that ST willfully maintained monopoly power in the market for sexed bovine semen processing in the U.S. by insisting on anticompetitive contract terms in its 2012 Agreement with ABS and in later agreements with other bull studs.  At trial, ABS argued that ST had monopoly power in the market for sexed semen processing by May of 2007, by which time ST had long-term contracts with ABS and two of the three other major bull studs in the U.S.  (*See* 8/9/16 Trial Tr. (dkt. #729) at 28:12-20.)  By finding that ST's patent acquisitions were not unlawful under the Sherman Act *and* that ST did not develop monopoly power until July of 2012, however, the jury credited ST's arguments that its efforts to develop its sexed semen sorting technology and legitimize the market for sexed semen straws were not realized until later.  (*See id.* at 81:8-22.)

In support of its argument that ST insisted on several terms in the 2012 Agreement for anticompetitive reasons (*see id.* at 43:17-44:14), ABS presented considerable, persuasive evidence, much of it in the form of expert opinion testimony.  (*See, e.g.,* 8/3/16 Trial Tr. (dkt. #709) at 103:11-105:2.)  Additionally, ABS pointed to ST's contracts with other bull studs to argue that those contracts, particularly their lengths, automatic renewal provisions and minimum purchase requirements,

demonstrated willfulness.  (*See* 8/3/16 Trial Tr. (dkt. #709) at 76:5-20; 8/9/16 Trial Tr. (dkt. #729) at 47:5-9, 48:9-49:2, 56:13-20, 58:1-59:6.)

Once again, it is only by ignoring ABS's claimed injury that ST can assert that the jury did not find that any of the challenged terms of the 2012 Agreement were anticompetitive; ABS would have had no reason to establish that ST violated the Sherman Act by insisting on anticompetitive terms in any contract other than the 2012 Agreement.  In light of the parties' evidence and argument at trial, therefore, the jury obviously found that ST insisted on anticompetitive terms in the 2012 Agreement.  Since the equitable relief ABS seeks is not inconsistent with the jury's findings as to ST's antitrust violation, the court will now consider whether ABS has shown that it is entitled to a permanent injunction.

### C.    Section 16 of the Clayton Act

To obtain injunctive relief under Section 16 of the Clayton Act, a party must make a threshold showing of "threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26; s*ee also Zenith Radio Corp.*, 395 U.S. at 130; *Marshfield Clinic*, 152 F.3d at 592.  Courts analyze whether injunctive relief is appropriate under the Sherman Act using traditional principles of equity.  *See* 15 U.S.C. § 26; *Zenith Radio Corp.*, 395 U.S. at 130.  In *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), the Supreme Court reiterated the four, general factors that a plaintiff must satisfy to be entitled to a permanent injunction:  (1) it has suffered an irreparable injury; (2) monetary damages are inadequate to compensate for that injury; (3) the balance of hardships between plaintiff and defendant warrant equitable relief; and (4) the public interest would not be

disserved by a permanent injunction.  *Id.* at 391.  The court addresses each of those factors in the patent and antitrust context below.[21]

### 1. Likelihood of future injury

The jury's finding that ABS had not suffered antitrust injury as a result of ST's willful maintenance of monopoly power is supported by two grounds:  (1) ABS was not ready to launch its GSS technology by the time of trial; and (2) ST had only recently achieved its dominant position in the new, niche submarket for sexing technology.  At trial, ST presented credible evidence that ABS was still testing new "protocols" for its

---

[21] ABS goes to great pains to emphasize that no court in the Seventh Circuit has formally applied the four-factor *eBay* test to date, but fails to explain how this is of *any* import in determining what, if any, permanent injunctive relief is appropriate under Section 16 of the Clayton Act. First, *eBay* is obviously controlling precedent for all lower courts.  Second, *eBay* simply articulates the four, equitable factors that federal courts have always considered in determining the appropriateness of injunctive relief.  Third, while suggesting that a showing of "future antitrust injury" suffices, ABS points to an older Supreme Court case stating only that a threat of future injury is enough to "*make* the cause of action for relief by injunction," not that showing such a threat alone is enough for a plaintiff to *obtain* a permanent injunction.  *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952) (emphasis added).  Fourth, while plaintiff is correct that the Seventh Circuit did not address the third and fourth *eBay* factors in *Marshfield Clinic*, the Seventh Circuit had already affirmed the district court's decision to grant equitable relief, which it reached after applying the traditional factors, including the balance of hardships, in an earlier appeal in that case. *See Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 883 F. Supp. 1247, 1263 (W.D. Wis. 1995), *aff'd in part and rev'd in part*, 65 F.3d 1406 (7th Cir. 1995).  Thus, the court appropriately looks to traditional equitable factors in determining the appropriateness of injunctive relief.  *See, e.g., SEC v. Citigroup Global Markets, Inc.*, 752 F.3d 285, 296 (2d Cir. 2014) ("*eBay* strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context") (citations omitted); *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 573 (7th Cir. 1999) (balancing hardships to the parties and the public in issuing preliminary injunction related to a section 7 Clayton Act claim).  If anything, this balancing under the *eBay* factors is even more appropriate considering the "unique aspects" of the interplay between patent and antitrust principles at issue here.  *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1312 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015); *see also Avaya Inc. v. Telecom Labs, Inc.*, Civil Action No. 06-2490 (JEI/KMW), 2014 WL 2940455, at *6 (D.N.J. June 30, 2014) ("Rather, a more coherent interpretation of §16 and federal courts' equitable powers is that the 'threatened injury' requirement sets forth the preliminary showing necessary to authorize injunctive relief, while the four-factor [*eBay*] test directs a court's issuance of the injunction sought.").

GSS technology, which it was forced to develop to replace those provided by ST's former employee, Kathy Mean, without authorization.   (*See* 8/4/16 Trial Tr. (dkt. #718) at 92:5-20.)   At best, evidence that ABS expected to receive positive results from those tests as early as the month following trial only suggested antirust injury in the near future if ABS remained restricted from commercializing the GSS technology.   (*See* 8/3/16 Trial Tr. (dkt. #709) at 39:25-40:7; 8/4/16 Trial Tr. (dkt. #718) at 92:9-20.)   At worst, the evidence suggests that ABS was not confident in its new technology until the end of the 2012 Agreement that ABS itself triggered -- August 31, 2017.

Having sent a notice to ABS that it would stop providing semen-sorting services on September 22, 2016, ST argues that future injury was no longer likely.   As the court already warned, however, ST's new monopoly position has a real world impact on its flexibility in dealing with customers and potential competitors.   *See Lorain Journal Co. v. United States*, 342 U.S. 143, 155 (1951) (a monopolist's right to select its customers and refuse to deal is "neither absolute nor exempt from regulation").   Still, monopolists have been held liable for refusing to deal in only a limited set of circumstances -- and in no way does the court mean to suggest that ST has committed a violation of the Sherman Act by sending the termination notice.   Here, the equities in favor of precluding ST as a monopolist from unilaterally terminating its obligation to provide services to a new competitor under the 2012 Agreement must be weighed against the jury's finding of ABS's material breach.

Aside from pointing to Kathy Mean's use of ST's trade secrets, which ABS appears to have remedied by developing new protocols once it discovered Mean's actions, ST

identifies no credible, likely threat that would justify it terminating the 2012 Agreement out of concern for misuse of its confidential information.  Although the jury still found a breach of contract, a further mitigating factor is Mean's gaining access to that confidential information as a former employee of XY, not through ST's interactions with ABS under the 2012 Agreement.  (8/9/16 Trial Tr. (dkt. #729) at 116:6-9.)

Thus, lacking a sound justification, and as a monopolist in a market in which it has faced virtually no competition (*see* 8/5/16 Trial Tr. (dkt. #714) at 123:18-21), and in which ABS remains the only foreseeable potential competitor with any degree of a likelihood of success (*see id.* at 124:3-14), ST's attempt to trigger an early termination of the 2012 Agreement hints of a move designed to forego its own, short-run benefits to harm ABS in the marketplace over the long run, particularly in light of evidence presented at trial that a bull stud unable to offer both sexed and conventional semen risks losing both reputation and a significant amount of business (s*ee* 8/1/16 Trial Tr. (dkt. #710) at 88:1-89:8; 8/2/16 Trial Tr. (dkt. #711) at 37:25-38:21; Dep. of David C. Thorbahn (dkt. #317) at 22:22-23:14).  *See Lorain Journal*, 342 U.S. at 154 ("[A] single newspaper, already enjoying a substantial monopoly in its area, violates the 'attempt to monopolize' clause of § 2 when it uses its monopoly to destroy threatened competition.").  Even aside from intending to impair a potential competitor through anticompetitive acts, a monopolist may be liable for refusing to deal when the characteristics of the market are such that some cooperation is required for there to be competition, as may likely be the case with respect to sexed semen processing for the reasons already discussed.  *See Olympia Equip. Leasing Co. v. W. Union Telegraph Co.*, 797

F.2d 370, 377 (7th Cir. 1986) (monopolist may have some duty to help a competitor when "competition require[s] some cooperation among competitors") (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)).

Under these circumstances, the court will not permit ST to cease providing sexed semen sorting services to ABS before the 2012 Agreement terminates by its terms on August 31, 2017.   Consistent with the jury's verdict, the court will enjoin ST from seeking any further damages or penalties from ABS under the contract provided it proceeds with an orderly, timely termination of its 2012 Agreement on that date. Similarly, ST will be enjoined from seeking damages or penalties from other bull studs who provide at least one year's written notice of the termination of their sorting contracts if entered into after 2012.

### 2.  Adequacy of legal remedies

With respect to whether damages would be adequate to remedy ABS's claimed future injury, ST argues that ABS's damages experts could easily calculate damages ABS would expect to sustain after trial based on the same calculations they were prepared to present at trial for its claimed inability to self-supply sexed semen with the GSS technology.   But ABS claims future injury not only in the form of an inability to self-supply under the 2012 Agreement, but also to begin supplying other bull studs, improving the GSS technology with field trials and developing goodwill among other bull studs as a potential supplier while the 2012 Agreement remains in effect.   Particularly given that the market for sexed bovine semen has thus far had -- and will continue, until ABS enters, to have -- no meaningful competition, any damages based on ABS's

76

continued restriction from commercializing the GSS technology once it is ready to launch will be difficult to calculate with any reliable accuracy.  *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (a damages remedy can be inadequate when the "nature of the plaintiff's loss may make damages very difficult to calculate").

### 3.  Balance of hardships

ST reasonably argues that it will suffer its own hardship if ABS obtains injunctive relief, having settled expectations regarding its contracts with other bull studs, ramped up product capacity and made various, sunken investments in reliance on those expectations, both at customer locations and its own facilities.   Having found that ST is a monopolist that insisted on anticompetitive contract terms in the 2012 Agreement, however, the jury spoke loudly:  ST is no longer entitled to all the settled, long-term benefits of its contracts with ABS and the other bull studs.  Again, offsetting this is the jury's award of substantial damages for ABS's trade secret misappropriation, as well as its findings that ABS infringed ST's patents, but having been compensated for those injuries, the hardships ABS, and more importantly, the downstream consumers of bull semen, would suffer if it remains contractually prevented from launching the GSS technology substantially outweigh the hardship to ST, particularly if those restrictions on competition are removed in an orderly, staggered and predictable fashion respectful of ST's intellectual property rights, as well as the need for meaningful competition, as is the intent of the injunction entered below.

### 4.  The public interest

With respect to perhaps the final factor -- whether an injunction would serve the public interest -- ST's lone argument is entirely self-serving:  permitting ABS to suddenly enter the market, earlier than the parties contemplated in the 2012 Agreement and before the GSS technology is up to par, "could do more harm than good" by reintroducing sexed semen with low fertility success rates in comparison to conventional semen, the original stigma ST had only recently overcome.   (Def.'s Opp'n Br. (dkt. #727) at 21-22.)   Certainly, risk of disparagement of a brand, product or even a technology is a legitimate concern, but that is typically because of a risk of product confusion.

As already discussed, the jury here rejected ABS's contention that a market for sexed bovine semen existed as early as 2007, finding instead that ST developed the market for sexed semen through risk-taking and technological improvements.   Having successfully diminished the stigma associated with sexed semen by developing an effective, competitive technology, and indeed built a monopoly position in a market of sophisticated customers, ST fails to explain why the introduction of an inferior product will meaningfully impact its successful efforts to legitimize the sexed semen market.   ST can hardly claim, for example, that the few, discerning bull studs purchasing sexed semen processing services -- all of whom currently depend on ST -- would be confused by ABS's entry into the market with an inferior product.   Almost as incredible is the likelihood that ABS, itself a leading supplier of bull semen, would risk its own investment in the

GSS technology, much less its reputation, by introducing an inferior or substandard product.

Similarly, ST's claims that the market for sexed semen processing services "inevitably will expand, and ST will face competition from other sexed semen suppliers" ring hollow, especially given that there appear to be no other viable competitors to ST on the horizon other than ABS.  (Def.'s Opp'n Br. (dkt. #727) at 21.)  As a general premise, the court agrees with ST that the sexed semen processing market should "evolve naturally," but contrary to ST's assertions, there will be no more natural evolution than to allow ABS to compete in that market with a non-infringing technology when it is ready to do so.

Even if ST is eventually proven right that lower prices or enhanced quality will not immediately materialize if ABS enters the sexed semen market in September of 2017, the court defers to the marketplace to resolve that uncertainty, not its own, and certainly not ST's, perception of ABS's readiness to compete.  *See Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978) ("Even assuming occasional exceptions to the presumed consequences of competition, the statutory policy [reflected in the Sherman Act] precludes inquiry into the question whether competition is good or bad.").[22]

On balance then, the court finds that ABS has met its burden to show entitlement to a permanent injunction under Section 16 of the Clayton Act, though it is not entitled

---

[22] For the same reason, ST's argument that ABS presented insufficient evidence at trial that other bull studs wish to terminate their contracts with ST early fails.  *See United States v. United Shoe Mach. Corp.*, 110 F. Supp. 295, 349 (D. Mass. 1953), *aff'd per curiam*, 347 U.S. 521 (1954) (finding that injunctive relief modifying the monopolist's leases with other manufacturers was appropriate even though a substantial majority of manufacturers expressed a preference for leasing).  The marketplace is best able to decide if this is so as well.

to the full scope of the injunctive relief it seeks.  In determining the appropriate scope of injunctive relief, the court keeps in mind the guiding principles pronounced by the Supreme Court:

> the purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws.  Section 16 should be construed and applied with this purpose in mind, and with the knowledge that the remedy it affords, like other equitable remedies, is flexible and capable of nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.

*Zenith Radio Corp.*, 395 U.S. at 130-31 (internal quotation marks and citations omitted); *see also Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 697-98 (holding that it was "entirely appropriate" for court to order injunctive relief that reasonably eliminated the consequences of the antitrust violation despite "go[ing] beyond a simple proscription against the precise conduct previously pursued"); *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88-89 (1950).

ORDER

IT IS ORDERED that:

1) The parties' motions for judgment as a matter of law under Rule 50(a) (dkt. ##660, 662, 663, 664, 668, 670, 686) are DENIED AS MOOT.

2) Plaintiff ABS Global, Inc.'s motions for judgment as a matter of law under Rule 50(b) and for a new trial under Rule 59 (dkt. #738) are GRANTED IN PART and DENIED IN PART consistent with this opinion.

3) Defendant ST's motion for judgment as a matter of law under Rule 50(b) (dkt. #741) is GRANTED IN PART and DENIED IN PART consistent with this opinion.

4) The parties' joint motion for entry of partial final judgment (dkt. #736) is GRANTED.

5) Defendant ST's motion for leave to file a surreply in opposition to motion for preliminary injunction (dkt. #746) is GRANTED.

6) Defendant ST's motion for leave to file supplemental authority (dkt. #758) is GRANTED.

7) Plaintiff ABS Global, Inc.'s motion for ruling on its motion for permanent injunction (dkt. #766) is GRANTED.

8) Plaintiff ABS Global, Inc.'s motion for a permanent injunction (dkt. #680) is GRANTED IN PART and DENIED IN PART.

9) A Permanent Injunction pursuant to Federal Rule of Civil Procedure 65 is ENTERED under the following terms and conditions:

    i. This Permanent Injunction shall remain in full force and effect for five (5) years;

    ii. For purposes of this Permanent Injunction, the following terms apply:

        a. "ABS" shall mean plaintiff ABS Global, Inc.

        b. "ST" shall mean defendant Inguran, LLC.

        c. "Other U.S. bull studs" shall mean entities in the business of selling semen from their own bulls for use in artificial insemination that operate in the United States and are third parties to this lawsuit.

81

    iii.    ST is permanently enjoined as follows:

- ST is enjoined from unilaterally terminating the 2012 Agreement due to ABS's material breach of contract as found by the jury;

- ST is enjoined from enforcing the research restrictions, field trial limitations and the "no sale or marketing" restrictions in the 2012 Agreement;

- ST is enjoined from seeking to prevent the termination of sorting contracts entered into with other U.S. bull studs on or after July of 2012, provided the bull stud gives at least one year's advance, written contractual notice, and ST is enjoined from seeking or collecting any damages or penalty for such an early termination; and

- ST shall give prompt, written contractual notice of this limitation on the exercise of its termination rights to all applicable bull studs by transmittal of this Opinion and Order by certified mail.

    iv.    Violation of this Permanent Injunction shall be subject to all applicable penalties, up to and including contempt of court.

    v.    This court shall retain continuing jurisdiction over ABS, ST and their actions for the purpose of enforcing this Permanent Injunction.

10)    The clerk of court is directed to enter partial final judgment consistent with this opinion and order.


Entered this 31st day of March, 2017.


                    BY THE COURT:


                    /s/
                    _____
                    WILLIAM M. CONLEY
                    District Judge