IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ABS GLOBAL, INC.,

        Plaintiff/Counterclaim Defendant,        OPINION AND ORDER

     v.

                                          14-cv-503-wmc

INGURAN, LLC,

        Defendant/Counterclaimant/Third-Party Plaintiff,

   and

XY, LLC,

        Intervening Defendant/Counterclaimant/Third-Party Plaintiff,

     v.

GENUS PLC,

        Third-Party Defendant.

---

The court previously entered a final judgment in this action, awarding: (1) permanent injunctive relief to plaintiff ABS Global, Inc., under Section 16 of the Clayton Act; and (2) damages and ongoing royalties to defendants Inguran, LLC ("ST") and XY, LLC, for trade secret misappropriation and patent infringement, as well as nominal damages for breach of contract. (Dkt. #790.) Still pending before the court are the parties' motions for attorneys' fees and costs. (Dkt. ##807, 810, 814, 817.) For the reasons that follow, the court will grant in part and deny in part ABS's petitions, awarding $4,865,324.13 in attorneys' fees and $129,392.99 in costs under 15 U.S.C. § 26. As to ST and XY, the court will deny their petitions for attorneys' fees, but will grant in part and

deny in part ST's petition for costs, awarding $151,152.26 as the prevailing party under Federal Rule of Civil Procedure 54(d).

OPINION[1]

## I.  ABS Fee Request[2]

Section 16 of the Clayton Act provides that "when the plaintiff substantially prevails [in obtaining an antitrust injunction], the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff."  15 U.S.C. § 26; *see also Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 595 (7th Cir. 1998) ("[15 U.S.C. § 16] is explicit in allowing an award of attorney's fees when only injunctive relief is sought or awarded.").  Because ABS substantially prevailed in obtaining an antitrust injunction, it has "a prima facie entitlement to an award of some of the attorneys' fees and court costs that it incurred."  *Marshfield Clinic*, 152 F.3d at 595.  At the same time, all parties agree that ABS "is not . . . entitled to fees and costs allocable to claims and theories that neither succeeded, nor contributed to the limited victory that it has obtained."  *Id.*; *see also Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("If . . . a plaintiff has only achieved partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount.").

---

[1] A detailed description of the facts of this case may be found in the court's summary judgment order.  (Dkt. #572.)

[2] ABS sought leave to file a reply brief in support of its motion for fees (dkt. #847), which defendants opposed.  Ordinarily, the court would deny such a request, but given the unique legal issues pressed in defendant's opposition to that fee request, the court will grant the motion and has considered the reply, as well as defendants' opposition to the motion for leave (dkt. #855), which reads in many ways as a surreply -- something this court would otherwise have surely denied.

Determining which fees are reasonable requires the court's exercise of discretion, with the movant having the burden to establish the amount of reasonably compensable fees. *See Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc.*, 776 F.2d 646, 650 (7th Cir. 1985). In *City of Burlington v. Dague*, 505 U.S. 557 (1992), the United States Supreme Court directed that reasonable fees under section 16 of the Clayton Act be determined using the "lodestar" approach -- "the product of reasonable hours times a reasonable rate." *Id*. at 559-62; *see Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 639 (7th Cir. 2011) ("There is a strong presumption that the lodestar calculation yields a reasonable attorneys' fee award."). Where appropriate, the lodestar approach also calls for adjusting downward to reflect limited success achieved in the litigation, with the understanding that "courts may award compensation for time spent pursuing unsuccessful claims that related to the successful claims." *Shott v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 338 F.3d 736, 739 (7th Cir. 2003) (citing *Hensley*, 461 U.S. at 436-37).

Here, ABS asserts that it is entitled to fees in the amount of $5,402,212.87, which were incurred "only for work directly related or contributing to the success of ABS's claim that ST was a monopolist that engaged in anticompetitive contracting practices to preserve its monopoly." (Pl.'s Opening Br. (dkt. #811) at 5.) For the most part, ABS has done an impressive job of limiting its fee request to work related to its successful claim before the jury -- that defendants used unreasonable, contractual restraints of trade to prevent entry and maintain its monopoly position in the U.S. market for sexed semen processing services, which resulted in entry of a permanent injunction. Indeed, ABS excluded whole time entries and categories of work despite their being portions of both that overlapped with its

successful claim. (Decl. of Kevin M. Fee in support of ABS's Motion for Attorney's Fees (dkt. #812) ¶¶ 6-13.) ABS then determined the starting point for its fee request by multiplying the plainly relevant time entries by the corresponding, discounted attorneys' billing rates negotiated at the outset of its engagement of lead counsel, Sidley Austin LLP. (*Id.*)[3]

For its part, defendants do not dispute that ABS is entitled to reasonable fees under the Clayton Act. Having opted not to disclose the fees paid to their counsel, nor their hours billed and hourly rate, defendants also do not dispute the reasonableness of hours spent by Sidley and its local counsel, nor the hourly rates charged. Instead, defendants argue that ABS's claimed fees are inflated by: (a) an unrecoverable "bonus" payment to counsel; (b) fees for unrecoverable clerical work or for work described in impermissibly vague terms; and (c) a failure to reduce fees to reflect the limited success achieved on its monopolization claim. Each argument is addressed below.

## A. "Bonus" payment to plaintiff's counsel

Defendants first dispute plaintiffs ABS and Genus's request for reimbursement of a lump sum invoice of $535,424.16 payable to Sidley, which was ostensibly triggered by the results achieved at trial. The basis for this payment is the original engagement letter between plaintiffs and Sidley, which calls for a 27.75% discount on "Sidley standard rates" for billing purposes, but allows for "additional bonus amounts" depending on the results

---

[3] ABS appears to have used the same methodology with respect for work done by contract and local lawyers. (Fee Decl. (dkt. #812), ¶¶ 19-21.) Since defendants' do not object to the award of those fees as requested, the court will not address them further.

actually obtained in the litigation.  Because this "sliding scale discount arrangement" was negotiated upfront and at arms-length, plaintiffs argue that any bonus payment was essentially "baked into" their presumptively reasonable, market-rate legal fees for purposes of calculating the lodestar in this case.  *See Pressley v. Haeger*, 977 F.2d 295, 299 (7th Cir. 1992) (fee awards should "determine what the lawyer would receive if he were selling his services in the market").

In contrast, defendants ST and XY characterize this additional sum as the contingent payment of a "fee enhancement bonus," which the Supreme Court's 1992 decision in *Dague* expressly prohibits in an award to a prevailing plaintiff under Section 16 of the Clayton Act.  *See Barrow v. Falck*, 977 F.2d 1100, 1105 (7th Cir. 1992) (citing *Dague* for the proposition that hourly rate "enhancements" in the form of contingent fee "bonus[es] for winning" are prohibited under fee-shifting statutes).  As support for enforcing this prohibition, defendants quote the actual terms of plaintiff's engagement letter with Sidley, which provide for the possibility of: (1) a "Client satisfaction bonus" to be determined "in the sole discretion of Genus plc" at an unspecified "amount" not to exceed 10% of the total invoice at the end of the engagement (after adjusting to 85% of Sidley standard rates, rather than the 72.25% of the standard rate initially paid); and (2) a "success bonus" based on counsel obtaining "either a settlement or judgment that allows ABS to operate on the IP front on a sustainable basis (such as through payment of a reasonable royalty and avoidance of excessive contract penalties)," preset at 20% "[i]f ABS can first begin operations in 2014 or 2015," reduced to 15% for operation in 2016, and 10% in 2017.  (Fee Decl., Ex. C (dkt. #812-6) 3.)

Defendants point out that ABS's opening brief in support of its fee request does not identify whether the bonus payment sought is based on a wholly-discretionary, "client satisfaction" bonus or a bench-marked, "success" bonus of 10% based on ABS beginning operations in 2017, or both, stating only that "the actual results at trial warranted a reduced discount." (Pl.'s Opening Br. (dkt. #811) 8.) Defendants argue that this failure alone should result in a finding that plaintiff failed to meet its burden of proving the reasonableness of this "bonus" fee request. The court disagrees. Even defendants readily deduced that the payment is likely a "success bonus," which ABS confirms in its reply, since it not only matches the fixed, ten percent of overall fees sought for obtaining injunctive relief after proving antitrust liability, but also matches the percentage called for in the letter if ABS is able to begin operations in 2017 under an established royalty rate.[4]

Defendants next argue that permitting counsel to recover the payment under the success bonus would award them fees for claims on which they lost at trial, since "ST proved its patents were valid and infringed, and they elected to receive an ongoing royalty instead of seeking a permanent injunction." (Defs.' Opp'n Br. (dkt. #841) 5.) In other words, defendants argue, the litigation resulted in ABS being permitted to launch its sexed semen sorting operation despite being on the wrong end of ST's patent infringement

---

[4] The court agrees with defendants that ABS should have spelled out in its initial fee request the *specific*, contractual basis for the invoiced bonus. Having said that, the invoice itself states the charge is for "success bonus per March 19, 2014, engagement letter," eliminating any arguable ambiguity, as does the actual calculation of the 10% bonus that follows. (Dkt. #812-7.) Were the record not so clear, so that some or all of the bonus paid was at "the sole discretion of Genus," the court agrees that ABS's claim for a fee enhancement would be more problematic, since it would effectively amount to plaintiff's agreeing to an award of an additional bonus for its counsel purely at defendants' expense.

counterclaims, rather than because of its monopolization claim.  Again, the court disagrees.

Defendants define the success ABS achieved by obtaining an injunction far too narrowly.

Although ABS did not prove that it was entitled to all of the relief it sought, it was able to

launch its competing technology before the termination of the 2012 Agreement by virtue

of showing that ST was maintaining its monopoly position in the market for sexed semen

processing services in the United States by effectively blocking new competitors through

the use of exclusive (or effectively exclusive) long-term supply contracts with the very

customers that ABS needed to sell their new processing services.  Contrary to defendants'

assertion, therefore, ABS's ability to launch its services is directly related "to ABS obtaining

an injunction under the Clayton Act" that voided some of these contractual provisions.

(Defs.' Opp'n Br. (dkt. #841) 5.)  Moreover, since ABS is only seeking reimbursement at

an enhanced hourly rate on hours actually spent working on its successful antitrust claim,

defendants offer no basis to conclude that the fees sought are for work on ABS's

unsuccessful patent or other claims.

The nature of the invoice presents a different problem for ABS, however, since

Sidley's success did not trigger an automatic bonus on all work performed in this case as

called for by the express terms of the engagement letter.  Rather, the invoiced "bonus" only

applied an enhanced hourly rate to the hours that would be reimbursed by defendants.

Had the invoice been for all work done as called for by the engagement letter, and ABS

were now seeking the portion attributable to hours spent on its successful antitrust claim,

it would have a stronger argument that the heightened hourly rate was in fact "baked in"

to the original fee agreement between ABS and Sidley.  Instead, ABS has failed to prove

this bonus payment, even framed as a smaller hourly fee discount "based upon the results achieved" (rather than a bonus for prevailing in the lawsuit), is compensable under the lodestar approach required by *Dague*. On the contrary, other than that it was negotiated at the outset of suit, ABS offers no reason to depart from the general principle that a traditional lodestar approach provides the presumptively reasonable fee amount. Indeed, regardless of how it is framed, the bonus payment amounts to an *enhancement* "above the 'lodestar' amount" rejected by the Supreme Court in *Dague*. 505 U.S. at 559. *Cf. Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, Civil Action No. 01-CV-2223, 2011 WL 5237573, at *5 (Nov. 2, 2011), *vacated on other grounds*, 572 F. App'x 988 (Fed. Cir. 2014) (finding that a "litigation success bonus" was unreasonable, since it "represent[ed] a form of duplication of the amounts allegedly paid to compensate Pepper Hamilton counsel for work performed in defending the lawsuit").

While ABS makes a persuasive case distinguishing itself from the facts in *Barrow v. Falck*, 977 F.2d 1100 (7th Cir. 1992), on which defendants principally rely in opposing this fee enhancement, ABS's reply underscores the problem with its claim for a "success bonus." The Seventh Circuit rejected an ultimate $135 per hour rate for a lawyer who had charged his client between $88 and $110 per hour, based simply on an "affidavit from a member of the local bar" that the "market rate for attorneys possessing the 'experience, qualifications, reputation and ability' of plaintiff's lawyer is $135 per hour." *Id.* at 1104-05. As the Seventh Circuit emphasized in rejecting the higher hourly rate, the lodestar approach requires that the court "stick to the market rate for the attorneys' time," and the amount actually paid to "*this* attorney at a market rate of $110 or less." *Id.* at 1105

(emphasis in original). The difference here, according to ABS, is that it has agreed to make the additional $535,424.16 payment, thereby establishing the actual "market rate" for Sidley attorneys in this case. (Pl.'s Reply Br. (dkt. #847-1) at 2.)

While this distinguishes Barrow on its facts, it does not solve ABS's *Dague* problem. That ABS *negotiated* with Sidley for a market rate to include a contingent component is not enough. The same could be said of the contingent fee agreed to in *Dague*, which a majority of United States Supreme Court found was not a proper consideration in the lodestar analysis. 505 U.S. at 563-64. And unless and until that Court or Congress decide otherwise, there would appear no basis to award a contingent or quasi-contingent payment where a lodestar analysis is required.[5]

This is not to hold that ABS could not have made a case for a higher hourly rate than the discounted rate negotiated at the outset of its engagement using the lodestar approach. If anything, the fact that Sidley had negotiated a substantial discount from its

---

[5] Of course, the approach adopted in *Dague* has been criticized, and its strict interpretation rejected under other federal and state statutes. *See, e.g., Polselli v. Nationwide Mut. Fire Ins. Co.*, 126 F.3d 524, 535 (3d Cir. 1997) ("The *Dague* majority found no justification for recognizing a *common law* enhancement for contingent risk; a *statutory* provision requiring consideration of enhancement would have been quite another matter."); *Clinchfield Coal Co. v. Harris*, 149 F.3d 307, 309–10 (4th Cir. 1998) ("All the parties to this consolidated appeal agree that [*Dague* is] inapposite to this case, which involves an interpretation of different statutory language—the word "thereafter" rather than "reasonable."); *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 564 (7th Cir. 1994) ("*Dague*, by its terms, applies only to statutory fee-shifting cases, and its reasoning is largely based on the statutory language of fee-shifting provisions."); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1301 (9th Cir. 1994) ("[T]he concerns expressed in *Dague* about unduly burdening losing parties in statutory fee cases are not present in common fund cases where fees are paid out of the settlement fund."); *Joyce v. Federated Nat'l Ins. Co.*, 228 So. 3d 1122, 1132 (Fla. 2017) ("[W]ith all due deference to the United States Supreme Court, we do not accept the *Dague* majority's rationale for rejecting contingency fee multipliers."); *Schefke v. Reliable Collection Agency, Ltd.*, 96 Haw. 408, 450, 32 P.3d 52, 94 (2001), *as amended* (Oct. 11, 2001) ("We conclude that *Dague* 's . . . dissenting opinion[] . . . [is] better reasoned than *Dague*'s majority opinion.").

so-called "Standard Rates," suggests that the lawyers working on this matter *may* have been regularly charging higher rates for similar work. If so, that fact could overcome the presumption of the negotiated hourly rate being the best evidence of the true market rate, particularly bolstered by the enhancement ABS was willing to pay. Unfortunately for ABS and its counsel, no affidavits or other evidence from counsel or third-party attorneys support this court finding that the "Sidley Standard Rate" (or the lower discounted rate reflected in the 10% bonus) is a better indication of the reasonable market rate for these lawyers' services. *See Dague*, 505 U.S. at 565-67 (recognizing that "the lodestar model often (perhaps generally) results in a larger fee award than the contingent fee model"). Aside from these other evidentiary failings in ABS's submissions, there is also the fact that plaintiff merely provides an *invoice* for remittance, rather than proof of payment like the other, regular invoices, reinforcing the likelihood that this "bonus," rather than representing a reasonable market rate, will only be paid if *defendants* are ordered to do so. Indeed, in light of ABS's apparent unwillingness to honor the higher hourly rate in the "success bonus," except on hours that defendants' would have to pay, the deeper discounted rates would appear to be the market rate negotiated at arm's length.

Finally, in light of the results that plaintiffs achieved at trial, which fell well short of total victory, awarding a sizeable, additional payment -- a ten percent chunk of compensable fees -- required ABS to come forward with stronger proof that this higher hourly rate was reasonable in the market place, particularly when it appears inconsistent with the principle that the lodestar should not be adjusted upward or downward due to a contingent fee arrangement. *See Pickett*, 664 F.3d 632, 644-45 (7th Cir. 2011). Having

failed to demonstrate that this enhancement should be included under the lodestar approach required by Dague, plaintiffs will not be awarded the $535,424.16 success bonus.

## B. Particular time entries

Defendants also object to certain time entries for which ABS seeks fees. Specifically, defendants argue that plaintiff is not entitled to recover fees for approximately 430 hours of "clerical work," including "assembling binders, counting document pages, and updating indices of documents," which defendants contrast with "substantive tasks" that parties can recover at paralegal rates, such as "reading exhibits, drafting and filing pleadings, and preparing discovery requests." (Defs.' Opp'n Br. (dkt. #841) 6 (citing *Reynolds v. EOS CCA*, No. 1:14-cv-01868-JMS-DML, 2016 U.S. Dist. Lexis 161706, at *16 (S.D. Ind. Nov. 22, 2016).) Defendants also argue that ABS seeks to recover fees for over 300 hours of time for what is described as impermissibly "vague" entries. (*Id.* at 7.)

### 1. Clerical work

As for defendants' objection to so-called clerical work, the Supreme Court recognized in *Missouri v. Jenkins*, 491 U.S. 274 (1989), a gray area between legal work that paralegals are capable of performing as well as attorneys and "non-legal work" that can be accomplished by non-lawyers. *Id.* at 288 (citing *Johnson v. Ga. Highway Express*, 488 F.2d 714, 717 (5th Cir. 1974)); *see also Montanez v. Simon*, 755 F.3d 547, 555 (7th Cir. 2014) (district court did not abuse discretion by excluding time billed for clerical work, including scanning and faxing performed by a partner). A review of the time entries that defendants argue fall into the non-legal or clerical reveals several, general categories of work that at worst fall into this gray area: (1) updating folders; (2) preparing binders for various

purposes, including for contract attorneys, training, witnesses and exhibits; (3) drafting and updating lists and indices, including for document production and deposition exhibits; (4) determining the number of document pages produced; (5) keeping track of documents to be used by expert witnesses; and (6) updating billing time entries.

Because each of these tasks may well include "legal" (or at least professional) judgment as to what to include, in what order and why, the court disagrees with defendants that they are *per se* non-compensable. At the very least, most of these tasks as described fall in the gray area of legal work that can be shared between attorneys and paralegals. The obvious exceptions are for time spent counting pages, "tracking documents sent to [an] expert," researching prices for court reporting vendors, and loading deposition videos onto a shared drive. With these entries excluded at the applicable hourly rate for the individual who performed them, plaintiff's reasonable fees are reduced by $1,467.58. To the extent some other entries *might* arguably be excluded, a further reduction strikes this court as inappropriate in light of ABS's overall, good faith efforts to include only compensable time and loss of any upgrade from what appear on their face to be discounted hourly rates. Plus, defendants refused to produce their own counsel's billing records, making it impossible to determine if the same work was deemed compensable legal work. Given this decision, ABS is entitled to the benefit of the doubt.

## 2. Vague entries

Defendants' alternative criticism is that a number of time entries describe "vague tasks." This argument fares little better. Certainly, the court has the discretion to reduce fee awards when the requesting party fails to adequately document what work time is being

compensated. *See Ohio-Sealy*, 776 F.2d at 658 (district court did not abuse discretion for reducing fee award for vagueness). Here, defendants argue that the plaintiffs' descriptions for over 300 hours of work neglect to provide "information linking them to this litigation, and [any] information of the subjects involved or the topics discussed." (Defs.' Opp'n Br. (dkt. #841) at 7.) In particular, many of the time entries that defendants identify as overly vague concern time spent preparing for and participating in meetings and phone calls with the client and other attorneys, most of which fail to specify which issues or claims the work concerned.

Obviously, the inclusion of some of this general time is in tension with plaintiff's assertions that: (1) "ABS has excluded from its Petition attorney time entries that did not directly relate or contribute to the success of the monopolization claim"; and (2) "ABS further reduced the fees it seeks by excising portions of attorney time entries that referenced work both related and unrelated to the successful claim, but did not specify the amount of time focused on compensable work." (Pl.'s Opening Br. (dkt. #811) at 5-6.) However, plaintiff also identifies several different categories of work that it did *not* include in its fee request despite being related at least in part to its successful antitrust claim. (Pl.'s Opening Br. (dkt. #811) at 6.) Moreover, the monopolization claim did *not* depend on a discrete set of legal theories and evidence, making it "difficult to divide the hours expended on a claim-by-claim basis." *Hensley,* 461 U.S. at 435. For this reason, it is difficult to fault plaintiff for spending approximately 300 hours on matters related to strategy in what was a relatively complex, antitrust claim, which both sides litigated vigorously for well over two years. Finally, again, defendants refused to disclose comparable billing records for its

13

counsel, making it more likely than not that its own bills reflect similar or more time spent on the antitrust claims here. Accordingly, the court again exercises its discretion in refusing to discount plaintiff's requested fee award further on the basis that certain descriptions in time entries could have been more specific.

## C. Degree of Success

Finally, defendants insist that a global reduction of half of plaintiff's fee request is appropriate to account for its limited success in this case. (Def.'s Opp'n Br. (dkt. #841) 8-13.) Obviously, "[n]o algorithm [exists] . . . for adjusting a lodestar to reflect partial or limited success." *Montanez*, 755 F.3d at 557 (citing *Richardson v. City of Chi.*, 740 F.3d 1099, 1103 (7th Cir. 2014)). "When the judge cannot easily separate the successful and unsuccessful work," therefore, "there is nothing to do but make an across-the-board reduction that seems appropriate in light of the ratio between winning and losing claims." *Id.*

Even with the reductions described above, plaintiff is still seeking a fee award that approaches $5 million. Defendants argue that such an award would be unreasonable in light of the marked limitations on plaintiff's success: (1) plaintiff did not achieve the full scope of its desired permanent injunction; (2) plaintiff failed to show any antitrust injury entitling it to monetary damages; (3) defendants were awarded sizable damages on their patent infringement and trade secret misappropriation claims; and (4) the jury found in favor of ST on its breach of contract claim. At the same time, in addition to obtaining injunctive relief permitting it to launch technology to compete immediately for the business of bull studs, plaintiff ABS *did* prevail on some contract-related issues, including

that: (1) the research and development of its competing technology was permitted under the 2012 Agreement; (2) the liquidated damages provision in the 2012 Agreement was unenforceable under Texas law; and (3) the non-competition provisions in the 2012 Agreement were unenforceable under Texas law as written. Still, defendants would further discount ABS's request for fees regarding the antitrust relief, pointing out that the majority of work identified as pertaining specifically to the injunction did not take place until after the jury rendered an adverse verdict on plaintiff's claimed antitrust injury.

In considering a global reduction to the lodestar, the court is guided by Seventh Circuit precedent that restricts district courts from reducing a fee request "by an arbitrary percentage because it seem[s] excessive to the court," and even if a global reduction *is* appropriate, courts must not "engage in double-counting." *Spellan v. Bd. of Ed. for Dist. 111*, 59 F.3d 642, 647 (7th Cir. 1995) (quoting *Tomazzoli v. Sheedy*, 804 F.2d 93, 97 (7th Cir. 1986)). Here, plaintiff took pains to limit its requested fee award to the aspects of its monopolization claim on which it actually prevailed, including reductions in requested fees for time spent reviewing documents by 45%, based on its analysis of the proportion of a random sample of documents that were related specifically to the antitrust claim. Ultimately, those efforts resulted in a request of approximately 39% of the fees that Sidley billed to ABS for its work on this case (a percentage that has been further reduced based on the court's rulings above). And this is on top of a seemingly sizable discount off of "Sidley Standard Rates," whatever those may actually be.

Taking into consideration the outcome of the litigation as a whole, accounting for the complexity of this case and accepting as credible the sizeable good faith exclusions

made from plaintiff's fee request already, the court finds that no further, across-the-board reduction in the fees is necessary to render the award reasonable, particularly where defendants have declined to disclose their own legal fees incurred in this matter.

Accordingly, the court's fee deductions and final fee award to ABS is summarized as follows:

|  | Initial Request | Deductions |
|---|---|---|
| Total Fees | $5,402,212.87 | |
| Subtraction for Additional Charge Based on Result | | $535,421.16 |
| Subtraction for Clerical Work | Cooper 2015 -- $1,354.69 (6.25 hours)<br><br>Buettner 2016 -- $112.89 (1.25 hours) | $ 1,467.58 |
| | | Final Award: $4,865,324.13 |

## II. Defendants Fee Request

Defendant XY also moves for an award of fees under the Wisconsin Uniform Trade Secrets Act ("WUTSA") for prevailing on its misappropriation claim, while defendant ST moves for fees under Texas law for prevailing on its breach of contract claim.[6]  Plaintiffs ABS and Genus oppose both requests.  First, plaintiff argues that XY cannot show ABS's misappropriation of trade secrets meets the knowledge standard for obtaining fees; and second, plaintiff contends that ST failed to demand a specific amount for the claimed

---

[6] Defendants acknowledge that recovering fees for both claims may result in an impermissible double recovery, which they suggest could be addressed by allowing them to elect the most favorable award.  Since that issue is moot for the reasons explained below, the court need not address it further.

breach of contract, as required by Texas law to recover fees, and failed to recover actual damages on that claim. The court addresses these requests separately below.

### A. Trade secret misappropriation

The parties' primary dispute concerns a fee award based on ABS's trade secret misappropriation claim, which turns on whether defendant XY has proven, or could prove, the required state of mind under the Wisconsin Uniform Trade Secrets Act ("WUTSA"). *See* Wis. Stat. § 134.90(4)(c) (court may award reasonable fees to the prevailing party when trade secret misappropriation was "willful and deliberate"). In particular, XY argues that because the Wisconsin legislature specifically rejected adopting the Uniform Trade Secret Act ("UTSA") standard for awarding fees for "willful and *malicious*" misappropriation, a showing of malice is not required under WUTSA. *See Racine Unified Sch. Dist. v. Labor & Indus. Review Comm'n*, 164 Wis. 2d 567, 567 n.6, 476 N.W.2d 707 (Ct. App. 1991) ("Where . . . the legislature has 'borrowed' from analogous federal legislation, differences in the language of [the statutes] must be presumed the result of deliberate choice exercised by the legislature."). Because the terms "willful" and "deliberate" are neither defined by WUTSA nor by the Wisconsin courts, XY further contends that Black's Law Dictionary supplies the appropriate definition of willful, meaning "voluntary and intentional, but not necessarily malicious," as well as deliberate, meaning "intentional" or "pre-meditated." (Defs.' Opening Br. (dkt. #808) 3.)

According to XY, the evidence supporting its trade secret misappropriation claim -- namely, that Kathy Mean intentionally took XY's trade secrets and used them for ABS's benefit despite knowing that those actions were prohibited -- was more than enough to

meet this definition of "willful and deliberate." XY adds that ABS's conduct related to the trade secret misappropriation claim supports an award of fees, because: (1) it did not investigate Mean's use of XY's information timely and thoroughly; and (2) it contested liability all the way up to the eve of trial and only then stipulated to Mean's misappropriation for the purpose of attempting to keep this evidence from the jury.

In line with a familiar theme throughout this litigation, plaintiff ABS initially argues that XY abandoned any claim for willful and deliberate misappropriation by failing to present it to the jury, ignoring that *ABS* stipulated to liability based on its employee Mean's use of XY's trade secrets to avoid consideration of that issue. Leaving this argument aside, ABS further disputes defendants' insistence that the WUTSA's "willful and deliberate" standard requires merely "misappropriation that is intentional and not accidental." (Defs.' Opening Br. (dkt. #808) 3.) Pointing to the legislative history of WUTSA, as well as to various cases, ABS instead proposes five guiding principles to discern the required state of mind: (1) willful misappropriation requires more than "garden-variety" intentional conduct; (2) Wisconsin courts would look to other courts applying a high bar to show willfulness under the UTSA; (3) Wisconsin courts would look to law governing the enhancement of patent damages for willfulness; (4) proof must be by clear and convincing evidence; and (5) proof that ABS authorized or ratified the misappropriation would likely be required. (Pls.' Opp'n Br. (dkt. #840) 5-7.)

Without engaging in an unnecessary, detailed analysis regarding each of these principles, particularly in light of the discretion afforded by WUTSA in determining whether fees should be awarded, the court agrees with plaintiff ABS that the weight of the

authority suggests a showing of entitlement to fees under the willful and deliberate misappropriation standard requires establishing some elevated degree of intentional wrongdoing on the part of ABS, even if the misappropriation need not be malicious. *See Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 654 (7th Cir. 1998) (describing "willfulness or malice" required to obtain punitive damages under UTSA as "vague terms but obviously implying some element of aggravation"); *cf.* Wis. Stat. § 134.90(4)(b) (permitting the court to award punitive damages when misappropriation is "willful and *malicious*") (emphasis added).[7]

Notwithstanding that XY neglected to request a jury finding on this issue, the facts of this case generally belie any egregious wrongful conduct, especially on ABS's part. Instead, the facts of record establish that Kathy Mean took and used information developed while an employee of XY without authorization to assist her in carrying out similar job duties at ABS. The evidence is also that Mean acted unbeknownst to ABS, and that ABS fired Mean upon discovery of her misdeeds. Further, ABS discarded her tainted work and hired another individual to re-do it. Even crediting XY's assertion that ABS should have policed Mean better given her background, this would still support a finding of mere negligence (or at the outside, gross negligence), rather than willful or deliberate misconduct. Finally, the court does not view ABS's litigation conduct to weigh in favor of awarding fees, especially considering that ABS disputed in good faith whether XY's stolen

---

[7] The court acknowledges *some* support for XY's interpretation of what is required to show "willful and deliberate" misappropriation, including that WUTSA "does not require actual knowledge or intent" to prove misappropriation, *Air Eng'g, Inc. v. Indus. Air Power, LLC*, 2013 WI App 18, ¶ 25, 346 Wis. 2d 9, 828 N.W.2d 565, but finds that XY's proof does not meet even this minimum threshold for an award of fees for the reasons explained in the next paragraph above.

information qualified as trade secrets, an issue that remained unresolved until summary judgment. Accordingly, the court declines to award XY fees for ultimately prevailing on its trade secret misappropriation claim.

## B. Breach of contract

This leaves defendant ST's claim to an attorneys' fee award under Texas law, which provides for recovery of fees by a party who prevails on a breach of contract claim. Tex. Civ. Prac. & Rem. Code § 38.001(8). As plaintiff points out, however, two prerequisites for obtaining fees are that the prevailing party (1) "must present the claim to the opposing party," Tex. Civ. Prac. & Rem. Code § 38.002(2), and (2) must recover damages, *Coffel v. Stryker Corp.*, 284 F.3d 625, 640 (5th Cir. 2002). Plaintiffs argue that ST's fee request on its breach of contract claim fails to satisfy either of these requirements.

With respect to the presentment requirement, it need not be accomplished in any particular form, whether oral or written, but it must be done "at least thirty days before trial to provide the defendant with any opportunity to pay the claim without incurring attorney's fees."[8] *Belew v. Rector*, 202 S.W.3d 849, 856-57 (Tex. App. 2006). In addition, neither filing suit nor including a demand in the pleadings alone can constitute presentment. *BCL-Equip. Leasing, LLC v. Davis*, Case No. 2:15-CV-195-WCB, 2016 WL 1403989, at *4 (D. Tex. Apr. 11, 2016) (citing *Llanes v. Davila*, 133 S.W.3d 635, 641

---

[8] Plaintiffs correctly point out that courts applying Texas law appear to disagree over whether presentment must take place before trial, *see Genender v. USA Store Fixtures, LLC*, 451 S.W.3d 916, 924 n.13 (Tex. App. 2014), but the court need not resolve that split in authority, since defendants failed to prove this requirement occurred before, during or after trial as explained below.

(Tex. App. 2003)). Finally, the party seeking fees has the burden to prove presentment. *Id.* (citing *Canine, Inc. v. Golla*, 380 S.W.3d 189, 193 (Tex. App. 2012)).

ST insists that it presented ABS with its breach of contract claim "repeatedly," identifying three specific instances: (1) "when Maurice Rosenstein raised his confidentiality concerns in 2012"; (2) "when ST served the expert report of John Nolan setting out the facts of ABS's liability in October 2015"; and (3) "when ST served the expert report of Todd Schoettelkotte in March 2016, claiming $1,000,000 in damages for ABS's improper use of XY's protocols." (Defs.' Opening Br. (dkt. #808) 12.) As plaintiff correctly points out, however, each of these instances do not qualify as presentment because, among other reasons, they all fail to include a demand for payment or performance. *See, e.g., Gibson v. Cuellar*, 440 S.W.3d 150, 157 (Tex. App. 2013) ("The term 'presentment,' as applied in section 38.002, is not defined in the Code; however, our supreme court has construed the word to mean simply a demand or request for payment or performance, whether written or oral."); *Jim Howe Homes, Inc. v. Rogers*, 818 S.W.3d 901, 904 n.3 (Tex. App. 1991) ("In all events, the elements of presentment in § 38.002 must include at minimum a demand or request for payment, irrespective of what else it might include.") (citing *Jones v. Kelley*, 614 S.W.2d 95, 100 (Tex. 1981)). Even with the inconsistencies in Texas law regarding what suffices as presentment, therefore, ST has failed to meet the bare minimum burden of proof with respect to that requirement using any of these three examples.

In any event, ST concedes that "nominal damages alone are not sufficient to sustain an award of attorneys' fees for breach of contract" under Texas law. (Defs.' Opening Br.

(dkt. #808) 12.)  Nevertheless, ST acknowledges that the jury was not even asked to decide what damages it incurred because of ABS's breach of contract, arguing instead that its damages were more than nominal because the jury awarded XY $750,000 for its trade secret misappropriation claim.  Having failed to cite any authority that this court is permitted to award a party fees for breach of contract under Texas law, despite being awarded no damages on that claim, ST once again fails to demonstrate entitlement to fees under Texas law.  For all these reasons, defendants' fee requests are denied.

## III.  Costs

This just leaves the parties' requests for costs.  As an initial matter, there is no dispute that ABS is entitled to recover $129,392.99 in costs incurred in obtaining permanent injunctive relief on its monopolization claim under 15 U.S.C. § 26.  Even so, ST seeks to treat that amount as an offset to the $279,445.06 in costs it seeks under Federal Rule of Civil Procedure 54(d)(1) as a prevailing party on certain of its counterclaims.  In response, plaintiff argues that ABS is the only prevailing party, having "proved that ST had engaged in unlawful monopolization under § 2 of the Sherman Act, and . . . obtained broad injunctive relief that will open the U.S. sexed bovine semen processing market to free and fair competition," as well as rendered "ST's request for an injunction a non-starter" by virtue of the jury's monopolization finding.  (Pls.' Opp'n Br. (dkt. #833) 1.)  As described by the Seventh Circuit, "[a] party prevails for purposes of Rule 54(d) when a final judgment awards it substantial relief."  *Smart v. Local 702 Int'l Bhd. of Elec. Workers*, 573 F.3d 523, 525 (7th Cir. 2009).  Rule 54(d) expressly gives the court discretion whether to award costs, and that discretion is "especially broad . . . in mixed

result cases[.]" *Gavoni v. Dobbs House, Inc.*, 164 F.3d 1071, 1075 (7th Cir. 1999) (citing *Testa v. Vill. of Mundelein, Ill.*, 89 F.3d 443, 447 (7th Cir. 1996)).

Here, ST achieved no more than mixed results. Certainly, ST avoided having to pay antitrust damages; it was awarded substantial damages on its own claims; and ST partially defended its patents and certain provisions in the 2012 Agreement against ABS's challenge. However, the jury also found ST had a monopoly in the U.S. sexed bovine semen processing market, and the court entered permanent injunctive relief in ABS's favor as a result of that finding. This is far from inconsequential relief.

Given the totality of what was at stake in this litigation, therefore, ST managed a victory, albeit a narrow one, since ST's patents at the center of the parties' disputes were upheld and found infringed, but ST was found to have unlawfully abused its market position to prevent congestion. Hence, ST is *a*, if not *the*, prevailing party. Given the "strong presumption that the prevailing party will recover costs," *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 945 (7th Cir. 1997), the court, therefore, turns to ABS's specific objections to ST's requested costs in the categories of transcripts, witnesses and exemplification.

### A. Transcripts

First, plaintiffs object to ST's request of $15,131.65 for real-time transcription services and of $13,188.70 for expedited rough transcripts, ostensibly because they were only incurred for the "convenience" of counsel. The court may award costs for expedited deposition transcripts under 28 U.S.C. § 1920(2), but only if they were "necessarily obtained for use in the case." *See Little v. Mitsubishi Motors N. Am., Inc.* 514 F.3d 699, 702

(7th Cir. 2008).  Costs for video recording a deposition can also be recoverable, so long as they were necessary.  *See Split Pivot, Inc. v. Trek Bicycle Corp.*, 154 F. Supp. 3d 769, 774 (W.D. Wis. 2015) (citing *Little*, 514 F.3d at 701-02).  This "determination of necessity must be made in light of facts known at the time of the deposition, and the introduction of a deposition at trial is not a prerequisite for finding that it was necessary to take the deposition."  *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1410 (7th Cir. 1991).

In response to plaintiff's objections, ST withdraws its request for real-time deposition transcript costs of $15,131.65, despite continuing to contend that they are taxable.  ST maintains, however, that the rough transcripts it obtained were necessary to prepare for imminent depositions of other witnesses, as well as court deadlines.  As examples, ST points to rough transcripts ordered during Juan Moreno's multiple-day deposition, so that counsel could prepare for the following day, and to an expedited transcript for expert witness Kevin Murphy's deposition, which took place three weeks before the dispositive motions deadline.  In reply, plaintiffs dispute the necessity of these transcripts, arguing that rough transcripts obtained in the course of a multiple-day deposition are essentially the same as real-time transcripts for the convenience of counsel and that the final transcript for Murphy's deposition was available nearly two weeks before summary judgment motions were due.  Plaintiffs also argue that another example of a rough transcript -- that of the deposition of their damages expert, Kirit Lezotte -- was not necessary because that expert was not even *mentioned* during the deposition of ST's damages expert, Barry Harris.

Based on the examples provided, the court nevertheless agrees with ST that the expedited rough transcripts that it ordered had the realistic potential to assist in preparing for upcoming depositions and the summary judgment deadline. At most, plaintiffs' objections to the Murphy and Lezotte transcripts are based on hindsight that the court cannot take into account in determining whether rough transcripts were necessary at the time ordered. Moreover, as already alluded to, the complexity of this case, combined with this court's typically demanding schedule, made rough transcripts necessary here, or at least ST's counsel could have reasonably concluded at the time. Having provided no other persuasive reason for the court to parse through specific rough transcripts that ST ordered, plaintiffs' objections as to those costs fall short.

### B. Video recordings

Plaintiffs also object to ST's request to recover $4,220.50 in costs for video recordings of its own witnesses' depositions, as well as $4,830 in costs for videos of depositions of ABS's experts. None of these videos were necessary, plaintiffs argue, because ST was able to bring its own witnesses to trial and because "[i]f ABS's experts were going to testify at trial at all, they would testify live." (Pls.' Objs. (dkt. #833) at 8.) Plaintiffs add that ST only used transcripts, not videos, to impeach witnesses at trial. ST, on the other hand, contends that it contemplated introducing deposition testimony of some witnesses at trial, although at the time each deposition was taken, ST had not yet determined which witnesses would testify live and which by video deposition.

Still, ST provides no persuasive reason why videotaping the depositions of its *own* witnesses was reasonable or necessary. *See Little*, 514 F.3d at 702 ("[I]n addition to being

authorized by statute, a cost must be both reasonable and necessary to the litigation for the prevailing party to recover it."). ST cites a case from this district for the proposition that videotaping a deposition is reasonable when "there is even a slight chance that the witness may not be present at trial," but none of the witnesses whose depositions were videotaped in that case were controlled by the prevailing party. *Z Trim Holdings, Inc. v. Fiberstar, Inc.*, No. 07-cv-161-bbc, 2008 U.S. Dist. LEXIS 61514, at *3 (W.D. Wis. Aug. 12, 2008). Further, ST identifies no reason to think that any of its own witnesses would be unable or unwilling to be present at trial, other than caused by its own indecision. *Id.* Therefore, while ST *may* have had a sound reason for videotaping with respect to some witnesses, it has presented an insufficient basis for the court to find that costs for videotaping depositions of its own witnesses were necessarily incurred, and so its request for costs will be deducted by $4,220.50.[9]

The necessity of ST's video recording of the deposition testimony of ABS's expert witnesses presents a closer question. As ST points out, not using the videos to impeach those experts at trial is not dispositive, since the necessary inquiry is made at the time of the deposition itself. Furthermore, given that the videotaped depositions were for ABS's experts, who were likely to present testimony critical to the case one way or the other, plaintiffs' invitations for the court to scrutinize ST's decision to tape that testimony further is unpersuasive.

---

[9] This is not intended as a blanket rule. Rather, absent some articulated concern or justification, a party is not entitled to the costs of a decision to video record all of its own witnesses as a matter of course.

### C. Witnesses

Next, plaintiffs object to more than $12,000 in costs that ST requests for witness fees under 28 U.S.C. § 1920(3).  As an initial matter, ST withdraws its requests for costs related to certain invoices, rental car expenses, shipping expenses and first class plane tickets, amounting to a total reduction of $4,773.94.  This leaves the parties' disputes surrounding costs for (1) meals and lodging for witnesses in excess of the maximum per diem allowance under 28 U.S.C. § 1821(d)(2) and (2) the travel costs for a deposition incurred by ST's expert, Cynthia Ludwig.

#### 1. Subsistence allowances

As to the first of these disputes, plaintiffs point out that the maximum daily allowance for Madison, Wisconsin, in August of 2016 under the government (GSA) rate was $164 per day.[10]  Assuming that the number of nights for which ST seeks costs for witness fees is reasonable, this would result in a maximum allowance of $3,608.  In support of their argument that this per diem rate should set a ceiling on a witness's daily lodging and meal expenses, plaintiffs cite several cases, including *Commercial Credit Equipment Corp v. Stamps*, 920 F.2d 1361, 1368 n.10 (7th Cir. 1990), for the proposition that "Rule 54(d) cannot overcome a specific limitation such as the 28 U.S.C. 1821 per diem witness fee." (Pl.'s Objs. (dkt. #833) 8; Defs.' Reply (dkt. #849) 4.)  On the other hand, ST cites a single district court case in which a party recovered lodging costs in excess of the per diem rate.  *See e2Interactive, Inc. v. Blackhawk Network, Inc.*, No. 09-cv-629-slc, 2015 WL 751728 (W.D. Wis. Feb. 23, 2015).

---

[10] The per diem rate for fiscal year 2016 is available at https://www.gsa.gov/portal/category/ 100120.

Based on the weight of the authority, as well as ST's failure to demonstrate the reasonableness of the expenses for its witnesses' lodging and meals beyond the per diem allowance, the court will reduce ST's award of costs to that allowance. *See, e.g., United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 575 (5th Cir. 2005) ("This court has held that an award of costs must be vacated when the costs exceed the maximum per diem amount permitted by statute."); 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2678 (3d ed.) ("The statutory amounts [for subsistence allowances in § 1821] usually will be awarded regardless of whether the witness spends the per diem allotment. If the witness is paid more by the prevailing party, however, nothing over the amount prescribed in the statute will be recoverable."). The same reduction is appropriate for $54.97 in "incidentals during trial" incurred by ST's witness Juan Moreno. (Pl.'s Objs. (dkt. #833) 10.) Accordingly, ST's award of costs for witness subsistence allowances is further reduced to $3608.[11]

### 2. Travel for Cynthia Ludwig

Plaintiff argues that it should not have to foot the bill for $2,181.14 in expenses that ST's expert witness, Cynthia Ludwig, incurred in traveling for her deposition from St. Louis, where she lives, to Houston, where the ST attorney who defended her deposition works. According to plaintiffs, Ludwig's travel was only for ST's convenience, since "ABS's counsel would have been willing to take her deposition in St. Louis." (*Id.* at 10.)

---

[11] The parties do not provide a detailed breakdown of what portion of ST's initial request for $19,532.27 in witness costs was allocated to lodging and meals for its witnesses, so the court will simply reduce ST's total request for $4,928 in lodging expenses for its witnesses by $1,320 to reach a total subsistence allowance of $3,608.

The court agrees with plaintiff. ST's only arguments in response to plaintiffs' objection is that "Ms. Ludwig reasonably and necessarily traveled to Houston for the deposition that ABS's counsel took, and her travel reduced overall costs in the litigation for both parties." (Def.'s Opp'n Br. (dkt. #846) 9-10.) Neither argument, however, disputes ABS's assertion that deposing Ludwig in Houston was not its call, and ST does not otherwise explain why it was reasonable to rack up over $1,300 in lodging for that deposition.[12] Accordingly, ST's fee award will also be reduced by $2,181.14.

## D. Exemplification

Finally, plaintiffs object to certain categories of exemplification costs, which are recoverable under § 1920(4) as "costs of making copies of any materials . . . necessarily obtained for use in the case." In response to plaintiffs' objections, and in light of the consensus approach regarding recovery for ESI costs after the Third Circuit's decision in *Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 674 F.3d 158 (3d Cir. 2012), ST reduces its request for ESI costs (beyond those for conversion of native files to TIFF formats) by $63,159.89. As a result, the parties' remaining disputes regarding exemplification costs only concern: (1) ST's costs for renting two photocopiers for trial; and (2) "trial technology" costs for "the services of [ST's] internal graphics and trial technology team to

---

[12] *Walters*, which ST cites for the proposition that "this District has awarded such costs before" (Defs.' Opp'n Br. (dkt. #846) 10) is inapposite. As the court noted explicitly in that case, the FMLA permits recovery of "'reasonable out-of-pocket expenses,' including 'costs beyond those normally allowed under Fed. R. Civ. P. 54(d).'" 91 F. Supp. 3d at 1085 (quoting *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 968-69 (10th Cir. 2002)). Regardless, it was incumbent on ST to give good reasons for this travel (e.g., it was cheaper overall to have the witness come to ST's counsel), and ST failed to meet this burden.

provide graphics and technological support, and prepare demonstratives throughout trial." (Defs.' Opening Br. (dkt. #816) 20.)

### 1. Photocopier rentals

The dispute over costs for photocopier rentals turns on whether the costs can be described as necessary or merely for counsel's convenience in avoiding the use of a local vendor to make copies. In support of their positions, the parties cite various, out-of-circuit district court cases answering this question differently. *Compare Balance Point Divorce Funding, LLC v. Scrantom*, 305 F.R.D. 67, 76 (S.D.N.Y. 2015) ("rental costs for . . . leasing photocopying equipment are not taxable as 'making copies'"), *with Abbott Point of Care, Inc. v. Epocal, Inc.*, Civil Action No. CV-08-S-543-NE, 2012 WL 7810970, at *5 (N.D. Ala. Nov. 5, 2012) ("Abbott has presented no convincing argument or authority that expenses for the rental of photocopiers during trial should not be allowed as part of copying costs under 28 U.S.C. § 1920(4)."). In light of this conflicting authority, as well as ST's failure to otherwise demonstrate how the costs of renting two photocopiers for trial were reasonable and necessary, the court will decline to award those costs, thus reducing ST's recovery of costs further by $8,337.16.[13]

### 2. Trial technology costs

The parties' dispute regarding ST's trial technology costs has a similar tenor, with ABS pointing to *Taniguchi v. Kan Pacific Sapian, Ltd.*, 566 U.S. 560 (2012), and several

---

[13] Again, this is not to render a blanket prohibition on the award of such costs. Rather, ST has failed in its burden of proof to show the anticipated volume of copies made renting copiers cost effective over outsourcing copiers, relying on electronic copies or obtaining a space with copiers available.

district court cases decided after that decision.  In *Taniguchi*, the Supreme Court emphasized that "taxable costs are limited by statute and are modest in scope," ultimately holding that "the category 'compensation of interpreters' in § 1920(6) does not include costs for document translation."  *Id.* at 2006-07.  District courts have cited *Taniguchi* in deciding whether the prevailing party should receive costs for in-courtroom technology assistance.  *See Broadspring, Inc. v. Congoo, LLC*, No. 13-cv-1866 (RJS), 2016 WL 817449, at *5-6 (S.D.N.Y. Feb. 24, 2016), *vacated in part on other grounds sub nom.*, *Broadspring, Inc. v. Nashed*, 683 F. App'x 13 (2d Cir. 2017) (rejecting taxation of costs for "assistance with trial graphics and demonstrative services at trial"); *Fowler v. Cal. Highway Patrol*, Case No. 13-cv-01026-TEH, 2014 WL 3965027, at *4 (N.D. Cal. Aug. 13, 2014) (same for "in-court technical support and equipment rental fees").

ST would disagree, pointing to the Seventh Circuit's decision in *Cefalu v. Village of Elk Grove*, 211 F.3d 416 (7th Cir. 2000), which held that costs were taxable under *Taniguchi* for "a computerized, multi-media system [the defendants] employed to present their exhibits to the jury."  *Id.* at 427.  In support, ST cites district court cases from this circuit that post-date *Taniguchi* and still tax costs related to demonstrative exhibits.  Consistent with *Cefalu*, however, those cases permitted exemplification costs for the *preparation* of multimedia demonstrative exhibits, not for presenting those exhibits at trial.  *See, e.g., Artunduaga v. Univ. of Chi. Med. Ctr.*, Case No. 12 C 8733, 2017 WL 1355873, at *4 (N.D. Ill. Apr. 13, 2017) (reducing request for $12,460 in costs for a third party's "trial technology" services to $510 for six hours of video editing, excluding costs for "assist[ing] counsel with presenting evidence at trial"); *Johnson v. Allstate Ins. Co.*, No. 07-cv-0781-

SCW, 2012 WL 4936598, at *8 (S.D. Ill. Oct. 16, 2012) (taxing "service costs in hiring a third party . . . to prepare graphics").  On this issue, therefore, the weight of the authority is clearly in plaintiff's favor, and the court will further reduce ST's trial technology costs by $112,234.

The court's costs reductions and award for ST are summarized as follows:

| Category | Initial Request | Voluntary Reduction | Court Reduction | Total Reduction |
|---|---|---|---|---|
| Total Costs | $362,510.54 | | | |
| Transcripts | $118,307.95 | $15,131.65 | $4,220.50 | $19,352.15 |
| Witnesses | $19,532.27 | $4,773.94 | $3501.14 | $8,275.08 |
| Exemplification | $222,392.43 | $63,159.89 | $120,571.16 | $183,731.05 |
| Costs owed ABS | $129,392.99 | n/a | n/a | ($129,392.99) |
| | | | | Final Award: $ 21,759.27 |

ORDER

IT IS ORDERED that:

1) Defendant Inguran, LLC ("ST") and defendant XY LLC's motion for attorneys' fees (dkt. #807) is DENIED.

2) Plaintiff's motion for attorneys' fees (dkt. #810) is GRANTED IN PART and DENIED IN PART as set forth above.

3) Defendants' bill of costs (dkt. #814) is GRANTED IN PART and DENIED IN PART as set forth above.

4) Plaintiff's bill of costs (dkt. #817) is GRANTED.

5) Plaintiff's motion for leave to file a reply brief (dkt. #847) is GRANTED.

6) Attorneys' fees are awarded in favor of plaintiff ABS Global, Inc. and against defendants in the amount of $4,865,324.13, plus post-judgment interest of 1.02%, compounded annually, between April 21, 2017, and the date of payment.

7) Costs are awarded in favor of defendant ST and against plaintiffs in the amount of $21,759.27 in costs.

Entered this 27th day of September, 2018.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY

District Judge