IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ABS GLOBAL, INC.,

                Plaintiff/Counterclaim Defendant,

      v.

INGURAN, LLC d/b/a SEXING TECHNOLOGIES,

                Defendant/Counterclaim Plaintiff,

      and

XY, LLC,

                Intervenor-Defendant/Counterclaim Plaintiff,

      v.

GENUS PLC,

                Counterclaim Defendant.

OPINION AND ORDER

14-cv-503-wmc

INGURAN, LLC, CYTONOME/ST, LLC,
and XY, LLC,

                Plaintiffs/Counter Defendants,

      v.

ABS GLOBAL, INC., GENUS PLC
and PREMIUM GENETICS (UK) LTD.,

                Defendants/Counter Claimants.

OPINION AND ORDER

17-cv-446-wmc

Following a jury trial of these consolidated cases in September 2019, the parties filed briefs on a number of remaining issues on damages and other equitable relief. The parties also filed a number of motions to seal trial exhibits and testimony. In this opinion, the court will address all of the outstanding issues and direct further submissions by the

parties to facilitate entry of judgment.[1]

## BACKGROUND

The following brief background is material to the present motions.  In Case No. 14-cv-503 (*ABS I*), counterclaim defendants ABS and Genus conceded that they infringed U.S. Patent No 8,206,987 (the "'987 patent"), but asserted invalidity counterclaims and defenses at trial.  While the jury in *ABS I* agreed that a dependent claim was invalid, it also concluded that ABS had not met its burden of demonstrating that two other claims were invalid.  (Dkt. #697.)[2]  As for damages, the jury awarded a lump sum payment of $750,000 for ABS's past infringement of the '987 patent and set a per-straw royalty rate of $1.25 for future infringing sales.  (Dkt. #700.)  On appeal before the Seventh Circuit because of the disposition of related antitrust claims, the court found the jury verdict as to invalidity of the asserted claims of the '987 patent inconsistent and remanded for retrial.

Given the overlap of the remaining invalidity issue of *ABS I* with the issues presented in Case No. 17-cv-446 (*ABS II*), the two cases were consolidated and a second jury was impaneled in September 2019.  That jury returned a verdict in favor of ST, finding that ABS infringed all of the asserted claims in U.S. Patent No. 7,311,476 (the "'476 patent") and U.S. Patent No. 7,611,309 (the "'309 patent") (collectively, the "Cytonome

---

[1] ABS Global is a Wisconsin-based company that sells bovine semen produced by its inventory of high-quality bulls.  Genus plc is ABS's parent company.  Inguran (referred to as "ST") processes the raw ejaculate into sexed bovine semen in the United States.  Cytonome is a privately-held biotechnology company in which Inguran holds a controlling interest.

[2] Unless otherwise noted, the docket entries are to Case No. 14-cv-503.

patents") and rejecting ABS's invalidity challenges to those patents.  (Dkt. #1129.)  The jury also found ABS failed to prove by clear and convincing evidence that the asserted claims of the '987 patent were invalid for lack of enablement.  (*Id.*)  Finally, the jury rejected ABS's separate breach of contract claim.  (*Id.*)  With respect to damages, the second jury found a reasonable royalty of $2.60 per straw for the Cytonome patents, and it concluded that ABS should be required to pay a reasonable royalty on 3,295,355 straws though June 30, 2019.

OPINION

## I.  Motions to Seal

As an initial matter, the parties have moved to seal portions of the trial transcript and exhibits.  Upon a showing of "good cause," Federal Rule of Civil Procedure 26(c)(1)(G) states that the court may enter an order "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way."  Consistent with that rule, the Seventh Circuit has held that sealing certain information may be warranted "in order to protect trade secrets or other compelling interests in secrecy."  *Jessup v. Luther*, 277 F.3d 926, 929 (7th Cir. 2002).[3]

Still, "[b]ecause there is a strong presumption toward public disclosure of court files and documents," a party seeking to seal portions of the transcript or trial exhibits must

---

[3] While it is not clear whether any further appeal will be decided by the Federal Circuit alone, this is of no import since that circuit looks to regional circuit law in determining issues of confidentiality. *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 497 F. App'x 66, 67 (Fed. Cir. Feb. 1, 2013) ("Because the protection of confidential information is not an issue unique to our jurisdiction, we will apply the law of the regional circuit.").

establish "good cause" to withhold that information from the public.  *Heraeus Kulzer, GmbH v. Biomet, Inc.*, 881 F.3d 550, 566 (7th Cir. 2018) (internal quotation marks and citation omitted).  Further, in deciding whether a party has met its burden, the Seventh Circuit notes that generally sealing transcripts and exhibits "disserves the values protected by the free-speech and free-press clauses of the First Amendment," and prevents the public from monitoring "judicial performance."  *Jessup*, 277 F.3d at 927-28.  Finally, for information that is "vital to claims," the Seventh Circuit advises that the presumption in favor of disclosure is particularly strong.  *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 547 (7th Cir. 2002).

### A. ABS's Motion Requesting Redactions to Transcript

Keeping this burden in mind, ABS seeks to seal portions of the trial transcripts, concerning trade secrets, suppliers of critical components, and competitively sensitive financial information.  (ABS's Mot. (dkt. #1169) 2.)  Specifically, plaintiff seeks to seal the following, five topics:  (1) the design of ABS's SSC-B chip, (2) the specific laser and laser settings used in ABS's GSS system, (3) the identification of suppliers of ABS's lasers and microfluidic chips, (4) ABS's costs and profits associated with the GSS technology, and (5) sensitive research into the label or stain-free method of detection and into inertial flow focusing.  (*Id.*)  These topics cover six of the twelve trial transcripts.  Consistent with this court's directive, ABS has already provided redacted versions of each of the transcripts at issue.

In response, ST does not oppose ABS's requests to seal "label-free" and "inertial chip" research and development projects -- topic no. 5 above -- but contends that the other

topics are either not confidential, having been previously disclosed, or that ABS has not shown good cause for preventing disclosure where the information is vital to ST's claims or ABS's defenses.  Accordingly, the court will grant ABS's motion with respect to its confidential "label-free" and "inertial chip" research and development projects, but will address the parties' arguments as to each of the remaining four topics individually below.

### 1. Design of ABS's SSC-B chip

ST argues that ABS's failure to seek protection for its GSS chip or SSC-A chip designs belies its claim that any trial testimony concerning the design of its SSC-B chip warrants sealing.  Moreover, ST points out that ABS did not object to Cytonome's Chief Technical Officer, Dr. John Sharpe, remaining in the courtroom during testimony about its design, despite being provided with an opportunity to object.  (ST's Opp'n (dkt. #1177) 5.)  ST also argues that the design of the SSC-B chip was integral to the jury's damages decision, and, therefore, the court should nonetheless not limit its disclosure, even if it is deemed confidential.

While ABS arguably did not take steps to protect disclosure of the SSC-B chip during trial -- for example, by failing to object to Dr. Sharpe's presence in the courtroom during testimony touching on that chip -- there was no assertion that the SSC-B chip infringed the Cytonome patents, unlike the GSS and SSC-A chip.  Therefore, while the availability of that chip had some relevance to the jury's damages analysis, its specific design was not particularly important to any of the jury's determinations.  Moreover, there is little question that the details of that chip's design has been maintained as a trade secret

by ABS.[4]  As such, the court will grant this portion of ABS's motion.

### 2.  Specific laser and laser settings

ABS next contends that, while its attempts to identify specific laser and laser settings was relevant to the  non-enablement defense, the *actual* specific laser and laser settings that ABS identified were not relevant to the jury's determination, and that information is highly sensitive in light of ST's and other third parties' failures to develop a working laser-kill system to date.

In response, ST represents, and submits evidence in support of its representations, that this information was disclosed as part of the first trial, is publicly available on manufacturer spec sheets (including the name of the specific laser at issue), and was disclosed in ABS's patent applications.  Absent contrary evidence, therefore, the court agrees with ST that this information is already in the public domain and, therefore, the court will deny this portion of the motion.

### 3.  Laser and chip suppliers

ABS further contends that the names of its two chip suppliers and one laser supplier constitute trade secrets.  With respect to the laser supplier, ST contends that this information is already publicly available, having been a part of the first trial, and ABS made no effort to seal any of that testimony.  With respect to the identities of its chip suppliers, ST argues that this is not a trade secret at all, as evidenced by ABS's willingness to describe

---

[4] Even the presence of Dr. Sharp during some of the trial testimony regarding the design of the SSC-B chip does not change this, because he is presumably subject to use of that information for purposes of this litigation only consistent with the court's protective order.

suppliers by their names (rather than, for example, by their location) despite ST and Cytonome officers in the courtroom during the testimony.

Here, too, the court agrees with ST that this information does not constitute trade secrets. While ABS expresses concern about interference with the contracts it has with these entities (or threats of litigation), these concerns do not give rise to a valid reason for sealing portions of the trial testimony disclosing their identity. Accordingly, this portion of the motion is also denied.

### 4. ABS's costs and profits

Finally, ABS argues generally that the dollar figures disclosed in trial testimony constitutes "commercially sensitive, non-public information, including information about ABS's profits and margins on its sales of sexed semen straws and processing." (ABS' Mot. (dkt. #1169) 14.) In response, ST points out that portions of the testimony that ABS now seeks to seal include cost projections or estimates from 2013,d the date of the hypothetical negotiation, neither of which are reflective of *actual* costs and profits. Moreover, ABS attempts to redact the figure "48 cents," which was its proposal of a reasonably royalty rate, and thus vital information to understanding the jury's damages award. Here, too, the court agrees with ST that ABS has failed to demonstrate good cause for redacting these portions of the trial testimony.

In sum, the court will grant ABS's motion to seal as to topics 1 and 5, but will deny it with respect to topics 2, 3 and 4. ABS is directed to file revised redacted transcripts consistent with this order.

**B. ABS's Motion to Seal Trial Exhibits Containing Confidential Information**

In a recent motion, ABS seeks to seal 32 trial exhibits, touching on the same five topics described above, with a couple of notable exception.  Specifically, ABS also seeks to seal trial exhibits concerning the design of the two chips found to infringe ST and Cytonome patents, namely the GSS and SSC-A chips.  While the design of those chips certainly constitute trade secrets, those designs were also vital to the jury's determination. Moreover, the court previously disclosed the designs in its summary judgment decision. ABS also seeks to seal exhibits containing *actual* sales data and pricing information from 2018 and 2019.  The court agrees that this information -- unlike projections -- is entitled to protection.

For the same reasons as provided in ruling on ABS's motion to seal portions of the trial transcript, the court will also grant the motion with respect to exhibits concerning (1) the design of ABS's SSC-B chip, and (5) label-free and inertial flow chip R&D.  In other words, this motion is granted with respect to Exhibits 37, 64, 119, 244, 304, 312, 644, 798, 820, 870, 881, 886, 895, 899, 902.  In all other respects, the motion is denied.

**C. ST's Request to Redact the Trial Transcript**

For its part, ST seeks to seal portions of the trial transcript and file redacted versions.  Specifically, ST seeks to seal the following portions of the trial transcript: (1) information pertaining to Cytonome's confidential sperm sorter, currently under development, the Viper SS; (2) ST's confidential business information, including individual officer's ownership stake in ST, as well as ST's gross and net profits in 2013; and (3) ST's commercial licensing and sorting agreements.  In response, ABS objects to

ST's request to seal very limited testimony about the Viper SS project -- namely Dr. Sharpe's testimony simply disclosing the existence of the project -- on the basis that its existence has already been disclosed in the court's prior opinions.  The court agrees with ABS, and it will deny ST's request to redact testimony concerning the Viper SS project.

With respect to the financial information, the court will grant ST's request, finding good cause to seal both Juan Moreno's testimony about his family's stake in the ST business, as well as actual (as opposed to projected) financial information dating back to 2013.

Finally, with respect to ST's request to redact testimony concerning ST's commercial licensing and sorting agreements, ABS offers no objection, except as to testimony concerning Cytonome's licensing of its cell-sorting technology to Sumitomo for a project aimed at treating Parkinson's disease because these facts are publicly available. (ABS's Opp'n (dkt. #1186) 3.)  As such, the court will deny the motion with respect to this testimony, but otherwise will grant ST's request with respect to its licensing and sorting agreements.  ST is also directed to file revised redacted transcripts consistent with this order.

### D. ST's Motion to Seal Trial Exhibits Containing Confidential Information

In this motion, ST seeks to seal the following categories of trial exhibits: (1) technical information (Ex. 205); (2) ST's confidential business information (Exs. 299, 300, 509, 510, 512, 517, 518, 522, 523, 525, 526); (3) ST's licensing and other business agreements (Exs. 224, 225, 581, 574); (4) ST's financial information (Ex. 730); and (5) ST's litigation-related documents (Ex. 772). (ST's Mot. (dkt. #1182).)  In response, ABS

9

does not object to sealing exhibits containing technical information, including the design of Cytonome's chips and the exhibits concerning ST's business practices, such as the terms of intellectual property licenses.  However, ABS does object to sealing exhibits that disclose the results of purity tests and audits that ST conducted, which primarily fall within the second category identified by ST above.  With the exception of Exhibit 299, which is an operating manual that described ST's procedures for conducting purity tests, ABS objects to sealing those exhibits because "[t]hey are simply internal emails, or letters ST sent to ABS, that describe the results of particular purity tests and audits that ST conducted," and there is "no justification for sealing these documents."  (ABS's Opp'n (dkt. #1187) 3.) Indeed, ABS points out that the documents were vital to the resolution of this case and do not contain trade secrets.  The court agrees with ABS that these exhibits do not contain trade secrets and, therefore, the court will deny ST's request to seal most of the documents that fall within this second category.

Finally, with respect to Exhibit 730, containing financial data from 2014, the court will grant this request for the reasons previously explained.

Accordingly, the motion is granted with respect to Exhibits 205, 224, 225, 299, 581, 574, 730 and 772.  In all other respects, the motion is denied.

## II. Damages

### A. Remaining Damages Issues for '987 Patent

ST seeks an award of past damages, an accounting, supplemental damages and pre-judgment interest for ABS's infringement of the '987 patent.  (Dkt. #1151.)  As described

10

above, the *ABS I* jury awarded a lump sum payment of $750,000 for ABS's past infringement of the '987 patent and set a per-straw royalty rate of $1.25 for future infringing sales.  In entering the judgment following the *ABS I* trial, the court also awarded $88,598 in pre-judgment interest on that lump sum payment.  (Am. Judgment (dkt. #870) ¶ 13.)

In this motion, ST seeks an award of damages for infringement of the '987 patent including: (1) past damages for straws sold through June 30, 2019; (2) an award of supplemental damages for infringing sales between July 1, 2019, through the date of trial, September 10, 2019; and (3) an award of pre-judgment interest.  As set forth in ABS's response, ST's motion raises two core disputes: (1) whether the royalty base should reflect the number of infringing straws found by the jury in *ABS II*, which includes sales or transfers to foreign affiliates; and (2) whether the court should award additional pre-judgment interest on the lump sum award and on unpaid ongoing royalties.[5]  The court will address each dispute in turn.

### 1. Royalty Base

The parties disagree as to the base for the on-going royalty calculation for infringement of the '978 patent.  In particular, the parties dispute whether sales or transfers of straws to foreign affiliates should be included in the royalty base.  To date, ABS has paid

---

[5] ABS raises a third issue in opposing this motion -- whether the court should award pre-judgment interest at the prime rate or at the weekly average 1-year constant maturity Treasury yield.  Because the court opts not to award any additional pre-judgment interest with respect to the '987 patent, the court need not take up this dispute now, but will address it below with respect to the damages calculation for the Cytonome patents.

ST $2,191,387.50, reflecting payment of $1.25 per straw for 1,753,110 straws processed

in the United States and sold by ABS globally from April 1, 2017, through December 31,

2018.  This number did *not* include sales or transfers to foreign affiliates.  In its motion,

ST seeks to revisit the payments made between April 2017 through December 2018 to

include these sales or transfers from June 2016 through December 2018, and also seeks to

include sales or transfers to foreign affiliates in the royalty payment it seeks from January

1, 2019, through June 2019.

> The judgment in *ABS I* granted:

>> ST an ongoing royalty for One Dollar and Twenty-Five Cents
>> ($1.25) per straw of sexed semen *sold* by ABS that was
>> processed with the infringing GSS technology, or any
>> technology nor more than colorably different, where such sale
>> or processing took part in the United States through the
>> remaining life of the '987 patent.  Any ongoing royalty
>> payments will be made on a quarterly basis with a report that
>> includes an accounting of the number of royalty-bearing straws
>> that were *sold* during that quarter.  Such payment and report
>> shall be made within 60 days of the end of the calendar quarter
>> for which payment and reporting are made.

(Am. Judgment (dkt. #870) ¶ 15 (emphasis added).)

> The court agrees that the plain language of this judgment does not expressly

foreclose inclusion of sales or transfers to foreign affiliates in the ongoing royalty base, nor

does it expressly include those sales.  From April 2017 through December 2018, ABS's

accounting of its royalty base did not include transfers or sales to foreign affiliates, and

ST neither raised a timely objection to ABS's method of calculating the royalty rate nor

sought enforcement of an alternative reading of the injunction to include these sales or

transfers, despite evidence from the first *ABS* trial that such transfers occurred.  (ABS's

Opp'n (dkt. #1160) 9 (citing Horowitz Decl., Ex. A (dkt. #1164-1) 95, 136).)[6]  As such, the court will not require ABS to recalculate the prior payments covering the quarterly periods through December 2018, but will require sales or transfers to foreign affiliates to be included starting in 2019 and going forward.

### 2. Pre-judgment interest calculation

As described above, in entering judgment, the court also awarded pre-judgment interest in the amount of $88,598.00 on the jury's award of a $750,000 lump sum royalty in *ABS I*.  In this motion, ST argues that the court should recalculate pre-judgment interest based on the date of first infringement, suggesting January 1, 2014, as a conservative estimate.  (ST's Br. (dkt. #1151) 11 & n.5.)  In response, ABS argues that as part of the original judgment, the parties "negotiated and arrived at a pre-judgment interest award" of $88,598 and, therefore, the court should not upset that agreed-upon amount, but rather ST should receive $838,598 (the lump sum royalty and the agreed-upon pre-judgment interest), "plus interest 'at a rate equal to the weekly average 1-year constant maturity Treasury yield' compounded annually."  (ABS's Opp'n (dkt. #1160) 7 (citing 28 U.S.C. § 1961(a),(b)).)

In *Ultratec, Inc. v. Sorenson Communications, Inc.*, No. 14-cv-66, 2019 WL 2285487 (W.D. Wis. May 29, 2019), this court considered this same issue:  "whether pre-judgment interest should accrue during a lengthy appeal that ultimately upholds the jury's verdict on

---

[6] Even if ST was unaware that ABS was excluding these transfer from the royalty base initially, it certain was on notice as a result of discovery in *ABS II* but never returned to this court seeking amendment to or clarification of the judgment.

damages." *Id.* at *2.  At the time, the court identified as the "majority rule" that:

> In general, where a first judgment lacks an evidentiary or legal basis, post-judgment interest accrues from the date of the second judgment; where the original judgment is basically sound but is modified on remand, post-judgment interest accrues from the date of the first judgment.

*Id.* (quoting *Cordero v. De Jesus-Mendez*, 922 F.2d 11, 16 (1st Cir. 1990)).  The Federal Circuit has described this test as whether the damages "were meaningfully ascertained as of the date of the first judgment."  *Transmatic, Inc. v. Gulton, Indus., Inc.*, 180 F.3d 1343, 1349 (Fed. Cir. 1999).

While the Seventh Circuit concluded that the jury verdict on invalidity of the '987 patent was inconsistent, the Seventh Circuit did not address the damages award.  As such, the court agrees with plaintiff that the award of $750,000 in a lump sum royalty was meaningfully ascertained as of the date of the first judgment, subject of course to a renewed finding of the patent's validity.  As such, the court concludes that pre-judgment interest accrues from the date of the first judgment in the original amount of $88,598.  However, again, it "would not be fair to [ABS] to accrue" higher, pre-judgment interest because of the "protracted post-judgment course" of [the] case."  *Ultratec*, 2019 WL 2285487, at *3.  Finally, ST is entitled to post-judgment interest accruing as of the date of the entry of the judgment in *ABS I*.[7]

---

[7] ST also argues that it is entitled to pre-judgment interest on supplemental damages on sales made by ABS.  Because the ongoing royalty rates roughly correspond with the date of infringement, however, the court finds no basis to award pre-judgment interest on these quarterly payments.

## B. Remaining Damages Issues for Cytonome Patents

ST also seeks an award of supplemental damages on the Cytonome patents for the infringing sales of sexed semen straws that ABS made between July 1, 2019, and the last day of trial on September 10, 2019 -- sales the court instructed the jury not to consider because sufficient evidence had yet to be gathered.  ST now requests the court calculate the damages amount for that period using the same $2.60 per-unit rate the jury awarded.  Consistent with the jury's verdict, ST also argues that the royalty base should include sales to foreign affiliates, and in a footnote, requests that "the Court calculate the prejudgment interest owed on the Cytonome patents in the same manner as for the pre-verdict royalties due on the '987 patent."  (ST's Br. (dkt. #1153) 4 n.3.)[8]

In opposition, ABS advances two arguments:  (1) ST is not entitled to pre-judgment interest because of its prejudicial delay in filing suit; and (2) any pre-judgment interest awarded should be at the Treasury bill rate, not the primary rate.  The court addresses each in turn.

### 1. Pre-judgment interest

As to ST's claim to pre-judgment interest on damages assessed for infringing the Cytonome patents, ABS argues that in filing *ABS I*, ST had already been presented with "an opportunity to identify the patents it thought would be infringed by [its] GSS technology."  (ABS's Opp'n (dkt. #1159) 4.)  Instead, it points out, ST waited another

---

[8] As part of its motion, ST further seeks a court order for an accounting of ABS's infringing sales, including sales to foreign affiliates, for this period.  The court has already addressed this request, requiring ABS to update Trial Exhibit 886.  (Dkt. #1178.)

three years, "until the launch of GSS system was imminent" to bring *ABS II*.  (*Id.*)  ABS further asserts that it was prejudiced because of this delay:  "had ST asserted the Cytonome patents earlier, ABS would have received clarity on both the scope of the patents and ST's theories of infringement significantly earlier—and, with that clarity, ABS could also have designed and implemented its non-infringing alternative, SSC-B chip, years earlier as well." (*Id.*)

In response, ST represents that it only learned of the possible infringement of the Cytonome patents a week before the *ABS I* trial, when ABS disclosed its pending patent application ("the '499 application"), which ST represented was "directed to" the GSS system.  (ST's Reply (dkt. #1171) 5.)  ST further represents that it then promptly initiated an investigation, obtained a memorandum setting forth an analysis of ABS's infringement of the Cytonome patents dated April 26, 2017, and filed the lawsuit six weeks later on June 7, 2017.

The court agrees that ST's ten-month period of time from the disclosure of the patent application detailing the GSS technology and the filing of this lawsuit did not constitute undue delay.  Accordingly, an award of pre-judgment interest on the supplemental damages award is appropriate.

### 2.  Interest rate

ABS also argues that the court should award pre-judgment interest at the Treasury bill rate because the prime rate is "excessive on the facts here."  (ABS's Opp'n (dkt. #1159) 6-7.)  As ST points out, the court awarded pre-judgment interest at the prime rate in *ABS I*, which ABS itself proposed.  (ST's Reply (dkt. #1176) 13.)  The court is disinclined to

alter the approach in entering judgment in *ABS I*. Moreover, consistent with the Federal and Seventh Circuit's practice, this court generally awards pre-judgment interest at the prime rate. *See Ameritox, Ltd. v. Millennium Health, LLC*, No. 13-CV-832-WMC, 2016 WL 9460661, at *3 (W.D. Wis. July 18, 2016) ("[T]he court will follow the practice approved by the Federal Circuit and Seventh Circuit, which is also consistent with its own practice, by awarding prejudgment interest based on the prime rate.").

### C. Damages for Pre-Verdict Sales of Straws Produced and Sold Abroad Using Infringing Chips

ST next seeks an award of damages on all pre-verdict sales of straws produced *and* sold abroad on the basis that the straws were produced using infringing microfluidic chips manufactured in the United States. At trial, ST's damages expert initially presented two calculations, one of which included these foreign units and one that did not. (ST's Opening Br. (dkt. #1154) 4 (citing Trial Tr. (dkt. #1146) 43).) During a conference with the parties outside the jury's presence, the court questioned whether there was a "dispute as to the counting of foreign sales," indicating that this issue was distinct from the sales or transfers to foreign affiliates discussed above. (Trial Tr. (dkt. #1146) 88.) Acknowledging "law bubbling up even to the Supreme Court that suggests that foreign sales actually can be recovered," ST then proposed that it would not ask the jury for damages on foreign sales of straws produced overseas using infringing chips manufactured in the U.S., and instead would "present it to the [c]ourt on motion after the case." (*Id.* at 89.) The court accepted that proposal, further indicating that ST was "not waiving any units that [it] may seek through foreign sales by virtue of agreeing not to ask the jury for them." (*Id.* at 90.) ABS

17

also signaled its agreement, stating that ABS was "on the same page as to the foreign sales." (*Id.*)  Based on this exchange, the court agrees with ST that the *only* issues before the court "are whether ST is legally entitled to recover royalties on the foreign-made units, and if so, how many such units have been sold."  (ST's Opening Br. (dkt. #1154) 7.)

### 1.  Legal Entitlement

In support of its asserted entitlement to these foreign units in the royalty base, ST primarily relies on the United States Supreme Court's relatively recent decision in *WesternGeco LLC v. ION Geophysical Corporation*, 138 S. Ct. 2129 (2018), which examined whether the extraterritorial prohibition on the application of U.S. patent law under 35 U.S.C. § 284 precludes a plaintiff from recovering damages suffered abroad caused by acts of infringement that occurred domestically.  In *WesternGeco*, the patented product was an ocean floor survey machine.  *Id.* at 2135.  The defendant built infringing machines, which it sold to third parties, who then conducted the surveys for their own purposes.  *Id.*  The plaintiff sought and obtained a jury award for lost profits, including profits that the defendants' customers had earned from using the machines to perform survey services in foreign waters for their own customers.  *Id.*  In reversing the Federal Circuit's holding that the plaintiff could *not* recover damages resulting from foreign uses of its patented invention, the Supreme Court concluded that the plaintiff could recover *all* damages arising out of the domestic act of infringement, including damages suffered abroad.  *Id.* at 2138-39.  Relying on this decision, ST argues "there can be no question that ABS -- by having the infringing chips made in the U.S. (through its direction and control over Translume), and then exporting the chips for use in GSS machines abroad -- committed direct acts of

domestic infringement that proximately led to the foreign sales for which ST now seeks a reasonable royalty." (ST's Opening Br. (dkt. #1154) 11.)

ST assumed, as did this court, that ABS would respond by distinguishing *WesternGeco,* but that is not the principal tact ABS took. Delegating that argument to a footnote, ABS halfheartedly asserts the holding in *WesternGeco* does not apply "as to both patents for the independent and adequate reason that it would be a prohibited extraterritorial application of 35 U.S.C. § 284." (ABS's Opp'n (dkt. #1161) 8 n.3 (citing *Power Integrations Inc. v. Fairchild Semiconductor Int'l Inc.*, 711 F.3d 1348 (Fed. Cir. 2013).) While *WesternGeco* involved component infringement under § 271(f)(2), courts have since extended the same reasoning to direct infringement cases under § 271(a), like here. *See, e.g.*, *Plastronics Socket Partners, Ltd. v. Dong Weon Hwang*, No. 218CV00014JRGRSP, 2019 WL 4392525, at *5 (E.D. Tex. June 11, 2019), report and recommendation adopted, No. 218CV00014JRGRSP, 2019 WL 2865079 (E.D. Tex. July 3, 2019); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l Inc.*, No. CV 04-1371-LPS, 2018 WL 4804685 (D. Del. Oct. 4, 2018). Moreover, while *WesternGeco* involved lost profits, courts have also extended the holding to cases seeking an award of a reasonable royalty. *See, e.g.*, *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 396 F. Supp. 3d 323, 336, 351 (S.D.N.Y. 2019), modified in part, No. 18-CV-5427 (JSR), 2019 WL 7816487 (S.D.N.Y. Dec. 11, 2019), clarified on denial of reconsideration, No. 18-CV-5427 (JSR), 2020 WL 498200 (S.D.N.Y. Jan. 22, 2020). Indeed, one could argue that the potential profits of such foreign sales would be even more likely on the table in any hypothetical royalty negotiation.

19

Perhaps this is why ABS principally argues that it has a non-infringing alternative and, therefore, the court should only award a nominal reasonable royalty of $.01 per straw for any foreign units sold.  (ABS.'s Opp'n (dkt. #1161) 9.)[9]  Specifically relying on testimony from its expert, ABS argues that the infringing chips made in the United States, could have been "made overseas, . . . tested overseas and then used in machines overseas, so they would not be an infringing sale in the U.S." (*Id.* (quoting Trial Tr. (dkt. #1146) 152-54 (Distler testimony)).)  Based on both the court's recollection and review of the relevant portion of the transcript, however, ABS agreed that the post-trial issue for the court to consider was only whether these foreign units should be included in the royalty base.  In particular, there was *no* indication that ABS intended to pursue an argument that a *different* royalty rate should apply to these; the issue was whether those units were in or out.  Even if it had preserved the issue, the only evidence that ABS can point to in support is the brief testimony of its own damages expert suggesting the court apply a royalty of $.01 per unit, and that testimony only concerned *one* of the *Georgia Pacific* factors -- the possible availability of a non-infringing alternative.   Even if ABS did not waive this argument, it certainly failed to develop and present timely evidence from which the court could determine a distinct reasonable royalty rate for foreign manufactured straws using

---

[9]  To be fair, ABS also argues that because the '309 patent is a method patent, it is only infringed when all of the steps of the patent are performed, including *use* of the infringing chip, which unquestionably occurs outside of the United States and, therefore, is subject to § 284's extraterritorial prohibition.  (ABS's Opp'n (dkt. #1161) 8.)  While ABS's position appears to be correct as far as it goes, ABS does *not* argue that excluding the '309 patent changes the reasonable royalty analysis for infringement of the '476 patent, a systems patent.  Indeed, both parties' experts proposed a single royalty rate regardless of the number of patents implicated.  (ST's Reply (dkt. #1170) 3.)

chips produced outside of the United States.  Accordingly, the court agrees with ST that it is entitled to include these foreign units in the royalty base

### 2.  Number of units

ST further contends that the number of foreign straws included in its damages expert's report of 344,826 "significantly understated" sales through June 30, 2019, because he "inadvertently omitted sales made by two of the foreign licensees (Meshana and Intermizoo)."  (ST's Opening Br. (dkt. #1154) 13.)  ST contends instead that the correct total of foreign units through June 30, 2019, is 479,631.  (*Id.* at 14.)  Just as the court previously declined to reopen the record to allow ABS to present evidence and develop an argument that the court should award a different royalty rate for these foreign units, the court will not allow ST to reopen the record to present evidence of additional sales of foreign straws.  If anything, these numbers should have been included in plaintiff's expert's original disclosures.  As such, while the court will include foreign units in the royalty base, the number of those units is limited to 344,826 at the $2.60 rate.

### D. Ongoing royalty

Finally, ST seeks an ongoing royalty and, alternatively, a limited permanent injunction.  With respect to the ongoing royalty, ST seeks a rate of $5.20 per straw, seeking a 100% increase to reflect both its improved bargaining position in light of the finding of

infringement and ABS's willful infringement post-verdict.[10]

### 1. Ongoing royalty rate

There is no dispute that ST is entitled to an ongoing royalty for future sales of straws produced on infringing chips. The only dispute is over the amount. Perhaps unsurprisingly, the parties propose dramatically different ongoing royalty rates. As described above, ST seeks an ongoing royalty rate of $5.20 per straw, while ABS contends a rate of $.50 per straw would be appropriate. ABS's proposal is a complete non-starter. In *Amado v. Microsoft Corp.*, 517 F.3d 1353 (Fed. Cir. 2008), the Federal Circuit "easily dispose[d]" of a proposal by a defendant that the court simply award the *same* rate as that set by the jury:

> On the other side of the dispute, Microsoft argues that the district court was entitled to award Amado no more than $0.04 per infringing unit, the amount the jury found to be a reasonable royalty. We easily dispose of this argument as well. The jury's award of $0.04 per unit was based on Microsoft's infringing conduct that took place *prior to the verdict*. There is a fundamental difference, however, between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement. *Cf. Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1317 (Fed. Cir. 2007) ("[P]re-suit and post-judgment acts of infringement are distinct, and may warrant different royalty rates given the change in the parties' legal relationship and other factors.") (Rader, J., concurring). Prior to judgment, liability for infringement, as well as the validity of the patent, is uncertain, and damages are determined in the context of that uncertainty. *Once a judgment of validity and infringement has been entered*, however, *the calculus is markedly different* because different economic factors are involved.

---

[10] If the court had declines to award an ongoing royalty for those straws, ST seeks, in the alternative, an injunction. Because the court determines an ongoing royalty is appropriate, the court need not take up this portion of the motion, other than to note that it appears ST waived any right to injunctive relief. (ABS's Opp'n (dkt. #1162) 24.)

*Id.* at 1361-62 (emphasis added). Since *Amado*, the Federal Circuit has reiterated its holding that in the context of a theoretical negotiation for an ongoing royalty, courts must "take into account the change in the parties' bargaining positions, and the resulting change in economic circumstances," when liability is no longer in doubt. *ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*, 694 F.3d 1312, 1343 (Fed. Cir. 2012) (quoting *Amado*, 517 F.3d at 1362).

As a result of *Amado* and its progeny, a number of ABS's arguments for a reduced rate per straw border on the frivolous. For example, ABS argues that ST's bargaining power did not increase following the jury's finding since ST did not in fact pursue its right to an injunction. This is a silly argument. In setting *any* reasonable royalty based on a hypothetical negotiation, the court begins with the premise that ST cannot simply refuse to negotiate.[11] Nonetheless, in setting an ongoing royalty, liability is now certain, and as such, ST's bargaining position has indisputably *increased* post-verdict. ABS also argues that its bargaining position somehow increased because of the possibility that it will succeed on appeal in overturning the jury's verdict in favor of ST, and perhaps ABS will be successful on appeal, but this also provides *no* reason for discounting the ongoing royalty rate from that awarded by the jury at trial. Instead, if ABS is successful, it will simply have to pay no ongoing royalty. Similarly, while ABS's argument that it has an available, non-infringing alternative in the SSC-B chip weighs in favor of a reduced ongoing royalty, the more logical consequence is that ABS will simply use this alternative when available, to

---

[11] In this sense, one might say that: the threat of an injunction or walking away is by definition an empty one; *or* since the negotiation occurs at the moment of infringement, a threat of an injunction or walking away is still real. Either way, it plays little role in arriving at the ongoing royalty amount.

eliminate the need to pay an ongoing royalty.  Either way, the question remains what royalty rate should ABS pay for those future straws that *are* infringing.

Some of ABS's other arguments gain more traction.  At this time, unlike in 2013, the parties know that ST has been adjudicated a monopolist, which would likely deter it from demanding a royalty rate so high that it might price ABS out of the market completely.  (ABS's Opp'n (dkt. #1162) 14.)  Moreover, unlike in 2013, the parties now know the actual profits earned on sales of Sexcel, which are approximately half of that estimated by ST's expert in his damages analysis.  This, too, cuts in favor of ST being more reasonable in its negotiating an ongoing royalty rate.  Based on these factors, the court concludes that a modest increase from the $2.60 royalty rate set by the jury is appropriate, and will award ST an ongoing royalty rate of $3.25 per straw.

ST argues for a further increase in part because ABS's ongoing infringement is now willful, but this argument is also nonsense.  In being required to pay an ongoing, reasonable royalty, ABS is by definition selling new straws legally.  In no way can this conduct be construed as "willful" within the meaning of 35 U.S.C. § 284.  *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016) (describing conduct warranting enhanced damages under § 284 as "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate"); *see also Wis. Alumni Research Found. v. Apple, Inc.*, 261 F. Supp. 3d 900, 922 (W.D. Wis. 2017) (explaining that willfulness is an "ill-fit" where, as here, the parties and the court "reasonably believed that the court would not enter a permanent injunction," but instead award an ongoing royalty), *aff'd in part, rev'd in part*, 905 F.3d 1341 (Fed. Cir. 2018).

24

### 2. Royalty Base

ABS shall pay this ongoing royalty based on sales of straws produced on infringing chips that were themselves manufactured *after* the judgment entered in this case.  To the extent that no such chips exist, then this exercise of setting an ongoing royalty rate may have been purely academic, although as ST points out in its reply, perhaps the enhanced royalty will serve to deter ABS from using the GSS chip for the remainder of the Cytonome patents.

ST also seeks to include in the royalty base straws made outside of the United States with infringing chips that were either produced in the United States or imported into the United States, citing the *WesternGeco* case and the language of 35 U.S.C. § 271(a) for support.  Section 271(a) defines direct infringement as "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent thereof, infringes the patent."  In addressing the motion seeking damages on pre-verdict sales of straws produced outside of the United States, the court already concluded that straws produced and sold outside of the United States with chips manufactured within the United States should be included in the royalty base.  Thus, the court sees no reason to depart from that finding to determine the royalty base for the ongoing royalty.

In this motion, however, ST further seeks to expand the base to also include straws produced and/or sold outside of the United States, despite the straws being produced from chips manufactured outside of the United States but imported into the United States for quality testing.  Given the plain language of § 271(a), while this is a closer call, the court

agrees that importing infringing chips back into the United States, even if only for purposes of testing them for quality, is enough to justify including straws that are produced using those chips in the royalty base.[12]

## III. Next Steps

The court will direct the parties to meet and confer about a proposed judgment, which is consistent with this opinion, the court's prior rulings, the jury's verdict, and other decisions in this case. The parties should submit a joint proposal, if feasible. If not, the parties should submit their own respective proposals, with briefs limited to five pages that address any areas of dispute and the parties' respective positions. Those submissions are due on or before June 2, 2020. The parties' proposals should calculate damages and interest as if judgment will be entered on June 5, 2020.

ORDER

IT IS ORDERED that:

1) ST's motion for an award of past damages, an accounting supplemental damages and pre-judgment interest for ABS's infringement of the '987 patent ('503 dkt. #1151; '446 dkt. #546) is GRANTED IN PART AND DENIED IN PART as set forth above.

2) ST's motion for an accounting and award of supplemental damages on the Cytonome patents for pre-verdict sales ('503 dkt. #1153; '446 dkt. #548) is GRANTED.

---

[12] In its reply brief, ST requests that the court assess an enhanced ongoing royalty on "ABS's continued use of infringing GSS chips outside of the United States." (ST's Reply (dkt. #1173) 6.) To the extent ST is seeking damages on chips manufactured outside of the United States and never imported into the United States, that relief is *not* available under 35 U.S.C. § 271(a).

3) ST's motion for an accounting and award of pre-verdict sales of sexed semen straws that were produced abroad with infringing chips ('503 dkt. #1154; '446 dkt. #549) is GRANTED IN PART AND DENIED IN PART as set forth above.

4) ST's motion for an ongoing royalty and, alternatively, for limited injunctive relief ('503 dkt. #1156; '446 dkt. #551) is GRANTED IN PART AND DENIED IN PART as set forth above.

5) ABS's motion requesting redactions to transcript ('503 dkt. #1169; '446 dkt. #564) is GRANTED IN PART AND DENIED IN PART as set forth above.

6) ST's motion to seal trial exhibits containing confidential information ('503 dkt. #1182; '446 dkt. #577) is GRANTED IN PART AND DENIED IN PART as set forth above.

7) ST's request to redact the trial transcript ('503 dkt. #1183; '446 dkt. #578) is GRANTED IN PART AND DENIED IN PART as set forth above.

8) ABS's motion to seal trial exhibits containing confidential information ('503 dkt. #1194; '446 dkt. #589) is GRANTED IN PART AND DENIED IN PART as set forth above.

9) The parties' joint or respective proposals on entry of judgment as described above are due on of before June 2, 2020.

Entered this 12th day of May, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge